**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| QUENTIN MCCLELLAN, <br><br> Plaintiff, <br><br> v. <br><br> REDNER'S MARKETS, INC., JIM POLCHIN, BOB MCDONOUGH, AND RICK MERKEL <br><br> Defendants. | CIVIL ACTION NO. 3:18-cv-02162-ARC |

### EXHIBITS TO REDNER'S MARKETS, INC., JIM POLCHIN, BOB MCDONOUGH, AND RICK MERKEL MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Date: April 3, 2020

**Respectfully Submitted,**

*/s/ Randall C. Schauer*

Randall C. Schauer, Esquire
Attorney ID No. 34273
Eagleview Corporate Center
747 Constitution Drive, Suite 100
Exton, PA 19341-0673
Tel – (610) 458-7500
Fax – (610) 458-7337
rschauer@foxrothschild.com

*Attorneys for Defendants, Redner's Markets, Inc., Jim Polchin, Bob McDonough, and Rick Merkel*

109225749

| Table of Contents | | |
|---|---|---|
| **Exhibits for Statement of Undisputed Material Facts** | | |
| **Motion for Summary Judgment Exhibit No.** | **Description** | **Discovery Designation** |
| 1 | Complaint | Pleading |
| 2 | Deposition of Redner's Markets Corporate Designee | Transcript |
| 3 | Deposition of Quentin McClellan | Transcript |
| 4 | Redner's Markets FMLA & Short Term Disability Form | McClellan Deposition ("McClellan Depo"), Exhibit 27 |
| 5 | Job Description | McClellan Depo, Exhibit 28 |
| 6 | Employee handbook signoff sheet | McClellan Depo, Exhibit 25 |
| 7 | Employee Handbook | McClellan Depo, Exhibit 29 |
| 8 | Note Dated 9/6/17 | McClellan Depo, Exhibit 22 |
| 9 | Memo from Robert McDonough dated 4/3/17 | Redner's Markets Corporate Designee Deposition ("Redner's Depo"), Exhibit 6 |
| 10 | Note dated 4/3/17 | McClellan Depo, Exhibit 6 |
| 11 | Memo from Robert McDonough dated 9/6/17 | Redner's Depo, Exhibit 16 |
| 12 | Screen shot of text message | McClellan Depo, Exhibit 17 |
| 13 | E-mail dated 9/2/17 | McClellan Depo, Exhibit 16 |
| 14 | E-mail dated 9/7/17 | McClellan Depo, Exhibit 24 |
| 15 | E-mail dated 9/5/17 | McClellan Depo, Exhibit 18 |
| 16 | Note dated 9/6/17 | McClellan Depo, Exhibit 20 |
| 17 | Note dated 9/7/17 | McClellan Depo, Exhibit 21 |

| 18 | Copy of work schedule | McClellan Depo, Exhibit 14 |
|----|-----------------------|---------------------------|
| 19 | Copy of work schedule | McClellan Depo, Exhibit 15 |
| 20 | E-mail dated 2/16/17 | McClellan Depo, Exhibit 2 |
| 21 | Screen shot of text messages | McClellan Depo, Exhibit 3 |
| 22 | Email from Quentin McClellan dated 2/16 | Redner's Depo, Exhibit 7 |
| 23 | Letter dated 3/23/17 | McClellan Depo, Exhibit 4 |
| 24 | Handwritten statement | McClellan Depo, Exhibit 12 |
| 25 | Memo from Lois Gasser dated 3/17/13 | Redner's Depo, Exhibit 10 |
| 26 | Handwritten Memo from a Concerned Employee dated 3/18/13 | Redner's Depo, Exhibit 11 |
| 27 | Handwritten Memo from Joe Rosario dated 3/18 | Redner's Depo, Exhibit 12 |
| 28 | Email from Quentin McClellan dated 6/5/13 | Redner's Depo, Exhibit 13 |
| 29 | E-mail dated 3/24/17 | McClellan Depo, Exhibit 5 |
| 30 | Application for FMLA leave | McClellan Depo, Exhibit 8 |
| 31 | Letter dated 7/15/17 | McClellan Depo, Exhibit 7 |
| 32 | Letter dated 7/25/17 | McClellan Depo, Exhibit 9 |
| 33 | Note dated 6/14/17 | McClellan Depo, Exhibit 11 |
| 34 | Redner's Markets FMLA & Short Term | Redner's Depo, Exhibit 18 |

# EXHIBIT 1

JS 44   (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Quentin McClellan | Redner's Markets, Inc., Jim Polchin, Bob McDonough, and Rick Merkel |

**(b)** County of Residence of First Listed Plaintiff    Luzerne
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
George Barron, Esq.
88 North Franklin Street
Wilkes Barre, PA 18701

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question *(U.S. Government Not a Party)*
- ☐ 2  U.S. Government Defendant
- ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | **PERSONAL INJURY** | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 365 Personal Injury - Product Liability | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | **PERSONAL PROPERTY** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 370 Other Fraud | **LABOR** | ☐ 480 Consumer Credit |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 751 Family and Medical Leave Act | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 790 Other Labor Litigation | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | ☐ 791 Employee Retirement Income Security Act | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☒ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | |
| | | ☐ 550 Civil Rights | | |
| | | ☐ 555 Prison Condition | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | |

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from Another District *(specify)*
- ☐ 6  Multidistrict Litigation - Transfer
- ☐ 8  Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
29 U.S.C. §2601 et seq, 42 U.S.C. §12101 et seq., 42 U.S.C. 1981

Brief description of cause:
Unlawful employment discrimination and termination under Title VII, ADA, FMLA and PHRA

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE                                  DOCKET NUMBER

DATE
11/08/2018

SIGNATURE OF ATTORNEY OF RECORD
/s/ George Barron

**FOR OFFICE USE ONLY**

RECEIPT #              AMOUNT              APPLYING IFP              JUDGE              MAG. JUDGE

JS 44 Reverse  (Rev. 06/17)

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.(a) **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II. **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

III. **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV. **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

V. **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket. **PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

VI. **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

VII. **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII. **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

QUENTIN MCCLELLAN       :     JURY TRIAL DEMANDED
    Plaintiff             :
                         :
vs.                    :
                         :     CASE NO.:
REDNER'S MARKETS, INC., JIM :
POLCHIN, BOB MCDONOUGH   :
AND RICK MERKEL         :
    Defendants           :

COMPLAINT

Plaintiff Quentin McClellan ("Mr. McClellan") by his attorney, George R. Barron, Esquire, for his Complaint alleges as follows:

JURISDICTION AND VENUE

1.   This action for declaratory, injunctive, monetary and other appropriate relief is brought by named Plaintiff against the Defendants to redress intentional violations by Defendants of rights secured by the laws of the United States and the statutory and common law of the Commonwealth of Pennsylvania.

2.   Defendants wrongfully discriminated against, wrongfully terminated, and unlawfully deprived Mr. McClellan of his rights under the Family and Medical Leave Act, 29 U.S.C.§2601 *et seq.,* the Americans with Disabilities Act, 42 U.S.C. §12101 *et seq.,* ("ADA") and the Pennsylvania

1

Human Relations Act, 43 P.S. §951-963 *et seq.*, ("PHRA"), Title VII of the Civil Rights Act of 1964 and 42 U.S.C. 1981.

3.    This Court has jurisdiction over this action pursuant to, *inter alia*, 28 U.S.C. §§1331 and 1367. Venue is proper in the Middle District of Pennsylvania under 28 U.S.C. § 1391(b) because most of the events and omissions complained of occurred in this judicial district.

4.    Mr. McClellan filed a Charge with the Equal Employment Opportunity Commission ("EEOC") on February 23, 2018 and received a Right to Sue Letter dated August 27, 2018 from the EEOC. All statutory and jurisdictional prerequisites have been met.

## THE PARTIES

5.    Plaintiff Quentin McClellan is a resident of Kingston, Pennsylvania.

6.    Defendant Redner's Market, Inc., ("Redner's") is Pennsylvania Business Corporation with a place of business at 2000 N Township Blvd, Pittston, Pennsylvania.

7.    Upon information and belief, Redner's operates supermarkets in Pennsylvania under the fictitious name "Redner's Warehouse Markets."

8.    Defendant Jim Polchin ("Mr. Polchin"), was, at all times relevant to, Redner's Regional Manager.

2

9.     Mr. Polchin, was, at all times relevant hereto, Mr. McClellan's supervisor and an agent of Defendant Redner's.

10.     Defendant Bob McDonough ("Mr. McDonough"), was, at all times relevant hereto, Redner's Vice President of Human Resources.

11.     Mr. McDonough, was, at all times relevant hereto, Mr. McClellan's supervisor and an agent of Defendant Redner's.

12.     Defendant Rick Merkel ("Mr. Merkel"), was, at all times relevant hereto, Redner's Meat Supervisor.

13.     Mr. Merkel, was, at all times relevant hereto, Mr. McClellan's supervisor and an agent of Defendant Redner's.

14.     Mr. McClellan was, at all times relevant hereto, employed by Redner's and was an "eligible employee" within the meaning of the Family Medical Leave Act.

15.     Defendant Redner's was, at all relevant times a "covered entity" within the meaning of Family Medical Leave Act.

16.     Upon information and belief, Redner's employs more than fifteen (15) people.

## STATEMENT OF FACTS

17.     Mr. McClellan was employed by Redner's for approximately

3

eight years (8), most of that time as a Meat Manager in several of Redner's
supermarkets, including Redner's Pittston Pennsylvania location.

18.    Mr. McClellan had an exemplary career with Redner's, and
received good performance evaluations throughout his eight (8) year
career.

19.    In or about July 2016, Redner's placed Mr. McClellan in its'
Assistant Store Manager ("ASM") training program.

20.    When Redner's placed Mr. McClellan in the ASM training
program, Redner's hired someone to take over Mr. McClellan's position as
Meat Manager at its Pittston, Pennsylvania location.

21.    Mr. McClellan is African-American.

22.    All of Mr. McClellan's supervisors at Redner's were Caucasian.

23.    On or about February 15, 2017, an employee at Redner's
Pittston, PA location, where Mr. McClellan was also working, placed a racist
posting on a break room bulletin board, comparing a photo of African-
American Congressman John Lewis with a photo of a gorilla.

24.    Mr. McClellan was the only African-American staff member at
Redner's Pittston, PA location and believed the racist posting targeted him.

25.    On or about February 16, 2017, Mr. McClellan complained
about the racist posting to the Store Manager of Redner's Pittston location,
Jeff Treichler.

26.     At all times relevant hereto, Mr. Treichler was Mr. McClellan's supervisor and an agent of Redner's.

27.     Mr. Treichler replied that he didn't see anything wrong with the racist posting.

28.     On or about February 16, 2017, after Mr. Treichler ignored Mr. McClellan's concerns, Mr. McClellan emailed a photo of the racist posting to Mr. Polchin, Bill Swartzlander (Redner's Perishables Supervisor) and Alexis Foreman (Redner's Human Resources Representative) informing them that he found the posting offensive and that Mr. Treichler had ignored his concerns.

29.     At all times relevant hereto, Mr. Swartzlander and Ms. Foreman were Mr. McClellan's supervisors and agents of Redner's.

30.     After Mr. McClellan sent the email, Mr. McDonough called Mr. McClellan regarding the racist posting.

31.     Mr. McClellan explained the situation and Mr. Treichler's response to Mr. McDonough.

32.     Upon information and belief, Mr. McDonough called Mr. Treichler to discuss the matter.

33.     On or about February 18, 2017, Mr. Treichler called Mr. McClellan to his office.

34.   When Mr. McClellan arrived at the office, Mr. Treichler had the racist posting in hand, and repeated that he didn't see anything wrong with the racist posting.

35.   On or about February 19, 2017, Mr. McClellan learned that a meat cutter at Redner's Pittston, PA location had been fired for posting the racist posting.

36.   Following these events, Mr. Treichler and other Redner's staff started treating Mr. McClellan less favorably than other employees who were not in Mr. McClellan's protected class.

37.   In or about April 2017, Mr. McClellan took one or two days of vacation time with the approval of Redner's.

38.   Upon his return, Mr. McDonough and Frank Fiori, (Redner's Vice President of Operations) called Mr. McClellan to a meeting to tell him that there were "issues" with his use of vacation time.

39.   At all times relevant hereto, Mr. Fiori was Mr. McClellan's supervisor and an agent of Redner's.

40.   Redner's had never previously expressed any concerns about Mr. McClellan's use of vacation time.

41.   Mr. McClellan completed the ASM training program in or around April 2017.

42.    Following completion of the ASM training program, Mr. McClellan was qualified and trained to hold a management position with Redner's.

43.    Upon completion of the ASM training program, Redner's told Mr. McClellan that no management positions were available for him.

44.    For the remainder of Mr. McClellan's employment with Redner's, he repeatedly and regularly requested that he be placed in a management position, and Redner's refused.

45.    Upon information and belief, Redner's had appropriate positions available for employees who had completed its ASM training program, including management positions, but declined to offer such positions to Mr. McClellan because of, *inter alia*, Mr. McClellan's race and his complaint about the racist posting.

46.    Following completion of the ASM training program, Redner's placed Mr. McClellan at its Pittston location, in an undefined position.

47.    By the time that Mr. McClellan was returned to the Pittston location, his previous position as Meat Manager was filled.

48.    Following completion of the ASM training program, and Redner's refusal to place Mr. McClellan in an appropriate management position, Mr. McClellan had no formal position or job duties.

49.    Mr. McClellan suffers from depression, anxiety and panic

7

disorder.

50.   Mr. McClellan's depression, anxiety and panic disorder constitute disabilities and serious health conditions.

51.   Mr. McClellan's disabilities significantly impair his ability to, *inter alia,* work, sleep and think.

52.   Redner's failure to place Mr. McClellan in an appropriate position following his completion of the ASM training program exacerbated Mr. McClellan's disabilities, causing him increased anxiety, depression and stress.

53.   On or about June 25, 2017, Redner's sent Mr. McClellan home on a medical "stress leave."

54.   Mr. McClellan's disabilities and/or Redner's perceptions that Mr. McClellan was disabled were the reason Redner's suggested the leave.

55.   Mr. McClellan was able and willing to continue working, and told Redner's that he was able and willing to continue working, but Redner's insisted that he take the leave.

56.   At the request of Redner's, Mr. McClellan completed FMLA paperwork and was approved for FMLA protected leave.

57.   Redner's told Mr. McClellan he must get medical approval from his physician before he could return to work.

58.   Upon information and belief, Redner's imposed this leave upon

8

Mr. McClellan in the hope that he would not return to work.

59.   Mr. McClellan was out of work on approved FMLA protected leave from approximately June 20, 2017 to August 28, 2017.

60.   On or about August 28th 2017, Mr. McClellan returned to work.

61.   On or about August 30, 2017, Mr. McClellan, with the knowledge and approval of Redner's, left work early to attend an appointment with his psychiatrist.

62.   Mr. McClellan's request to leave work early was a request for a reasonable accommodation and for FMLA protected leave.

63.   On or around September 4, 2017, Redner's suspended Mr. McClellan until further notice pending an "investigation."

64.   On or about September 5th, 2017, Mr. McDonough, Mr. Merkel, and Mr. Polchin contacted Mr. McClellan by telephone.

65.   During that telephone conversation, Mr. McDonough, Mr. Merkel, and Mr. Polchin expressed concerns regarding Mr. McClellan having left work early to attend his psychiatrist appointment on or about August 30, 2017, and stated *inter alia* "you just can't come and go as you please."

66.   Mr. McDonough, Mr. Merkel, and Mr. Polchin told Mr. McClellan, on behalf of Redner's that they would have to "decide your future with the company."

9

67.    Upon information and belief, Mr. McClellan had no prior disciplinary history with Redner's.

68.    Upon information and belief, Redner's reaction to Mr. McClellan's leave was inconsistent with Redner's personnel policies.

69.    In a series of text messages following that conversation, Mr. McDonough, acting on behalf of Defendants, tried to convince Mr. McClellan to quit.

70.    Mr. McClellan voiced his opposition to Redner's discriminatory actions by, *inter alia*, asserting that he was being treated in a discriminatory manner, and refusing to quit.

71.    On or about September 5, 2017, when Mr. McClellan refused to quit, Redner's terminated Mr. McClellan's employment.

<u>COUNT ONE</u>
(42 U.S.C. § 1981)
(Against Redner's)

72.    All previous paragraphs are incorporated herein by reference as if set forth in full.

73.    Mr. McClellan made protected complaints about a racist posting in his workplace that he believed was targeting him because of his race.

74.    Mr. McClellan was the only African-American staff member at Redner's Pittston, PA location.

10

75.    In response to Mr. McClellan's protected complaints regarding the racist posting, Redner's retaliated against Mr. McClellan by, *inter alia*, refusing to place Mr. McClellan in a management position from Mr. McClellan after he completed ASM training, placing him on an unnecessary and involuntary leave, and terminating his employment.

76.    The conduct of Redner's described above constituted racial discrimination.

77.    Redner's violated Section 1981 by, *inter alia,* subjecting Mr. McClellan to retaliation for his protected complaints on the basis of race and ethnicity, and by, *inter alia*, terminating Mr. McClellan's employment.

78.    As a direct and proximate result of Redner's unlawful retaliatory conduct in violation of Section 1981, Mr. McClellan has suffered and continues to suffer monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation and benefits for which he is entitled to an award of monetary damages and other relief.

79.    As a direct and proximate result of Redner's unlawful retaliatory conduct in violation of Section 1981, Mr. McClellan has suffered and continues to suffer severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain

and suffering for which he is entitled to an award of monetary damages and other relief.

80.    Redner's unlawful retaliatory conduct constitutes a willful and wanton violation of Section 1981, was outrageous and malicious, was intended to injure Mr. McClellan, and was done with conscious disregard of Mr. McClellan's civil rights, entitling Mr. McClellan to an award of punitive damages.

COUNT TWO
RETALIATION IN VIOLATION OF TITLE VII OF THE
CIVIL RIGHTS ACT OF 1964
(Racial Discrimination)
(Against Defendant Redner's)

81.    All previous paragraphs are incorporated herein by reference as if set forth in full.

82.    Mr. McClellan's complaint about the racist posting was a protected activity under Title VII of the Civil Rights Act of 1964.

83.    In response to Mr. McClellan's protected activity regarding the racist posting, Redner's retaliated against Mr. McClellan by, *inter alia*, refusing to place Mr. McClellan in a management position after he completed ASM training, placing him on an unnecessary and involuntary leave, and terminating his employment.

84.    Based upon the foregoing, Mr. McClellan alleges that Redner's did violate Title VII of the Civil Rights Act of 1964.

12

## COUNT THREE
## INTERFERENCE WITH PLAINTIFF'S RIGHTS UNDER
## THE FAMILY MEDICAL LEAVE ACT
### (Against All Defendants)

85.     All previous paragraphs are incorporated herein by reference as if set forth in full.

86.     As set froth herein, Mr. McClellan took FMLA protected leave from work.

87.     Defendants interfered with Mr. McClellan's rights under the FMLA by, *inter alia*, failing to properly designate leave as FMLA protected, and failing to provide the notice required under the law, disciplining Mr. McClellan for using the leave and terminating his employment for taking FMLA protected leave.

## COUNT FOUR
## RETALIATION IN VIOLATION OF
## THE FAMILY MEDICAL LEAVE ACT
### (Against All Defendants)

88.     All previous paragraphs are incorporated herein by reference as if set forth in full.

89.     In retaliation for Mr. McClellan's requests for and use of FMLA protected leave, and for Mr. McClellan's expressing opposition to Defendants' unlawful activities, Defendants disciplined Mr. McClellan and terminated his employment.

90.    Defendants retaliated against Mr. McClellan for asserting his rights under the FMLA.

## COUNT FIVE
## UNLAWFUL DISCRIMINATION ON THE BASIS OF DISABILITY IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT
### (Against Defendant Redner's)

91.    All previous paragraphs are incorporated herein and referenced as if set forth in full.

92.    At all times relevant, Mr. McClellan was a "qualified individual with a disability" and was able to perform the essential functions of his position with or without accommodations.

93.    At all times relevant hereto, Redner's was aware of Mr. McClellan's disabilities.

94.    At all times relevant hereto, Redner's perceived Mr. McClellan as an individual with a disability.

95.    Redner's knew that on or about August 30, 2017, Mr. McClellan left work to attend an appointment with his psychiatrist.

96.    Upon information and belief, Redner's treated Mr. McClellan more harshly than it treated employees without disabilities.

97.    Redner's discriminated unlawfully against Mr. McClellan on the basis of Mr. McClellan's disabilities by, *inter alia*, refusing to place him in a management position following ASM training, reprimanding him for

14

attending a psychiatric appointment and by terminating Mr. McClellan's employment.

98.    Mr. McClellan's disabilities were a motivating factor in Redner's decisions to refuse to place him in a management position following ASM training, by forcing him to take an unneeded leave from work, reprimanding him for attending a psychiatric appointment and terminating Mr. McClellan's employment.

99.    Mr. McClellan's disabilities were a determinative factor in Redner's decisions to refuse to place him in a management position following ASM training, reprimanding him for attending a psychiatric appointment and terminating Mr. McClellan's employment.

100.   Based upon the foregoing, Mr. McClellan alleges that Redner's did violate the Americans with Disabilities Act.

## COUNT SIX
### UNLAWFUL DISCRIMINATION ON THE BASIS OF DISABILITY IN VIOLATION OF THE PENNSYLVANIA HUMAN RELATIONS ACT
(Disability Discrimination)
(Against Defendant Redner's)

101.   All previous paragraphs are incorporated herein and referenced as If set forth In full.

102.   Based upon the foregoing, Mr. McClellan alleges that Redner's did violate the Pennsylvania Human Relations Act.

## COUNT SEVEN
## UNLAWFUL RETALIATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT
### (Against Defendant Redner's)

103.   All previous paragraphs are incorporated herein and referenced as if set forth in full.

104.   Mr. McClellan's request to leave work early to attend an appointment with his psychiatrist was a request for an accommodation, and a protected act.

105.   Mr. McClellan's opposition to Redner's unlawful practices, including his refusal to quit his job, were protected acts.

106.   In retaliation for Mr. McClellan's protected acts, Redner's, *inter alia*, suspended Mr. McClellan and ultimately terminated Mr. McClellan's employment.

107.   Based upon the foregoing, Mr. McClellan alleges that Redner's did violate the Americans With Disabilities Act.

## COUNT EIGHT
## UNLAWFUL RETALIATION IN VIOLATION OF THE PENNSYLVANIA HUMAN RELATIONS ACT
### (Disability Discrimination)
### (Against Defendant Redner's)

108.   All previous paragraphs are incorporated herein and referenced as if set forth in full.

109.   Based upon the foregoing, Mr. McClellan alleges that Redner's did violate the Pennsylvania Human Relations Act.

COUNT NINE
FAILURE TO ACCOMMODATE IN VIOLATION OF THE AMERICANS
WITH DISABILITIES ACT
(Against Defendant Redner's)

110.   All previous paragraphs are incorporated herein and referenced as if set forth in full.

111.   Mr. McClellan's request for time off of work to attend an appointment with his psychiatrist was a request for a reasonable accommodation.

112.   Redner's failed to provide Mr. McClellan with the reasonable accommodation he requested for his disabilities, and instead disciplined him.

113.   Redner's failed to engage in good faith in the interactive process required by law to identify and implement an accommodation for Mr. McClellan's disabilities.

114.   Based upon the foregoing, Mr. McClellan alleges that Redner's did violate the Americans with Disabilities Act.

## COUNT TEN
## FAILURE TO ACCOMMODATE IN VIOLATION OF THE PENNSYLVANIA HUMAN RELATIONS ACT
### (Disability Discrimination)
### (Against Defendant Redner's)

115.  All previous paragraphs are incorporated herein and referenced as if set forth in full.

116.  Based upon the foregoing, Mr. McClellan alleges that Redner's did violate the Pennsylvania Human Relations Act.

## COUNT ELEVEN
## RACIAL DISCRIMINATION IN VIOLATION OF THE PENNSYLVANIA HUMAN RELATIONS ACT
### (Against Defendant Redner's)

117.  All previous paragraphs are incorporated herein by reference as if set forth in full.

118.  In response to Mr. McClellan's protected activity regarding the racist posting, Redner's retaliated against Mr. McClellan by, *inter alia*, refusing to place Mr. McClellan in a management position after he completed ASM training, placing him on an unnecessary and involuntary leave, and terminating his employment.

119.  Based upon the foregoing, Mr. McClellan alleges that Redner's did violate the Pennsylvania Human Relations Act.

## PRAYER FOR RELIEF

120.    Since his employment was terminated, Mr. McClellan has

suffered lost wages, lost employment opportunities, loss of medical benefits

and other fringe benefits. In addition, Mr. McClellan has suffered and will

continue to suffer severe emotional and physical distress.

WHEREFORE, Mr. McClellan respectfully requests that this Court:

(a) Enter a declaratory judgment that Defendant's action, policies,

practices and procedures complained of herein have violated and continue

to violate the rights of Mr. McClellan as secured by the statutes of the

United States and the Constitution, statutes and common law of the

Commonwealth of Pennsylvania;

(b) For Count One, award to Mr. McClellan an amount to be

determined at trial, including back pay and front pay damages for lost

income and benefits at the same level as if he had been fully employed

since his termination by Defendants, compensatory damages to

compensate Mr. McClellan for future pecuniary losses, emotional pain,

suffering, inconvenience, mental anguish, loss of enjoyment of life,

emotional distress, anguish and humiliation, loss of his self-esteem and

ability to provide himself with the rewards of his chosen career, punitive or

exemplary damages in a monetary award in order to discourage future

19

unlawful behavior, interest, costs, disbursements and reasonable attorney fees;

(c) For Counts Two, Five, Seven and Nine, award to Mr. McClellan an amount to be determined at trial, including back pay and front pay damages for lost income and benefits at the same level as if he had been fully employed since his termination by Defendants, compensatory damages to compensate Mr. McClellan for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, emotional distress, anguish and humiliation, loss of his self-esteem and ability to provide himself with the rewards of his chosen career, punitive or exemplary damages in a monetary award in order to discourage future unlawful behavior, interest, costs, disbursements and reasonable attorney fees;

(e) For Counts Three and Four, award to Mr. McClellan back pay and front pay damages for lost income and benefits at the same level as if he had been fully employed since his termination by Defendants, liquidated damages, interest, costs, disbursements and reasonable attorney fees;

(f) For Counts Six, Eight, Ten and Eleven, award to Mr. McClellan back pay and front pay damages for lost income and benefits at the same level as if he had been fully employed since his termination by Defendants,

compensatory damages to compensate Mr. McClellan for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, emotional distress, anguish and humiliation, loss of his self-esteem and ability to provide himself with the rewards of his chosen career, interest, costs, disbursements and reasonable attorney fees;

(g) Grant to Mr. McClellan  such additional relief as this Court deems just and proper.

<u>DEMAND FOR JURY</u>

Plaintiff demands a jury trial for all claims triable by a jury.

<u>S/George R. Barron</u>
George R. Barron, Esquire
Counsel for Plaintiff PA ID. # 88747
88 North Franklin Street
Wilkes Barre, PA 18701
(570) 824-3088

# EXHIBIT 2

1                 UNITED STATES DISTRICT COURT

               MIDDLE DISTRICT OF PENNSYLVANIA

2

3 QUENTIN McCLELLAN,          :   CIVIL ACTION - LAW

             Plaintiff   :

4                    :   No. 3:18-CV-02162-ARC

        vs.          :

5                    :

REDNER'S MARKETS, INC., JIM   :

6 POLCHIN, BOB McDONOUGH, AND   :

RICK MERKEL,           :

7              Defendants  :

8

9                    ------------

10                 Oral Deposition of

           REDNER'S MARKETS, INCORPORATED

11                Rule 30(b)(6)

                 ------------

12

13

        Date:    Thursday, August 29, 2019

14

        Time:    10:05 a.m.

15

        Place:   Redner's Markets, Incorporated

16                3 Quarry Road

               Reading, PA  19605

17

18

19                    ------------

20

21

22       COMPUTERIZED REPORTING SERVICES, INC.

          By:  M. Ellen Valent, RMR

23            2209 Quarry Drive

            Suite C-45

24         West Lawn, PA  19609

25         Phone:  (610) 678-6652

```
 1    APPEARANCES:

 2         Barron Law
           By:  George Barron, Esquire
 3         88 North Franklin Street
           Wilkes-Barre, PA  18701
 4              For the Plaintiff

 5

 6         Fox Rothschild, LLP
           By:  Randall C. Schauer, Esquire
 7         Eagleview Corporate Center
           747 Constitution Drive, Suite 100
 8         P.O. Box 673
           Exton, PA  19341-0673
 9              For the Defendant

10

11    ALSO PRESENT:

12         Bob McDonough (during testimony of Susan Rotkiske)

13                         ------------

14                           I N D E X

15

16    WITNESS                 EXAMINED BY            PAGE

17    Robert McDonough        Mr. Barron                4

18                            Mr. Schauer             120

19                            Mr. Barron              122

20

21    Susan Rotkiske          Mr. Barron               98

22                            Mr. Schauer             118

23                            Mr. Barron              119

24

25
```

```
 1                              EXHIBITS

 2   REDNER'S EXHIBITS                                   PAGE

 3   No. 1    Notice of Deposition                        7

 4   No. 2    Redner's Employee Information and
              Handbook                                    18
 5
     No. 3    Email Chain beginning with Email from
 6            Jay Schaeffer dated 9/5/17                  30

 7   No. 4    Memo from Jim Polchin dated 9/6/17          37

 8   No. 5    Undated Memo                                48

 9   No. 6    Memo from Robert McDonough dated 4/3/17    52

10   No. 7    Email from Quentin McClellan dated 2/16    55

11   No. 8    Memo from Robert McDonough dated 6/10/13   69

12   No. 9    Memo from Randy Kostelac dated 3/23/17     74

13   No. 10   Memo from Lois Gasser dated 3/17/13        77

14   No. 11   Handwritten Memo from a Concerned
              Employee dated 3/18/13                      79
15
     No. 12   Handwritten Memo from Joe Rosario
16            dated 3/18                                  81

17   No. 13   Email from Quentin McClellan dated 6/5/13 82

18   No. 14   Warning Notice dated 9/5/17                85

19   No. 15   Email from Quentin McClellan dated 9/5     88

20   No. 16   Memo from Robert McDonough dated 9/6/17    92

21   No. 17   U.S. Department of Labor FMLA Form         101

22   No. 18   Redner's Markets FMLA & Short Term
              Disability Form                            116
23

24

25
```

```
1                    P R O C E E D I N G S
2                    ROBERT McDONOUGH
3    was called as a Witness and, having been duly sworn by
4    the Reporter-Notary Public, was examined and testified as
5    follows:
6                    MR. BARRON:  Good morning, Mr. McDonough.
7    We've met before.  As you know, I'm George Barron.  I am
8    the attorney for Quentin McClellan in this matter.  And
9    we are here today to take your deposition.
10                   I have some preliminary questions and
11   preliminary instructions to go through with you.  So I
12   will do that, but let's address on the record, if we
13   may --
14                   MR. SCHAUER:  Yeah, first, the usual
15   stipulations in the sense of all objections to questions
16   are preserved until trial or later proceeding, except for
17   objections as to form.
18                   And the other thing that is not being waived
19   is the witness will sign, you know, the deposition
20   transcript prior to finalization.  That's it.
21                   MR. BARRON:  Okay.  Thank you.
22   BY MR. BARRON:
23        Q    Okay.  So, Mr. McDonough, have you ever been
24   deposed before?
25        A    Yes.
```

```
 1          Q     Okay.  When was that?

 2          A     I don't remember.

 3          Q     Okay.

 4          A     It has been awhile.

 5          Q     In the last five years?

 6          A     Yes.

 7          Q     In the last three years?

 8          A     I don't think so.  I think it has been longer

 9  than that.

10          Q     Can you tell me what -- other than that

11  deposition, have you ever been deposed?

12          A     I believe I have been deposed more than once,

13  yes, probably three or four times.

14          Q     Can you tell me what those matters were

15  regarding?

16          A     They were lawsuit cases that we were involved

17  in.

18          Q     When you were testifying, were you testifying

19  on behalf of Redner's?

20          A     Yes.

21          Q     Have you ever been -- let me back up.  Other

22  than those depositions when you have testified on behalf

23  of Redner's, have you ever given any depositions on your

24  own and where you were representing yourself?

25          A     No.
```

```
 1          Q      Have you ever been a party to a lawsuit

 2   before?

 3          A      No.

 4          Q      Tell me, what is your position with Redner's?

 5          A      I'm the vice president of human resources.

 6          Q      These are questions that -- let me back up

 7   with that.  I'll go through basically how this works,

 8   although you have some familiarity.

 9                 Basically how this works is I will ask you

10   questions, and you will answer the questions.  And our

11   court reporter takes down everything that each of us

12   says.  So a couple of things are important to make her

13   life easier.

14                 It's important that we both speak rather than

15   use gestures or nods, things like that, because she can't

16   record that.  It's important that we do our best to not

17   speak at the same time, because that gets difficult and

18   confusing for her, as well.  Okay?

19          A      Yep, I'll do my best.

20          Q      We are here at Redner's.  Is this Redner's

21   headquarters we are at?

22          A      Yes.

23          Q      If there is any time at which you want to

24   take a break, need to take a break, bathroom, water,

25   whatever, just let me know; and there is no problem at
```

```
 1    all with that.  We will have to go off the record, and we
 2    will come back when we are through.
 3             The only thing I ask is that you do not take
 4    a break while there is a question on the table.
 5        A    Okay.
 6        Q    Okay.  Let's see, these are questions I ask
 7    everyone.  Please don't be insulted.  Are you this
 8    morning under the influence of any drugs or substances or
 9    medical conditions that would prevent you from answering
10    the questions truthfully and completely?
11        A    I am not.
12        Q    Okay.  Good.
13             Now, I will mark this as Exhibit 1.
14             MR. SCHAUER:  Off the record a second.
15             (Whereupon, a discussion was held off the
16              record.)
17             MR. SCHAUER:  Back on the record.
18             (Whereupon, Redner's Exhibit No. 1 was marked
19              for identification.)
20    BY MR. BARRON:
21        Q    So, Mr. McDonough, it is my understanding
22    that you are here today to testify on behalf of the
23    Defendant in this case -- the Corporate Defendant in this
24    case, I apologize, which is Redner's Markets,
25    Incorporated; is that correct?
```

```
 1          A     That's correct.

 2          Q     And was Redner's Markets, Incorporated,

 3    Mr. McClellan's employer?

 4          A     Yes.

 5          Q     Is it your employer, as well?

 6          A     I'm not sure what you mean.

 7          Q     Is Redner's Markets, Incorporated, also your

 8    employer?

 9          A     Oh, yes, yes.

10          Q     You are here to testify on behalf of that

11    corporation?

12          A     That's correct.

13          Q     So the document we have put in front of you

14    that is marked as Exhibit No. 1 is the notice for the

15    deposition today.  And it goes through a series of 10

16    topics -- I corrected the numbering on this one; so now

17    there are 10 -- regarding which we plan to ask questions

18    today.

19                And what I would like you to do is take a

20    look at that for a moment, if you would.  Let me know

21    when you are ready.  And I have a couple of questions

22    about that.

23          A     Okay.

24          Q     Okay.  Now, it is my understanding from your

25    counsel that with the exception of some or all of Topic
```

1    No. 5, which is on the second page of the exhibit if you

2    could look at that -- with the exception of that topic,

3    you have been designated to testify as to the other

4    topics on this page; is that correct?

5         A    Yes.

6         Q    Okay.  And with regard to that topic, I guess

7    just to clarify as long as we are on the subject, is

8    there -- is there any portion of that No. 5 that you

9    are -- have been designated to speak about or capable of

10   speaking about?

11        A    I'm capable of speaking about it.  I may not

12   be as familiar with it as the other party.

13        Q    Okay.  Is your -- the area or areas that you

14   say you are not as familiar with, are you talking

15   about -- because there are really two things there.  Some

16   of it is about Mr. McClellan's medical condition and his

17   FMLA leave, and the other is about Redner's policies and

18   practices.

19        A    So I can speak to both, but not as

20   specifically as our benefits manager can.

21        Q    Okay.  So the benefits manager then will

22   speak as to the entirety of No. 5?

23        A    She can do both, yes.

24             MR. SCHAUER:  Yes.

25   BY MR. BARRON:

```
 1          Q       And if we get into that -- in the course of

 2     this, if we start getting into that area and it is

 3     something that you want to leave for her, that's fine,

 4     just please let me know.

 5          A       Okay.

 6          Q       Okay.  So who designated you to testify on

 7     behalf of Redner's today?

 8          A       It was a collaboration between my attorney --

 9     our attorney and myself.

10          Q       Okay.  So do you have -- I think you said

11     you're director of HR.

12          A       Vice president.

13          Q       Vice president of HR.  Do you have the full

14     authority to speak on behalf of Redner's?

15          A       Yes.

16          Q       And you're aware -- are you aware that the

17     answers that you give will be binding on Redner's?

18          A       Yes.

19          Q       Let's see.  And who will the person be who

20     speaks as to No. 5?

21          A       Her name is Susan Rotkiske.

22          Q       Okay.  And what is her position?

23          A       Benefits manager.

24          Q       Tell me -- let's start at the end.  Can you

25     tell me why Mr. McClellan's employment with Redner's was
```

1    terminated?

2         A    As I recall, it was for falsely reporting his

3    work time and leaving the job without permission.

4         Q    Were those considered two separate offenses,

5    or was this --

6         A    They could have been, yes.

7         Q    Okay.  Well, I'm asking if they were.

8         A    Yes.

9         Q    How was it that he falsely reported work

10   time?

11        A    So each manager in his role is required to

12   work a 45-hour work week.  In the week that was in

13   question, he only worked 34.7 hours and didn't request or

14   report vacation to fill in for the time that was

15   underworked.

16        Q    Okay.  How did you learn that he worked 34.7?

17   Well, what was Mr. McClellan's position at that point?

18        A    At that time, he was a meat manager.

19        Q    At what store?

20        A    Store 55 in Pittston, PA.

21        Q    Was he a salaried employee?

22        A    Yes.

23        Q    And how did Redner's track his hours that he

24   worked?

25        A    In that particular week, we used video

1    surveillance.

2        Q     What kind of video surveillance?

3        A     Just cameras that view entrances and general

4    store areas.

5        Q     Okay.

6        A     I don't know a whole lot about the actual

7    camera system to speak to it.

8        Q     Okay.  So was this video surveillance of

9    Mr. McClellan entering and leaving the store?

10       A     Yes.

11       Q     Is that something that was reviewed for all

12   employees?

13       A     It has been used to review employees who we

14   have had questions about their time, yes.

15       Q     So before Mr. McClellan -- let me back up a

16   bit.  So during this week in which you say he worked 34.7

17   hours instead of the 45, why was it that Redner's had

18   concerns about his time?

19       A     Well, it was reported that he left on one day

20   long before his scheduled shift was to end.

21       Q     Reported by whom?

22       A     If I remember correctly, the store director.

23       Q     Do you know who that was?

24       A     I believe it was Jeff Treichler.

25       Q     Did Mr. McClellan tell anyone where he was

1    going or why?

2          A      To my knowledge, he did not.

3          Q      Did he at any time after that?

4                 MR. SCHAUER:   Prior --

5    BY MR. BARRON:

6          Q      At any point after the day that he left?

7          A      He did not.

8          Q      Okay.  Did you view those videotapes?

9          A      Not all of them, no.

10         Q      Okay.  How many were there?

11         A      Well, there would have been multiple

12   determining his each day.  We have a department that

13   provides that information to us.

14         Q      What department is that?

15         A      It's the loss prevention department.

16         Q      So is that security?

17         A      It can be referred to as that, yes.

18         Q      Is this the same department that would deal

19   with shoplifting and things like that?

20         A      Yes.

21         Q      So when you say, you viewed some of them, do

22   you mean certain days or certain times?

23         A      I can't really recall exactly, but I believe

24   I did look at the day in question where he left, if I

25   remember correctly, at 10:00 a.m., confirming that that

```
 1    was the time he left.

 2          Q      Do you still have those videos, video

 3    recordings?

 4          A      No.

 5          Q      Why not?

 6          A      No one requested them be preserved.

 7          Q      Those recordings, I think you testified, were

 8    the basis for the decision to terminate Mr. McClellan's

 9    employment, right?

10          A      In part.

11          Q      And what was the other part?

12          A      So, you know, his reluctance to -- in

13    conversation, his reluctance to come back to work in the

14    store that he was assigned to.

15          Q      Can you tell me -- what can you tell me about

16    that?

17          A      Well, that had to do with the conversation at

18    the end of his employment period where he basically

19    refused to go back to the store that he was assigned to.

20          Q      And was that the Pittston store?

21          A      Yes.

22          Q      Did he give you a reason why he refused to go

23    back?

24          A      Not specifically, no.

25          Q      Did anyone at Redner's ask?
```

```
 1           A      I don't recall.

 2           Q      How did he express to Redner's that he was

 3    not willing to go back to Pittston?

 4           A      It was in a phone conversation.  He just

 5    said, I can't go back there.

 6           Q      And it's your testimony that he didn't tell

 7    you why he couldn't go back there?  When I say you, I

 8    mean Redner's.

 9           A      I don't recall him specifically providing a

10    reason that he couldn't go back there.

11           Q      And Redner's didn't ask?

12           A      I don't recall if we asked or not.

13           Q      Was Mr. McClellan looking for a transfer at

14    that point?

15           A      So to the best of my recollection in that

16    conversation, I asked personally and specifically, What

17    is it that you want to do?

18                  And his answers were, I just can't go back to

19    Pittston.

20           Q      You said this is a telephone conversation?

21           A      Yes.

22           Q      Was this before or after the incident where

23    you believed he didn't work enough time?

24           A      After.

25           Q      You say managers are required to work 45-hour
```

1   weeks.  Are there ever any exceptions to that?

2          A      Sure.

3          Q      What kind of exceptions would they be?

4          A      If, you know, there are reasons that you have

5   to be absent, whether it's illness or emergencies, we are

6   certainly generally flexible with people who need time

7   off.  So it's not written in stone.

8          Q      Okay.  And are you aware, did Mr. McClellan

9   have any emergencies or need for leave time during that

10  week?

11         A      Not that I was aware.

12         Q      Did Redner's ask him if he had any

13  emergencies?

14         A      I don't recall.

15         Q      You say he left without permission.  What

16  permission did he need?

17         A      It is standard that any supervisor that is

18  leaving work should check in with their immediate

19  supervisor.

20         Q      Who would his immediate supervisor have been?

21         A      The store director.

22         Q      And who was that?

23         A      Jeff Treichler.

24         Q      Treichler.  Did Mr. Treichler tell Redner's

25  that Mr. McClellan did not do that?

```
 1          A     That's what he reported, yes.

 2          Q     Did Redner's ask Mr. McClellan if he had

 3   checked in with Mr. Treichler?

 4          A     I did, yes.

 5          Q     And what did he say?

 6          A     His answer was, No.

 7          Q     Did he explain why?

 8          A     I don't recall an explanation, no.

 9          Q     And you also said that he falsely reported

10   work time.  How did he do that?

11          A     Well, if you miss time, it's your obligation

12   to either put in for vacation or report that you didn't

13   work your full schedule.  He did neither.

14          Q     When you say, report that you worked your

15   full schedule, do you mean by informing, in this case,

16   Mr. Treichler --

17          A     Yes.

18          Q     -- of leaving?

19                Did Mr. McClellan at any point make an

20   affirmative representation to Redner's that he had, in

21   fact, worked his full number of hours that week?

22          A     Not that I know of.

23          Q     In other words, there was no -- I'm assuming

24   from your testimony that there was no time sheet that he

25   filled out each week to report when he worked?
```

1       A       No.   A salaried employee does not need to do

2    that.

3       Q       He is not punching a clock?

4       A       No.

5               MR. BARRON:   Okay.   This will be No. 2.

6               (Whereupon, Redner's Exhibit No. 2 was marked

7                 for identification.)

8    BY MR. BARRON:

9       Q       Mr. McDonough, directing your attention to

10   what has been marked as Exhibit 2, if you would like to

11   take a moment and look through that, please feel free to

12   do so.

13              But I will represent to you that this was

14   produced by your counsel.   And it is an Employee

15   Information and Handbook.   There appears to be a date on

16   the front of 3/2017.

17              Do you see that?

18      A       Yes.

19      Q       What is this document?   Can you tell me what

20   this is?

21      A       It's our employee handbook.

22      Q       And does it contain procedures regarding

23   discipline and things of that nature?

24      A       Yes.

25      Q       And was this the handbook that was in effect

1        at the time of Mr. McClellan's termination?

2               A       Yes.

3               Q       Okay.  I understand I think that your counsel

4        produced a few of these that had been revised over time;

5        is that correct?

6               A       That's correct.

7               Q       Does Redner's have a progressive disciplinary

8        policy?

9               A       Yes.

10              Q       And tell me how that works.

11              A       It generally begins with verbal warnings and

12       can proceed to written warnings and suspensions and

13       ultimately termination.

14              Q       Okay.  So with regard to the incident that

15       led to Mr. McClellan's termination, had he ever received

16       a verbal warning for that kind of thing, for missing

17       work?

18              A       Yes.

19              Q       Do you know who gave that to him?

20              A       I gave it to him.

21              Q       And when was that?

22              A       It was in a conversation sometime prior.  I

23       can't tell you exact dates.  But both myself and our vice

24       president of operations had a conversation with him about

25       his missing time and being late, and it was a general

1      verbal conversation.

2              Q      And who is the vice president of operations?

3              A      Mr. Frank Fiore.

4              Q      You said you're not sure when that was?

5              A      I'm not exactly sure, no.

6              Q      Was there any -- was there any documentation

7      of that conversation?  Was it ever reduced to writing?

8              A      I believe I wrote a summary of our

9      conversation that would be contained in some of the

10     materials provided.

11             Q      And I may -- let me go on, and I will come

12     back to that.

13                    So was Mr. McClellan ever issued a written

14     warning with regard to this issue?

15             A      Not that I recall.

16             Q      Was he ever suspended with regard to this

17     issue?

18             A      Yes.

19             Q      When was that?

20             A      So, again, my memory of the exact chronology

21     would have been even after the conversation with Fiore

22     and I that that time period was to be used to decide

23     whether he wanted to continue.

24                    So I don't think it was characterized

25     specifically as a suspension.  But he was also suspended

```
 1   shortly after he had missed -- or he had left that day at
 2   10:00 a.m.  So two different occasions.  But the day that
 3   he left at 10:00, he was not to return to work until we
 4   had a conversation.
 5        Q     Okay.  So the first, what you characterized
 6   as a suspension, I think you said came in conjunction
 7   with the verbal warning you discussed?
 8        A     Yes.
 9        Q     So was he actually suspended from work?  Did
10   he miss time from work as a result of that?
11        A     I don't recall.  I believe we talked to him
12   on a Friday.  So it is likely he wasn't scheduled until
13   Monday.  But he was to use that time to determine what he
14   wanted to do with respect to his career.
15        Q     During that time, what you characterized as a
16   suspension, you said he was instructed to think about his
17   career with Redner's.  Was he instructed to not report
18   for work for any period of time?
19        A     I don't recall.
20        Q     Would you agree with me that, generally
21   speaking, being suspended from work means being told not
22   to come to work?
23        A     That's correct.
24        Q     So do you know if he was told not to come to
25   work?
```

```
 1        A     As I said, I don't recall.

 2        Q     So with regard to the second, what you

 3   characterized as a suspension, Mr. McClellan did not

 4   return to work after that, correct?

 5        A     I don't think so.

 6        Q     Was that what led to his termination?

 7        A     He was subsequently terminated.

 8        Q     So what was the purpose of the second

 9   suspension?

10        A     It was, A, for us to evaluate the

11   circumstances and, you know, determine next steps.  So he

12   was suspended and told not to work until we could

13   determine what the next steps were.

14        Q     And when you say, evaluate the circumstances,

15   what do you mean by that?

16        A     Evaluate whether or not he had asked for

17   permission, whether he told his own staff that he was

18   leaving, determine exactly what time he left, evaluate

19   the number of hours that he came up short, and then

20   determine whether or not it was a terminable offense.

21        Q     Would you characterize that as an

22   investigation?

23        A     Sure.

24        Q     Are there any records of that investigation?

25        A     Yes.
```

```
 1              Q     Can you tell me what form they take?

 2              A     There is probably several in some of the

 3    evidence provided, schedules that were reviewed,

 4    reporting from the loss prevention department that

 5    outlined the times he came in and the times he left.

 6    There may even be some record of statements given from

 7    persons involved in the investigation.  My own summary of

 8    the investigation is probably included in some of the

 9    documents provided.

10              Q     Okay.  And to your knowledge, was that

11    disclosed in this litigation, those documents?

12              A     I believe so, yes.

13              Q     So it was preserved since Mr. McClellan's

14    termination?

15              A     Yes.

16              Q     Why wasn't the video recording preserved?

17              A     I can't answer that specifically.  It

18    wasn't -- we didn't ask for it to be preserved at the

19    time.  There is a limited time that it is available is

20    what I understand.  But we would have to get specific --

21    someone who understands the preservation of video to

22    answer that question.

23                    But when I asked if it was available, the

24    answer was it was never requested to be preserved.

25              Q     Okay.  So the other pieces of the
```

```
 1    investigation were preserved, just not the video

 2    recording?

 3          A     I guess that would be correct, yes.

 4          Q     Do you preserve video recordings -- do you

 5    use video recordings in prosecuting shoplifting?

 6          A     I don't know.  I don't prosecute shoplifting.

 7          Q     You're not involved in that?

 8          A     I'm not involved in that.

 9          Q     Who would know that?

10          A     Our director of loss prevention.

11          Q     Who is that?

12          A     Cory Deily.

13          Q     Is this the person who was -- can you give us

14    a spelling on his name, please?

15          A     D-e-i-l-y.

16          Q     Was he at the job when Mr. McClellan was

17    employed at Redner's?

18          A     Yes.

19          Q     Okay.  Do you remember in the course of that

20    investigation of Mr. McClellan's co-workers what they had

21    to say about his leaving, if he told them he was leaving?

22          A     I'm sorry, can you repeat that?

23          Q     Do you remember what -- I think you said as

24    part of that investigation, Redner's spoke to

25    Mr. McClellan's co-workers regarding his absence; is that
```

1    correct?

2         A       I believe, yes.

3         Q       Do you remember what they -- did they give

4    written statements?

5         A       I believe they did, yes.

6         Q       Do you remember any of their names?

7         A       I don't.

8         Q       Any other reasons for Mr. McClellan's

9    termination?

10        A       No.

11        Q       When you mentioned earlier that you had

12   conversations with Mr. McClellan regarding whether he

13   wanted to continue his employment, can you tell me why

14   you thought to have those conversations with him?  What

15   was it that made you think he might not?

16        A       His own admission that when we spoke to him,

17   he indicated that he could not work at the Pittston store

18   any longer.

19        Q       And did he tell you why?

20        A       He did not.

21        Q       Did you ask?

22        A       I believe I did.  I don't think we got an

23   answer.  And I can only speak to this conversation being

24   incredibly contentious and asking specific questions of

25   him that we didn't feel we were getting answers to.

```
 1          Q     Okay.  Contentious how, can you explain that?
 2          A     Yeah.  I mean, we wanted to know multiple
 3    things.  And if he gave us an explanation that was
 4    reasonable for leaving, these were things that we wanted
 5    to consider, you know, to preserve his employment.
 6                And he gave us no answers as to why he left.
 7    And that was the nature of the conversation.  And it is
 8    noted somewhere in some of my summaries that we asked
 9    specific questions, yes-or-no questions; and he evaded
10    questions over and over until the point where we asked,
11    What is it you want to do?
12                And he said, I can't work here anymore.
13                And I said, There are very few other options.
14                And his answer continued to be, I can't work
15    here anymore, telling me that he was -- at this point, I
16    was led to believe that he didn't want to work for
17    Redner's and/or in Pittston any longer.
18          Q     Okay.  I just want to clarify.  I mean, they
19    are two different things.  When he was saying, I can't
20    work here anymore, was he referring to Redner's, or was
21    he referring to Pittston?
22          A     Well, there were no other options.
23          Q     I understand what you are saying.  My
24    question is:  Was Mr. McClellan saying, I can't work at
25    Pittston anymore, and then whatever comes -- whatever
```

```
 1   other options there are, then you go to the next thing.
 2                Or was he saying, I can't work for Redner's
 3   anymore?
 4                MR. SCHAUER:  Well, what did he say?
 5                MR. BARRON:  That's what I'm asking.
 6                MR. SCHAUER:  Are you asking him to
 7   speculate, or are you asking did he say one or the other?
 8                MR. BARRON:  I'm asking, did he say one or
 9   the other, or did you ask him to clarify?
10                MR. SCHAUER:  There are two questions there.
11   BY MR. BARRON:
12        Q     Right.
13                When you said that Mr. McClellan said, I
14   can't work here anymore, I had the impression that you
15   testified that you were not sure whether Mr. McClellan
16   meant, I can't -- by the word, here, I can't work for
17   Redner's anymore or whether he meant I can't work at
18   Pittston anymore.
19        A     I believed he meant Pittston.
20        Q     Okay.
21        A     Yes.
22        Q     I just wanted to clarify that.
23                And I understand it is your testimony there
24   were -- when you say, there were very few other options,
25   what did you mean by that?
```

1        A     Well, you know, there is no -- I mean, if he

2  wanted to transfer, you can't just get a transfer if

3  there is not an opening at another location.

4        Q     Right.  I understand.

5               Did Redner's look to see if there were any

6  openings?

7        A     I knew there weren't.

8        Q     Okay.  That's fine.

9                I meant to ask you in the beginning, I

10  apologize.  How many stores does Redner's have?

11        A     43 supermarkets.

12        Q     43.  And geographically, where are they

13  located?

14        A     Delaware, Maryland, and Pennsylvania.

15        Q     How many employees approximately?

16        A     About 4,500.

17        Q     Were you aware at the time of his termination

18  that Mr. McClellan had taken an FMLA leave?

19        A     Yes.

20        Q     Were you aware of the reasons why?

21        A     No.

22        Q     Were you aware that he was under the

23  treatment of a mental health professional at that stage?

24        A     I was not.

25        Q     Do you have any information about when

```
 1    Mr. McClellan was placed on FMLA leave what the

 2    circumstances of that were?

 3         A    I'm sorry, ask me the question again, please.

 4         Q    Do you have any knowledge of what the

 5    circumstances were that led to Mr. McClellan's FMLA

 6    leave?

 7         A    I don't.

 8         Q    That may be a topic for the other designee,

 9    and that's fine.

10              Were you aware at the time that he was

11    terminated that there had been an FMLA leave?

12         A    Yes.

13         Q    Did he still have an intermittent FMLA in

14    place at that time, do you know that?

15         A    Not that I know of.

16         Q    Were you aware that he was still in treatment

17    for his mental health issues?

18              MR. SCHAUER:  Are you stating -- are you

19    stating as a fact that he was, in other words?

20              MR. BARRON:  I believe that he was.

21              MR. SCHAUER:  It assumes a predicate.

22              MR. BARRON:  Right.

23    BY MR. BARRON:

24         Q    To your knowledge, was he still in treatment

25    for mental health issues at that time?
```

1          A      I have no idea.

2                 MR. BARRON:   This will be 3.

3                 (Whereupon, Redner's Exhibit No. 3 was marked

4                  for identification.)

5    BY MR. BARRON:

6          Q      Okay.  Mr. McDonough, directing your

7    attention to what has been marked as Exhibit 3, it is a

8    two-page, I think it is a series of emails.  Please take

9    a look at both pages, if you would.

10         A      Yep.

11         Q      Okay.  This appears to be a series of emails

12   between, well, several people and yourself; is that

13   correct?

14         A      Yes.

15         Q      I have a couple of questions about this.  So

16   it looks like it goes in reverse chronological order from

17   the bottom of the second page which starts with an email

18   from the store director -- from No. 55 store director on

19   September 4.  Do you see that?

20         A      Yes.

21         Q      Okay.  And is that the report from him that

22   he had a concern about Mr. McClellan's hours?

23                What is that email about?  What is it telling

24   you?

25         A      It appears that it's reporting to me what his

1   schedule was and what he actually worked.  At some point,

2   there must have been a phone conversation asking for this

3   information to be provided.

4        Q    Okay.  No. 55 store director, is that an

5   individual or an email account used with the store?

6        A    Not necessarily, no.

7        Q    So at the bottom, it says, Alan@55.  Do you

8   know who that is?

9        A    It's the assistant store director.

10       Q    What is his name?

11       A    Alan Harvilla.

12       Q    So it looks like you forwarded that email to

13  Cory Deily saying, Can you help?

14       A    That's correct.

15       Q    That's happening next.

16            And it looks like the response is -- you got

17  a response from Jay Schaeffer.  Who is Jay Schaeffer?

18       A    Jay is the assistant in the loss prevention

19  department.

20       Q    Is he still with Redner's?

21       A    Yes.

22       Q    And on the bottom of the first page, it says,

23  What is Quentin's last name?  I want to see if I can get

24  lucky with a rewards card.  Thanks.

25            What does that mean?

```
 1        A    Okay.  So a rewards card is a card customers

 2   would use for purchases.  So he would use that to

 3   determine times, perhaps, that he would have been

 4   shopping.  And it would give him -- I don't want to speak

 5   for him -- but a better sense of when Quentin was

 6   leaving.

 7             If you looked at -- I assume it was easier

 8   for him to look at his rewards times than it was to watch

 9   a whole bunch of video.

10        Q    So is it your understanding that with that

11   information, he could go into your system and see when

12   Mr. McClellan had used his rewards card at the store?

13        A    Yes.

14        Q    And how would Redner's expect that that would

15   correlate with the time that he worked?

16        A    I mean, I don't want to speak for Jay, but I

17   think his methodology is that oftentimes employees shop

18   when they are leaving and may make a purchase and use

19   their rewards card.

20             And, again, I don't want to speak for him,

21   but the assumption is that is an easier search if you can

22   see when someone was using their rewards card.

23        Q    Okay.

24        A    It is just easier than watching a camera

25   going to wait for somebody to go through the door.  If
```

1   you had the rewards card, you would know, Okay, he made a

2   purchase, he is likely to have left shortly after that.

3   I think it was just an easier search method.

4         Q     On what basis do you say he is likely to have

5   left after that?

6         A     Just on a general basis that, you know, often

7   employees will make a purchase at the time they are

8   leaving for the day.  I mean, that's not a fact.  It is

9   just an observation.

10         Q     Will they make a purchase because they are

11   having lunch?

12         A     I have no idea.

13         Q     I mean, is it possible?  Is it permissible?

14         A     Oh, sure, yeah.

15         Q     Is it permissible for an employee to go --

16         A     Absolutely.

17         Q     -- and buy a bottle of Coke in the middle of

18   their shift?

19         A     Absolutely, yes.

20         Q     So is there anything else that might be

21   indicated by the rewards card?

22         A     Not that I know of.

23               MR. SCHAUER:  I don't believe this was a

24   subject, per se, but --

25               MR. BARRON:  Yeah.  And I understand you are

1    not the security guy.

2              THE WITNESS:  Yes.

3              MR. SCHAUER:  Yes.

4              MR. BARRON:  But we are talking about the

5    circumstances of the termination and stuff that led to

6    it.  So I think we are within the guide.

7    BY MR. BARRON:

8         Q    Are there any restrictions on how an employee

9    can use a rewards card?

10        A    Yes.

11        Q    And what are they?

12        A    They are to be used for only their own

13   purchases.

14        Q    Have you had employees in the past who have

15   violated that policy?

16        A    Yes.

17        Q    And what has happened to them?

18        A    In almost all cases, they are terminated.

19        Q    And how would they -- if I'm getting beyond

20   what you know, please just let me know.  I am just trying

21   to understand this.

22             So an employee might -- would not be

23   permitted to lend his or her rewards card to someone

24   else, right?

25             A    I believe that that is okay.  You can lend it

```
1    to someone else.  You just can't use yours for someone

2    else's -- for a customer's purchase.

3             Q     I see.

4             A     In other words, and generally the only people

5    who have conflicts with rewards cards are cashiers.

6    They're generally the only ones that can find a way to

7    misuse it.

8                   In other words, if a customer's groceries are

9    scanned, and the cashier pulls out his or her rewards

10   card, they put it and take the credit for those

11   purchases.  That would be a terminable offense.

12            Q     And do they get some kind of -- the

13   cardholder --

14            A     Yes.

15            Q     -- do they get some kind of reward?

16            A     Yes.

17            Q     What form does that take?

18            A     Either a credit against their groceries or a

19   credit against their gasoline.

20            Q     So is it fair to say that if Mr. Schaeffer

21   had found that Mr. McClellan's card was being used for

22   something like that, that would have led to his

23   termination?

24            A     I don't know.

25            Q     Could it have led to his termination?
```

```
 1          A      I don't know that either.  I don't know that.

 2                 THE REPORTER:  Did you object?  I'm sorry, I

 3     didn't hear.

 4                 MR. SCHAUER:  We are in a hypothetical

 5     situation now.  Nobody said he was terminated because of

 6     a rewards card.

 7                 We are going very far afield off of a comment

 8     here.

 9                 MR. BARRON:  I'm just trying to clarify.

10     BY MR. BARRON:

11          Q      I think your testimony was that that would be

12     a -- for an employee to do that would be a terminable

13     offense, right?

14          A      If an employee used their personal card to

15     take credit without authorization for a customer's

16     purchases, yes, that would be a terminable offense.

17          Q      Right.  Okay.

18          A      But generally, the only people that could

19     achieve that are cashiers.

20          Q      Right.

21          A      Quentin was not a cashier.

22          Q      I understand.  They are at the -- they have

23     to be at the register.

24                 So then above this then is Mr. Schaeffer, I

25     guess, emailing to you, Here is the week.  And it goes
```

1   Monday, Tuesday, Wednesday, Thursday, Friday, with some

2   numbers.  Can you tell me what that is?

3        A     Time in and time out.

4        Q     And what was that based on?

5        A     His observations of Quentin leaving the store

6   and arriving at the store.

7        Q     And those observations were -- were they

8   based on the video recording or personal?

9        A     That's where he got it from, yes.

10       Q     Video recording.  Okay.

11             This is, I guess, No. 4.

12             (Whereupon, Redner's Exhibit No. 4 was marked

13              for identification.)

14  BY MR. BARRON:

15       Q     Mr. McDonough, directing your attention to

16  Exhibit 4.  I know this is a memo written by Mr. Polchin.

17  But it talks about a conference with yourself and

18  Mr. Merkel and Mr. McClellan.  I would just like you to

19  review that for a moment.  And I want to ask some

20  questions about the conversation that this purports to

21  memorialize.

22       A     Okay.

23       Q     Okay.  Do you remember the conversation that

24  this memo references?

25       A     Yes.

1          Q      Is that a conference call with a telephone
2     call?
3          A      Yes.
4          Q      Did you participate in the entire telephone
5     call?
6          A      Yes.
7          Q      It says, While Q -- and it looks like Q is
8     shorthand for Quentin -- admitted he was wrong not
9     talking with Jeff, the store director, he said it should
10    be no issue since he put in his required hours for the
11    week.
12               Is that reflective of Redner's policy
13    regarding time?  In other words, did Redner's permit
14    managers to take off hours to make up for extra hours
15    that they had worked or anything like that?
16         A      That's permissible, yes.
17         Q      I understand that there was the issue with
18    getting approval.
19               The second paragraph says, Q tried to bring
20    up past issues, but we kept trying to address the current
21    issue only.
22               What past issues did he bring up?
23         A      So Quentin often complained about what some
24    of his assignments were, what other employees were doing,
25    what he believed were things in the store that were being

1    overlooked or ignored that he felt were important.

2              And during this conversation, that was not

3    what we were talking about.  And you'll find that there

4    is other cases where he has brought up things that, you

5    know, didn't really necessarily have anything to do with

6    his employment.  It was about other people and other

7    things and weren't relevant to the conversation we were

8    having on that day.

9         Q    All right.  Was he reporting concerns that

10   other employees were doing things they shouldn't have

11   done?

12        A    Some.  I don't remember specific, but, yes.

13        Q    I mean, just in general, what kind of

14   concerns was he bringing up?

15        A    I mean, I think to give you an example, I

16   think he believed that there were people eating in the

17   deli and that it wasn't being addressed and that he

18   suspected that some people may have been not making --

19   following the purchase -- employee-purchase policy enough

20   and that that wasn't being addressed.

21             And in many cases, and somewhere I remember

22   it was noted, that these were observations that were

23   stale, they were from weeks prior, that he kept bringing

24   up and largely too late to be addressed.

25        Q    Generally speaking -- and I understand what

1    you're saying about trying to focus the conversation on

2    the time issue.  But generally speaking, those kinds of

3    concerns, are they something that is legitimate for an

4    employee to bring up as a concern?

5         A    Sure.

6         Q    Is there a rule against employees eating in

7    the deli?

8         A    Sure.

9         Q    Did he bring up any other past issues in this

10   phone call?

11        A    There may have been more, but I can't recall

12   them specifically.

13        Q    It seems like a good time to kind of segue to

14   the manager training program.  My understanding is

15   Quentin was selected to -- well, Quentin participated in

16   the management training program at some point, right?

17        A    Yes.

18        Q    And was that something that he was selected

19   to do or invited to do?  How did he enter that?

20        A    He requested consideration.

21        Q    And is it -- tell me about the program, if

22   you will.

23        A    So we have -- it's an assistant store

24   director training program.  You know, pretty much anybody

25   can apply.  You know, we take people from various

1    departments around the company.

2              It's managed by our training director.  He

3    does 95 percent of the selections and designs the

4    training.  It's a comprehensive training that is

5    specifically designed around the person and the

6    individual candidate based on their experience.  You

7    know, some could be as short as 6 weeks, some could be 26

8    weeks, some could be a year depending on the candidate.

9         Q    Okay.  So who was the training director at

10   that point?

11        A    It's Randy Kostelac.

12        Q    So on what basis does Redner's select people

13   to participate in the program?  You said they have to

14   apply.  Then what happens?

15        A    Generally we look for someone who has

16   performed well and is in good standing with the company

17   and is expressing a desire for growth.

18        Q    So Mr. McClellan was approved for that,

19   right?

20        A    Yes.

21        Q    And you said that the program could last for

22   various lengths of time?

23        A    There is no standard specific number of weeks

24   that someone would be in the training program.

25        Q    And how do you decide -- how does Redner's

41

```
 1   decide when the program is complete?
 2         A     Generally the training director conducts that
 3   either based off of the progress the candidate has made
 4   or, you know, timing for a need when an opening occurs.
 5   Someone's training may get cut short if there is an
 6   opening that we need to fill.
 7               So there is a whole host of things that can
 8   -- you know, moving parts with respect to the training
 9   program.
10         Q     Is there a certification or something of that
11   nature at the end of it?
12         A     Not specifically, no.
13         Q     Like a certificate of achievement or
14   something?
15         A     No.
16         Q     Does Redner's keep a record of which of its
17   employees have completed that program?
18         A     I believe so, yes.
19         Q     Did Mr. McClellan complete the program?
20         A     No.
21         Q     Why not?
22         A     He asked to be removed from the program.
23         Q     How long was he in it?
24         A     I don't recall the specific number of weeks.
25         Q     Why did he say he wanted to be removed?
```

1      A     So if I remember correctly, his words were he

2    lacked motivation, he lacked interest.  There were a

3    couple of other quotes that he made that he just -- if I

4    remember correctly, his words were, I'm just not into it.

5      Q     Okay.  And do you remember when that was

6    approximately?

7      A     That was in a conversation that Mr. Fiore and

8    I had with him in the Scranton store.  I couldn't tell

9    you the date, but it is in the records somewhere.

10     Q     Okay.  Did he tell you anything more about

11   his reasons for withdrawing from that program?

12     A     No.

13     Q     No.  Do you know how his progress was within

14   that program, how he was doing?

15     A     He was stumbling particularly with, you know,

16   reporting to work on time; you know, these continuous

17   complaints about some of the work that he was being

18   assigned which were reviewed and investigated and

19   determined to be nothing unusual about what he was being

20   asked to do.  And, you know, honestly his, you know,

21   continuing to complain about things that didn't affect

22   his role specifically was addressed by the training

23   director to the extent that it could be.

24             And the fact that he wasn't coming in on

25   time, and there was an issue with him reporting vacation

1    when he should have.  So those were the things that we

2    talked to him about in that conversation.

3         Q     Was he issued any kind of discipline for not

4    coming in on time?

5         A     Just that conversation.

6         Q     No written warnings or anything like that?

7         A     No.

8         Q     Did Mr. McClellan have any explanation for

9    his not coming in on time?

10        A     His explanation to us was, I'm just not into

11   it which -- that was what he told us.

12        Q     I understand.  I mean, and maybe I

13   misunderstood.  Are you talking about the conversation

14   when he exited that program?

15        A     Yes.

16        Q     Okay.  So during the program, before that

17   conversation, were there issues with his attendance then?

18        A     Yes.

19        Q     And what was his response to that?

20              MR. SCHAUER:  Are you saying were there

21   discussions, or were there issues?

22              I think you asked, were there issues?  Yes,

23   there were issues.

24              Now, are you asking a new question of when

25   there were -- a day when he was late, was there a

1   discussion that day?  Is that what you're asking?  I

2   mean, I think it's a little confusing.  I don't mean to

3   interrupt here.

4   BY MR. BARRON:

5        Q     Did you understand my question?

6        A     Not necessarily, no.

7        Q     So you testified that when he -- when

8   Mr. McClellan asked that he be removed from the program,

9   he said it was because he just wasn't into it, wasn't

10  motivated, correct?

11       A     Yes.

12       Q     Before he asked to leave the program when he

13  was participating in the program, did he ever tell you

14  during that time that he was just not into it?

15       A     No.

16       Q     Did he have issues with attendance or

17  lateness during his participation in the program?

18       A     Yes.

19       Q     Okay.  And were those addressed?

20       A     Not by me.  But I believe they would have

21  been addressed by the store personnel during the course

22  of his training and may have been addressed further by

23  the training director, but I don't recall specifically.

24       Q     Okay.  Now, by the store personnel, who would

25  that be?

```
 1         A    Well, Jeff Treichler or Alan Harvilla or
 2  anyone in supervision for that store.
 3         Q    Okay.  That was the Pittston store, right?
 4         A    Yes.
 5         Q    So was Mr. McClellan's management training
 6  program conducted at the Pittston store?
 7         A    Primarily, but I don't think entirely.
 8         Q    If you would --
 9         A    Maybe Scranton.
10         Q    Scranton.  Is it generally -- is the training
11  conducted in Redner's stores?
12         A    Yes.
13         Q    Is there a classroom component?
14         A    There are some CBT training that he would
15  participate in.  But not necessarily.
16         Q    Okay.  What is CBT?
17         A    It's a computer-based training.
18         Q    Okay.  But it sounds like for the most part
19  he is in a store?
20         A    Um-hum, yes.
21         Q    And who is actually doing the training and
22  supervising?
23         A    Well, again, Randy Kostelac oversees it.
24         Q    Right.
25         A    But generally if Quentin or a candidate is
```

1    assigned to train in the produce department, they will

2    train with the produce manager.  If they are assigned to

3    learn the scanning operations, they will train with the

4    scanning manager and so on and so forth depending on --

5    and in Quentin's case, he had already been a meat

6    manager, so he didn't need to go through the meat portion

7    of the training.

8         Q    Okay.  Would he train with the store manager

9    and the assistant store manager?

10        A    At some point, yes.

11        Q    Do you know if Mr. McClellan did that at the

12   Pittston store?

13        A    I don't know.

14        Q    Mr. Kostelac, does he work out of the

15   Pittston store?

16        A    No.

17        Q    Where does he work from?

18        A    He is from corporate.

19        Q    So does he oversee the training program for

20   the entire organization?

21        A    Yes.

22        Q    Okay.  How was -- what was Mr. McClellan's

23   relationship with Mr. Treichler like?

24        A    I don't know.

25        Q    Did Mr. Treichler ever perform -- do

1    performance evaluations on Mr. McClellan?

2          A     I don't know for sure, but I would assume he

3    had, yes.

4                MR. BARRON:  5.

5                (Whereupon, Redner's Exhibit No. 5 was marked

6                 for identification.)

7                MR. BARRON:  Can we go off the record just a

8    moment?

9                (Whereupon, a discussion was held off the

10               record.)

11   BY MR. BARRON:

12         Q     Back on.

13               Sir, directing your attention to what has

14   been marked as Exhibit 5, I understand this is not a memo

15   that you wrote.  Have you seen it before, though?

16         A     Yes.

17         Q     And I guess my first question down in the

18   bottom, a signature appears.  Is that Rick Merkel?

19         A     That is the name.

20         Q     Okay.  And what is his position?

21         A     Director of meat operations.

22         Q     Where does Mr. Merkel work?

23         A     He has an office here, but primarily works in

24   the stores.

25         Q     Okay.  In one particular store, or does he

1    travel?

2         A    He travels.

3         Q    Do you know what his involvement was in this

4    situation, the situation discussed in Exhibit 5 with

5    Mr. McClellan?

6         A    If I can take a minute to read it.

7         Q    Sure, absolutely, take your time.

8         A    Okay.

9         Q    Okay.  I think what I asked was, if you know,

10   what was Mr. Merkel's involvement in this -- the issues

11   discussed in this document?

12        A    So he oversees the meat operations.  And to

13   clarify, during that time, he may not have been the meat

14   director, and he may have been a direct meat supervisor

15   for that store.

16        Q    Okay.

17        A    So just to be clear about that, I don't

18   remember the timing.  But he later, I think, became the

19   director of meat.  So he would have been, in part of this

20   time, Quentin's direct supervisor.

21        Q    If he was -- what was Quentin's title at this

22   time?

23        A    Meat manager.

24        Q    So was this after his involvement in the

25   manager training program ended?

```
 1          A      Yes.

 2          Q      And so what position -- who would have been

 3   his direct supervisor then?

 4          A      Well, it's -- it's a dual supervision.  He

 5   does report to the store director who is largely the more

 6   direct supervisor.  But he does -- there is a traveling

 7   meat supervisor that visits the stores.

 8          Q      I see.

 9          A      And that's what Rick's role was, I believe,

10   at this time.

11          Q      Okay.  I see.  I understand.  Thank you.

12                 In the second paragraph, it talks about when

13   he had to leave, had to leave on Wednesday.  And it says

14   later in the paragraph -- well, I'll read it.  Quentin

15   proceeded to state that he had to leave suddenly on

16   Wednesday and may or may not return to work later that

17   day to complete the shift.  He did say that he did

18   communicate all this to someone in charge of the store.

19   He did not return that day.  He did work some time on

20   Friday, however it was not a full day.  And then he said

21   he came into work on Saturday and left early because he

22   thought he was over on his salaried amount of time.  He

23   said he consulted with the workers and asked them if they

24   were going to be good and if they could handle the burger

25   situation, and they said they were good, and he left.  He
```

1    did admit that he did not communicate to someone in

2    charge of the store that he was leaving.

3              Is there anything -- I understand this is

4    Mr. Merkel reporting what Quentin told him.  Is there

5    anything in that paragraph where Mr. McClellan is not

6    telling the truth or about which Mr. McClellan is not

7    telling the truth?

8         A    Yes.

9         Q    What is it?  What are those things, if there

10   are more than one?

11        A    So it was later determined that he did not

12   speak to his subordinate employees.  And in this

13   conversation, he claimed he had.

14        Q    How did you determine that?

15        A    Mr. Merkel asked the parties that were on

16   duty that day.

17        Q    Okay.  Did he take statements from them?

18        A    I believe he did.

19        Q    Anything else that was in this paragraph that

20   appeared not to have been true?

21        A    I can't see anything else.

22        Q    Okay.

23             MR. SCHAUER:  Are we done with Exhibit 5?

24             MR. BARRON:  We are done with Exhibit 5 for

25   now.  This will be 6.

```
 1                    (Whereupon, Redner's Exhibit No. 6 was marked

 2                     for identification.)

 3    BY MR. BARRON:

 4         Q     Mr. McDonough, directing your attention to

 5    Exhibit 6, this appears to be a memo you drafted.  Please

 6    take a moment to read it.  Let me know when you are

 7    ready.  I just have a couple of questions.

 8         A     Okay.

 9         Q     Okay.  Is this a memo written by you?

10         A     Yes.

11         Q     Okay.  It talks about -- in the first

12    sentence, it says that Quentin -- you and Frank Fiore met

13    with Quentin to discuss some of his concerns that he had

14    expressed in an email where he requested a transfer.

15                    Where was Mr. McClellan assigned at this

16    point?

17         A     Pittston.

18         Q     Okay.  And so did he request a transfer from

19    the Pittston location then; is that what you are

20    referring to here?

21         A     Yes.

22         Q     Okay.  Why did he want a transfer?

23         A     I don't remember, but he sent the request to

24    the training director.  I don't remember the details.

25         Q     You don't remember the details.  Do you
```

1   remember anything else about that conversation with

2   Quentin about the transfer?

3        A     Yeah.  I mean, so what I can tell you, the

4   conversation, again, surrounded around these issues that

5   he was seeing in the store that we didn't feel, nor did

6   the training director after meeting with him to discuss

7   them felt they rose to any concern that he should have.

8              He kept wanting to point out deficiencies

9   that he saw in what other management employees were

10  doing, didn't necessarily reflect on him; and some of the

11  work assignments that he was being given that he didn't

12  feel were appropriate.

13       Q     In the management training program, is it

14  possible for an employee in that program to be assigned

15  to a store other than Pittston?

16       A     Sure.

17       Q     Do you do that -- does that program operate

18  in all of your stores?

19       A     You have to be more specific.

20       Q     Is there anything special about the Pittston

21  store that would --

22       A     No.

23       Q     -- dictate why someone in that training

24  program would be assigned to that store as opposed to a

25  different store?

```
 1          A      Generally it is decided based on the
 2   employee's location, what is most convenient for the
 3   employee --
 4          Q      Okay.
 5          A      -- is used to determine where someone would
 6   train or the best training environment.  In other words,
 7   if our best produce manager is in Pittston, that's where
 8   you're going to go.  If our best meat manager is in
 9   Scranton, that's where you're going to go.
10          Q      For that segment of the training you mean?
11          A      Exactly, yes.
12          Q      Who made the decision to assign Mr. McClellan
13   to Pittston?
14          A      Mr. Kostelac.
15          Q      And was he ever transferred?  Was
16   Mr. McClellan ever transferred?
17          A      No.
18          Q      And why not?
19          A      I don't think that there was an opportunity
20   for him to transfer.
21          Q      What do you mean by an opportunity?
22          A      Well, so employees can't just say, I want to
23   transfer.  We are going to dictate what we feel is the
24   best training opportunity for you.  And without a
25   substantial reason to request a transfer, it is likely to
```

1    be denied.

2         Q    Okay.  I don't want to mischaracterize your

3    testimony.  But I think you said you did not recall what

4    the reasons Mr. McClellan had for this request, what they

5    were.

6         A    Are you asking me a question?

7         Q    Do you recall what reasons Mr. McClellan had

8    for his request for a transfer?

9         A    Well, I think, yeah.  I mean, what I do

10   recall is this continuing concern about nonrelevant

11   matters to his training.  That's the reasoning that I

12   recall.

13        Q    That was why he wanted a transfer?

14        A    Yes.

15        Q    Any other reason?

16        A    Not that I can think of.

17             MR. BARRON:  We will make this 7.

18             (Whereupon, Redner's Exhibit No. 7 was marked

19              for identification.)

20   BY MR. BARRON:

21        Q    Mr. McDonough, directing your attention to

22   what has been marked Exhibit 7.  Have you seen this

23   document before?

24             MR. SCHAUER:  Ever?

25             MR. BARRON:  I guess ever, yeah.

1    BY MR. BARRON:

2        Q       Have you seen that document before?

3        A       Yes.

4        Q       Okay.  Now, it doesn't appear to have been

5    addressed -- it appears to be, I think, an email.  It is

6    from Mr. McClellan to Bill, jpolchin, and aforeman.

7                Can you tell me who those people are?

8        A       Jim Polchin is the district manager for that

9    region.  Bill would have been the meat supervisor at that

10   time for that region.  And A. Foreman is the employee

11   relations director.

12       Q       Okay.  And he says in this email that this is

13   a photograph of some pictures that had been -- that had

14   been posted, I guess, in the employee break room; is that

15   your recollection --

16       A       Yes.

17       Q       -- that he found offensive?

18               Do you understand why he found that

19   offensive?

20       A       Yes.

21       Q       And tell me what you will about Redner's

22   response to this issue?

23       A       Once we became aware of it, we did a complete

24   and thorough investigation; of course, promptly removed

25   the material; did an investigation to determine who or

1   how it got posted; and took appropriate action.

2        Q       What was the appropriate action?

3        A       The employee that we determined had posted

4   the material was dismissed.

5        Q       And how did you determine who posted it?

6        A       We had a video surveillance camera in the

7   break room.

8        Q       And I think -- I think that images from that

9   surveillance camera have been produced to us.  Have you

10  seen images from that surveillance camera?

11       A       Yes.

12       Q       Who made the decision to preserve those

13  images?

14       A       Well, if they are still photos, that may be

15  -- you would have to speak to the folks that run those

16  systems.  Still photos may be easier to preserve than

17  live video, but I don't -- I don't know that there was a

18  specific directive to preserve them.  If there was, I

19  don't recall it.

20       Q       Okay.  Are there -- to your knowledge, and I

21  understand you're not the security guy, but are we

22  talking about different cameras, different types of

23  cameras, some that take video and some that take

24  pictures?

25       A       I don't know.

1          Q     But at any rate, there was a camera in the
2    break room?

3          A     That's correct.

4          Q     Do you remember being involved at all in that
5    investigation?

6          A     Yes.

7          Q     And do you remember viewing those photos or
8    those videos to determine who put the pictures up?

9          A     Yes.

10         Q     How far back in time, if you recall, had that
11   been posted?

12         A     I don't remember the timing specifically.

13         Q     And was this at the Pittston store?

14         A     Yes.

15         Q     Do you know how Mr. McClellan initially
16   reported these pictures?

17         A     I believe he reported it to Jeff.

18         Q     Is that Mr. Treichler?

19         A     Yes.

20         Q     And do you know what Mr. Treichler's response
21   was?

22         A     I don't.

23         Q     In the email that is Exhibit 7, Mr. McClellan
24   said, I told the store director, and he said he didn't
25   see anything wrong with it.  Do you see that?

1         A     Yes.

2         Q     Is that Mr. Treichler?

3         A     Yes, that's who he is referring to.

4         Q     That's who he is referring to.  He was the

5 store director?

6         A     Yes.

7         Q     Did Redner's discuss this situation with

8 Mr. Treichler?

9         A     Yes.

10        Q     And tell me about that discussion.

11        A     So once I was provided this photo and email,

12 I called Mr. Treichler and instructed him to remove it.

13             He said he had looked for it, didn't see it.

14 And I instructed him to go back and look again and to

15 make a comprehensive sweep of anything that might be

16 posted that is, you know, this type of material and

17 remove it immediately.

18        Q     Okay.  So he told you that he -- did he tell

19 you that Mr. McClellan had reported this to him?

20        A     Yes.

21        Q     Had Mr. McClellan shown him a photograph of

22 it?

23        A     I don't know.

24        Q     Had Mr. McClellan -- I take it Mr. McClellan

25 hadn't removed it from the bulletin board; is that your

```
1    understanding?

2         A    That's my understanding, yes.

3         Q    So Mr. McClellan told Mr. Treichler.  And

4    what Mr. McClellan says here is that Mr. Treichler said

5    he didn't see anything wrong with it?

6         A    That's what he says, yes.

7         Q    Do you think he is lying?

8              MR. SCHAUER:  Objection.  How would he know?

9              MR. BARRON:  I don't know.

10             MR. SCHAUER:  Then, no, don't speculate.  No,

11   don't answer the question.  Form of the question.  It

12   calls for complete speculation.

13             MR. BARRON:  I said, Do you think he is

14   lying?  Do you have reason to believe --

15             MR. SCHAUER:  No, he's not going to answer

16   the question.

17             MR. BARRON:  We're going to have to call the

18   Judge, Randy.  It is a relevant question.

19             MR. SCHAUER:  You can ask if he thinks --

20   well, it is different than what he was told by

21   Mr. Treichler obviously.

22             MR. BARRON:  Right, I understand.  I want to

23   understand.  And that's what I'm getting at.  It

24   obviously is different than he was told by Mr. Treichler.

25             MR. SCHAUER:  Right, but lying is a whole
```

1    different conclusion than the fact that one person says

2    one thing and the other person says another.

3                MR. BARRON:  Well, it depends on --

4                MR. SCHAUER:  It doesn't mean either is

5    lying.

6                How does it matter?  It doesn't matter.

7                MR. BARRON:  It absolutely matters.

8                MR. SCHAUER:  Is it accurate or not accurate?

9    BY MR. BARRON:

10        Q     So let me go at it another way.

11              So did you receive the email marked as

12   Exhibit 7 before you spoke to Mr. Treichler?

13        A     Yes.

14        Q     Okay.  So after receiving it, I think you

15   said you spoke to Mr. Treichler?

16        A     Yes.

17        Q     And Mr. Treichler said -- what did he say?

18   Tell me what he said.

19        A     He said, I didn't see anything.  I went back

20   to the break room, and I did not see anything, and I

21   don't know what he is referring to.

22        Q     Did he acknowledge that Mr. McClellan had

23   told him about this?

24        A     Yes.

25        Q     And he went and looked and didn't see it and

1    said he didn't know what Mr. McClellan was talking about?

2         A    Yes.

3         Q    And so what did you tell him to do?

4         A    Go back again and look.

5         Q    Okay.  Did he say that he had gone back to

6    the break room the first time?

7         A    Yes.

8         Q    When he went back the second time, what did

9    he tell you he found?

10        A    These photographs.

11        Q    Okay.  And did he call you back?

12        A    I don't remember the exact sequence, but I

13   believe that was the case, yes.  He called me back and

14   said, I took them down.  I think we may have talked

15   about, you know, how they may have gotten there.  And I

16   just said, Make sure you put them away.  And I think

17   that's where it was left.

18        Q    Did you instruct Mr. Treichler to find out

19   who posted them?

20        A    I don't think so.  I don't think

21   specifically.  I don't remember, to be honest with you.

22   I said, Hey, you know, you need to investigate this.  I

23   said -- I probably said, You know, this is something

24   we've got to look into to see how they got there.

25        Q    Were you involved in the decision to

1    terminate the employment of the individual who posted

2    these photographs?

3         A    Yes.

4         Q    Okay.  Tell me about that decision.  Who else

5    was involved, and what discussions did you have?

6         A    You know, we looked -- once we determined who

7    it was, and it was a fact that he posted these, there

8    wasn't a whole lot of dialogue about it.  He was

9    terminated.  It was not a difficult decision.

10        Q    Okay.  Do you believe that Mr. Treichler --

11   when Mr. McClellan reported this, do you believe that

12   Mr. Treichler went back to the break room and looked and

13   didn't see these things?

14        A    I have no reason not to.

15        Q    Well, Mr. McClellan says something completely

16   different.  Would you agree with me?

17        A    He does.

18        Q    So is that not reason to disbelieve

19   Mr. Treichler?

20        A    I didn't get into it one way or another.  I

21   just wanted the pictures removed and the situation

22   addressed.

23        Q    All right.  I understand.

24        A    And if Mr. McClellan had additional concern

25   about that, I would have expected that he would have

 1    raised it.  It seemed to me it was a simple

 2    misunderstanding of what, you know, Mr. Treichler's

 3    response was to the request.

 4         Q     Misunderstanding on whose part?

 5         A     It may have been a misunderstanding on

 6    Quentin's part.

 7         Q     Did ask you him any more about that?

 8         A     I didn't.  I did not.

 9         Q     So just to clarify, you have this posting

10    which you would agree with me is offensive and racist, I

11    think, right?

12         A     Yes.

13         Q     In the employee break room in your Pittston

14    location, right?

15         A     That's correct.

16         Q     Where, I believe, Mr. McClellan is the only

17    African American employee?

18         A     That's probably correct.

19         Q     Mr. McClellan reports in this message that he

20    told Mr. Treichler, and Mr. Treichler said he didn't see

21    anything wrong with it?

22              MR. SCHAUER:  Admitted.

23              MR. BARRON:  He is telling you that.

24              MR. SCHAUER:  There it is.

25    BY MR. BARRON:

1        Q    And then when you talked to Mr. Treichler, he

2    said he didn't -- he didn't see it.  He said he didn't

3    say that?

4              MR. SCHAUER:  Excuse me.  How many -- there

5    are two questions there.  Well, there is a statement, and

6    there is a question.  Could you please go over it --

7              MR. BARRON:  Is there an objection?

8              MR. SCHAUER:  Yeah, there is an objection.

9              MR. BARRON:  What's the objection?

10             MR. SCHAUER:  I think what I understood you

11   to say was, you asked Mr. Treichler, but he said he

12   didn't see it.  And we heard this two or three times.

13   But is that what you are saying?  Is that your question?

14             MR. BARRON:  I am setting up a question.

15             MR. SCHAUER:  Okay, yes, all right.

16             MR. BARRON:  Can I do that?

17             MR. SCHAUER:  Yeah.

18   BY MR. BARRON:

19        Q    So in this situation where, again, you had

20   Mr. McClellan saying that Mr. Treichler didn't see

21   anything wrong with this picture; and Mr. Treichler

22   saying, Well, I didn't see the picture, right; you are

23   telling me Redner's did not think to ask Mr. McClellan

24   any more about what had actually happened?

25        A    With respect to his conversation with

1    Mr. Treichler?

2         Q    Yes.

3         A    No.

4         Q    Did you -- did Redner's discipline

5    Mr. Treichler in any way?

6         A    No.

7         Q    Did Redner's counsel or educate Mr. Treichler

8    in any way?

9         A    As a result of this, no.

10        Q    Did you counsel him or discipline him?

11        A    Well, there may be other matters that he has

12   had training or counseling on that aren't related to

13   this.

14        Q    Not related to this issue?

15        A    Yeah.

16        Q    Has he ever had any kind of counseling or

17   training with regard to race and racial discrimination?

18        A    Yes.

19        Q    When did he have that?

20        A    I couldn't give you the exact date.  But we

21   have training programs that we provide to our managers

22   with respect to harassment, discrimination, diversity,

23   all sorts of things.

24        Q    Are those programs for all managers?

25        A    Yes.

```
 1          Q    Was there ever any training directed
 2   specifically at Mr. Treichler or provided specifically to
 3   Mr. Treichler?
 4          A    There may have been, but I can't think of
 5   anything.  Generally it is a global training.
 6          Q    And when does that happen?
 7          A    There is no specific time frame.  Our
 8   training director selects programs that he feels are
 9   timely or appropriate and sends them out for management
10   employees to complete.  I couldn't give you -- there is
11   no specific timing or reasoning that they go out.  We try
12   to do a couple a year.
13          Q    Is that the computer training you spoke of
14   earlier?
15          A    Yes, yes.
16          Q    Do you keep records of when those trainings
17   are provided?
18          A    Yes.
19          Q    And when each manager --
20          A    Yes.
21          Q    -- participates in them?
22          A    Yes.
23          Q    Other than this email that is Exhibit 7, did
24   Mr. McClellan ever express to anyone at Redner's that he
25   was uncomfortable with Mr. Treichler's sensitivity or
```

1    attitudes toward African Americans?

2          A     He didn't to me.

3          Q     Okay.  Do you know, did he express that to

4    anyone else at Redner's?

5          A     Not that I'm aware of.

6          Q     Did he ever express that that kind of issue

7    was part of the reason why he wanted a transfer at

8    Pittston?

9          A     No.  In fact, he seemed generally satisfied

10   with our response to it.

11         Q     Did he seem satisfied with Mr. Treichler's

12   response?

13         A     He didn't note otherwise.

14         Q     Other than Exhibit 7?

15               Would you agree with me --

16         A     Yes.

17         Q     -- that in Exhibit 7, he is not satisfied

18   with Mr. Treichler's response?

19         A     This was the initial report.

20         Q     Right.  To you?

21         A     Yes.

22         Q     It was not the initial report to

23   Mr. Treichler; this came after?

24         A     True.

25         Q     Okay.  He says at the end, Maybe it isn't

1    just one store that I may not belong in, which is not

2    maybe grammatically correct.

3              But did you have an understanding of what he

4    is saying with that sentence?

5         A    So tell me the specific sentence you are

6    referring to.

7         Q    It's the next-to-the-last sentence.  Maybe it

8    isn't just one store that I may not belong in.

9         A    Yeah, I don't know what that means.

10        Q    Did you ever ask him?

11        A    No.

12             MR. BARRON:  Okay.  Let's take a little

13   break.

14             (Whereupon, a recess was taken from

15                11:40 a.m. to 11:54 a.m.)

16   BY MR. BARRON:

17        Q    Back on.  We are getting to the home stretch,

18   I think.  I don't want to promise, but I think we are.

19        A    I like it.

20        Q    Mr. McDonough --

21             MR. SCHAUER:  Off the record.

22             (Whereupon, a discussion was held off the

23              record.)

24             MR. BARRON:  This will be 8.

25             (Whereupon, Redner's Exhibit No. 8 was marked

```
 1                      for identification.)

 2    BY MR. BARRON:

 3         Q     Mr. McDonough, if you can take a look at what

 4    is marked Exhibit 8.  I'm using that, because it appears

 5    to be a memo written by you.  I just wanted to have you

 6    take a look at it.  Let me know when you are through,

 7    please.

 8         A     Okay.

 9         Q     Okay.  This is a -- can you confirm for me

10    that this is a memo written by you?

11         A     Yes.

12         Q     And when you wrote this memo, was it part of

13    Mr. McClellan's personnel file?

14         A     I believe so, yes.

15         Q     Is that why you wrote it?  I guess that's

16    what I am asking is why you wrote the memo.

17         A     Just as a matter of recordkeeping; that, you

18    know, an issue was brought up that was sensitive at the

19    time.  And I just thought it was good to memorialize it.

20         Q     And would you generally keep -- because

21    Mr. McClellan was the person involved, would you

22    generally keep that in Mr. McClellan's file?

23         A     Yes.

24         Q     So do you recall, it talks about an incident

25    that happened with Mr. McClellan at the Nesquehoning
```

```
 1    store.  Do you recall the incident that he reported?

 2         A     I do not.

 3         Q     I won't get into the details.  But the last

 4    sentence of the first -- hold on.   The second sentence,

 5    I guess, says, I spoke with Quentin on Wednesday, June

 6    5th.  Quentin felt as though many of the events that had

 7    taken place were some form of racial discrimination.  And

 8    this happened in 2013.

 9              Do you remember exactly what he was

10    complaining about?

11         A     I don't.  It's a long time ago.

12         Q     Okay.  In the second paragraph, it says, I

13    offered him an opportunity to transfer to any Lehigh

14    Valley store or we would relocate him to the Delaware

15    area and that he would have a few days to think about it.

16              Do you remember making that offer?

17         A     Yes.

18         Q     And why did you offer him that opportunity?

19         A     Well, at the time, there was new growth in

20    Delaware, for one.  And, you know, I thought that if he

21    were interested, either by virtue of his -- the way he

22    felt about the store that he was in or just for career

23    opportunities, that that would be an opening for him, and

24    as it were for many other people as we were building new

25    stores at the time in Delaware.  And we had several
```

1    stores in the Lehigh Valley that, you know, he could have

2    been considered for.

3         Q    Okay.  So why did you not offer him a

4    transfer when he asked for one in 2017?

5         A    We believed that he was limited to just

6    travel to either Pittston or Scranton.  And I wasn't

7    aware of any openings in any other stores.

8         Q    I think you said that Mr. McClellan at the

9    time of his termination was a meat manager; is that

10   correct?

11        A    Yes.

12        Q    Was there another meat manager at the

13   Pittston store?

14        A    Not at the time that he was the meat manager,

15   no.

16        Q    No.  Was there someone before him?

17        A    There was someone in the time frame that he

18   was in the management training program that was assigned

19   to be the meat manager.

20             But when Quentin returned, we determined that

21   to make -- to have a spot for Quentin to return to, the

22   gentleman that was meat manager really was prematurely

23   assigned to that meat department and was put back into a

24   training program, a meat department training program.

25        Q    At the Pittston store?

```
 1          A     Yes.  He was going to train or continue to

 2    learn the meat department under Quentin's direction.

 3          Q     Who was that person?

 4          A     I believe his name was Paul Austin.

 5          Q     A-u-s-t-i-n?

 6          A     I believe that's the spelling, yes.

 7          Q     And did he ultimately become the meat

 8    manager?

 9          A     I think so, yes.

10          Q     Do you know if his job title ever formally

11    changed while Quentin was in the training program or

12    after?

13          A     I don't recall.

14          Q     Is he still with the company?

15          A     I don't know.

16          Q     Are you aware of any time that it was alleged

17    that Mr. McClellan put a sticky note on a document and

18    then put it into a trash can?

19          A     Yes.

20          Q     Can you tell me about that situation?

21          A     Yeah.  It was reported that he had left a

22    note to charge his vacation account 4 hours.

23          Q     Okay.

24          A     And later removed the note and threw it in

25    the trash.
```

1          Q      Who would he have left the note for?

2          A      Whoever would be doing the payroll for that

3      week, one of the other managers, likely Jeff or Alan.

4          Q      And is that -- let me just do this.  I guess

5      we are at, what, 9?

6                 (Whereupon, Redner's Exhibit No. 9 was marked

7                  for identification.)

8                 MR. SCHAUER:  Off the record.

9                 (Whereupon, a discussion was held off the

10                 record.)

11      BY MR. BARRON:

12         Q      So, Mr. McDonough, directing your attention

13      to Exhibit 9.  I will represent for the record that as we

14      just discussed, in the lower right-hand corner of this

15      document, there is some handwritten message that says,

16      Quentin McClellan, VAC Day 4 hours.  Then it says, 8

17      hours, and it is crossed out.  And the date is 3-24-17.

18                And it is apparent on other copies of this

19      document that that writing was not written directly on

20      this document but was rather a sticky note that was

21      attached to it.

22                So is that the sticky note that you are

23      referring to?

24         A      Yes.

25         Q      Okay.  And explain to me, if you would, now

1    this is a -- the document itself here to which the sticky

2    note was attached is something written by Randy Kostelac.

3              When Quentin -- where would that note -- how

4    would that note have become attached to this document, if

5    you know?

6         A    I don't know.

7         Q    Okay.  So tell me what the sticky note

8    portion of this document would indicate to you?

9         A    So at the time when we saw that the sticky

10   note was being discarded was that he -- his intent was

11   initially to report vacation time and have it charged

12   against his bucket of vacation.  And then later had

13   second thoughts about that and threw it away so he

14   wouldn't be charged for any vacation.

15             So if he had time that he was short during

16   the course of the week, you know, you're supposed to put

17   in for vacation to cover that time.  In this case, it

18   appears he thought about it and then decided not to.

19        Q    Okay.  Do you know if he actually used the

20   vacation time?

21        A    He didn't.

22        Q    He didn't?

23        A    No.

24        Q    So he was thinking about taking vacation time

25   and changed his mind?

```
 1          A      He didn't work the time either, and he got

 2    paid for it.

 3          Q      I misunderstood.

 4          A      Yes.

 5          Q      So how did -- how was this note found?

 6          A      The grocery manager at the time saw it on the

 7    desk and then later saw it in the trash.

 8          Q      Okay.  Was this Mr. McClellan's office?

 9          A      No, this was Mr. Treichler's office.

10          Q      How does Redner's know that Mr. McClellan was

11    the one that threw it away?

12          A      I believe there was video of him throwing it

13    away.

14          Q      Do you still have that video?

15          A      I don't know.  I don't think so.

16          Q      Okay.  Had you ever seen the video?

17          A      I believe I did, yes.

18          Q      So there is a video recording taking place in

19    Mr. Treichler's office?

20          A      Yes.

21          Q      You're saying that it is Redner's position

22    that that video showed Mr. McClellan taking the note off

23    of the desk and throwing it in the garbage?

24          A      Yes.

25          Q      But you don't have that video?
```

```
 1          A     We don't.

 2          Q     Was Mr. McClellan disciplined for this?

 3          A     No.  This was the discussion that I had with

 4   him when Mr. Fiore and I met with him.  This was -- this

 5   point was raised with him in that discussion at the end

 6   of his training that this was one of the points that I

 7   made about him misusing or -- misusing the vacation

 8   policy.

 9          Q     Okay.  Writing down, Vacation day, 4 hours on

10   a sticky note seems, to me, kind of informal.  Is that

11   accepted practice for taking vacation time --

12          A     Sure.

13          Q     -- within Redner's?

14          A     Yes, yes, absolutely.

15          Q     That's not true for hourly employees, is it?

16          A     Sure.  You can do it in any way you want.

17                MR. BARRON:  10.

18                (Whereupon, Redner's Exhibit No. 10 was

19                 marked for identification.)

20   BY MR. BARRON:

21          Q     Directing your attention to what has been

22   marked Exhibit 10, can you take a moment and read that,

23   please.

24          A     Okay.

25          Q     Okay.  Have you seen this document before?
```

```
 1          A     Yes.

 2          Q     Does that refresh your recollection about the

 3    incident at the Nesquehoning store?

 4          A     Yes.

 5                MR. SCHAUER:  There is a few things discussed

 6    in this document.  What's the incident, if I may?

 7                MR. BARRON:  Sure.

 8    BY MR. BARRON:

 9          Q     The third paragraph, Saturday morning, one of

10    the meat wrappers, Susan Loftus, spoke to Quentin

11    regarding tasks she was given to do by Jeremy Dunbar, one

12    of the other meat cutters.  She made reference to the

13    color of one's skin in assigning menial tasks.  Quentin

14    was upset by her remark but did not say anything at the

15    time.

16                Do you know if Ms. Loftus was disciplined?

17          A     I don't recall.

18          Q     The next sentence says, On another occasion,

19    he was told that the meat manager in Douglassville had

20    referred to him as being a, quote, coon, closed quote.

21    This information was relayed to him by Sean McGill.

22                Do you know if the meat manager in

23    Douglassville was ever disciplined?

24          A     I don't know.

25          Q     Were you involved -- were you vice president
```

```
 1    of HR during this time frame, 2013?

 2         A    Yes.

 3         Q    Were you involved in any investigations

 4    regarding this, these incidents?

 5         A    I don't remember being involved in a specific

 6    investigation with respect to this.

 7         Q    Do you know if there was anyone else

 8    involved?

 9         A    I believe Alexis Foreman.  She wasn't at the

10    time the employee relations director but was working in

11    the HR department and was likely to have been more

12    specifically involved.

13         Q    Okay.  Is she still with the company?

14         A    Yes.

15              MR. BARRON:  11.

16              (Whereupon, Redner's Exhibit No. 11 was

17               marked for identification.)

18    BY MR. BARRON:

19         Q    I am directing your attention to Exhibit 11.

20    Have you seen that document before?

21              MR. SCHAUER:  Ever or before the litigation

22    or during --

23              MR. BARRON:  Before today.

24              THE WITNESS:  I don't recall ever seeing

25    this.
```

1    BY MR. BARRON:

2         Q    Okay.  Do you know if this was part of the

3    investigation into the -- well, was there an

4    investigation into the --

5         A    If there was, I didn't participate in it.

6    And I will say the use of the word coon in that document

7    and this document is not familiar to me.

8         Q    Okay.

9         A    Even though I remember seeing that document,

10   I don't remember specifically reading that word coon and

11   would tell you that that would have stood out to me, and

12   it doesn't.

13        Q    So, I mean, these were produced by your

14   counsel.  Obviously it came from Redner's.

15        A    Yes.

16        Q    So when you say that, are you saying that for

17   that reason you think you hadn't seen this before?

18        A    I am certain I had seen that before.  This, I

19   don't recall seeing before, either before or during

20   litigation.

21        Q    Okay.

22        A    And I may have just overlooked it.

23        Q    Okay.  And I'm sorry, I may have asked this

24   already.  But do you know if there was an investigation

25   into the allegations of racist kind of language and

1    conduct at the Nesquehoning store?

2          A     I don't recall.

3                MR. BARRON:  We will make this 12.

4                (Whereupon, Redner's Exhibit No. 12 was

5                marked for identification.)

6    BY MR. BARRON:

7          Q     Directing your attention to Exhibit 12.  If

8    you can just take a look at that quick and let me know

9    when you are done.

10         A     Okay.

11         Q     Okay.  Have you seen this document before?

12         A     I have.

13         Q     Okay.  When did you see this before?

14         A     I believe as a result of reviewing materials

15   for litigation.

16         Q     Okay.  When you reviewed it in preparation or

17   in participation in the litigation, do you recall seeing

18   it at any time before that?

19         A     I don't.

20         Q     Do you know who Joe Rosario is?

21         A     I don't.

22         Q     Again, you said you weren't sure about an

23   investigation.  But you personally weren't involved in

24   any investigation of this?

25         A     I don't recall being involved in an

1    investigation in this particular time frame or that

2    store.

3                    MR. BARRON:  Okay.  13.

4                    (Whereupon, Redner's Exhibit No. 13 was

5                     marked for identification.)

6    BY MR. BARRON:

7         Q    Mr. McDonough, directing your attention to

8    Exhibit 13.  Do you recognize that document?

9         A    Yes.

10        Q    So it appears to be an email from

11   Mr. McClellan to you, I think; is that correct?

12        A    It appears to be, yes.

13        Q    So, you know, I don't expect a technical

14   answer unless you can give one.  But when it says, From:

15   #19 Nesquehoning Department Mail, what does that

16   indicate?  Does that indicate it was sent from a company

17   machine at Nesquehoning?

18        A    Yes.

19        Q    Is there one email address for Nesquehoning?

20        A    No, there are several.

21        Q    But this is one of them, right?

22        A    Yes.

23        Q    Is Nesquehoning Store 19?

24        A    Yes.

25        Q    And then when it says, To: Redner's HR, is

1    that -- it looks like this was sent to you personally,

2    right?

3         A     It does, yes.

4         Q     So would any email sent to Redner's HR go to

5    you personally at least at this time?

6         A     Well, Redner's HR could be -- if it goes to

7    Redner's HR, there are 10 or 12 people that get it

8    including myself.

9         Q     Okay.

10        A     So it is a global --

11        Q     So 10 people receive it; it's not one of the

12   10?

13        A     Right.  Again, I can't tell you that he

14   didn't type in Redner's HR or is that the actual Redner's

15   HR email address.

16        Q     Okay.  I am not asking you to be a detective

17   and stuff.

18        A     I don't know.

19        Q     I just wanted to try to understand what was

20   happening here.  But do you remember getting this email?

21        A     I do.

22        Q     And do you remember what it was about?

23        A     Again, I was familiar with all those things

24   that were produced earlier.  And I believe that I

25   assigned it to Alexis Foreman to review.

1          Q      In the email, Mr. McClellan says, The

2     problems that I spoke to Alexis about before still have

3     not been taken care of.  I did not get a meeting that was

4     supposed to occur with human resources and about being

5     moved.

6               So is Mr. McClellan talking about these

7     racial incidents in the Nesquehoning store?

8          A      I don't know.  This is a really long time

9     ago.  So to answer those questions is extremely difficult

10    for me to remember the details and the specifics, so --

11         Q      Do you remember him complaining about

12    anything else when he was at the Nesquehoning store?

13         A      No.

14         Q      So I think you said you assigned Alexis to

15    address the situation; is that correct?

16         A      That's what I recall, yes.

17         Q      And do you recall what happened after that?

18         A      I don't.  Only that I think the way it ended

19    up was that the end result was me ultimately having a

20    conversation and not recognizing the detail that was

21    involved, having a conversation with Quentin to offer,

22    you know, solutions and/or opportunities for transfer,

23    things like that.

24               So that first email that we reviewed or that

25    first summary was, I think, the end result.  Alexis may

1    have investigated it and reviewed it.  But ultimately I

2    think it ended up with me having this conversation with

3    Quentin about, Are we okay here?

4              I think at that point he did get transferred

5    to Pittston which was something that was at his request.

6              MR. BARRON:  Okay.  14.

7              (Whereupon, Redner's Exhibit No. 14 was

8              marked for identification.)

9    BY MR. BARRON:

10        Q    All right.  Mr. McDonough, directing your

11   attention to Exhibit 14, can you tell me what this is?

12        A    It's an employee warning record.

13        Q    Okay.  And did you prepare this?

14        A    Yes.

15        Q    And while it says it's -- on the top, it

16   says, Date of warning, 9/5/17; in fact, under, Action To

17   Be Taken, it says, Quentin is being terminated for

18   falsely reporting his hours and leaving without

19   permission.  Correct?

20        A    I'm sorry, can you repeat that?

21        Q    If you look with me near the top of the page,

22   in the first block, the second row, it says, Position,

23   Meat manager.  Date of Warning, 9/5/17.  Do you see that?

24        A    That's correct.

25        Q    But under Action To Be Taken, it says,

1    Quentin is being terminated for falsely reporting his

2    hours and leaving without permission.  Do you see that?

3         A    Yes.

4         Q    Okay.  So this isn't a warning, in fact; this

5    is a record of his termination, right?

6         A    It is a warning and a record of his

7    termination.

8         Q    Well, I guess first, there is a space for an

9    employee signature that is blank.  Was this presented to

10   Mr. McClellan?

11        A    No.

12        Q    Would you agree with me that a warning should

13   be presented to the person who is being warned?

14        A    Yes, if they are available.

15        Q    All right.  So he was not available because

16   he had been terminated, right?

17        A    Yes.

18        Q    So then this isn't a warning, is it?

19        A    It is simply -- I mean, I'm not sure where

20   you are going with this.  But it is simply our method of

21   recordkeeping.  And so generally when someone is

22   terminated, this is how we record the termination, is our

23   warning report.

24        Q    Do you use this -- this looks like it is a

25   form that you complete, correct?

```
 1          A     It is a form, yes.

 2          Q     Do you use this form for anything else?

 3          A     For warnings and terminations.

 4          Q     And terminations.  Verbal warnings?

 5          A     The verbal warnings are not recorded.

 6          Q     You don't use this to record a verbal

 7   warning?

 8          A     I mean, I guess there could be cases where it

 9   has been recorded on this form, yes, just as a matter of

10   recording it.

11          Q     I mean, is there a policy?  Are your managers

12   instructed that when they issue a verbal warning they

13   should document it on a form like this?

14          A     Yes, but not always just this form.  There is

15   a counseling form that they can use also.

16          Q     Okay.

17          A     That's a different document.

18          Q     Different document.  Also a form?

19          A     Exactly, yes.

20          Q     And so this form that we are looking at in

21   Exhibit 14, are your managers instructed when they give a

22   written warning, this is the form they should use?

23          A     Yes.

24          Q     To your knowledge, are there any other

25   written warnings that were issued to Mr. McClellan?
```

```
 1            A      I don't recall.

 2            Q      In the middle just above Employee Remarks

 3     Regarding Violation, it says, Previously warned?

 4                   I assume that's part of the form.  And then

 5     it looks like further along, it says, Yes.  And there is

 6     a date April-17.

 7            A      Yes.

 8            Q      So you completed this form.  What does that

 9     indicate?

10            A      So I believe that's referring to the

11     conversation that we had with Mr. Fiore and I.

12                   MR. SCHAUER:  You, Quentin, and Mr. Fiore?

13                   THE WITNESS:  Yes.

14     BY MR. BARRON:

15            Q      It doesn't indicate when warned and by whom.

16     But you think that was you and Mr. Fiore?

17            A      Yes.

18                   MR. BARRON:  All right.  15.

19                   (Whereupon, Redner's Exhibit No. 15 was

20                    marked for identification.)

21     BY MR. BARRON:

22            Q      Mr. McDonough, I am directing your attention

23     to what has been marked as Exhibit 15.  I will represent

24     this is a text message that we produced in the case.  And

25     I think it was sent to you.  Do you recognize this?
```

1          Sent to Bob.  I think that's you.  I want to

2     clarify that.

3          A     It's familiar to me, but I would say I don't

4     recall ever receiving an actual text.  It would have been

5     an email.

6          Q     Okay.  Well, it's -- I characterized this as

7     a text.  But actually as I look at it a little more

8     closely, I think it may be an email.

9          A     Yeah, I don't ever recall -- he didn't have

10    my cell phone number, nor did I have his.

11         Q     Okay.

12               MR. SCHAUER:  It's a fair assumption,

13    however.

14    BY MR. BARRON:

15         Q     Yeah, it is the way it was reproduced.  So

16    assuming this was an email, does it seem likely that this

17    was an email addressed to you?

18         A     Yes.

19         Q     Sent to you by Mr. McClellan?

20         A     Yes.

21         Q     This is the same date as the last exhibit is

22    dated, right, which is September 5, 2017?

23         A     Well, there is no date on this document that

24    I see.

25         Q     On the top, right under where it says, To

1    Bob, it says, Sep 5.

2          A     Okay.

3          Q     I'm assuming that's September 5 of 2017.

4          A     Okay.

5          Q     Do you recall the conversation that

6    Mr. McClellan is referencing here?

7          A     Yes, it was the conversation early that

8    morning.

9          Q     He says here, I told you that I want my

10   position which is still very confusing to me because I

11   might have been demoted back to meat even though I was

12   assistant store director and did nothing wrong.

13               Was Mr. McClellan assistant store director?

14         A     Never officially an assistant store director.

15         Q     Okay.  When he was in the training program,

16   did his official job title change?

17         A     So if he went -- he was -- yes, it would have

18   been a promotion to the store director -- assistant store

19   director training program.

20         Q     Okay.  I don't want you to speculate.  But in

21   the context of, you know, let's say, the Pittston store,

22   do you have an idea of how, you know, cashiers would see

23   Quentin if he is in the assistant store director program?

24   What would they believe would be his job title?  What

25   were they told would be his job title?

1        A        That he is training to become an assistant

2   store director.

3        Q        Are they -- as a -- as someone in the

4   training program, would cashiers and other store

5   employees be expected to accept supervision from

6   Mr. McClellan or the person in training?

7        A        Yes, sure.

8        Q        Do you see then -- it then says -- skip to

9   the next sentence.  I have trained the meat manager and

10  helped Bill as much as he asked.

11              So when he says, I have trained the meat

12  manager, is that the person who you referred to earlier

13  as also having been in the assistant manager program?

14  Who is that person he trained?

15       A        I'm assuming he is referring to Paul Austin

16  who was -- in order for Quentin to become promoted, we

17  needed someone to fill his position.  It is the natural

18  order of things.

19              So, you know, you can't just take somebody

20  out of a job without replacing that job.  So he helped --

21  in order for him to become promoted, he helped us to get

22  Paul Austin trained to become a meat manager.  That's

23  what I am assuming he is referring to.

24       Q        To train to take his position as a meat

25  manager when he moved up?

1        A    Yes.  It was in his interest to help us get

2    him trained so he could be promoted.

3        Q    He says, You have not treated me the same as

4    anyone else in that store since day one.

5             Did he ever tell you why he felt that way?

6        A    No.

7        Q    Did you ever ask?

8        A    No.

9             MR. BARRON:  16.

10            (Whereupon, Redner's Exhibit No. 16 was

11                marked for identification.)

12   BY MR. BARRON:

13        Q    Mr. McDonough, directing your attention to

14   Exhibit 16, what has been marked as Exhibit 16.  Please

15   take a look at that document, it is a two-page document,

16   and let me know when you are through.

17        A    Okay.

18        Q    Okay.  Can you tell me what this document is?

19        A    It is my record of the events leading to

20   Quentin's termination.

21        Q    And this appears to be dated -- is that your

22   signature on the second page?

23        A    It is.

24        Q    It appears to be dated 9/6/17.  So it's the

25   day after Mr. McClellan's termination?

1       A       Likely, yes.

2       Q       Or it is within days at least, right?

3       A       Yes.

4       Q       Okay.  Let's see.  The first paragraph, it

5   says, He was warned about this conduct in the past, April

6   of 2017.  In fact, he was demoted as a result of this

7   behavior in April of 2017.

8               What is that demotion?

9       A       That's when he -- when we confronted him

10  about his absences and his tardiness, when he decided

11  that he was going to take a demotion from the assistant

12  store director training program and agree to go back to

13  become a meat department manager.  That's what I'm

14  referring to.

15      Q       Was he given a choice?

16      A       Absolutely.

17      Q       As to what were his options as far as, did he

18  have an option other than to take the demotion?

19      A       It was presented to him that if he wanted to

20  continue in the training program, we expected him to work

21  his hours and be on time.  And if he wanted to continue

22  in that program, we needed that type of commitment from

23  him.  Or he could step down from the program, and we

24  would provide him an opportunity to go back to become a

25  meat department manager.

1        Q      Would you agree with me that at least that

2   sentence in this memo suggests that it was Redner's

3   decision that Mr. McClellan be demoted?

4        A      I used the term demoted.  But it was more --

5   it was more his decision to withdraw from the program and

6   go back to becoming a meat manager.  So it may be

7   mischaracterized in the word demoted.

8        Q      Did you actually write this memo, Exhibit 16?

9        A      Yes.

10       Q      Did you actually type this?

11       A      Yes.

12       Q      I want to ask a few more questions.  And I

13  understand we will have the other person speak about FMLA

14  issues.  And if there is anything that you think would be

15  -- you know, you think should go to that person, please

16  let me know.

17              But I want to ask you some questions about

18  Mr. McClellan's mental health issues --

19       A      Okay.

20       Q      -- at work.

21              I think it is Mr. McClellan's representation

22  that when he took the FMLA leave, it was not his -- it

23  was not his idea; it was actually the store manager's

24  idea.

25              Do you know anything about that?

```
 1          A      Only from what he testified during his
 2    deposition.
 3          Q      Okay.
 4          A      That's the first I was aware that he believed
 5    that.
 6          Q      Okay.  So before that, you haven't heard
 7    that?
 8          A      No.
 9          Q      And that was Mr. Treichler, as well, right?
10          A      Yes.
11          Q      He was the store manager at that time?
12          A      Yes.
13          Q      Did Mr. Treichler ever raise any concerns to
14    you or anyone else at Redner's regarding Mr. McClellan's
15    mental health?
16          A      Not to me.
17          Q      Okay.  Did anyone else ever raise any
18    concerns or notify you of any concerns about
19    Mr. McClellan's mental health?
20          A      No.
21          Q      Do you know why he was out on FMLA?
22          A      I do now, but I didn't at the time.
23          Q      You didn't at the time.
24                 Do you know if he had ongoing treatment,
25    mental health treatment after his return from FMLA?
```

```
 1            A      I have no idea.

 2            Q      I won't get into policy kinds of questions,

 3    because I think the other designee is the one who is to

 4    speak to that.

 5                   Did you have any suspicion in your

 6    interactions with Mr. McClellan that there were any kind

 7    of mental health issues?

 8            A      No.

 9            Q      Did he ever tell you that he had any kind of

10    mental health issues?

11            A      No.

12                   MR. BARRON:  All right.  Can we go off the

13    record for a moment?

14                   (Whereupon, a discussion was held off the

15                    record.)

16    BY MR. BARRON:

17            Q      If we can go back on the record.

18                   I just have one or two more follow-up

19    questions.  So it is -- you have talked about

20    Mr. McClellan's attendance and leaving work early as

21    being at least part of the reason for the termination of

22    his employment, correct?

23            A      Yes.

24            Q      Do you have any insight into why

25    Mr. McClellan -- was that a change in Mr. McClellan's
```

1  behavior as opposed to how he had been in years past?

2      A    I would agree with that, yes.

3      Q    Does Redner's have any insight as to what

4  might have caused that change?

5      A    No.

6      Q    Did Redner's ever ask Mr. McClellan?

7      A    I think during the conversation we had with

8  him in Scranton with Mr. Fiore and I, we asked.  And his

9  answers were that he had low morale and he lacked

10 motivation.  There was never any discussion about a

11 health condition or a mental health concern.  So we did

12 ask.

13     Q    And did he give you any explanation for why

14 he had low morale?

15     A    He did not.

16     Q    Did you ask or anyone at Redner's ask?

17     A    I didn't ask.  I did not.

18     Q    Had you ever had that kind of discussion with

19 anyone else at Redner's as far as what happened to

20 Quentin, why is he not the employee he used to be?

21     A    I don't recall having any other conversations

22 about it, no.

23          MR. BARRON:  Okay.  I think I am done.  I am

24 ready for the other witness.

25          MR. SCHAUER:  Can you go get her?

```
 1                    THE WITNESS:  Sure.  Would you like me to

 2   stay?

 3                    MR. SCHAUER:  Yes.

 4                    (Whereupon, a recess was taken from

 5                 12:43 p.m. to 12:46 p.m.)

 6                    SUSAN ROTKISKE

 7   was called as a witness and, having been duly sworn by

 8   the Reporter-Notary Public, was examined and testified as

 9   follows:

10   BY MR. BARRON:

11        Q    Hello, Ms. Rotkiske, my name is George

12   Barron.  We have not met before.  I am an attorney.  I

13   represent Quentin McClellan in a case against Redner's.

14        A    Okay.

15        Q    And you have been designated -- it is my

16   understanding that you have been designated by Redner's

17   to speak as to a specific subject.  And let me go through

18   that.  Let me do that first.

19             I am going to show you what has been marked

20   as Exhibit 1 in this deposition.  And I would like you,

21   if you would, to turn to the second page of that notice

22   and take a look at Paragraph No. 5 and read that, please.

23   Let me know when you are through.

24        A    Okay.

25        Q    It is my understanding you have been
```

```
 1    designated by Redner's to testify on behalf of Redner's

 2    with regard to the matters contained in Paragraph No. 5.

 3          A     Okay.

 4          Q     Is that correct?

 5          A     Yes, it is.

 6          Q     Okay.  What is your position at Redner's?

 7          A     I'm a benefit manager.

 8          Q     Do you work here at the headquarters?

 9          A     Yes.

10          Q     And I have to ask you some routine questions

11    that I also asked Mr. McDonough.  It's nothing personal.

12    Please don't be insulted.

13                Have you ever -- as we sit here today, are

14    you under the influence of any kind of medications or

15    drugs or substances that would prevent you from giving

16    complete and truthful testimony?

17          A     No.

18          Q     Have you been deposed before?

19          A     No.

20          Q     Okay.  The way that this works is that I am

21    going to ask you some questions on the subject for which

22    you have been designated.

23          A     Um-hum.

24          Q     And you will answer the questions.  Our court

25    reporter writes down everything that each of us says.  So
```

```
 1    a couple of things are important for us to both try to

 2    remember; the first being that when you answer the

 3    question, please make sure you do verbally rather than

 4    shaking your head --

 5         A    Okay.

 6         Q    -- because she can't record that.

 7         A    Yes.

 8         Q    And we should both try to make sure as much

 9    as possible that we don't speak at the same time because

10    that makes our court reporter's life more difficult, and

11    we don't want that.

12              Do you understand that?

13         A    Yes.

14         Q    Okay.  If you do not understand a question,

15    please let me know, and I will do everything I can to

16    clarify it and make sure you do understand it.

17              If you do answer the question, of course, we

18    will all assume that you understood it and answered it

19    accurately to the best of your ability.

20              And if you want to take a break at any time,

21    all you have to do is let me know; bathroom, water,

22    whatever.  I don't think this is going to take a very

23    long time.  We just spent some time with Mr. McDonough.

24              But the only thing I ask is that you don't

25    ask for a break while a question is on the table.  Okay?
```

```
 1            A      Yes.

 2            Q      So kind of in between questions.  Do you have

 3     any questions about that?

 4            A      No.

 5            Q      Okay.  So we are speaking about, again,

 6     Paragraph No. 5 in Exhibit 1, the deposition notice.  Has

 7     Redner's designated you to testify on behalf of Redner's

 8     with regard to that subject?

 9            A      Yes.

10            Q      And do you have full authority to speak on

11     behalf of Redner's with regard to that subject?

12            A      Yes.

13            Q      Are you aware that the answers you give will

14     be binding upon Redner's?

15            A      Yes.

16            Q      Tell me -- I guess, I'll just start with a

17     general question.  Mr. McClellan used an FMLA leave, I

18     believe it was in July of 2017; is that correct?

19            A      I'm not quite sure of the date.

20            Q      Let me take a look.  I have got the document.

21            MR. BARRON:  Let me have this marked as 17.

22            (Whereupon, Redner's Exhibit No. 17 was

23             marked for identification.)

24     BY MR. BARRON:

25            Q      Ms. Rotkiske, I am directing -- and I hope I
```

```
 1   am pronouncing your name correctly.

 2        A     You're close enough, it's fine.

 3               MR. SCHAUER:  She knows who you are talking

 4   about.

 5   BY MR. BARRON:

 6        Q     What's your first name?

 7        A     Susan.

 8        Q     Susan.  Can I call you Susan?

 9        A     Yes.

10        Q     Susan, directing your attention to

11   Exhibit 17, can you take a look at that?  It's like a

12   four-page document, I think, and let me know if you

13   recognize it.

14        A     Yes, I do recognize this.

15        Q     Can you tell me what it is?

16        A     It is a physician health statement from the

17   Department of Labor that we use for FMLA.

18        Q     And is the employee in this form --

19   referenced in this form Mr. McClellan?

20        A     Yes.

21        Q     Okay.  Now, your name is on the first line

22   for employer name and contact information, correct?

23        A     Yes.

24        Q     Did you complete the first page of this?

25        A     Are we looking at the same document?
```

1      Q      We should be.

2      A      Okay.

3      Q      Are we?  I mean, the handwritten information

4  on the first page of this document, did you complete

5  that?

6      A      Not all of it.

7      Q      Okay.  Do you know which parts of it you did?

8      A      I completed the employee job title, the

9  regular work scheduled hours, and his first name and his

10  last name, and of course, Check if job description is

11  attached, the N/A.

12      Q      Okay.  So the Customer Service at Redner's --

13      A      That is not my writing.

14      Q      -- that's not your writing?

15      A      No.

16      Q      Do you know whose writing it is?

17      A      No, I do not.

18      Q      Okay.  Do you think that line was left blank

19  when you completed the portions of the form?

20      A      Yes, it is left blank when I do it.

21      Q      Maybe it was the doctor.  I didn't see the

22  difference in the writing.  But looking at the writing in

23  the rest of the document, it may have been the physician.

24              Tell me, if you would, what were the

25  circumstances of this FMLA leave?  How did it come to

1    your attention that Mr. McClellan would be going out on

2    FMLA leave?

3         A    I was instructed on a Monday to send FMLA

4    paperwork to Quentin for an issue that he was having.

5    And that instruction came from Mr. McDonough.

6         Q    Okay.  So what did he tell you was the issue?

7         A    He didn't.  He just told me that he would

8    need FMLA paperwork.

9              MR. SCHAUER:  Do you mind if we go off the

10   record for a second?

11             MR. BARRON:  Sure.

12             (Whereupon, a discussion was held off the

13              record.)

14             MR. BARRON:  We can go back on the record.

15   BY MR. BARRON:

16        Q    Counsel has pointed out to me that what I

17   gave you as an exhibit is actually Mr. McClellan's second

18   FMLA leave request.

19        A    That is correct.

20        Q    And his first request apparently was entered

21   earlier in July.  That looks like July 3rd is the date on

22   the first request, which I do not have as an exhibit.

23   But is that consistent with your recollection?

24        A    Yes.

25        Q    Okay.  So I want to make sure we are talking

1    about the first request.

2         A     Okay.

3         Q     The first request for FMLA, how did you learn

4    that Mr. McClellan would be going out on FMLA leave?

5         A     As I answered before, on a Monday morning, I

6    walked in.  I was instructed by Bob McDonough to send

7    FMLA paperwork to Quentin McClellan.

8         Q     Okay.  Because there was an issue?

9         A     There was evidently an issue.

10        Q     And you didn't know what it was?

11        A     No, not at that point.

12        Q     Okay.  How did you send that paperwork to

13   Mr. McClellan?

14        A     I mail all FMLA paperwork to an employee's

15   home.  They receive the legal rights and responsibility

16   letter, the Department of Labor letter explaining their

17   rights on the leave.  The physician statement is also

18   given in that information.  But it's mailed to the

19   employee's home.

20        Q     Okay.  So did you ever speak to Mr. McClellan

21   about this FMLA leave?

22        A     Yes, I did, that Monday.

23        Q     Okay.  And can you tell me about that

24   conversation?

25        A     Basically, he was told that he should call in

1  for FMLA paperwork.  I did state that I did know, and I

2  would be mailing it out to his home.

3              At that time frame, I usually -- excuse me.

4  At that time frame, I walked through the process of the

5  FMLA.  I explained he would be receiving the legal rights

6  and responsibility letter in the mail.  He is eligible

7  for a leave.  He has worked one year of service, worked

8  over the 1,250 hours.

9              The next section in the form is stating that

10 he would have a 15-day period of time to get the

11 physician statement back to us, and that would be dated

12 on the letter with the explanation.

13             On the back of the legal rights and

14 responsibility letter, it states the first thing he would

15 see is we would -- he would have to make arrangements

16 with the weekly deductions out of his paycheck, but he

17 should avoid that, because we will go into more detail on

18 his pay.  Explained that we use any balance of vacation

19 and personal time until we actually have an approved

20 leave; that there is a seven-day waiting period.  But

21 Redner's does have salary continuation pay that we will

22 go in and pay for our salaried people, that he would be

23 also entitled to that.

24             So I stated he would be receiving the

25 physician statement, that is four pages, two pages

1    printed form front and back.  All he would need to do is

2    drop it off at his doctor's office, and they can fax it

3    back into the main office here.  My fax number is on the

4    form at two different places.

5         Q    Okay.  And in this case, do you recall if

6    that's what happened, did the doctor fax it back to you?

7         A    Yes, they did.

8         Q    And then from that point, who makes the

9    decision as to whether or not to approve the FMLA?

10        A    Basically I do by the information in two of

11   the questions that are answered -- that are directed from

12   the physician by the form.

13        Q    Okay.  Now, in this case, you said you were

14   directed by Mr. McDonough to give Quentin the FMLA

15   paperwork; is that correct?

16        A    Yes.

17        Q    Had Mr. McDonough made the determination that

18   Quentin was eligible for FMLA?

19        A    No.

20        Q    Did he tell you why he was -- is it common

21   for Mr. McDonough to tell you that an employee needs

22   FMLA?

23        A    I am instructed from anybody's supervisor to

24   release FMLA paperwork if it has come to their knowledge

25   that the person might need it.

```
 1          Q      So do employees contact you directly?

 2          A      Yes, some do.

 3          Q      Some do.  Is there a process or policy in

 4   place as far as if an employee, you know, breaks their

 5   leg and needs FMLA leave, what should they do?

 6          A      They basically call me directly.  Even if

 7   they would call and contact a store director, the store

 8   director would tell them to call me.

 9          Q      That didn't happen with Quentin?

10          A      No.

11          Q      Do you have any idea why?

12          A      No.

13          Q      What did Quentin tell you about the

14   circumstances under which he was taking FMLA leave?

15          A      Basically that he needed time off.

16          Q      Did he say he needed time off or someone else

17   thought he needed time off?

18          A      No, he stated he needed time off.

19          Q      Okay.  Did he say why?

20          A      Medical.

21          Q      Excuse me?

22          A      Medical.

23          Q      Just medical, nothing more specific than

24   that?

25          A      Just medical.
```

```
 1        Q      So when you got the paperwork back and
 2   reviewed it, I think you said it was your decision to
 3   approve the FMLA leave?
 4        A      Yes.
 5        Q      Did you discuss that with anyone else at
 6   Redner's?
 7        A      No.
 8        Q      What happens to the paperwork once the leave
 9   is approved?
10        A      I follow up with an employee to their home,
11   and they get a conclusion letter.
12        Q      Okay.
13        A      They get a copy of the salary continuation
14   pay.  They get a designation notice stating how many
15   weeks or days they are using that is going to be counted
16   against them on FMLA.  That is all mailed to their home.
17               The paperwork is then -- I think there is a
18   chart that will show you how I pay someone the salary
19   continuation.  That is all put together, stapled together
20   and put into a filing cabinet at my desk.
21        Q      Okay.
22        A      I then email the store director and any
23   supervisor that is in charge of the employee and let them
24   know that they have been approved, and I give them a date
25   frame of what they have been approved for.
```

```
 1          Q     Okay.  The same process for the intermittent

 2    FMLA?

 3          A     Intermittent is a little differently because

 4    it's ongoing, it's constant.  So store directors -- what

 5    we usually do is I will sit down, and I will actually

 6    have a conversation and actually an open meeting with the

 7    employee, the supervisor, and the department manager on

 8    how they can do the calling off.

 9                But usually, the paperwork is collected.  And

10    then we sit down and have a meeting usually over the

11    phone.

12          Q     Okay.

13          A     I don't go to the store itself.  And we set

14    up an arrangement that this person knows they just have

15    to call in and say, This is an FMLA day.  That manager

16    would record it.  And then on a weekly basis, they send

17    me that information.

18          Q     And then so you can calculate --

19          A     Correct.

20          Q     -- the hours remaining?

21          A     Yes.

22          Q     Did you ever have a meeting like that with

23    Mr. McClellan?

24          A     No.

25          Q     Was he ever formally offered intermittent
```

```
 1   FMLA?

 2        A     No.

 3        Q     He did apparently extend his FMLA leave from

 4   the initial one, correct?

 5        A     Yes.

 6        Q     And do you remember how that came about or

 7   why that happened?

 8        A     Additional paperwork appeared on my desk.

 9        Q     Okay.  Do you know where it came from?

10        A     I take it, his doctor.

11        Q     Okay.

12        A     A physician statement like this one appeared

13   on my desk.

14              MR. SCHAUER:  Pointing to Exhibit 17.

15              THE WITNESS:  Right.

16              MR. SCHAUER:  Sorry.

17              MR. BARRON:  No, I understand.

18   BY MR. BARRON:

19        Q     So with the first leave, you gave Quentin a

20   blank form, right?

21        A     Correct.

22        Q     Or a partially completed form, right?

23        A     Yes.

24        Q     For the extension of the leave, you're saying

25   you did not?
```

1        A      No, I did not.

2        Q      Do you know offhand where he got that other

3   form?

4        A      No, I do not.

5        Q      And was the second FMLA leave approved?

6        A      Yes.

7        Q      With an ongoing FMLA leave, a nonintermittent

8   FMLA leave, is there any requirement for the employee to

9   call in and give anyone at Redner's an update as far as

10  their status?

11       A      If someone has been approved to a leave up

12  until that time frame, no, there is -- they don't need to

13  call and report off or work with our attendance policy

14  because they are approved for a block of time.

15       Q      And how do you communicate to the store

16  manager or the other supervisors as far as the duration

17  of the FMLA?

18       A      I email, once the person has been approved,

19  the length of time.

20       Q      Okay.  Any other information?

21       A      No.

22       Q      Let's see.  So I think you said that -- did

23  you say that Quentin was paid while he was on FMLA?

24       A      Yes.

25       Q      And tell me how that works, what that policy

1    is.

2         A      From the first day that an employee is out,

3    as I stated, we use the balance of any vacation and

4    personal that is available to them at that time.

5               After a seven-day waiting period has been

6    finalized and vacation and personal has been absorbed,

7    then they go into -- a salaried person in Quentin's case

8    at 45 hours based on his years of service, the first six

9    weeks is paid at 100 percent of his pay.  After that, he

10   went down -- he would have went down to 80 percent.  I

11   don't recall if he had gotten that far.

12        Q      Okay.  And just to clarify, he did not

13   exhaust his entire 12 weeks of FMLA, did he?

14        A      No.

15        Q      Tell me what -- so in your role with

16   Redner's, you deal also with issues under the Americans

17   with Disabilities Act and disability accommodations?

18        A      Yes.

19        Q      And tell me how that process works.

20        A      Basically if someone comes to us or if we

21   notice, a supervisor notices someone might need help with

22   a limitation or they have, you know, something that has

23   been brought to their attention, then basically we ask

24   for information from their doctor stating what the

25   request of the accommodation or the limitation is and

1    what we can do to address that in their job.

2         Q    Okay.  Can that include time off, time away

3    from work?

4         A    Yes.

5         Q    And on behalf of Redner's, are you the person

6    who makes that decision?

7         A    No.

8         Q    Who makes the decision to --

9         A    That decision -- I help with gathering the

10   information.  But that decision goes to Mr. McDonough.

11   And I think John Flickinger, sometimes we get opinions

12   from workmen's comp involved.

13        Q    If it is a work injury?

14        A    Right.

15        Q    Are you always involved in that process?

16        A    I usually am the one that brings it to their

17   attention, yes.

18        Q    And are you the one who, say, a supervisor or

19   store manager would call if they had an employee who may

20   need some accommodation?

21        A    Yes, I could be a part.  They could go

22   directly to Mr. McDonough also.

23        Q    Right.  Did anyone ever discuss the potential

24   need for accommodations for Mr. McClellan?

25        A    No.

1          Q      So Mr. McClellan's supervisors and

2    Mr. McDonough, none of those people ever talked to you

3    about potential accommodations for Mr. McClellan?

4          A      No.

5          Q      When you have a request for an accommodation,

6    do you always seek a doctor's input or --

7          A      Pretty much so.  We would like to know if it

8    is a medical --

9          Q      Right.

10         A      -- of what we would need to require for that

11   -- you know, the restriction against their job.

12         Q      So do you have a form that you ask the

13   employees to have their doctor complete for that?

14         A      Yes.

15         Q      It is a different form than the FMLA?

16         A      Correct, yes.

17         Q      Did you ever provide one of those forms to

18   Mr. McClellan?

19         A      No.

20         Q      Did you ever have any conversations with the

21   store manager, Mr. Treichler, regarding Mr. McClellan?

22         A      No.

23         Q      What did Mr. McDonough tell you about

24   Mr. McClellan's situation?

25         A      Just that he needed FMLA paperwork.

```
1          Q      He didn't say why?

2          A      No.

3          Q      Did you ask why?

4          A      No.

5                 MR. BARRON:  Okay.  Let me ask about this

6     exhibit.  18.

7                 (Whereupon, Redner's Exhibit No. 18 was

8                  marked for identification.)

9     BY MR. BARRON:

10         Q      Susan, directing your attention to

11    Exhibit 18.  I suspect that you know what this is.  It

12    was produced in discovery by Redner's.  And now I think I

13    suspect I know what it is, but I had no idea before I

14    came in here today.  Can you tell me what this is?

15         A      These are my notes on how Mr. McClellan was

16    paid while he was out on FMLA.

17         Q      Did you complete this form?

18         A      Yes, this is all my notes.

19         Q      Okay.  So under Period of Time Requested, it

20    looks like it starts 6-24 and then it says 7-24, but

21    that's crossed out.  And it says 8-28 underneath it.

22                Is that the extension that Mr. McClellan

23    received?

24         A      Correct.

25         Q      And then the pay dates and the amounts of pay
```

1  are what he would have received; is that right?

2       A     That is correct.

3       Q     So does that mean the week of June 17th (as

4  spoken), he used nine vacation hours?

5       A     Repeat that.

6       Q     The week of June 26th, under Amount of Pay,

7  it says, 9 vac.

8       A     Correct.

9       Q     So that means he used 9 vacation?

10      A     9 hours.

11      Q     And then the next week he used 27 vacation

12 hours?

13      A     That is correct.

14      Q     And then for the weeks after that, what does

15 45-100 percent mean?

16      A     45 hours at 100 percent pay.

17      Q     Okay.  So the first two weeks, did he get

18 less than 100 percent pay?

19      A     Well, I would like to clarify one thing.

20 When you see 6-26, that is not a true pay date.  That is

21 actually a Monday date prior to our Thursday pay date.

22 We do payroll on a Monday for Thursday.  So these aren't

23 true pay dates.  This could have been, well, you figure

24 four days later, the 26th.  So 6-26, Quentin got paid 9

25 hours of vacation.  He worked 36 hours that week.

```
 1          Q     I see.

 2          A     So it would have been 45.  The 7-3, he was

 3   paid 27 hours because that is all the balance he had in

 4   his vacation at the time.

 5          Q     Okay.  I see.  And then it looks like he got

 6   100 percent at least up to the week of 8-21 where it says

 7   80 percent, correct?

 8          A     Correct.

 9          MR. BARRON:  Okay.  I don't have anything

10   further.

11   BY MR. SCHAUER:

12          Q     Did Mr. McClellan ever speak with you about

13   intermittent FMLA leave?

14          A     No.

15          Q     Did he ever request it to your knowledge?

16          A     Yes.

17          Q     And what happened with that?

18          A     Paperwork was sent out for that.

19          Q     Did you ever receive the paperwork back?

20          A     No.

21          Q     You sent it to Mr. McClellan in the same way

22   that you sent him the other FMLA paperwork and mailed it

23   to his house?

24          A     No.

25          Q     How did it get sent?
```

1          A     It was actually emailed.  It was attached to

2    an email he sent to me directly.

3          Q     And you sent it back to him on that email as

4    an attachment?

5          A     Correct.

6          Q     But it was never returned by Mr. McClellan?

7          A     No.

8                MR. SCHAUER:  No other questions.

9    BY MR. BARRON:

10         Q     I just have a brief follow-up from that.

11               So is that an email that Mr. McClellan sent

12   to you requesting intermittent FMLA?

13         A     Yes.

14         Q     Do you remember approximately what time frame

15   that was?

16         A     No.

17         Q     Do you remember if it was after his

18   nonintermittent FMLA?

19         A     Clarify that, please.

20         Q     Well, we talked about the FMLA that was from

21   July through, I think, August, the last two exhibits that

22   we looked at.  Of course, I misplaced mine now.

23               We talked about, you know, the FMLA leave

24   that is reflected here.

25         A     Um-hum.

1        Q      Do you know if his request for intermittent

2   FMLA happened before that or after that?

3        A      No, it was after.  It was -- his returning

4   date was 8-28.  That was around the time frame he asked

5   me for intermittent.

6        Q      Intermittent, okay.

7               And that was Mr. McClellan directly, not his

8   supervisor or anyone else, right?

9        A      Correct.

10       Q      And did you ever reach out to him and ask why

11  he hadn't returned the paperwork?

12       A      No.

13       Q      Did he tell you why he needed intermittent

14  FMLA?

15       A      I think the wording is in his email.

16              MR. BARRON:  Okay.  That's fine.  I have

17  nothing further.  Thank you.

18              MR. SCHAUER:  I have nothing further.

19              (Whereupon, a discussion was held off the

20              record at 1:15 p.m. to 1:17 p.m.)

21              ROBERT McDONOUGH resumed as witness.

22  BY MR. SCHAUER:

23       Q      Just briefly, you had been asked some

24  questions --

25              MR. BARRON:  I'm sorry, can we just make sure

120

1    that the record reflects this is Mr. McDonough again, if

2    it is not going to.

3              MR. SCHAUER:   Yes.

4    BY MR. SCHAUER:

5        Q    Mr. McDonough, you had been asked some

6    questions about preservation of, I believe, a videotape

7    that had been observed of an individual posting some

8    pictures that ultimately were removed at the Pittston

9    store.  Do you remember those questions?

10       A    Yes.

11       Q    Do you as a practice keep videotapes that

12   might be reviewed in some manner as part of an

13   investigation leading to employee discipline?  Do you

14   keep those videotapes because of that reason?

15       A    Not generally, no.

16       Q    Do you once litigation is instituted against

17   Redner's have a practice with respect to preservation of

18   potential evidence?

19       A    Yes, we would.

20       Q    And what is that?

21       A    Well, I think in any case where an EEOC claim

22   has been submitted or we have evidence that a claim may

23   be forthcoming, of course, we would ask that if it is

24   still available at the time that the department preserves

25   that video.

```
 1          Q     Did you do that in this case?

 2          A     Once we knew there was litigation, yes.

 3                MR. SCHAUER:  No other questions.

 4                MR. BARRON:  You know, I do have a brief

 5    follow-up as long as -- if you have no objection to

 6    follow up on Ms. Rotkiske's testimony quickly.

 7                MR. SCHAUER:  That's fine.

 8    BY MR. BARRON:

 9          Q     Mr. McDonough, did you contact Susan to tell

10    her that Mr. McClellan needed FMLA leave?

11          A     She says so.  I do not recall telling her

12    that.  And I don't even recall why I would have told her

13    that.  So she is -- you know, she is probably more likely

14    to be accurate about that than I am.  But I don't

15    remember specifically saying, Hey, send paperwork.  It's

16    very possible.

17          Q     Okay.  And so I am assuming you don't

18    remember why, if you did?

19          A     I don't.

20          Q     You don't remember why?

21          A     I don't.

22          Q     That's your testimony.

23                MR. BARRON:  Okay.  That's all.  Thank you.

24                (Whereupon, the deposition concluded at

25                1:19 p.m.)
```

```
1                          CERTIFICATE
2            I, M. Ellen Valent, the officer before whom
3   the deposition of REDNER'S MARKETS, INCORPORATED was
4   taken, do hereby certify that REDNER'S MARKETS,
5   INCORPORATED, the witnesses whose testimony appears in
6   the foregoing deposition, was duly sworn by me on August
7   29, 2019, and that the transcribed deposition of said
8   witness is a true record of the testimony given by them;
9   that the proceedings here are recorded fully and
10  accurately; that I am neither attorney nor counsel for,
11  nor related to, any of the parties to the action in which
12  this deposition was taken; and further that I am not a
13  relative of any attorney or counsel employed by the
14  parties, nor financially interested in this action.
15
16
17          Mary Ellen Valent
            _____
            M. Ellen Valent, RMR
18
            COMPUTERIZED REPORTING SERVICES, INC.
19
            Notary Public in and for the
20          Commonwealth of Pennsylvania
21          My Commission expires December 9, 2021.
22
23
24
25
```

1              C E R T I F I C A T E

2          I have read my deposition, and it is true and

3    correct to the best of my knowledge and belief, except

4    for any corrections listed on the enclosed Errata Sheet.

5

6

7                              _____

8                              ROBERT McDONOUGH

9

10   _____
     Witness

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        C E R T I F I C A T E

2            I have read my deposition, and it is true and

3    correct to the best of my knowledge and belief, except

4    for any corrections listed on the enclosed Errata Sheet.

5

6

7                         _____
                          SUSAN ROTKISKE
8

9
     _____
10   Witness

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    ERRATA SHEET  - McDONOUGH

 2   Date forwarded to witness: 9/11/19

 3   Caption:  McClellan vs. Redner's

 4   Deposition No.:  8/29/19

 5   ************************************************************
     DO NOT MAKE ANY CHANGES IN THE DEPOSITION TRANSCRIPT.  IF
 6   YOU HAVE ANY CORRECTIONS, PLEASE LIST THEM BELOW.  UPON
     COMPLETION, PLEASE SIGN THE DEPOSITION ON PAGE 124 AND
 7   AT THE BOTTOM OF THIS FORM.
     ************************************************************
 8
     PAGE      LINE          CORRECTIONS
 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   Signature:_____ Date:_____

21   WITHIN 30 DAYS, RETURN THIS SIGNED FORM AND DEPOSITION
     TO:
22        Barron Law
          By:  George Barron, Esquire
23        88 North Franklin Street
          Wilkes-Barre, PA  18701
24
     COUNSEL, PLEASE PROVIDE OPPOSING COUNSEL WITH A COPY OF
25   THE SIGNED ERRATA SHEET UPON RECEIPT FROM THE WITNESS
```

```
 1              ERRATA SHEET  - ROTKISKE

 2   Date forwarded to witness: 9/11/19

 3   Caption:  McClellan vs. Redner's

 4   Deposition No.:  8/29/19

 5   *************************************************************
     DO NOT MAKE ANY CHANGES IN THE DEPOSITION TRANSCRIPT.  IF
 6   YOU HAVE ANY CORRECTIONS, PLEASE LIST THEM BELOW.  UPON
     COMPLETION, PLEASE SIGN THE DEPOSITION ON PAGE 125 AND
 7   AT THE BOTTOM OF THIS FORM.
     *************************************************************
 8
     PAGE     LINE        CORRECTIONS
 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   Signature:_____ Date:_____

21   WITHIN 30 DAYS, RETURN THIS SIGNED FORM AND DEPOSITION
     TO:
22       Barron Law
         By:  George Barron, Esquire
23       88 North Franklin Street
         Wilkes-Barre, PA  18701
24
     COUNSEL, PLEASE PROVIDE OPPOSING COUNSEL WITH A COPY OF
25   THE SIGNED ERRATA SHEET UPON RECEIPT FROM THE WITNESS
```

127

# EXHIBIT 3

**Page 1**

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

QUENTIN MCCLELLAN,          :  NO.

                         :  3:18-CV-02162-ARC

     Plaintiff      :

   vs.            :

                 :

REDNER'S MARKETS, INC., JIM  :

POLCHIN, BOB MCDONOUGH, AND   :

RICK MERKEL,                 :

                 :

     Defendants      :

DEPOSITION OF QUENTIN MCCLELLAN

Taken in the Law Offices of George R.

Barron, 88 North Franklin Street, Wilkes-Barre,

Pennsylvania, on Wednesday, June 19, 2019,

commencing at 9:30 a.m., before Justine

Starrick, Registered Professional Reporter.

**Page 2**

1  APPEARANCES:
2
    FOX ROTHSCHILD, LLP
    By:  RANDALL C. SCHAUER, ESQ.
3     Eagleview Corporate Center
    747 Constitution Drive
4     Suite 100
    Exton, PA 19341
5     Rschauer@foxrothschild.com
     -- For the Defendants
6
7  BARRON LAW
    By:  GEORGE R. BARRON, ESQ.
8     88 North Franklin Street
    Wilkes-Barre, PA 18701
9     Grb@georgebarronlaw.com
     -- For the Plaintiff
10
11
   ALSO PRESENT:
12
    Rick Merkel
13    Bob McDonough
14
15
16
17
18
19
20
21
22
23
24
25

**Page 3**

1                    INDEX TO WITNESS
2  THE WITNESS                                  PAGE
3  Quentin McClellan
4    By Mr. Schauer                             4
    By Mr. Barron                            209
5    By Mr. Schauer(Re-examination)            210
6               INDEX TO EXHIBITS
7  EXHIBIT   DESCRIPTION                         PAGE
8   1     Screen shot of e-mail dated
       February 16                           23
9   2     E-mail dated 2/16/17                    24
   3     E-mail dated 3/16/17                    30
10  4     Letter dated 3/23/17                    31
   5     E-mails dated 3/24/17                   44
11  6     Note dated 4/3/17                       52
   7     Letter dated 7/15/17                    97
12  8     Application for FMLA leave              98
   9     Letter dated 7/25/17                   103
13  10    Second application for FMLA leave      105
   11    Note dated 6/14/17                     113
14  12    Handwritten statement                  122
   13    Statement dated 6/10/19                127
15  14    Copy of work schedule                  141
   15    Copy of work schedule                  141
16  16    E-mail dated 9/2/17                     149
   17    Screen shot of text messages           153
17  18    E-mail dated 9/5/17                     155
   19    Screen shot of e-mail dated 9/5        159
18  20    Note dated 9/6/17                       163
   21    Note dated 9/7/17                       170
19  22    Note dated 9/6/17                       175
   23    Screen shot of e-mail dated 9/5        182
20  24    E-mail dated 9/7/17                     182
   25    Employee handbook signoff sheet        186
21  26    Acknowledgement & receipt of
       handbook                             188
22  27    Understanding of employment            189
   28    Job descriptions                       190
23  29    Employee handbook                      191
   30    Complaint                              192
24  31    Indeed job listing                     205
25

**Page 4**

1              * * * *
2       QUENTIN MCCLELLAN, having been duly
3  sworn, was examined and testified as follows:
4              * * * *
5      MR. SCHAUER:  Usual stipulations?
6      MR. BARRON:  Can we agree to reserve
7  objections other than as to form?
8      MR. SCHAUER:  Yes.  And does the
9  witness want to sign?
10     MR. BARRON:  Usually not, no.
11     MR. SCHAUER:  Waived also.  Okay.
12            * * * *
13         EXAMINATION
14           * * * *
15  BY MR. SCHAUER:
16  Q.    Mr. McClellan, my name is Randy Schauer.  I
17  represent Redner's Markets in a lawsuit that was
18  filed by you through Mr. Barron claiming that you
19  were wrongfully terminated by the company in
20  violation of several statutes.  Today I am going to
21  take your deposition, which means I am going to ask
22  you a series of questions relative to the claims
23  that are made in that lawsuit as well as just
24  generally your employment with Redner's Markets.
25      My first question is, have you ever



QUENTIN MCCLELLAN                                    June 19, 2019
QUENTIN MCCLELLAN vs REDNER'S MARKETS                        5–8

Page 5

1  been deposed before?
2  A.    I have not.
3  Q.    All right.  Well, you know, the purpose of
4  the deposition is for me to find out, you know, what
5  information you have available.  It's an important
6  process both for you, your attorney, as well as for
7  the defendants.  So to that end I have a couple of
8  suggestions or requests for making the deposition go
9  better.
10          First, it's important that only one of
11  us speak at a time, because the court reporter only
12  has two hands.  So if you would wait until I'm
13  finished with my question before giving your answer
14  that would be great, and I'll try and wait until
15  you're finished your answer before I ask my
16  question.  Do you understand that?
17  A.    Yes.
18  Q.    If at any time I ask you a question that
19  you don't understand that is confusing or for
20  whatever reason you simply want to have it
21  rephrased, please ask that I rephrase the question
22  or, you know, ask me to clarify the question, that
23  kind of thing.  Do you understand that?
24  A.    Yes, sir.
25  Q.    If during the course of this deposition you

Page 6

1  determine that a question you have previously given
2  is for some reason inaccurate or incomplete or, you
3  know, just for purposes of providing full and
4  complete answers to the questions you want to
5  somehow supplement it or change it, please indicate
6  your desire to do so and I'll give you that
7  opportunity.  Do you understand that?
8  A.    Yes, I do.
9  Q.    If at any time during the course of this
10  deposition you want to consult with your attorney,
11  please indicate that you desire to do so.  Other
12  than having to wait until you answer the question
13  that's before you, I will, you know, agree and say,
14  fine, you can go and talk with your attorney about
15  whatever it is you want to talk with your attorney
16  about.  Do you understand that?
17  A.    Yeah, sorry.  Can I ask one question?
18  Sorry, just on the -- like if I ask you to elaborate
19  a question or something like that, should I just
20  answer the question and then try to elaborate more?
21  Like if it's a yes or no question, should I just
22  answer exactly the yes or no, or should I try to
23  elaborate?
24  Q.    What I would say is answer the question if
25  it's a yes or no answer.

Page 7

1  A.    Just stick to yes or no.
2  Q.    Depositions take their own course.
3        MR. BARRON:  If I may.  Certainly we
4  want you to understand the question when you answer
5  it.  If you don't just do everything -- let us do
6  everything or let Mr. Schauer do everything he can
7  to clarify, because if you answer it everyone will
8  assume that you did understand it.  I don't know if
9  that helps.
10        THE WITNESS:  Yes, it does.
11  Q.    Just basically, answer the question.
12  A.    Yes, sir.
13  Q.    And my final question, are you under any
14  kind of special stress or strain or under any
15  medications that would in any way affect your
16  ability to truthfully and accurately answer
17  questions put forth to you today?
18  A.    No.
19  Q.    Mr. McClellan, I would like to go back to
20  September 5, 2017, that's the date that you were
21  terminated from Redner's, do you recall that day?
22  A.    I believe so.
23  Q.    And I would like you to go a day forward,
24  to September 6, 2017, and tell me on that day why
25  did you think you were terminated from Redner's

Page 8

1  Markets?
2  A.    On the 6th?
3  Q.    Yeah, the next day you wake up, in your
4  head at that time what were you thinking as to why
5  you were terminated from Redner's Markets?
6  A.    I believe that was the day that I had --
7  the night I believe was when I was texting and
8  e-mailing Mr. McDonough, I believe if that's the
9  correct date.
10  Q.    I want to know the reason you thought in
11  your mind why you were terminated, not how it
12  happened or who said it to you.  When you woke up on
13  September 6 in your head why was it that you had
14  been terminated by Redner's Markets, what was their
15  reason?
16  A.    The conversation between Mr. McDonough was
17  if I wanted to come back, and then it turned to, you
18  were terminated.  There wasn't -- the problem before
19  that was hours I believe he said.
20  Q.    He expressed concern -- was there concern
21  expressed about having left your position as a
22  manager prior to -- without telling anybody on
23  Saturday, September 2?
24  A.    Yes.
25  Q.    And was that discussed with Mr. McDonough



**Page 9**

1  on September 5?
2  A.      I don't know if we discussed every part of
3  it because it wasn't a full conversation on the 5th.
4  Q.      Without getting into the details of what
5  was said, in your mind why were you terminated from
6  Redner's Markets on -- you know, as of where your
7  head was on September 6?
8  A.      By September 6 my head was -- there was a
9  roll down of a lot of events.  I guess the
10  conversation is why I felt I was terminated.
11  Q.      Because of the way the conversation went?
12  A.      Yeah.  I mean, at the end of the
13  conversation or -- I believe it was either the end
14  of the conversation or between text messages and
15  e-mails that's pretty much how it ended, yeah.
16  Q.      Is it accurate that you, you know, in a
17  phone conversation with Mr. McDonough and I believe
18  Mr. Merkel and a Jim Polchin, do you recall a phone
19  conversation on September 5 with those people?
20  A.      The date, it's right next to each other,
21  but, yes, I do remember that conversation.
22  Q.      Is it accurate the telephone conversation
23  ended with you hanging up the phone?
24  A.      Yeah.
25  Q.      And that was in part it appears in response

**Page 10**

1  to Mr. McDonough asking you to provide a yes or no
2  answer to a question that he had put to you,
3  correct?
4  A.      It was somewhere along the lines, yes.  I
5  think it was a yes or no question that he asked me.
6  Q.      Is it fair to say that that telephone
7  conversation at times was somewhat perhaps
8  contentious?
9  A.      For me or for them?
10  Q.      Was it contentious in any fashion?
11  A.      It wasn't the most comfortable
12  conversation.  The whole situation probably made it
13  seem that way of course.
14  Q.      Okay.  Back in let's say 2017, during the
15  time you were employed by Redner's Markets, did you
16  keep any kind of record separate and apart from the
17  Redner's Markets records of hours you worked, you
18  know, did you keep a notebook, pad of paper,
19  something like that?
20  A.      No.  I did have on my phone at one point a
21  tracker, to track when you were coming in and out,
22  but that was two phones ago.
23  Q.      So that would have been some time before
24  2017?
25  A.      Well, it was leading up -- yes, no, sorry.

**Page 11**

1  Q.      Actually these do tend to go faster if we
2  just do the answer and the question.
3  A.      Yes, sorry.
4  Q.      All right.  Was it -- do you recall saying
5  in this conversation that occurred, and I'm going to
6  suggest to you that it occurred on September 5, that
7  you felt that you had in fact worked 45 hours that
8  week of September 2?
9  A.      Yes, I worked -- yes.
10  Q.      Do you recall saying in the conversation on
11  September 5 when you were told that management, if
12  you will, was concerned that you had left your
13  position as manager or your job as manager on
14  Saturday, September 2, concerns that you had left
15  without getting permission or telling anybody else
16  at the store, do you recall that being said to you?
17  A.      I remember him saying that to me, yes.
18  Q.      Isn't it true that you did not get any
19  permission, or you didn't inform a superior that you
20  were going to be leaving?
21  A.      Not that day, but it was already given to
22  me before by a higher up.
23  Q.      To just leave early on Saturday?
24  A.      Yes.
25  Q.      Who was that?

**Page 12**

1  A.      The store manager, Jeff Treichel, because I
2  came in that Friday.
3  Q.      Okay.  And now that week you had left I
4  think, what -- you had gone for an appointment on
5  that Wednesday at 11 o'clock?
6  A.      Somewhere around there I believe.
7  Q.      More or less?
8  A.      Yes.
9  Q.      And you had mentioned to your -- was it
10  Jeff or another manager that you would be going to
11  this appointment?
12  A.      I believe that was with Mr. Harvilla, the
13  assistant store manager.
14  Q.      Okay.  And you were given permission to
15  leave on that Wednesday at whatever time, 11 or 12
16  or whatever?
17  A.      Yes.
18  Q.      And you say you were -- something about
19  making up time.  Did you make up time?
20  A.      On Wednesday?
21  Q.      No, later in the week.
22  A.      From Friday.  That was for Saturday.
23  Q.      Okay.  All right.  Tell me about that.
24  A.      Because I was asked to come -- I wasn't on
25  the schedule that Friday.  I was asked by Jeff, the



QUENTIN MCCLELLAN                                        June 19, 2019
QUENTIN MCCLELLAN vs REDNER'S MARKETS                    13–16

Page 13

1   store manager, to come in. Because that was the day
2   -- I guess that weekend, I believe it was a holiday
3   weekend, the store manager didn't know if the meat
4   cutter was coming in, if they had a meat cutter at
5   that time. I was asked to come in that Friday, just
6   to make sure everything was all right, just to make
7   sure that the meat cutter was going to be there,
8   talk to the guys, make sure they were in good shape,
9   which then led to me leaving Saturday.
10  Q.      Had you made any arrangements prior to your
11  departure Saturday to leave early Saturday?
12  A.      Like did I make arrangements?
13  Q.      Did you tell anybody?
14  A.      Yeah, that's when I was talking to Jeff.
15  Q.      When did you have that conversation with
16  Jeff?
17  A.      It depends because how they were off. Like
18  Wednesday, that Wednesday, I ended up talking to
19  Alan because Jeff wasn't there. So it had to be
20  before Wednesday, I'm going to say maybe Tuesday or
21  Monday. It had to have been before Wednesday I
22  believe, or might have been Thursday, I'm sorry.
23  Q.      Let's work backwards a little bit off those
24  questions. In your complaint, we'll get to this
25  later, you make a claim that you were terminated

Page 14

1   based upon your race.
2           Can you identify to me the information
3   known to you, I'm not asking you to identify through
4   all the documents that might have been exchanged in
5   discovery, but as of shortly after your termination,
6   can you identify to me the reasons why you think you
7   were terminated because of your race?
8   A.      Situations that happened in February, and
9   then started going downhill from there due to
10  because of my race in the store, then led to me
11  getting in trouble more and more throughout the time
12  in that store.
13          Prior to this we had a situation where
14  the race -- not directed -- it was in my department,
15  and that person got terminated. It seemed that
16  became a problem in my eyes because unfortunately
17  I'm black, I understand that, but other people were
18  getting fired because I'm the only black person in
19  the store.
20  Q.      Did anyone ever say directly to you that,
21  hey, it's because of you that this individual lost
22  their position, or something to that effect?
23  A.      There was no other way for it to happen.
24  Q.      No?
25  A.      In February --

Page 15

1   Q.      My question is --
2   A.      No, no one ever specifically said, because
3   of you or because of your race that happened.
4   Q.      Okay. The other situation with another
5   employee, but not directed to you that you
6   described, is that something that occurred back
7   around 2013?
8   A.      Yeah, somewhere around there. That was a
9   while back.
10  Q.      And do you agree that particularly with
11  respect to the situation that occurred in February
12  of 2017, termination of the individual found to be
13  responsible for the items that you expressed concern
14  about was appropriate?
15  A.      Can you restate it, sorry?
16  Q.      Okay. I'll break it down.
17  A.      Thank you. Sorry.
18  Q.      No, that's what I asked you to do. You
19  actually listened to what I say.
20  A.      Thank you.
21  Q.      All right. Back to the incident in
22  February of 2017. You mentioned that, you know,
23  based on a concern you voiced an individual ended up
24  being terminated, correct?
25  A.      Yes.

Page 16

1   Q.      And in your opinion was that the right
2   thing for Redner's to do in light of what had
3   happened?
4   A.      If that's what their protocols called
5   for.
6   Q.      Did you as a person feel that given what
7   you had seen and what you voiced a concern about
8   that termination of that individual was an
9   appropriate thing to do?
10  A.      Yeah.
11  Q.      No member of Redner's management ever came
12  to you and somehow, you know, blamed you or said to
13  you that we lost this good employee or we lost this
14  employee or this bad employee because you complained
15  about what they had done?
16  A.      I was asked what's the big deal, when the
17  store manager got called from Mr. McDonough or
18  someone from the HR department.
19  Q.      That's not quite the answer to my question.
20  Did any member of management express any
21  dissatisfaction with you because you had raised a
22  concern about this posting in February of 2017 and
23  it led to someone's termination?
24  A.      Well, I would say yes still.
25  Q.      What did they say?



Page 17

1  A.    Well, I don't -- what's the big deal with
2  that, usually we want to keep things at store level,
3  there was no need for you to call HR, things such as
4  that.  Even though it's not specifically saying,
5  it's your fault, nobody else made the call.
6  Q.    Okay.  Who -- tell me about this
7  conversation you had with somebody that said, we
8  want this to stay at store level?
9  A.    When I -- should I tell you about the
10 situation when I found the note?
11 Q.    No.  I want you to tell me about
12 conversation you had with somebody at Redner's that
13 said, this should stay at store level.  Who said
14 that to you?
15 A.    The store manager.
16 Q.    And who was that?
17 A.    I believe -- no, I know, Jeff Treichel.
18 Q.    And had you said -- what was the, if you
19 could describe it even in summary, what was the
20 conversation where that was said?
21 A.    It's going to be very short, but when I
22 found the pictures, or the situation at hand, I went
23 to the store manager at that point in time.  He went
24 back to take a look.  On his evaluation in coming
25 back to me, he said he sees no big deal in the break

Page 18

1  room, or whatever about it, and I said, okay.  So I
2  then contacted HR, I believe I e-mailed him, and once
3  the HR -- they first called him and talked to him
4  while I was talking to them in the back I believe.
5  Once I got off the phone and got up front I guess he
6  got told to take the pictures down.
7        He called me into his office and said,
8  I didn't see these.  He said, but we didn't need to
9  get HR and them involved.  He said, I don't know
10 what the outcome is going to be of this, I didn't
11 see a big deal.  I said, I understand if you did or
12 didn't, I still contacted -- it's already done, HR
13 is contacted, it is what it is at that point.  He
14 also said he didn't know that was, Samuel L.
15 Jackson, and I kind of laughed at that.
16 Q.    So you had come to him with a concern of
17 what was in the break room?
18 A.    Yes.
19 Q.    He went into the break room, were you with
20 him when he went into the break room?
21 A.    No, he was -- I'm sorry, no.
22 Q.    He came back to you and said, I see no
23 big deal in the break room, or something to that
24 effect?
25 A.    Yes.

Page 19

1  Q.    He later said to you, I didn't see these,
2  when you I guess what, identified the pictures to
3  him?
4  A.    I didn't identify the pictures to him.
5  That's the only reason I'm assuming, I have to
6  assume somebody from HR told him to get them from
7  the break room.
8  Q.    Did you ever walk back with Mr. Treichel or
9  point them out, were the two of you in the break
10 room?
11 A.    I told him specifically where they were, I
12 named the wall they were on and the corkboard they
13 were hanging on.  And the break room is maybe the
14 size of this room.  (Indicating.)
15 Q.    When he came back to you then and said, I
16 see no big deal in the break room, is that when you
17 reported the matter to HR?
18 A.    Pretty much.  There was a lot of things
19 that happened, but within the next, I'm going to say
20 maybe 40 minutes or so, hour, yes.
21 Q.    And is it -- did you then speak with HR
22 about, you know, your concerns about what was posted
23 in the break room?
24 A.    I believe -- it wasn't exactly just to HR,
25 it was like the chain of command.  So it was Jim

Page 20

1  Polchin I believe and HR, and then they called me
2  over the intercom.
3  Q.    All right.  And then what happened?
4  A.    When they called me over the intercom I
5  went into the back to get the phone, instead of
6  staying up front, and I was asked, what is this.
7  Because I sent the e-mail, and in the e-mail it
8  showed what it was.  And I asked what did they think
9  or whatever.  And Mr. McDonough was on the phone,
10 and he said, what is -- like he was definitely a
11 little -- seemed hurt or upset about the situation,
12 what is this, you know, like where did you find
13 this, what's going on.  And he asked me the
14 situation, and I told him, and I let him know that
15 the store manager he didn't see any big deal with it
16 in the break room.
17 Q.    Was it your sense that Mr. McDonough was
18 upset about what he saw, in other words, what you
19 had sent him as being posted?
20 A.    Well, I don't know, because I sent a
21 paragraph in the e-mail as well with the pictures.
22 So I don't know if it was because of the pictures or
23 the e-mail.  But either way as a group he seemed
24 disturbed by it, yes, he seemed a little disturbed,
25 which that was a little comforting at first after



Page 21

1  the store manager said he didn't see anything wrong
2  with it.
3  Q.     So after you had that interaction, you
4  know, where does that relate with your conversation
5  with the store manager that said, I didn't see
6  those?
7  A.     That's why I was --
8  Q.     Okay.
9  A.     When I was in the back -- so I was in the
10  back of the store, the store manager was either up
11  front or doing whatever, he was doing store manager
12  stuff and I was on the phone. Before I think I even
13  hung up the phone there was a page for the store
14  manager on the phone. I believe Mr. McDonough said,
15  all right -- we talked, obviously, and the end of
16  that conversation was just, go back to work.
17         I hung up the phone, and I proceeded
18  to go back to work. And there was some time that
19  passed, I don't know how long, it wasn't like hours,
20  the store manager after getting his phone call then
21  called me up to the office.
22  Q.     Was this situation, when I say, situation,
23  in other words, identifying the posting, you know,
24  talking to your store manager, talking to HR, taking
25  it down, after it was taken down and after you had

Page 22

1  had that conversation with your store manager about,
2  you know, I would like to keep this at store level,
3  was that situation ever spoken to by you, to you by
4  a manager again?
5  A.     The grocery manager I believe. It was a
6  grocery store, people talk, I mean, everyone talked.
7  So I hate to sound --
8  Q.     Let me be more specific. Were you ever
9  talked to or was it ever brought up even in just
10  conversation by one of your supervisors after that
11  occurrence?
12  A.     I believe Mr. Swartzlander, not in a bad
13  way, just asked me how things were going, if
14  everything was taken care of. I don't think anyone
15  said anything demonstrative or anything about it,
16  no.
17  Q.     So your sense was Mr. Swartzlander was
18  following up on making sure you were comfortable?
19  A.     Yeah.
20  Q.     Any other events, occurrences, information
21  that you have that made you think that your
22  termination was somehow related to your race?
23  A.     Some of the unfair things that happened,
24  but I can't -- there's no way for me to definitely
25  specifically say they were racist against me.

Page 23

1         MR. SCHAUER:  Off the record.
2         (Discussion held off the record.)
3         (Exhibit 1, screen shot of e-mail
4  dated February 16, marked for identification.)
5  BY MR. SCHAUER:
6  Q.     Mr. McClellan, I would like to show you
7  what's been marked as Exhibit 1, and I would like
8  you to review that exhibit. And when you're done
9  reviewing it my first question is, is this the
10  e-mail that you just spoke of as having been sent to
11  HR?
12  A.     Yes. I apologize, it wasn't sent directly
13  to HR.
14  Q.     Well, Alexis Foreman is --
15  A.     Yeah, she's my supervisor.
16  Q.     Is Alexis Foreman the person you generally
17  dealt with at human resource?
18  A.     No.
19  Q.     Was there a Randy?
20  A.     Randy or Mr. McDonough, I believe at that
21  time though Alexis might have -- no, let's just say
22  that.
23  Q.     And in fact, was it the same day that you
24  sent this e-mail to the HR department that, you
25  know, the pictures were taken down?

Page 24

1  A.     Yes.
2  Q.     Is there any way you can identify what time
3  of day -- actually, I can help you with that.
4  A.     Okay.
5         (Exhibit 2, e-mail dated 2/16/17,
6  marked for identification.)
7  Q.     I'm showing you Exhibit 2, which is
8  actually a printout of the e-mail that's reflected
9  in Exhibit 1. It has a date of February 16, and a
10  time of 11:07 a.m. would that sound about right?
11  A.     I assume, yeah.
12  Q.     What was your position at that time, on
13  February 16 of 2017?
14  A.     I was in training to be assistant store
15  manager I believe.
16  Q.     Okay. And was that as part of some formal
17  program at Redner's, or was that something done on a
18  store by store basis? Tell me what you understand
19  as to how you ended up in management training.
20  A.     Constant asking. I mean, not constant
21  asking, but I tried to ask and prove myself wherever
22  I could for the position to move up. Was it done
23  store by store? Go ahead.
24  Q.     Let me help you out. At some point you had
25  the understanding that you were being trained to be

QUENTIN MCCLELLAN
QUENTIN MCCLELLAN vs REDNER'S MARKETS

Page 25

1  a store manager, correct?
2  A.      Yes.
3  Q.      And who was it that, if you know, approved
4  you being trained to be assistant store manager?
5  A.      I do not 100 percent know who approved it.
6  I know -- sorry, Bill Swartzlander I know did my
7  evaluations.  And I think Randy was the gentleman
8  that helped me throughout the process.  So I don't
9  know if either one of them --
10 Q.      Well, was there to your understanding some
11 process that was a combination of work done
12 obviously in a store, but also with supervision
13 oversight by Redner's corporate office?
14 A.      They gave me a book that had a training
15 schedule in it.  It had dates that you were supposed
16 to switch to each different spot and do that.
17 Q.      When you say different spots, do you mean
18 departments?
19 A.      Yes.  Each different department.  And
20 sometimes it would be multiple -- it would change
21 positions in the department.  So let's say front end
22 I would be cashiering, and then the next week I
23 would be in the office, it's still front end but
24 different positions in that department.
25 Q.      Is it fair to say that this program of

Page 26

1  management was a combination of learning to be a
2  manager of people and also becoming familiar with
3  the work done by the various departments at Redner's
4  Markets?
5  A.      Yeah, I would assume so.
6  Q.      Prior to your going into this management
7  program, what was your position?
8  A.      I was a meat cutter and a meat manager.
9  Q.      Would you be both those things at the same
10 time, or were those positions you held consecutively
11 or what?
12 A.      At the time before I got into the assistant
13 manager program I was a meat manager, but I was -- I
14 kept floating.  Like my supervisor would use me in
15 other stores as a meat cutter whenever let's say a
16 store was down somebody or needed help.  So that's
17 the only reason I say that.  Like some days I was in
18 -- I wasn't in necessary -- 2013 I was in
19 Nesquehoning, but if they needed a meat cutter they
20 would send me down to Nesquehoning for a couple days
21 to help out.  That's why I say I was a meat manager
22 in my store, but I was a meat cutter when I went to
23 other stores.
24 Q.      In 2017 what was your store?
25 A.      2017 Pittston was my store.

Page 27

1  Q.      How long had -- when did you start working
2  as the meat manager in Pittston?
3  A.      I want to say 2014, somewhere around there,
4  2015.
5  Q.      And from that time that you started in 2014
6  or 2015, did you stay a meat manager in Pittston, or
7  was there some time you were doing something else in
8  another store?
9  A.      No, there was sometimes I went down to
10 Nesquehoning.
11 Q.      No, other than temporary assignments?
12 A.      No, that was it.
13 Q.      So your primary assignment, or store, was
14 Pittston, from 2014, 2013 on -- or 2014, 2015 on?
15 A.      Yes.
16 Q.      And you would occasionally have some
17 relatively temporary assignment to assist other
18 stores if they were short in the department?
19 A.      Yes.
20 Q.      Eventually did you move from the management
21 program back into being a manager of the meat
22 department?
23 A.      I was moved back -- at the time I was still
24 confused at my position.  And I say that only
25 because there was a meat manager that was trained

Page 28

1  when I got pulled out.  So he was still there.  So
2  it was an awkward spot for a little bit.  He was the
3  meat manager, but I was the -- I was either the meat
4  cutter or assistant meat manager, but they didn't
5  have an assistant meat manager.
6  Q.      Did you ever ask anybody for
7  clarification?
8  A.      On the couple of times I saw my
9  supervisor.
10 Q.      Who was your supervisor?
11 A.      Mr. Bill Swartzlander -- actually I might
12 have asked Mr. Merkel once or twice, and I know I
13 asked Randy during the time of me being in training
14 and everything.  So I probably asked Randy once or
15 twice, he was my HR guy.
16 Q.      During that time were you a salaried
17 employee?
18 A.      Yeah, I was still a salary employee.
19 Q.      You received a salary, you received a bonus
20 if you worked over some number of hours, but
21 otherwise you were a salaried employee during the
22 time you were in the training program and when you
23 were a meat manager, correct?
24 A.      Uh-huh.
25 Q.      You have to say yes or no.



QUENTIN MCCLELLAN
QUENTIN MCCLELLAN vs REDNER'S MARKETS

June 19, 2019
29–32

Page 29

1  A.    Yes.  Sorry.
2  Q.    I forgot that instruction.
3  A.    I nodded my head a new times too, sorry for
4  that.
5  Q.    And then after you were no longer in the
6  management program, you were also still a salaried
7  employee, correct?
8  A.    Yes.
9  Q.    Okay.  And the expectation at Redner's is a
10  salaried employee works 45 hours a week, correct?
11  A.    That's their expectation, yes.
12  Q.    Was it your decision to withdraw from the
13  management program?
14  A.    It was -- yes and no.  I wanted to be an
15  assistant store manager and I kept asking about the
16  dates in the book on the program.  But after a while
17  I was told that the dates in the book aren't exactly
18  the timeline of the program.  So then as I kept
19  asking, things kept going on and it was, do you want
20  to be an assistant store manager, I said yes.  And
21  as things kept going on it was kind of like they
22  felt you didn't want it enough.  So it wasn't that I
23  didn't want to be in it, but things kept going down.
24          MR. SCHAUER:  Okay.  I'm going to mark
25  a document as Exhibit 3.

Page 30

1          (Exhibit 3, E-mail dated 3/16/17,
2  marked for identification.)
3  Q.    Mr. McClellan, I'm going to ask you to take
4  a moment and review what's been provided to you as
5  Exhibit 3.  Focusing on the middle portion of that
6  document it appears to be an e-mail from you to Jim
7  Polchin March 16 at 11:36.  Do you see that?
8  A.    Yes.
9  Q.    And if you want to take a moment and look
10  at this.  Let me know when you've had a chance to
11  review it.
12  A.    I have.
13  Q.    All right.  Was this something that you
14  were saying, you know, questioning about your time
15  in the management or what you were doing in the
16  management program?
17  A.    Yes.
18  Q.    And why did you write this e-mail?
19  A.    At this point I believe it was because the
20  things in the book were not corresponding to the
21  training, and I was told I need to make sure I get
22  trained properly if I'm going to be in training.  So
23  I e-mailed Mr. Polchin about the situations going
24  on.
25  Q.    What if anything happened after you sent

Page 31

1  Mr. Polchin this e-mail relative to your concerns
2  about things not going on in management?
3  A.    I believe Randy -- they sent Randy and him
4  -- he came down and Randy might have come down at a
5  different time and talked to me.
6  Q.    And was one of your concerns that you felt
7  you might have been doing a little more kind of, you
8  know, lower level work, stocking work, things like
9  that, as part of the management program than you
10  felt appropriate?
11  A.    It wasn't that I felt that it was lower
12  level work.  It was the fact that the stocking, like
13  the billing and things like that, I believe at the
14  time was what I was supposed to be doing, the inner
15  office is what I was supposed to be doing in
16  training, I believe.  So at that point I was a
17  little worried that I wasn't getting shown the inner
18  office, and I couldn't really say because I wasn't a
19  store manager at that point.
20          MR. SCHAUER:  Let's mark this as 4.
21          (Exhibit 4, Letter dated 3/23/17,
22  marked for identification.)
23  Q.    Mr. McClellan, I'm going to show you a
24  document I've marked as Exhibit 4.  This may or may
25  not be something that you had seen prior to today.

Page 32

1  I will suggest to you that it is a document that has
2  been produced to your counsel.  And it's a memo
3  prepared by Randy Kostelac, HR manager, it has a
4  date of March 23, 2017.  Do you see that?
5  A.    Yes.
6  Q.    And I'm going to maybe work through this
7  with you and ask you questions about some of the
8  things in this memo.  Is that okay with you?
9  A.    Yes.
10  Q.    The first sentence refers to, on Thursday
11  March 16, we had received an e-mail from Quentin
12  about some challenges he is facing at the Pittston
13  location and expressed interest in possibly
14  transferring.
15          Would that have been the e-mail we
16  were just talking about, Exhibit 3?
17  A.    Okay.
18  Q.    Well, there's a --
19  A.    Yes.
20  Q.    As best you know, do you know if you wrote
21  any other e-mails?
22  A.    No, that's what made me jump back and look
23  at the date.
24  Q.    Next sentence says, Bob McDonough, Jim
25  Polchin and I, that would be Randy, called Randy on



QUENTIN MCCLELLAN
QUENTIN MCCLELLAN vs REDNER'S MARKETS

June 19, 2019
33–36

Page 33

1  Friday, March 17, to discuss his concerns to get a
2  better idea of what he was referring to in relation
3  to letters that were written and sent into the
4  corporate office.
5      Do you recall that being discussed?
6  A.    Yes.
7  Q.    Do you recall being on a phone conversation
8  with those three individuals?
9  A.    I do not recall all three of them being on
10  the phone call.
11  Q.    Okay.  Do you recall a call with at least
12  one or more?
13  A.    Yeah.
14  Q.    It says, during the conversation it was
15  decided to go to the store and meet in more depth,
16  did that happen?
17  A.    I believe Randy came down.
18  Q.    Next is, on Wednesday, March 22, Randy
19  went, and he says, I went to the store and had a
20  very good conversation with Quentin.
21      Do you see that?
22  A.    Yes.
23  Q.    Do you recall having that meeting and the
24  conversation with Randy Kostelac?
25  A.    I believe, yeah, he just popped in to meet

Page 34

1  with me.
2  Q.    There was a discussion of a letter that had
3  been written and it says, we discussed the letters
4  and reaffirmed our support for him as these letters
5  were written by someone with little knowledge of the
6  situation.
7      Do you see that?
8  A.    Yes, I do.
9  Q.    Did that happen, did he discuss it with
10  you and reaffirm to you that you were being
11  supported?
12  A.    Yeah, I don't know if it was actually about
13  the letters though, but, yes.
14  Q.    Well, in any event was the communication
15  from Randy that, you know, there is support for
16  you?
17  A.    Yes.
18  Q.    It says, since Quentin is in training we
19  discussed how we need him to observe the other
20  managers and learn from him and we don't need him
21  doing 100 percent of the stock work, right?
22  A.    Yes.
23  Q.    It says, I asked him, that would be you, on
24  numerous occasions during the meeting to let me
25  know if there was anything else he would like to

Page 35

1  discuss.
2  Q.    Do you recall being asked that by
3  Mr. Kostelac?
4  A.    I do.
5  Q.    And did you say anything further, or at the
6  end of the meeting was --
7  A.    No, I believe it was in the meat room,
8  which is why I didn't.
9  Q.    The discussion you had with him was in the
10  meat room?
11  A.    It was.  It was either in the meat room or
12  on the sales floor.
13  Q.    Did you ask him to go somewhere else for
14  the conversation?
15  A.    No, we ended up having talks later, so that
16  might be an exhibit.
17  Q.    Okay.  Did you -- at the bottom it says,
18  Quentin understood our discussion and we ended on a
19  very good note and he was very appreciative of the
20  visit.
21      Was that an accurate perception of
22  Mr. Kostelac?
23  A.    Yes.
24  Q.    You were appreciative, you felt better
25  after this conversation?

Page 36

1  A.    Well, no, I appreciated him coming down and
2  talking to me.  He didn't have to drive all the way
3  from Reading.
4  Q.    Going back further, and I apologize for
5  jumping around, in the end of the second paragraph
6  there's a sentence, he feels like the employees
7  see him as a bad guy because many of the policies
8  weren't strictly enforced with previous
9  managers.
10      Do you see that?
11  A.    Yes.
12  Q.    There's also a reference, he refers to the
13  challenges of adjusting to the new store director as
14  he is very particular about the management team
15  upholding the policies within the handbook, and that
16  is a little challenging with the employees that have
17  been working at this location for many, many years.
18      Do you see that?
19  A.    Yes.
20  Q.    And did you share that thought with Mr.
21  Kostelac in that meeting on March 22?
22  A.    Yes.
23  Q.    Now, the handbook, did you have a copy of
24  the employee handbook?
25  A.    It was revised, but I don't believe I had a



Page 37

1  copy. But there should have been a copy in the
2  store director's desk, and I was in training so I
3  was able to go in there.
4  Q.      If you ever wanted to consult the handbook
5  or review the policies in the handbook, was it
6  readily available to you?
7  A.      As long as I was -- yes and no. Because
8  when I was in training I was able to go in the
9  office whenever I wanted to. That's why I said yes
10 or no. Usually it was, but when I got out of
11 training you had to ask somebody to get it,
12 independent who it was, you would have to ask the
13 store manager to get it.
14 Q.      Did you receive a copy of the handbook when
15 you were hired?
16 A.      It was a totally different handbook. And
17 no, I did not receive a handbook, it was in the
18 store manager's desk.
19 Q.      During the time you were in assistant
20 manager training and had access to the handbook did
21 you consult it?
22 A.      It got revised during that time. We got a
23 new one that I had to sign off somewhere, when the
24 new one got revised.
25 Q.      My question is, did you, while you said you

Page 38

1  had access to the handbook as part of the assistant
2  manager training, did you ever consult the
3  handbook?
4  A.      Yeah, I read through some of it, yeah. I
5  don't know if it was the new one or old one.
6  Q.      Did you ever consult the handbook with
7  respect to any personal concerns you had vis-a-vis
8  your employment at Redner's separate from what's
9  the policy with something you saw with somebody
10 else?
11 A.      Can you elaborate?
12 Q.      Well, okay. You mentioned the situation
13 that occurred with the posting. Did you consult the
14 handbook to see what the handbook had to say about
15 what to do in a situation like that?
16 A.      No.
17 Q.      You make a claim in this case which we'll
18 get to in more detail that you were terminated
19 because of having a disability and not getting
20 accommodated. Did you consult the handbook to see
21 what the handbook said should happen or what you
22 should do in a situation where that occurred?
23 A.      I was in a direct conversation with Sue
24 Rotkiske, the woman that handled FMLA. I was
25 just -- what she told me is what I did.

Page 39

1  Q.      My question is, did you consult the
2  handbook with respect to any concerns you had about
3  a disability, not FMLA, a disability, and an
4  accommodation under the Americans with Disabilities
5  Act?
6  A.      No.
7  Q.      Well, did you consult the handbook with
8  respect to how the Family Medical Leave Act is
9  administered at Redner's Markets?
10 A.      No, that's what I --
11 Q.      You contacted Sue?
12 A.      Sue contacted me.
13 Q.      All right.
14 A.      And she contacted me actually for FMLA. I
15 didn't even ask about FMLA. The store director I
16 guess contacted her, who contacted me.
17 Q.      Okay. But back to it, did you make an
18 effort to look at the handbook with regard to any
19 concerns, issues, thoughts that you had during the
20 times you say you had at least direct access to the
21 handbook, i.e., when you were in the manager
22 training program?
23 A.      No, not when I was in the manager training
24 program I don't believe so.
25 Q.      Okay. In the third paragraph of the

Page 40

1  Exhibit 3 -- excuse me, 4, it begins, I reaffirmed
2  with him we will stand behind all our of managers as
3  a large part of their job responsibility to uphold
4  all of our policies set forth in our handbook.
5          Do you see that?
6  A.      Yes, I do.
7  Q.      Did he say that to you?
8  A.      I have to say yes.
9  Q.      And down on the bottom right hand corner
10 there's a handwritten note -- well, I will suggest
11 to you what that is a photocopy of a post-it.
12 Okay. It doesn't necessarily show or profile the
13 post-it, but I will suggest to you that it's a post
14 it. Do you recognize the handwriting on that?
15         MR. BARRON: Can we just clarify? It
16 appears to me there are two handwritten notes on
17 this document, or at least on my version there is.
18         MR. SCHAUER: Okay. Lower right hand
19 corner, the language, Quentin McClellan, VAC day
20 four hours, then eight hours is crossed off it looks
21 to be 3/24/17. I'm referring to that.
22 Q.      Do you recognize the handwriting?
23 A.      That appears to be my handwriting.
24 Q.      Do you recall ever having written or
25 prepared a post-it note that says that?



QUENTIN MCCLELLAN                                                  June 19, 2019
QUENTIN MCCLELLAN vs REDNER'S MARKETS                                    41–44

Page 41

1  A.      I believe so.  I must have put in for a
2  vacation day, four hours.
3  Q.      Okay.  What is your understanding of the
4  process for putting in for or obtaining approval of
5  vacation days while you were at Redner's,
6  specifically in the first half of 2017?
7  A.      I was told that the vacation day just
8  needed to be requested and put in at first by
9  February, then April I was told something different.
10  Q.      All right.  So what did you learn in April?
11  A.      In April I learned that -- I was told it
12  was my fault that vacation wasn't put in for myself.
13  But I wasn't able to put in vacation for myself, and
14  I was told that I needed to discuss with store
15  managers or someone up above about vacation, and I
16  needed to follow that from now on instead of just
17  trying to take vacation.
18          When I told him that I couldn't do it
19  myself, he said, well, things happen, and just
20  moving forward you need to let people know.  If
21  they approve it, the vacation is approved by the
22  store manager, so long as they approve it, you're
23  okay.
24  Q.      When they say put in, was it something you
25  needed to enter into some electronic system, or is

Page 42

1  it just that you needed to let your store manager
2  know you needed to take vacation for some period of
3  time, a day, a week, whatever?
4  A.      What happens is, put in means that the
5  store manager or whoever can put it in to payroll,
6  they'll put it into the computer system that you
7  used vacation time.  I directly couldn't put in
8  vacation time myself without the passwords to get
9  into the computer software and things like that, the
10  scheduling system for them.
11          So usually they would say -- like, for
12  instance, if the store manager knew that you were
13  taking vacation or you were using a half day, he
14  would say, either tell me or leave me a note.  The
15  problem with telling them was everything, the hustle
16  and bustle of the day, they may forget.  So you
17  would leave a note for them and they could put in
18  time for you.
19  Q.      Prior to April what was your understanding
20  of the method for vacation?
21  A.      Vacation was used a lot sometimes for
22  different managers in different ways.  Some managers
23  would take their full weeks, while some managers --
24  let's say something came up, you used a vacation day
25  if you had it, if you didn't have personal time or

Page 43

1  whatever, the store manager would be okay with that
2  and let you put it in.  Sometimes the manager would
3  say, if it was a slow week, they didn't have the
4  salary -- not they didn't have the salary
5  technically, but the budget wasn't flowing right, if
6  there was time you could use your time and take a
7  day.
8  Q.      And typically when you decide to take a
9  day, is that something you would tell the manager,
10  that you're taking a day?
11  A.      You'll tell the manager and usually --
12  yeah, or unless you scheduled like a week, then that
13  got sent to corporate I believe.
14  Q.      But at the end of the day you weren't just
15  allowed to decide one morning you didn't feel like
16  coming in, or in the middle of the day decide to
17  leave because you felt maybe you had some comp time
18  due?
19  A.      No.  You could put in -- if it was slow --
20  because you figure, I was in training some days, and
21  some days there was four managers there.  So if I
22  asked, hey, do you mind if I take off, and they'll
23  be like, do you have vacation time, and they'll be
24  like, how much time do you need.
25  Q.      My point was, you still needed to let

Page 44

1  somebody know you were going out or leaving?
2  A.      Yeah, sure.
3          MR. SCHAUER:  We'll mark this as
4  Exhibit 5.
5          (Exhibit 5, E-mails dated 3/24/17,
6  marked for identification.)
7  Q.      I would like you to turn first to the --
8  well, I would suggest to you Exhibit 5 is a document
9  that was provided to your counsel.  It's a series of
10  e-mails dated March 24, 2017.  The first e-mail is
11  on the second page, the bulk of the second page.
12  There's an exchange between you and Mr. Kostelac.
13  Do you have a recollection of this e-mail exchange?
14  A.      Yes.
15  Q.      And let's go to the second page where it
16  says -- you have all these signs off to the left, it
17  says on March 24, 2017 at 8:19 a.m., you wrote -- do
18  you see that?
19  A.      Yes.
20  Q.      And this would have been I guess two days
21  after Mr. Kostelac had been down to see you and talk
22  with you about the concerns you voiced?
23  A.      Yes.
24  Q.      What was your purpose in writing this?
25  A.      After the conversation in Exhibit 4, I came


ESQUIRE
DEPOSITION SOLUTIONS

QUENTIN MCCLELLAN                                          June 19, 2019
QUENTIN MCCLELLAN vs REDNER'S MARKETS                              45–48

Page 45

1  in and asked what to do I believe, and there was --
2  the store manager and assistant manager were off
3  that day I believe, I asked, what do they need done
4  or what am I going to be doing that day, and they
5  said cleaning shelves the whole day.  Today I was
6  told to steam clean bottom shelves.
7     Q.     And what was wrong with that?
8     A.     Going to the part that he shouldn't be
9  stocking all day, I thought there was something else
10 that could have been done with training.
11    Q.     If you would, move to number 10.  It says,
12 I didn't mess up my schedule Friday, said I wouldn't
13 be here, but store and assistant said they were, but
14 only assistant was.  What were you communicating
15 there?
16    A.     I'm not exactly sure.  I don't know if
17 that's a grammatical error or not, I'm not sure.
18    Q.     Is it your belief that the items in
19 paragraphs one through nine as you numbered them,
20 and I'll give you a moment to look them over, but my
21 question would be, are those items part of your
22 responsibilities as somebody in the training
23 program?  I mean, responsibility to bring to the
24 attention to someone like Randy?
25    A.     No.  The reason I brought it to Randy, and

Page 46

1  this is just like the e-mail from Exhibit 4, I
2  didn't want to say anything after a while because
3  every time I opened my mouth in the store, things
4  progressively started getting worse.  So then what I
5  tried to do was instead of -- Randy talked to me
6  when we were in the sales floor in the meat room, I
7  felt that wasn't going to be the best time for me to
8  say some of the things, that would make it worse.
9  So then I e-mailed him in a one on one.
10    Q.     Was there any reason you couldn't have
11 said, hey, Randy let's go outside and talk about
12 this, or let's move further up this aisle or go
13 somewhere else so we can talk a little bit?
14    A.     I'm assuming work.  I mean, that's the
15 only --
16    Q.     Do you know?
17    A.     From that day, no, I do not remember the
18 exact reason why I did not tell him that day.
19    Q.     No.  My question is, was there a reason why
20 you didn't try and get to a place in the store or
21 around the store, even outside the store, where you
22 would feel more comfortable sharing information with
23 Mr. Kostelac?
24    A.     I don't know if there was a place I felt
25 more comfortable in the store.  At this point if

Page 47

1  you --
2     Q.     My question isn't really related to this
3  e-mail chain.  It's on the day, March 22, when you
4  had the conversation with Mr. Kostelac where he came
5  to you after you expressed concerned in an e-mail,
6  and he felt you had discussed the issues fairly
7  fully, is there any reason why you weren't able to
8  suggest to him, hey, there's some more things I
9  would like to talk about, let's try and go somewhere
10 else, let's go outside, let's go over here, let's do
11 whatever?
12    A.     No.  But in the first paragraph on the
13 first page all these things aren't just from the
14 past couple of days, they've been going on since
15 training began until now, somewhere since the last
16 time we talked.  The reason I didn't want to say
17 anything when I tell some things they get right out
18 or isn't getting to the right people.
19    Q.     Well, did that happen with things that you
20 shared with Randy?
21    A.     That happened with things I shared in
22 general.
23    Q.     Does it happen -- I will ask questions
24 until I get an answer.  Did that ever happen with
25 Mr. Kostelac, that you shared something with him

Page 48

1  that somehow came back to you through some channel
2  that you thought shouldn't have?  Can you identify
3  something?
4     A.     With HR.
5     Q.     No.  That's not my question.
6     A.     Well, normally I wouldn't contact Randy.
7     Q.     Well, that's okay.  You said you were not
8  comfortable sharing information with Mr. Kostelac on
9  that day because things some things that you said
10 about things from the past, to reference the e-mail,
11 you know, came back to you.  Had you ever had that
12 experience with Mr. Kostelac in your time at
13 Redner's?
14    A.     I do not believe so.
15    Q.     Okay.  Back to a prior question also.  With
16 respect to items one through nine, I think you said
17 those were observations you had, they weren't
18 necessarily within the responsibilities and duties
19 you had as an assistant manager trainee, correct?
20    A.     No, they weren't direct duties of mine I
21 guess.
22    Q.     Or to the extent perhaps these were things
23 to be reported, it's not something that necessarily
24 gets reported to HR, perhaps reported to the
25 supervisor that would be involved?



Page 49

1  A.      That's what I was trying to elaborate
2  before.
3  Q.      Moving down to the bottom of the e-mail
4  that you wrote on March 24 on page 2 of Exhibit 5.
5  There's a sentence, every day here I am more and
6  more just a body.  There is only the grocery manager
7  here, I will be using a vacation day.  Do you see
8  that?
9  A.      Yes.
10 Q.      And is that saying that you were going to
11 be taking a vacation day here on March 24?
12 A.      I believe so.
13 Q.      All right.  So then if you move to the next
14 e-mail up the chain, beginning at the bottom of the
15 first page, it's a response, 8:52 a.m., about 43
16 minutes later, from Mr. Kostelac, asking why you
17 didn't tell him those things before.  Do you see
18 that?
19 A.      Yes.
20 Q.      But you do then answer I guess in your
21 e-mail in the middle of the first page dated 9:16
22 a.m., correct?
23 A.      Yes.
24 Q.      So the March 24 appears to be a Friday,
25 correct?

Page 50

1  A.      Yes.
2  Q.      Now, I would like you to go back to Exhibit
3  4 in that handwritten note that you say is in your
4  handwriting, do you see that?
5  A.      Yes, I do.
6  Q.      Isn't it a fact that you had placed that
7  note on your manager's chair at some point on the
8  day of March 24?
9  A.      On his desk.
10 Q.      On his desk?
11 A.      Yeah.
12 Q.      And is it also true that you went in and
13 took that note and put it into the trash?
14 A.      I don't know.
15 Q.      Well, do you recall having gone in to your
16 manager's office, taking that note stating you're
17 taking vacation, removing it from your manager's
18 desk, and putting it into the trash?
19 A.      I do not recall, but it could be possible.
20 Q.      When you give an answer like, it could be
21 possible, that means that if somebody else says
22 that's what happened, you know, that you're not
23 denying it, you're saying, well, that could be.
24 A.      I don't -- I want to say I don't think I
25 did, but if you're saying that's what happened, I

Page 51

1  have to assume -- I don't remember.
2  Q.      I'm asking you.  I'm not saying it
3  happened, I'm asking you.
4  A.      I'm trying to explain to you.  I don't
5  remember.  I wouldn't have remembered the exact date
6  I put this on his desk.  I don't know.  I don't
7  recall if I threw it away, or if I put it there
8  exactly that day, the hour, I do not know that.
9  Q.      Do you recall whether you in fact were
10 charged with having utilized vacation on March 24
11 either for eight hours or four hours?
12 A.      I do not recall.  But I'm assuming -- I
13 assume this leads up to the conversation I had with
14 Mr. McDonough.
15 Q.      Don't worry about where it might go.  Just
16 try and answer my question.  Do you recall whether
17 you were charged with four or eight hours or any
18 vacation on March 24, 2017?
19 A.      I answered your question.  I do not.
20 Q.      Is it -- would it be fair to say that given
21 your testimony with respect to the nature of the
22 items identified on Exhibit 5, specifically on the
23 first e-mail on that day, the one on the second
24 page, those were -- those were the items, at least
25 at that moment, primary concern to you, that's what

Page 52

1  was on -- those were the things on the top of your
2  head?
3  A.      At that moment.
4  Q.      In addition to whatever it was you may have
5  discussed with Mr. Kostelac on Wednesday, correct?
6  A.      Yes.
7  Q.      Okay.
8          MR. SCHAUER:  Exhibit 6.
9          (Exhibit 6, note dated 4/3/17, marked
10 for identification.)
11 Q.      Mr. McClellan, I'm showing you a document
12 that's marked as Exhibit 6.  It's been produced to
13 your counsel in discovery.  I will suggest to you
14 that it is a summary of conversation or a summary of
15 events prepared by Mr. McDonough, references your
16 name at the top, and it's dated April 3, 2017.  Do
17 you understand that?
18 A.      Yes.
19 Q.      So I'm going to go through this document
20 similar to having gone through the prior document I
21 think with Mr. Kostelac.  I was going to ask you
22 whether you recall that event or conversations
23 having occurred or not.  Is that fair?
24 A.      Yes, I recall.
25 Q.      Well, the first sentence of this document



QUENTIN MCCLELLAN                                          June 19, 2019
QUENTIN MCCLELLAN vs REDNER'S MARKETS                            53–56

Page 53

1  prepared by Mr. McDonough, Exhibit 6, says, Thursday
2  March 20, Frank met with Quentin to discuss some of
3  his concerns in an e-mail recently where he
4  requested a transfer.  Do you recall having a
5  meeting with Frank Fiore and Mr. McDonough?
6  A.    Yes, but it wasn't about what they said.
7  Q.    It wasn't a matter for transfer?
8  A.    No.  Because I didn't call the meeting, and
9  I didn't know about the meeting.  I went to a
10 different store, I wasn't even in Scranton.
11 Q.    Did you have a meeting with Mr. McDonough
12 and Fiore on March 30?
13 A.    Yes.
14 Q.    Where did it take place?
15 A.    Scranton, Pennsylvania.
16 Q.    Without regard to who asked for the meeting
17 or didn't ask for the meeting.  So you're saying
18 that you didn't know there was going to be a
19 meeting?
20 A.    No, I was called to a different store.  I
21 was sent to a different store for tomato soup.
22 Q.    And you met -- at that time though you had
23 occasion to meet with Mr. Fiore and Mr. McDonough?
24 A.    Yes.
25 Q.    Well, you had just expressed these concerns

Page 54

1  to Mr. Kostelac in your e-mail, Exhibit 5, of March
2  24, correct?
3  A.    Yes.
4  Q.    In your e-mail of March 24 Mr. Kostelac it
5  says, I trust no one in this store, correct?
6  A.    Yes.
7  Q.    Are you saying that you would -- you
8  mentioned a transfer, would you say you would be
9  adverse to that, or would you prefer to stay at that
10 store, Pittston?
11 A.    I was looking at options.
12 Q.    Okay.  So did you somehow think there was
13 something wrong with Mr. McDonough and Mr. Fiore's
14 meeting to talk with concerns that you had
15 expressed?
16 A.    That's --
17 Q.    Head of HR, and well, what is Mr. Fiore's
18 position?
19 A.    Vice president of operations, I believe.
20       Is that what it is?
21 Q.    They'll get their chance to answer
22 questions.
23 A.    Sorry.  I believe he's the vice president
24 of operations.
25 Q.    So you had the attention of vice president

Page 55

1  of operations and vice president of human resources,
2  correct?
3  A.    Yes.
4  Q.    Is there anything inherently bad or wrong
5  about that?
6  A.    Yes.
7  Q.    What do you think?
8  A.    The reason that they told me they had to
9  come up.
10 Q.    What did they say to you?
11 A.    They said they were told by the assistant
12 store manager that I didn't put in time for
13 vacation.
14 Q.    All right.  And what's wrong with that?
15 A.    As I explained to them, I can't put in time
16 for vacation.
17 Q.    Well, you said that your understanding of
18 the practice was you would communicate to the store
19 manager or assistant manager that you were putting
20 in for vacation, correct?
21 A.    Yes.
22 Q.    And would an example of that be leaving, as
23 you say you're not sure if you did or didn't, a
24 post-it note similar to the, what I'll say is a
25 post-it note, on the lower right hand coroner of

Page 56

1  Exhibit 4?
2  A.    That's one way of communicating, yes.
3  Q.    To your knowledge at that time that's what
4  you would have done to request vacation time?
5  A.    Or just tell the store manager, like I
6  said, tell the store manager or leave a note.  Yes,
7  sir.
8  Q.    And so they said to you that the store
9  manager told them that you had not --
10 A.    Assistant store manager.
11 Q.    Assistant store manager said you had not
12 requested?
13 A.    No.
14 Q.    What was said?
15 A.    It was said that I didn't put in my time,
16 not that it wasn't requested, that I didn't put in
17 the time.  So I had to elaborate to them, I can't
18 use the computer to put in the time.  I did tell
19 Alan, and he agreed he was told.
20 Q.    On the afternoon of March 24?
21 A.    I think it was -- this is when I said that.
22 I think it was because of this date, but I'm not
23 sure what day they were referencing that Alan told
24 -- I didn't talk to them about it.  The assistant
25 store manager called -- e-mailed or talked to them



Page 57

1  about me not putting in time for vacation is what I
2  was told.  So I elaborated that I can't put in time.
3  But I did tell them, and that's the way the
4  conversation started.
5  Q.     Okay.  And you are saying that you're
6  pretty sure -- well, you don't know whether in fact
7  you may have put this post that's shown on the lower
8  right hand corner of Exhibit 4 on the desk of your
9  manager at Pittston on March 24 and then moved it or
10  thrown it into the trash, you don't know that?
11  A.     No.
12  Q.     Okay.
13  A.     I don't believe so.
14  Q.     Do you recall taking off the afternoon of
15  March 24, did you leave?
16  A.     I remember taking vacation time.  So I
17  remember the vacation time going in.  I remember the
18  conversation about me taking vacation time, that's
19  to believe only -- that's what I'm trying to say.  I
20  remember that I -- I don't remember throwing the
21  post-it note away.  But I can't sit here and argue
22  with you, I can't -- that's just a small piece.
23  Q.     All right.  So there's a statement that
24  they met and discussed some of his concerns, he
25  expressed in an e-mail recently where he had

Page 58

1  requested a transfer.  Was there a discussion about
2  concerns you had raised in, I'm assuming the e-mail
3  of March 24?
4  A.     I believe so.
5  Q.     Okay.  During the conversation Quentin
6  expressed many concerns we addressed as best we
7  could.  Did you feel that during the conversation
8  they addressed as best they could concerns that you
9  addressed?
10  A.     Yes and no.
11  Q.     Well, I'm not necessarily saying that
12  everything -- they did exactly what you wanted them
13  to do.  But do you feel they listened to what you
14  said to say and reacted to it in a real way, not in
15  a dismissive way?
16  A.     That's the part that's different.  Yes, I
17  believe they did, but some of the parts were a
18  little grey area.  Like I have to explain to you
19  about putting in vacation, that was left a little
20  gray area, but that's the reason we were having this
21  conversation about me not putting in time for
22  vacation.
23  Q.     I'm going to ask you a hypothetical.
24  A.     All right.
25  Q.     But would there have been any reason why

Page 59

1  you would have put the note that's on Exhibit 4,
2  saying vacation day four hours, onto your manager's
3  desk and then thrown -- gone in and picked it up and
4  thrown it away?
5  A.     If I talked to the assistant manager.
6  Q.     Do you know whether you talked to the
7  assistant manager?
8  A.     That's what made me upset during the
9  meeting.  Not upset, like I was irate, that's what
10  made it a shock when I had the meeting, because the
11  meeting was that I didn't physically put in time for
12  the vacation, not that I took a vacation day, not
13  that I took a half vacation day, that I tried to
14  steal the time.  But Alan knew I was taking a half
15  day, the assistant store manager.  But to me it
16  seemed like you just said, do I always contact
17  Alexis Foreman or Randy when something could be
18  handled at store level, no.  But it was weird that
19  the vice president and president of HR came up to
20  talk to me about a vacation day that the assistant
21  store manager is the only one there that could put
22  it in.  To me I was taken aback, that's what I kept
23  asking how do I fix it, if he didn't put in the
24  vacation day.  And that's why it was left gray area.
25  There was no answer to that.  There was no clear

Page 60

1  picture to if anyone did anything wrong or right in
2  that situation.
3  Q.     Had you had issues around concerns about
4  not recording vacation days or having, you know,
5  left early without notifying folks prior to April of
6  2017?
7  A.     I would let -- I always used to tell store
8  managers, assistant store managers that I'm leaving,
9  somebody knows when you're leaving.  Did I have
10  issues before, not until the Pittston store.
11  Q.     You were in Pittston as of what, 2015?
12  A.     Yes.
13  Q.     And is that when the issues came up?
14  A.     Yeah, usually I'll take a full week of
15  vacation.  It was consistent, and then we started
16  getting busy and it was slow, but, yes.
17  Q.     Okay.  The next sentence says, it was
18  difficult to discern exactly what he wanted us to do
19  as many of the complaints were dated and most seemed
20  trivial.  That characterization, did you bring up
21  things that occurred in the past?
22  A.     Yes, because of the fact that after we're
23  saying the store level thing, I used to say it at
24  store level, I used to just tell the people at store
25  level my concerns.  My concerns that came up I would



Page 61

1 just tell the assistant store manager, store
2 manager, grocery manager, at this point it got to
3 where nothing was ever -- nothing ever was affected,
4 and then I was in trouble for not putting in
5 vacation time and then I started elaborating, and
6 said like you said, some things were dated.
7 Q.     During the conversation we addressed
8 Quentin's reluctance in day-to-day operations and
9 that it was noted there would be things he could or
10 should do to help out when training opportunities
11 were not available.  Do you remember a conversation
12 around that?
13 A.     Yes.
14 Q.     Was it your understanding that was intended
15 to say, if you don't really have a management
16 training opportunity available in a store then, you
17 know, you're going to be expected to help out with
18 day-to-day operations, is that essentially what that
19 meant?
20 A.     No.
21 Q.     What was said?
22 A.     That was back to the -- after discussing
23 the whole vacation day how I can't physically go and
24 put it in, I was told that some things -- things at
25 store level aren't always done perfectly, you aren't

Page 62

1 going to be trained perfectly because there's things
2 that some people are able to do and some people
3 aren't able to do, so you're going to have to take
4 it with a grain of salt who is training you, and
5 what they're training you.  You're going to have to
6 ask more questions to try to figure out what you
7 need to learn and what you don't need to learn.
8 That was --
9 Q.     Was there a conversation between you,
10 Mr. Fiore and Mr. McDonough, where they expressed
11 some concern about reluctance to participate in
12 day-to-day operations?
13 A.     Yes.
14 Q.     There would be things he could or should do
15 to help out when training opportunities were not
16 available.  Was there a conversation around that
17 topic?
18 A.     Yes.
19 Q.     Next sentence says, as the conversation
20 proceeded Quentin indicated he lacked enthusiasm and
21 his morale was low.  Did you do that?
22 A.     Yes.
23 Q.     This prompted me, Mr. McDonough, to ask the
24 question about his leaving early and coming in late.
25 Do you recall being asked about that?

Page 63

1 A.     Yes.
2 Q.     On Friday he left at 10:30, on Saturday he
3 left at 7, and Sunday he left around 10.  All these
4 days he was scheduled into the afternoon.  Do you
5 remember being asked about those circumstances or
6 situations?
7 A.     Not in that context.
8 Q.     Well, was there conversation during this
9 meeting on March 30 between you, Mr. McDonough,
10 Frank Fiore, relative to you, Friday leaving at
11 10:30, Saturday at 7, Sunday at 10?
12 A.     Because of putting vacations in.  So it all
13 went back to -- vacations were put in they didn't
14 say.
15 Q.     Are you saying on all those occasions
16 you had spoken with your manager or assistant
17 manager?
18 A.     That was -- for the conversations with the
19 two vice presidents, that was store level.  That's
20 pretty much how -- they didn't hear me every day
21 when I took a vacation day or things like that.  So
22 as long as the store manager was okay with it, they
23 were okay with it.
24 Q.     Well, my question is, it says on Friday you
25 left at 10:30, on Saturday you left at 7, Sunday at

Page 64

1 10.  Did you discuss taking vacation days, you
2 know, with your manager or store manager, on those
3 dates?
4 A.     I believe so.
5 Q.     Well, do you have a recollection of that, you
6 know, you went and had spoken with your store
7 manager on the dates indicated?
8 A.     Between the store manager and assistant
9 store manager, yes.
10 Q.     You think you had?
11 A.     Yes.
12 Q.     Did you say that to Mr. McDonough and
13 Mr. Fiore in this conversation?
14 A.     Yes, all wrapped into vacation, this is all
15 still part of vacation time being taken.
16 Q.     His response was, he lacked the drive and
17 motivation to come in on time and basically wasn't
18 into it.  Did you say that?
19 A.     Yes, I guess.
20 Q.     Well, I mean, do you have a recollection of
21 having said that or not?
22 A.     I don't know if it was those exact words I
23 said.
24 Q.     Then says, I warned him that that was not
25 acceptable and that he also failed to report



QUENTIN MCCLELLAN                                    June 19, 2019
QUENTIN MCCLELLAN vs REDNER'S MARKETS                       65–68

Page 65

1  vacation time and this could be a violation of
2  policy, not to mention irresponsible contact for a
3  management trainee.  Do you recall Mr. McDonough
4  saying those words or words to that effect?
5  A.      Not fully.  Because that's where I said to
6  you was the gray area about the vacation days.
7  Because once I explained to him that I wasn't the
8  one that put in the vacation days, that's when it
9  got -- he was upset at first, but that's when he
10  kind of calmed down and was like well -- it was an
11  awkward spot.
12  Q.      The question is simpler than that.  Did Mr.
13  McDonough say to you the words to effect that with
14  respect to vacation it was not acceptable, and he
15  also failed to report vacation time and this could
16  be a violation of policy not to mention
17  irresponsible contact for management trainee.  Did
18  he say that?
19  A.      Yes.
20  Q.      I'm not asking what you said back or the
21  conversation.
22  A.      Yes.
23  Q.      Quentin was informed that this lateness and
24  leaving early must end immediately.  Did Mr.
25  McDonough communicate that to you, or words to that

Page 66

1  effect during this meeting on March 30?
2  A.      Yes.
3  Q.      You agreed with him that was not
4  acceptable, correct?
5  A.      Yes.
6  Q.      Next sentence says, we also discussed
7  ending the training and having him return to a meat
8  manager.  Do you recall a discussion around that
9  topic?
10  A.      Very little that day.  I thought that
11  happened after some time I had a meeting and they
12  told me I was going to be --
13  Q.      Well, do you recall discussion on that day
14  or not?
15  A.      Yes.
16  Q.      I wanted to give him this option because he
17  just didn't seem like this was for him.  Do you --
18  that's more of a statement to self.  But given your
19  -- the things that you said, your e-mail, some of
20  the conversation from above about your morale, I
21  mean, were you having any question or doubts about
22  the management program versus other positions at
23  Redner's?
24  A.      I was having doubts about the manager
25  training program.

Page 67

1  Q.      It says, I told him to think about it over
2  the weekend, and we should have a call on Monday to
3  decide.  Do you recall Mr. McDonough suggesting that
4  to you?
5  A.      It's plausible.
6  Q.      Okay.  The next sentence says, on Monday I
7  learned that Quentin was late again, on Saturday,
8  4/1/17, April 1, '17, he arrived at 6:30 a.m., this
9  was one day after being warned about being late.  Do
10  you recall being late on that day, or do you know
11  that you were late on that day?
12  A.      I do not off the top of my head.  It's
13  plausible.
14  Q.      Isn't it -- is it your understanding that
15  Redner's Markets has cameras throughout a good bit
16  of their store at Pittston?
17  A.      All their stores I'm pretty sure.
18  Q.      And these cameras can record individuals
19  coming in and out, correct?
20  A.      Yes.
21  Q.      There's cameras in the manager's office,
22  isn't there?
23  A.      Yes.
24  Q.      There's camera's in the break room, right?
25  A.      Yeah, I don't know exactly where all the

Page 68

1  cameras are, but, yes, there's cameras throughout
2  the whole store.
3  Q.      Do you have any reason to believe those
4  cameras reflect events that don't occur?
5  A.      No, that's why I said it's plausible, I
6  couldn't say 100 percent myself.
7  Q.      Returning to Exhibit 6, Randy and I were on
8  the call on Monday.  I'm assuming that's Randy
9  Kostelac, and Quentin agreed this was best for him
10  at this time.  And I believe that this is to end
11  your participation in the training program.  Do you
12  have a recollection of the phone call on that
13  Monday?
14  A.      I believe I do, and it's a little
15  different.
16  Q.      What is your recollection of the call on
17  Monday?
18  A.      I believe I called them on Monday because
19  my training was supposed to be over, the training
20  book was -- the date was over, that's what made me
21  actually start talking to Mr. McDonough and Randy
22  more this weekend, because of the fact that the
23  book, remember I said it has different dates in it
24  about where you're supposed to be.  Well, April was
25  coming to the end of the training.  So really that's



Page 69

1  -- when I first got, this is where I kind of got
2  blindsided. I'm thinking we're going to be talking
3  about what's happening after training, because
4  that's when I was talking to them. We're talking
5  like this looks like it's coming down to the end,
6  I'm getting signed off by the store manager and
7  stuff like this, and I was pretty much told, because
8  of the situations they're not sure, they're not sure
9  if I want it and things like that. And I agreed
10  with them to go back to the meat room. I didn't
11  want to get fired, what else was I supposed to do in
12  my mind.
13  Q.     Did somebody tell you either go back to the
14  meat room or you're going to be fired?
15  A.     It was kind of like the transfer, there was
16  nowhere else to go, right now there is no position
17  for assistant store manager that we have. The
18  training process could take longer or shorter, but
19  that was at the end. I'm thinking, I'm eager, where
20  am I going, where is the next position, and they
21  said, we don't have that position.
22  Q.     Do you have any reason to believe that
23  wasn't an accurate statement, that, you know, can
24  you identify any assistant manager position
25  somewhere that makes sense for you geographically

Page 70

1  that was available?
2  A.     I think that's the main issue. Geographic
3  was more of an issue. Like we only had three
4  stores, three stores right near each other, the rest
5  were down south, 40 minutes or so away. I
6  interpreted it as at first they didn't have a
7  position right now in the store geographically able
8  for me to go to moving through the process. Then I
9  found out as they elaborated there was no position
10  at the time for assistant manager, that I would have
11  to wait and continue through the training process,
12  but no one knew when that end date would be. So I
13  said, I didn't want to -- like there's going to be
14  four managers here, three or four store managers
15  here, I didn't want to be floating in the wind. So
16  I said, what do I do in that case, there was nothing
17  else for me to do, stay in training or go back to
18  the meat room. So I said, well, I guess go back to
19  the meat room.
20  Q.     Did you have any concern given lateness,
21  leaving early without using vacation time that was
22  of concern to Mr. McDonough and/or Mr. -- to Randy
23  Kostelac?
24  A.     There might have been, but this was the
25  same thing that happened throughout the store.

Page 71

1  That's the only reason that the concern -- it didn't
2  seem like a concern to me as -- it didn't seem like
3  it was concern to them as much as it's being -- as
4  I'm reading it now I guess it was.
5  Q.     And back to where we were. I mean, you
6  weren't presented with the choice of either, you
7  know, leave, or return to the meat department?
8  A.     No one said, you're fired, they just said
9  there's nowhere else -- every time I asked, there
10  was still the answer of there's nowhere else for you
11  to go. There's nothing else we -- there's no other
12  position.
13  Q.     And just to get back to the question I
14  asked. I'm not sure I got an answer.
15  A.     Sorry.
16  Q.     Are you aware of any position to which you
17  could have been transferred that made sense?
18  A.     I am not aware at the time. I wasn't --
19  Q.     Okay. It then says, I confirmed this with
20  Quentin on Tuesday, April 13, and we worked out most
21  of the details, salary, et cetera, and he will
22  return to a meat manager position effective 4/10/17
23  at a pay rate of some amount.
24  A.     Yeah, I don't think I -- I don't remember
25  talking about the pay rate.

Page 72

1  Q.     And do you recall the conversation then
2  again on Tuesday with Mr. McDonough about returning
3  to the meat manager position?
4  A.     That's where I do remember -- I remember
5  the conversation of him telling me I could go back
6  to the meat room, but that's where the confusion was
7  me being a meat manager, because there was a meat
8  manager there.
9  Q.     When you say, there was confusion, what
10  exactly was the significance to you of this
11  confusion?
12  A.     Well, he said, you were the meat manager,
13  but there was a meat manager there.
14  Q.     Right. But as far as your functional work,
15  day-to-day following April 10, 2017, you had -- you
16  got a schedule, right?
17  A.     Yeah, and I wasn't always in the meat room.
18  Like I still was -- like there was a couple of days
19  I helped in the deli, the bakery, if the store
20  manager needed me he was still asking me, because
21  there was a meat manager there, they had a pretty
22  full crew. So I think that's the only reason it was
23  a --
24  Q.     But you were paid at the pay rate of the
25  meat manager?



Page 73

1  A.    Yeah, whatever came on my check, yes, sir.
2  Q.    No other difference than perhaps you're
3  saying after April 10 you didn't -- you weren't
4  necessarily doing all the duties and
5  responsibilities of the meat manager, is that
6  correct?
7  A.    Yes, sir.
8         MR. BARRON:  If it's an okay time --
9         MR. SCHAUER:  This is a good time to
10  take a break.
11         (The deposition was recessed.)
12  BY MR. SCHAUER:
13  Q.    So it's now some point after April 10, 2017
14  you're at the Pittston station -- Pittston store and
15  you're working in the meat department perhaps
16  sometimes doing work in other departments, is that
17  kind of where we left off, just to keep things
18  going, is that fair?
19  A.    That's fair.
20  Q.    I want to go back to one thing, did you
21  ever learn this, you say system, where you needed to
22  enter your vacation time as compared to telling your
23  manager or leaving a note?
24  A.    I learned the whole system, but you have to
25  -- I guess after you get into the position you get

Page 74

1  your password and stuff.  So while I knew how to do
2  it I couldn't enter that computer to put in that
3  stuff unless I had -- I believe -- I don't know who,
4  I guess the store manager and assistant store
5  manager.
6  Q.    That's my question.  Let's assume I'm a
7  stocker, I don't even know if that's a name you use,
8  I'm not a manager, I work, you know, kind of an
9  entry level position stocking the store.  If I want
10  vacation do I enter it into the computer?
11  A.    Huh-uh.
12  Q.    Is that a no?
13  A.    No, you cannot.
14  Q.    All right.  So then when you're talking
15  about this entering time into the system, is that
16  something done by either the manager or the
17  assistant manager?
18  A.    Anyone who can do payroll, yes.
19  Q.    All right.  And who can do payroll at the
20  Pittston store while you're there?
21  A.    The manager and assistant manager, I'm not
22  100 percent positive if the grocery manager can or
23  not.
24  Q.    So if I'm a stocker and I want vacation, I
25  let my assistant manager or manager know and they

Page 75

1  then enter it into the payroll system, is that
2  correct?
3  A.    Partially, yes.
4  Q.    What's wrong with it?
5  A.    There's also -- they have a sheet for some
6  of the stockers they tell them to just put it on and
7  they take the sheet up front and do everything on
8  the sheet.  So the entry level employees usually
9  have to write it down somewhere and the managers
10  take that whole sheet for all the stockers or
11  whatever.
12  Q.    Is there a piece of paper that you could
13  fill out when you're, you know, asking to use
14  vacation time?
15  A.    Not that I know of.
16  Q.    As a meat manager, were you responsible for
17  entering payroll?
18  A.    Maybe elaborate, I'm sorry, because there's
19  a couple of parts of payroll.
20  Q.    Does it change over time -- what don't you
21  understand?  As meat manager in the Pittston store
22  during your employment, were you responsible for
23  entering payroll?
24  A.    I would make the schedule, after they give
25  me the budget, but the budget and everything was

Page 76

1  decided by the store managers.
2  Q.    Let me ask this again.  I think this is a
3  yes or no answer.  Was one of your responsibilities
4  as a meat department manager at the Pittston store
5  of Redner's in the year 2017, to enter time into the
6  -- or information into the payroll system?
7  A.    No.
8  Q.    Do you know was it the responsibility of
9  any of the department managers?
10  A.    No.
11  Q.    Who was it at the Pittston store in 2017
12  while you were employed there, who entered time into
13  the payroll system, or information into the payroll
14  system?
15  A.    Both the assistant and store director.
16  Q.    Okay.  So am I understanding you to say
17  that somehow the system broke down, at least in
18  part, where you say you got oral permission from the
19  manager or store manager for use of vacation and
20  they didn't enter it into the system?
21  A.    On the meeting with Mr. McDonough, the
22  conversation with that meeting is yes, because of I
23  felt that I orally told them, and I said maybe they
24  forgot, but that's neither here nor there.
25  Q.    Did you ever track, or check your vacation



QUENTIN MCCLELLAN
QUENTIN MCCLELLAN vs REDNER'S MARKETS

June 19, 2019
77–80

Page 77

1 bank or vacation availability against what you
2 understood to have been time to be used vacation
3 time?
4 A.    We can also request that from the assistant
5 store manager and store director.
6 Q.    Did you ever do it?
7 A.    Yeah.
8 Q.    And did you ever find times and go to the
9 assistant manager and say, hold it, you know, I
10 actually, you know, that week I worked this number
11 of hours, but, you know, you didn't record vacation
12 for other hours.  Did you ever do that?
13 A.    I don't believe so.  I don't recall.
14 Q.    Okay.  On the payroll reports you would
15 receive, or could look at, did it record the number
16 of hours you, although a salaried employee, worked?
17 A.    Record the hours I worked?
18 Q.    Yes.
19 A.    Yes.
20 Q.    Because again, over a certain number of
21 hours you might be entitled to a bonus, correct?
22 A.    I'm sorry, no, it doesn't show you as a
23 salaried employee, it just says you get the set
24 salary, but you don't have hours on there.  For your
25 vacation time you have the hours and the PTO time,

Page 78

1 you have the hours on there that will go up and
2 down.
3 Q.    So you're saying you didn't actually record
4 time in and out?
5 A.    Yeah, no.
6 Q.    You had a schedule that were the hours you
7 were to be there?
8 A.    Schedule template, yes.
9 Q.    And typically you would be scheduled for 45
10 hours a week?
11 A.    Around there, yes.
12 Q.    And if you decided to take off like an
13 afternoon prior to the week's schedule being set is
14 when you would talk to your manager or assistant
15 manager about it, correct?
16 A.    Depending, yes.
17 Q.    Okay.  And if that were recorded it would
18 show up in the next payroll cycle in the records as
19 that week for whatever reason you have four, six,
20 our eight hours of vacation time?
21 A.    On the check, yes, sir.
22 Q.    Right.
23 A.    Yes.
24 Q.    But you still get your salary?  You get
25 paid for the week, but you would see that you had

Page 79

1 used --
2 A.    Correct.
3 Q.    And do you ever recall times when you had
4 indicated or asked your store manager or assistant
5 manager to leave early or something like that where
6 you then looked at your paycheck the next time and
7 the record of your vacation available and said, oh,
8 you forgot?
9 A.    Yes.
10 Q.    When did you do that?
11 A.    I can't say every situation.  But there was
12 times -- like sometimes around the weeks leading up
13 to holidays or the week there was something busy for
14 a store manager to come on.  That would be that's
15 not just the manager taking vacation, there's so
16 many people taking vacation there was times there
17 would be a mistake that, oh, I forgot to put you in
18 for four hours compared to 16 hours of this guy.
19 They would fix it and it would work its way into the
20 next week's check.
21 Q.    Hold on.  They would make a mistake and not
22 record time you took as vacation?
23 A.    Yeah.  Like let's say I would say, hey, I
24 want vacation put in -- like I believe Friday might
25 have been starting a new -- like they would have

Page 80

1 sent their stuff to payroll, store managers, let's
2 say Friday afternoon and I say, I'm going to use
3 vacation and they approved it, or let's say they
4 missed it, they would say, all right, I'm going to
5 put it in, and we'll just deduct it.  So the
6 vacation would go in maybe a week late, and they
7 would fix it and it would go into the next week's
8 check.
9 Q.    That's not my question.
10 A.    Sorry.
11 Q.    When you get your information relative to
12 payroll, utilized, available, did you ever look at
13 that document and say, whoa, I left early last week
14 and I told them I was taking vacation but they
15 didn't assess my vacation bank for that time, that's
16 the question.
17 A.    That would only be on my check.
18 Q.    Right.  Did you ever look at your check and
19 say --
20 A.    Oh, yeah.
21 Q.    And go back to your manager or assistant
22 manager and say, hey, guys, you forgot to assess my
23 vacation for that afternoon I took off?
24 A.    Yes, that would happen.  I don't know exact
25 times when that would happen but, yes, that's --



QUENTIN MCCLELLAN
QUENTIN MCCLELLAN vs REDNER'S MARKETS

June 19, 2019
81–84

Page 81

1  Q.      Did you ever do that?
2  A.      Yes.
3  Q.      Who was your manager you said that to?
4  A.      That would have been multiple managers in
5  different stores.
6  Q.      Did you ever do that with the people in
7  Pittston?
8  A.      But there was still -- since my time in
9  Pittston there was three or four store managers, so,
10  yeah, but I don't know which one it would have
11  been.
12  Q.      Let's go back to the one that was the
13  manager, you know --
14  A.      Jeff Treichel?
15  Q.      Yes.
16  A.      I may -- actually, the time, when they said
17  the vacation wasn't put in, they had to put it in
18  afterwards.
19  Q.      After -- but you hadn't noticed it on your
20  check?
21  A.      I wouldn't have gotten paid yet for it.
22  Q.      And you didn't -- but my scenario is, you
23  look at your check, and you go back to Jeff, nobody
24  has talked to you, no one said anything about it?
25  A.      I can't say that off the top of my head.

Page 82

1  Q.      That's my question.
2  A.      Sorry.
3  Q.      So you don't have a recollection of a time
4  where you looked at your paycheck and said, oh, gee,
5  you know, I'm not assessed for any time against my
6  available vacation, I need to go talk to my manager
7  to make sure that, you know, he assesses that time?
8  A.      No.  Usually we --
9  Q.      Okay.
10  A.      Sorry.
11  Q.      So, all right, we're back to mid April,
12  2017, you're working as the meat manager as well as
13  I think you said you would do some other jobs as
14  assigned, correct?
15  A.      Yes.
16  Q.      And I guess at some point in time you make
17  an application to receive leave under the Family
18  Medical Leave Act?
19  A.      I didn't, but yes.
20  Q.      Well, did you make an application or not?
21  A.      I was told to call, it was already in the
22  works.
23  Q.      Well, what is your understanding of the
24  sequence of events if you will that led to you
25  receiving leave under the Family Medical Leave Act?

Page 83

1  A.      I went into work and it was somewhere
2  toward the weekend, I want to say it was -- I
3  believe it was toward the weekend.  I was in the
4  meat room, the store manager Jeff came in, asked to
5  speak to me.  We went out back, he said he knows
6  things have been difficult for a little bit, and he
7  was just looking out for me.  Maybe I should try to
8  call Sue Rotkiske, she wants to talk to me, I said
9  okay.  Then I went and made a phone call and she
10  said she talked to Jeff and it was already --
11  everything is ready, I just needed to -- I believe I
12  had to go see a doctor, a psychiatrist.
13  Q.      Okay.  Do you have any understanding based
14  on what, let's start with this, based on anything
15  that Jeff said to you as to what he meant when he
16  said, I know things have been rough?
17  A.      He shared with me that he's been on FMLA
18  before.
19  Q.      All right.  Well, did he say anything as to
20  why it was he felt things were rough for you?
21  A.      Well, he said -- the conversation I believe
22  was -- along the lines --
23  Q.      Tell me as much as you can remember.
24  A.      We were out back, this was a private
25  conversation, and he said he experienced a time when

Page 84

1  he got a little overwhelmed I'm pretty sure.  I'm
2  not exactly sure how he said it, he got overwhelmed
3  and he had to take some time and you shouldn't feel
4  bad for taking time if you need it.  I was confused
5  because I never asked about taking FMLA.  So then he
6  said -- he was still trying to comfort me.  He was
7  very nice he talked to Sue if I would give her a
8  call and could explain more about the situation.  He
9  had something to do in the store and we walked back
10  in the store.  He told me just take my stuff off and
11  go out to the car and call her.
12  Q.      Approximately how long did this
13  conversation with Jeff out back last?
14  A.      He was in the middle of doing the
15  store walk or order, so it couldn't have been too
16  long.  It may have been -- it couldn't have been
17  more than an hour.  I don't think it was that long,
18  it might have been a 20 minute conversation, 15
19  minute conversation.
20  Q.      We'll get to the information, but it
21  appears that the application that was submitted, the
22  first application, for family and medical leave is
23  dated July 3 of 2017.  Does that sound about right
24  to you?
25  A.      It may, but I was already out I think.



QUENTIN MCCLELLAN                                      June 19, 2019
QUENTIN MCCLELLAN vs REDNER'S MARKETS              85–88

Page 85

1  Q.     Well, do you have a recollection of when --
2  A.     I want to say the last week in August I was
3  already out.
4  Q.     No.  The records indicate that an
5  application was made on or about July 2 of 2017.
6  Does that sound like around the time that you
7  applied for an FMLA leave?
8  A.     Could that have been sent -- yes, it could
9  have been, yes.
10 Q.     Okay.  Had you had any discussions with
11 Jeff about, you know, this job has been getting to
12 me, you know, were there any discussions prior to
13 the one that happened out back where you shared with
14 him, you know, the job was getting to you or you
15 were feeling overwhelmed or anything to that
16 effect?
17 A.     We both -- it was more so we would just
18 talk about the crazy things, because we were both
19 from a different store, like we've seen other
20 stores.  So when he came he used to get frustrated
21 in the morning, not like angry, but why did that
22 happen or why is this one doing that and we would
23 share things like that.  The frustration would be
24 the same thing about a water cooler, you would be so
25 confused why a 16-year-old kid did that.  It was

Page 86

1  just frustrations of the day.
2  Q.     Did you push back on Jeff when you went out
3  back and he suggested that perhaps you consider a
4  leave, take some time off and contact Sue?
5  A.     I was nervous.
6  Q.     What do you mean by nervous?
7  A.     Well, I wasn't asked -- I didn't ask about
8  FMLA, so when he first came -- I was in the meat
9  room cutting, I was in the middle of cutting for the
10 day, and he told me he wanted to talk to me in the
11 back and we went outside.  So I was a little
12 nervous, because that's something that doesn't
13 normally happen, when a store manager says, I want
14 to talk to you out back, not out back in receiving,
15 but outside the store.  I was a little nervous, I
16 was a little --
17 Q.     Well, did you say to him, hey, nothing I
18 can't handle, or I don't need to go, or I don't know
19 what you're talking about, I'm not feeling like I
20 could use some time off, anything along those lines?
21 A.     That's what led him to telling me his
22 story.
23 Q.     Well, what did you say?
24 A.     Well, I said, what's going on, why?  And he
25 said, well, sometimes -- he said, listen, I went

Page 87

1  through it, you just -- sometimes you just need some
2  time.  I said, but, Jeff, I don't think I did
3  anything wrong.  You see, some of the things that
4  happen around here, and he did, he agreed, but he
5  said just talk to Sue.  And that's what he kept
6  trying to reiterate --
7  Q.     Were you -- if you need to look at it,
8  please do, but going back to the e-mail you sent to
9  Randy Kostelac around March 24 where you listed
10 about nine things that you said you didn't feel
11 comfortable with him talking about at the store,
12 those observations that we looked at, were you
13 continuing to see and observe things of that nature
14 through and to April and May, June of 2017?
15 A.     Yes.  But the time -- I was nervous with
16 Jeff because there was a little before that there
17 was a situation with my meat cutter and Jeff and
18 myself.  So there was a lot of things leading up to
19 that conversation with Jeff.
20 Q.     Well, to your knowledge, what was it that
21 led Jeff to have that conversation with you?
22 A.     He said -- from Jeff, he said he saw me as
23 a good employee, he just sees that something is
24 wrong.  That's how he put it, something is wrong.
25 And I said, well, I can't really -- I don't know

Page 88

1  what you want me to change.  I'm just trying to do
2  my job.  I did say that.  I just want to come and do
3  my job and go home.  I can't deal with the people
4  anymore.  I'm not in the assistant manager program
5  at this point, I just want to do my job and go
6  home.
7  Q.     Did you feel that somehow you were being
8  sucked into other things than your job?
9  A.     Well, as a manager you're always sucked
10 into other things, yeah, in the grocery store, yes,
11 that's just what it is.  You're not working -- we
12 all work for the same company and you're going to
13 see somebody that needs help and if you're the type
14 of person that says, do you want help, you're going
15 to help them.  Or if the store manager says, can you
16 help this person, you're just going to do what the
17 store manager says, that's what it is.
18 Q.     You mentioned some situation that occurred
19 with a meat cutter in the meat department and you
20 and Jeff just prior to, you know, this conversation
21 that you had with him where he suggested you contact
22 Sue.  What was that?
23 A.     Maybe, it might have been a few weeks.  The
24 meat clean up guy and the meat cutter were having
25 difficulties.  The meat cutter ended up losing his



QUENTIN MCCLELLAN
QUENTIN MCCLELLAN vs REDNER'S MARKETS

June 19, 2019
89–92

Page 89

1  job in February, the meat clean up guy was trying to
2  move up to be a meat cutter or more.  The one day I
3  came in, it might have been around this weekend, and
4  my meat wrapper pulls the case, says there's a whole
5  ton of meat, expensive meat, marked down to 2.50 a
6  pound.  I get confused, I said what do you mean it's
7  marked down.  She said, I don't know, I think it was
8  the meat cleaner's name.  I said when, did you find
9  it, she said toady.
10       I went and talked to Jeff about it.
11  Jeff said he approved it.  I said, you can't approve
12  that, you can't mark it down that low, it's going to
13  look like somebody is sweethearting or stealing.  He
14  said it's okay.  I talked to the meat clean up guy
15  to tell him, you can't do that, supervision told me
16  you're not allowed to do that.  He blew up, screamed
17  at me.  The assistant store manager was like, you
18  should have sent him home.  The meat clean up guy
19  then becomes the evening manager.
20       Then I have this, when Jeff comes in
21  the meat room, and says, come back and talk to me.
22  So for me, the situation leading up to him coming
23  into the meat room saying, come out back and talk to
24  me, I thought I was in trouble, I thought I was
25  trouble for something.  I didn't know what I did.

Page 90

1  Q.     Did you have any sense that Jeff was acting
2  out of anything other than concern for you?
3  A.     During the which time, during the
4  conversation with FMLA?
5  Q.     Right.
6  A.     Yes and no.  I mean, a part of me -- a part
7  of me wanted to say because of the situation at
8  hand, he might not -- it might not have been in my
9  best intentions, but at the same time when he told
10  me the story of him dealing with it, I'm human, you
11  think somebody relates with you, so, yeah.
12  Q.     Well, I mean, did you think whether, you
13  know, it resonated with you or not, but did you
14  think he was doing, you know, anything but in his
15  mind trying to help you out?
16  A.     It was weird that -- it was weird for me
17  that the situation with FMLA was talked with Sue and
18  him before I got to the store.  So I was a little
19  off -- that was off for me.  That really was off.
20  Q.     Did you ask him what he said to Sue?
21  A.     I asked him how did -- well, before he
22  left, I asked him, what do I need to do?  And he
23  said, just call Sue Rotkiske, that is what he kept
24  saying, call Sue Rotkiske, talk to Sue and she'll
25  help you out and talk to the things you need to do.

Page 91

1       So I called Sue, she said she already
2  had things, she talked to him about me and things
3  were already in motion.  Just let her know.  That
4  day I was sent home.  So we might have had at 10 or
5  11, I talked to Sue, was told to go home.  I think I
6  might have got the paperwork for FMLA for July 3, or
7  if it was July 3 it might have been June, the end of
8  June when I got sent out.  I'm sorry, I said August
9  but --
10  Q.     There's probably records for that.  I'm
11  trying to get a sense of when the conversation
12  happened with reference to the date of application?
13  A.     No problem.
14  Q.     Had you, prior to going on FMLA leave, had
15  you been under any kind of medical care, had you
16  been seeing a physician for any particular
17  condition?
18  A.     Yeah, I had depression, I've seen my --
19  just my normal doctor, no one special, until that --
20  until that FMLA came and I had to start seeing other
21  people.
22  Q.     Okay.  When was it that you began seeing
23  your regular doctor for purposes of addressing, you
24  say you had depression?
25  A.     15, 16, 17, somewhere around there.

Page 92

1  Q.     Did you discus with anybody at Redner's
2  Markets the fact that you were treating or seeing
3  your regular physician with respect to depression,
4  or regarding depression?
5  A.     I know I told my -- Bill Swartzlander once,
6  I'm not sure if I mentioned it to previous
7  supervisors or store manager, I don't know.
8  Q.     And what was the circumstance when you
9  mentioned it to Bill Swartzlander?
10  A.     I believe we were talking about -- this
11  isn't probably going to sound well.  We were talking
12  about something and something came up along the
13  lines of, that was just so odd and wrong, and I
14  think I said, I don't think I'll ever do that, and I
15  feel -- I have depression I don't think I would
16  ever go any -- the evening manager broke a monitor.
17  Q.     And approximately when did that occur?
18  A.     Maybe unfortunately between January and
19  April, somewhere before that, somewhere around
20  there.
21  Q.     What year?
22  A.     2017 as we're speaking -- it might have
23  been in the previous 2016.  But the evening manager,
24  I guess they were complaining about them to the
25  supervisor as I was there.  And the store manager or



Page 93

1  assistant store manager, and that I said, I don't
2  know if that has anything -- because they were like
3  maybe he's depressed, I said the anger part, I don't
4  know if that's depression.  I have depression, but I
5  said, you don't just break monitors, I don't walk
6  around punching monitors.
7  Q.      What was Bill Swartzlander, where was he as
8  far as supervisory with you?
9  A.      Top down in the meat room, was Rick Merkel,
10  Bill Swartzlander, and the rest of the meat
11  supervisors had different regions, and Bill was my
12  meat supervisor.  Jim Polchin was above Bill
13  Swartzlander as the all around regional, and they're
14  all above the store directors and things like that.
15  Q.      So did Mr. Swartzlander ever circle back to
16  you and mention that you had mentioned you had
17  depression?
18  A.      No.
19  Q.      Did you ever hear any other member of
20  management at Redner's Markets allude or say to you
21  in any way that they had understood that you were
22  treating for depression or had depression?
23  A.      Just Jeff.  He understood -- that's pretty
24  much what we were going over, the day we were going
25  out for FMLA, that's what he was trying to share

Page 94

1  with me.
2  Q.      Other than the situation with Bill
3  Swartzlander said, hey, I wouldn't do that?
4  A.      Yes.
5  Q.      Because of depression?
6  A.      Yes.
7  Q.      And in the context of the discussion you
8  had with Jeff about going out on FMLA, did a
9  management position person at Redner's say anything
10  to you about you treating for depression or having
11  depression or anything to that effect?
12  A.      I don't believe, no.
13  Q.      All right.  Who was your family physician
14  that you were seeing prior to your going out on the
15  FMLA, and I think also along -- you continued to see
16  that person?
17  A.      Yes.
18  Q.      Who was it?
19  A.      Joseph Anistranski and Marnetta Bradford.
20  They were in the same practice so I would see both.
21  Q.      Were you medicated?
22  A.      Yes.
23  Q.      Did you ever mention to any management
24  level people at Redner's Markets prior to going out
25  on FMLA that somehow you needed some change or

Page 95

1  accommodation in your work environment, your job,
2  because of depression, using those words?
3  A.      I don't know if I said -- I don't believe I
4  said because of depression.  I was already asking
5  about being transferred and things.
6  Q.      Right.
7  A.      I don't believe I said because of
8  depression.
9  Q.      Okay.  After you returned from FMLA leave,
10  do you have any recollection of having said to any
11  management level individual at Redner's Markets that
12  you felt you might need some job adjustment or
13  change in your workplace situation because, you
14  know, something that was problematic or difficult
15  was caused by your depression?
16  A.      I didn't get a chance to.
17  Q.      Well, did you?
18  A.      No.
19  Q.      Okay.  Just as I recall, or I think the
20  records would indicate you were back for
21  approximately -- back at work at Redner's for
22  roughly five or six days after returning from FMLA,
23  correct?
24  A.      Somewhere around there, give or take.
25  Q.      Did you ever consult the employee handbook

Page 96

1  with respect to what if anything you might do if you
2  feel there's something -- there's some problem for
3  you in the workplace and it's related to depression?
4  A.      I actually --
5  Q.      Or disability?
6  A.      I found out from my -- the woman, the
7  psychiatrist they sent me to see actually.
8  Q.      Okay.  And she just, what -- what did she
9  say?
10  A.      She was worried.  We were talking about me
11  going back to work, the weeks leading up to it, Sue
12  called and said she needed some paperwork I think,
13  so we were talking about that, and she said how do I
14  feel about going back, I said I'm a little nervous,
15  I said honestly I don't know if it's good or bad
16  nerves, you get nerves either way.  She said okay,
17  do you know if you have any time left, I said I
18  don't know, I didn't know anything about that stuff.
19  She said I'll try to find out for you.  I said okay.
20  She said if you have any trouble, contact me.  I
21  said, okay.  I said it's only going to be my first
22  day back, hopefully I don't have to call you on my
23  first day jokingly, and I went back to work.
24          When I got back to work, I never
25  talked to Mr. Harvilla about FMLA or anything like



Page 97

1  that, but he already knew, that's what made it seem
2  weird, he thinks I still may have time for FMLA.
3  The only person I ever talked to in the store was
4  Jeff, but I didn't get to talk to anyone else, I
5  left, literally right after I talked to Jeff and he
6  told me not even to finish cutting, so I didn't.
7        MR. SCHAUER:  Just to kind of run
8  through some paperwork here.  We're up to Exhibit 7.
9  I'm going to give you a document I'll mark as
10  Exhibit 7.
11        (Exhibit 7, Letter dated 7/15/17,
12  marked for identification.)
13  Q.    And Mr. McClellan, Exhibit 7 appears to be
14  a letter dated July 5, 2017 I guess advising you
15  you're granted a leave under FMLA and it'll run
16  through July 23, 2017.  Do you recall receiving
17  this?
18  A.    I believe I did.
19  Q.    Is 58 South Dawes Avenue, Kingston, PA your
20  address?
21  A.    That's what made me say I believe so, yes,
22  sir.
23        MR. SCHAUER:  Exhibit 8.
24        (Exhibit 8, application, marked for
25  identification.)

Page 98

1  Q.    I'm putting in front of you Exhibit 8,
2  which I will suggest to you is the application that
3  was submitted to Redner's as I referenced on the
4  last page on July 3, 2017, regarding an FMLA leave
5  on your behalf.  If you want to review the document
6  to make sure that makes sense to you, please do so.
7  A.    It does.  That doesn't look like my
8  signature, does that matter?
9  Q.    Well, does it look like your signature?
10  I'm asking you, I'm not being smart.
11  A.    I'm being serious.
12  Q.    It doesn't appear to be your signature?
13  A.    I don't think so.  I write very chicken
14  scratchy, that's the only -- it looks weird.
15        MR. BARRON:  Let me reflect for the
16  record you're referring to the first page of the
17  document.
18        MR. SCHAUER:  Sure.  Section two.
19  Q.    The signature at the end of section two on
20  the first page on Exhibit 8 is what you're referring
21  to?
22  A.    Yes.
23  Q.    What happened, you were told to -- you were
24  said, hey, call Sue, you called Sue.  So what
25  happened when you called Sue?

Page 99

1  A.    I called Sue.  I said that -- she said,
2  what do you need, hello, Quentin.  Well, I told her
3  my name and I was from store 55, she said she knows.
4  I said -- I was pretty upset, I was still a little
5  confused about the whole FMLA thing and he just told
6  me to go out of the store.  And so I told her that,
7  and she said, don't worry about it.  She said, the
8  only thing that will have to happen is I'll need to
9  see a psychiatrist, I'll get some paperwork in the
10  mail, don't go back to the store until everything
11  else is situated.  I said, so I'm not supposed to go
12  back into work?  Honestly my focus was confused
13  because I was told to leave the store.  So for that
14  day, that's pretty much the main conversation we
15  had.
16  Q.    Did you have any conversation with Sue
17  around, well, do I have to go, or is this a choice
18  or something along those lines?
19  A.    It was recommended.
20  Q.    It was recommended?
21  A.    Yes, I guess that's what her and Jeff
22  talked about, it was recommended by Jeff.
23  Q.    She said that to you?
24  A.    Yes.
25  Q.    And did you say, I don't want to do it?

Page 100

1  A.    I said, I don't understand.  I didn't say I
2  didn't want to do it.
3  Q.    And you then consulted where I guess Saxon
4  Psychiatric Services?
5  A.    Yes.
6  Q.    I think that's --
7  A.    Yes.  I might have had to see -- I saw
8  someone at General too at one point.  That's the
9  only reason --
10  Q.    Did you see a copy of this Exhibit 8, the
11  certification of health care provider prior to it
12  being provided to Sue?
13  A.    Yes.  Because I think Saxon had to fill it
14  out.
15  Q.    Did you deliver this or how -- if you know
16  how did it come back into the possession of Susan
17  Rotkiske?
18  A.    I believe she mailed it to me with the
19  address, and I just literally turned over the
20  paperwork.  My psychiatrist said if I get paperwork
21  at the house turn it over to them and they will fax
22  and mail back to Sue.  They would stay in contact
23  with Sue, I didn't have to stay in contact with
24  Sue.
25        Q.    Now, during the time that this paperwork



Page 101

1 was being completed, were you being paid?
2 A.    The first -- I believe so, yes.
3 Q.    Okay. How did you end up going to Saxon
4 Psychiatric Services if that's what it says, I think
5 it is?
6 A.    Yes, the writing is crazy. I believe I
7 called, literally just looked it up with the
8 insurance card that I had.
9 Q.    Okay. Had you ever done any consulting or
10 received any, you know, advice, therapy, or worked
11 with them?
12 A.    Not with them, no.
13 Q.    Had you ever consulted with any, you know,
14 medical professional other than your general doctor
15 relative to the depression, a psychiatrist or
16 somebody that might specialize in that condition?
17 A.    When I was a kid.
18 Q.    Was that the last time?
19 A.    Yes.
20 Q.    How old are you now?
21 A.    A kid to some. 32.
22 Q.    I mean, you don't look old.
23 A.    Thank you.
24 Q.    But not since your adult life?
25 A.    No, no, sir, not in my adult life.

Page 102

1 Q.    All right. I'm still not sure, did you
2 ever see what's now been marked as Exhibit 8 as it
3 now exists, you know, completed and filled in?
4 A.    Completed and filled in, I do not believe
5 -- when Sue sent it to me, the top part would have
6 been filled out, the manager, the hours, and the
7 number. But I believe the rest of it would have
8 been filled out by my psychiatrist.
9 Q.    Okay.
10 A.    Or Saxon.
11 Q.    All right. So you are -- it says -- well,
12 I guess you went out after the conversation with
13 Jeff?
14 A.    Uh-huh.
15 Q.    And then at some point you received this
16 designation dated July 5, and, again, there's
17 records for all that, but did you then stay out?
18 You're on the leave, I guess the real question is,
19 did you ever go back into the store during that
20 time?
21 A.    During the time?
22 Q.    Yes.
23 A.    I was instructed not to go back into the
24 store.
25 Q.    And you followed those instructions or

Page 103

1 directions?
2 A.    Yes.
3 Q.    Did there come a time where you decided to
4 seek an extension of the FMLA leave?
5 A.    My psychiatrist did for me.
6 Q.    Okay. So we're going to look at some more
7 documents.
8 A.    Okay.
9       MR. SCHAUER: Exhibit 9.
10      (Exhibit 9, letter dated 7/25/17,
11 marked for identification.)
12 Q.    Exhibit 9 is a letter dated July 25, 2017
13 addressed to you at your address in Kingston where
14 it appears that you have now been provided with a
15 leave through August 28, 2017. Do you see that?
16 A.    Yes, sir.
17 Q.    And does this refresh your recollection
18 that, yes, there was then an extension from the
19 prior notice you received acknowledging that you're
20 eligible for leave under FMLA?
21 A.    Yes.
22 Q.    And this came about -- tell me about how it
23 came about, I think you mentioned it was your
24 psychiatrist, what happened?
25 A.    After talking to my psychiatrist and the

Page 104

1 nerves of going back, I was a little nervous
2 sometimes, when asked about the situations there,
3 because I did feel there was going to be
4 repercussions for me. So she made the extension,
5 she said she can make the extension, that's based
6 upon what she -- their findings I guess or what they
7 felt.
8       Then when we got to this one, the same
9 thing -- I just took her note and the same thing
10 was asked of me, do you think you're ready to go
11 back? And just like I said to you, I'm nervous but
12 I have to work, I had no choice.
13 Q.    Do you recall whether you were being paid
14 during this FMLA leave, during most of the month of
15 August?
16 A.    I believe it was partial pay, but either
17 way I got paid, yes, either way I got paid.
18 Q.    Turning to sections 1 and 2, although you
19 can't tell it's sections 1 and 2 on the first page
20 of Exhibit 9, sorry.
21 A.    Okay.
22      MR. SCHAUER: I'm marking this 10.
23      (Exhibit 10, second application for
24 FMLA leave, marked for identification.)
25 Q.    Looking at Exhibit 10 which I'll suggest is



QUENTIN MCCLELLAN                                         June 19, 2019
QUENTIN MCCLELLAN vs REDNER'S MARKETS                     105–108

Page 105

1  the second application for the FMLA leave, the one
2  that would underlie your August leave?
3  A.     Uh-huh.
4  Q.     Do you recognize the handwriting in the --
5  on the first page?
6  A.     Yeah, that's not mine again.
7  Q.     Okay.  Do you know whose it is?
8  A.     It has to be -- I'm assuming someone at the
9  psychiatrist office.
10 Q.     Okay.  Did you have, you know, did you have
11 -- did you challenge or have any questions or feel
12 maybe the second -- you know, the extended FMLA
13 leave somehow wasn't necessary or was something you
14 didn't want do?
15 A.     The whole FMLA was something I was still
16 confused -- I didn't know what the -- I didn't know
17 what the outcome would have been if I didn't take
18 it.
19 Q.     Did you ask anybody?  You didn't, did you?
20 A.     No.  It was a fast -- sorry, go ahead.
21 Q.     You didn't say, gee, what if I didn't do
22 this?  I'm not saying you should or shouldn't.
23 A.     I kept saying, why, to Jeff, why.
24 Q.     And you said he explained it to you and
25 talked about his own experience?

Page 106

1  A.     Yeah, but he never said what my problem
2  was, what made me have to go on FMLA.
3  Q.     Did you ask it that way or did you just say
4  why?
5  A.     Why.
6  Q.     And he -- what did he say back?
7  A.     He started talking about himself, about the
8  situation he went through and he experienced.
9  Q.     All right.  Did you find that the time
10 spent on FMLA leave was helpful to you?
11 A.     Somewhat yes and no.
12 Q.     Okay.  Let's take the yes part of that
13 answer.
14 A.     Yes, because it helped me I guess establish
15 that I had a problem that I thought I could control.
16 According to them and my psychiatrist who somewhat
17 didn't agree with them but still said I do have a
18 depression problem that I have to work on and worry
19 about.
20 Q.     Well, hold it.  Who did you -- who did you
21 disagree with here, your psychiatrist?  Let me ask
22 that question again.  Did you feel it was, you know,
23 helpful to you taking the FMLA leave, and I think
24 you said somewhat yes and no.  And, I said, okay,
25 tell me about the yes part.  I'm trying to summarize

Page 107

1  and move on.  And then you said something about
2  someone disagreeing with someone?
3  A.     They didn't --
4  Q.     Who is they?
5  A.     My psychiatrist didn't agree with really
6  the situation of how I explained to you how I was
7  sent on FMLA.
8  Q.     Okay.  But how -- I'm asking you, did you
9  find the FMLA to be helpful to you?
10 A.     Yes.
11 Q.     Okay.  You mentioned previously that you
12 were worried about going back and there might be I
13 think you said repercussions, if that's the word you
14 said.
15 A.     Yes.
16 Q.     And what was your basis for that?
17 A.     Situations leading up to me going on FMLA.
18 Q.     Well, was the repercussion because of
19 things that occurred before you went out, or was it
20 simply -- or was it because of going out or what, I
21 mean, I don't --
22 A.     That's what would make me confused.  The
23 situations led up to this that I didn't think was
24 going right or were right, led me to get on FMLA.  I
25 took time off and now I'm going back.  So in my

Page 108

1  mind, I just got in trouble in April for asking for
2  vacation that the store -- assistant store director
3  didn't put in that I couldn't put in, so to me, yes,
4  there was going to be something else coming.  I
5  didn't know if I was a meat manager or meat cutter,
6  there was a lot of things that made me nervous
7  about, repercussions that were going to happen.
8  Q.     Did you -- were you contacted by anyone
9  from Redner's during the period of time that you
10 were out on FMLA leave?
11 A.     Sue.
12 Q.     All right.
13 A.     That's -- no, Sue, that's it.
14 Q.     Up until, you know, the time that you left
15 employment at Redner's in early September, did
16 anybody at Redner's say anything to you that made
17 you think that somehow they had, you know, were
18 privy to the diagnosis in your FMLA papers, they
19 heard that you're, you know, treating for
20 depression, anything along those lines?
21 A.     The assistant store manager.
22 Q.     When was that -- oh, when you returned?
23 A.     Yeah, that's when I returned.
24 Q.     I think you said he just said, hey,
25 acknowledged you were out on FMLA leave?



QUENTIN MCCLELLAN
QUENTIN MCCLELLAN vs REDNER'S MARKETS

June 19, 2019
109–112

Page 109

1  A.    No, he thought -- the problem with that was
2  he thought I still had FMLA left, along with my
3  psychiatrist.
4  Q.    Let me break this down a little bit.  What
5  exactly was said to you by your assistant store
6  manager when you returned?
7  A.    When I saw -- I returned that Monday or
8  something like that, like you said five days or so
9  before, that weekend was when I saw the assistant
10  store manager.  So when I saw him and I said -- he
11  said, it's for FMLA?  I said, yeah, I don't know how
12  this works.  He said, don't worry about it, I think
13  you still have time left, and we always discussing
14  the time.  I said, I don't know how much time I have
15  left or anything along the lines of that, for
16  FMLA.
17  Q.    But, did the assistant store manager in any
18  way indicate he had any idea of the reason why you
19  went out as far as your condition?
20  A.    We didn't have to talk about it.
21  Q.    You didn't talk about it?
22  A.    We didn't talk about that.
23  Q.    Did anyone else in management or anywhere
24  at Redner's say anything to you that they indicated
25  they knew what the underlying condition was that you

Page 110

1  went out on leave?
2  A.    I believe the grocery manager and I talked
3  a little bit about me getting sent out, just because
4  we were talking about the things that happened --
5  some of the things that happened during the time I
6  was gone.
7  Q.    Did that person, is it male?
8  A.    Yes, it's a male.
9  Q.    Did the grocery manager come to you and say
10  or in any way indicate to you he had any idea as to
11  the basis, i.e. the diagnosis?
12  A.    No, he just asked, how were you doing,
13  something like that.
14  Q.    Okay.  Did you notice any particular change
15  in your work situation, the way others treated you,
16  upon your return from FMLA to even late August,
17  early September?
18  A.    Yes.
19  Q.    And what did you observe?
20  A.    The department was still confused about if
21  I was the manager or not.  Nobody really wanted to
22  listen to the -- any direction that was given
23  because --
24  Q.    Was that saying before you were telling us?
25  Like before your leave you were telling us you were

Page 111

1  still not sure?
2  A.    No, now the department -- remember I said
3  there was a meat manager there?
4  Q.    Right.
5  A.    When I came back I was back in the meat
6  room.
7  Q.    Right.
8  A.    That's when it became a problem because if
9  I told someone to do something in the meat room Paul
10  was the meat manager.
11  Q.    Okay.  What else, any kind of a change in
12  the way you were treated by your supervisors or
13  managements at Redner's after a you returned from
14  FMLA?
15  A.    I don't believe I seen any supervisor,
16  other than the store manager.
17  Q.    Okay.  What about your store manager, did
18  you notice any particular change in the way the
19  store manager acted toward you at work following
20  your return from FMLA?
21  A.    We were distant.  We didn't really -- he
22  was doing his thing and I was in the meat room, I
23  was quiet, he was quiet, and I let it be.
24  Q.    Did you find that to be different or a
25  change from how it was prior to your going out?

Page 112

1  A.    Yeah, we had a lot of conversations.
2  That's what made -- I assume that's what made him
3  talk to me about the whole his story with the
4  FMLA.
5  Q.    Do you know whether there was anything that
6  the store manager did that made your life any more
7  difficult, et cetera, you know, upon your return
8  from FMLA and prior to this situation that led to
9  your leaving?
10  A.    The guy who reduced product.
11  Q.    I'm sorry?
12  A.    The guy who reduced product in my
13  department and got a promotion.  That was one weird
14  situation.
15  Q.    Anything else?
16  A.    Off the top of my head, oh, well, the fact
17  that there was possibly no meat cutter scheduled for
18  the holiday weekend, which is that's what made the
19  whole schedule get flipped around, that was a little
20  weird.
21  Q.    Anything else?
22  A.    Not that I can recollect right now, no.
23  MR. SCHAUER:  I'm just curious --
24  let's mark this as Exhibit 11.
25  (Exhibit 11, note dated 6/14/17,



Page 113

1 marked for identification.)
2 Q.    Can you just -- are you familiar with
3 what's been marked as Exhibit 11, which appears to
4 be a note from Wilkes-Barre General Hospital dated
5 June 14, 2017?
6 A.    Yes.
7 Q.    What's your recollection of what this is?
8 A.    Actually I do remember this. I had a panic
9 attack.
10 Q.    Tell me about that.
11 A.    It was kind of weird. I can't remember
12 exactly leading up to it. I remember I was in the
13 break room, sweating, breathing heavily. I
14 literally had a panic attack. I don't believe
15 anyone saw me -- there was a couple of employees
16 that saw me, but I tried not to be in the meat room
17 or somewhere, you know what I mean. And I then
18 ended up going to the emergency room.
19 Q.    Okay.
20 A.    So that might have been something that
21 could have led up to --
22 Q.    Did you -- do you have any recollection now
23 of any kind of a similar circumstance or situation
24 involving a panic attack or onset of a panic attack
25 or something along those lines, anxiety?

Page 114

1 A.    Anxiety, yeah, one time in Edwardsville,
2 that's years --
3 Q.    Yeah, I don't --
4 A.    Sorry, I'm just --
5 Q.    No, no, I asked. Any other times say in
6 the 2017 that occurred at Redner's store 55?
7 A.    I don't believe so. I was more vocal.
8 Like I would just tell -- the notes were me telling
9 people what's going on or what's bothering me and
10 things like that.
11 Q.    Do you recall how it is that you ended up
12 at the emergency room on or about June 14?
13 A.    I remember bits and pieces. I don't --
14 that's what I mean. I don't remember what happened
15 before that. It was earlier in the day. I remember
16 having a panic attack, and then I remember being in
17 a room, not even like a normal room, but a room in
18 the hospital, if that makes sense.
19 Q.    Do you know who might have -- how did you
20 get from Redner's to the hospital, did someone drive
21 you?
22 A.    I believe I drove myself.
23 Q.    Who suggested that you go to the hospital,
24 if anybody?
25 A.    I do not recall.

Page 115

1 Q.    Did you just go?
2 A.    I had to tell someone. It was earlier in
3 the day, this wasn't like a random thing, I think a
4 couple of employees saw me, and I then told one of
5 the managers, I believe, I'm not trying to --
6 Q.    Okay.
7 A.    And then I think one of them suggested just
8 to go, just like go. And I ended up going, I
9 believe, that's what I believe happened.
10 Q.    Did anyone at store 55, the Pittston store
11 of Redner's talk with you about what happened on
12 June 14 after it happened, you know, when you're
13 back at work and come up to you and say, hey,
14 anything?
15 A.    A couple of employees were a little
16 worried. They didn't know what happened. Like I
17 said, a couple of employees saw me, a couple of
18 employees were a little worried about what happened.
19 The meat room, after it happened, almost everyone --
20 once one employee knew, everybody kind of saw, knew
21 what happened -- they didn't know what happened, but
22 they knew something happened to me like I said.
23 Q.    But did anybody come up to you and say
24 anything, you know, inquiries, or were they -- if
25 they came to you would it be, hey, how are you

Page 116

1 doing?
2 A.    They were inquiring about it. There was a
3 lot of employees coming to me and talking to me that
4 I just tried to get them to calm down and go back to
5 their job. So those employees that I used to talk
6 off the ledge if you will, those are the employees
7 that came to me and said, we heard something
8 happened, is it this place, what's going on. Just
9 trying to get as much out of me, don't think it was
10 malicious, I'm sure it was buzzing around.
11 Q.    What about management level, assistant
12 manager, manager, department hierarchy, any of them
13 have any kind of conversation, discussion with you
14 relative to what happened on the 14th of June?
15 A.    With me, no, I don't believe so.
16 Q.    Did any of them mention it to you?
17 A.    No, they wouldn't mention it to you. They
18 would definitely -- like the evening manager
19 situation with the screen, nobody was there for it.
20 Management ended up telling everybody about it. So
21 the stories would float around. People would come
22 in the meat room and start blabbing about what
23 happened.
24 Q.    All right. Just to kind of figure out what
25 we need to talk about here today. You described an



Page 117

1 incident back in March of 2013 when you were talking
2 about things that happened that caused you concerns
3 around your race.  Do you feel that that is in any
4 way part of your lawsuit now, that whatever happened
5 then at the store where that occurred, you know,
6 somehow had an impact or was part of the decision
7 process of Redner's in terminating you in September
8 of 2017?
9 A.      Yes.  Not only the race, but other things.
10 I think sometimes -- I think things led up to the
11 way they led up because I might have been perceived
12 as a problem at a certain point.  Not a problem --
13 as a problem dealing with other people, which is
14 something that I used to always voice.
15 Q.      What do you mean by a problem with dealing
16 with other people?
17 A.      2013 I was sent to Nesquehoning, somewhere
18 around there, so I was in Nesquehoning around there.
19 I got sent down there, there was a meat manager,
20 supervisor who was there, who on the first day and
21 go to shake his hand, I said, hi, my name is
22 Quentin, I heard about you, you're a great guy.  He
23 said, you're making me move.  He said, your the
24 F'ing guy who is making me move.  I said, I'm not
25 making you move, corporate made you move, that

Page 118

1 wasn't me.  Then there was a problem with the two
2 wrappers, I told store management --
3 Q.      Let's go back to the first one.  Do you
4 think that was somehow based upon your race?
5 A.      I don't think it was my race.  But I think
6 that started the ball rolling and things that went
7 wrong.  I then ended up having things -- for
8 instance, they were selling pork for dirt cheap that
9 wasn't according to company policy.  And I ended up
10 saying something about.  Things like that I kept
11 bringing up -- I kept bringing up issues that I
12 didn't think was me bringing up an issue, it was
13 just things I thought were wrong.
14 Q.      So what -- all right.  Let me see if I
15 understand what you're saying.  You would bring up
16 concerns about things you saw at that Nesquehoning
17 store?
18 A.      Yeah.
19 Q.      Okay.  You would bring those concerns up
20 and then, what, people might become unhappy or upset
21 with you, is that what you're saying?
22 A.      Yeah.  Like that -- it wasn't a concern.  I
23 was told that was stealing almost, you're stealing
24 from the company.  So I said, well, the guy has been
25 coming here for years doing this.  I wasn't the

Page 119

1 manager who decided this, I just went with the
2 program.  He was an ex-supervisor.  I thought this
3 was normal.  That became a problem.  The store
4 manager was upset because corporate got involved.
5 That wasn't me.  That was me telling my supervisor.
6 Q.      Right.  Sort of I guess my overriding
7 question here is, do you believe that, let's use
8 that as an example, that was -- that occurred
9 because of your race?
10 A.      That didn't occur because of my race, no.
11 The N word being dropped in the meat room occurred
12 because of my race.
13 Q.      I think when you first described the 2013
14 situation you said it wasn't directed at you, but it
15 occurred in your presence?
16 A.      It was directed --
17 Q.      Is that fair?
18 A.      It was about me.  I was the N word in the
19 statement, but she didn't point at me and said,
20 you're the N word if that makes sense.
21 Q.      We're going to work through this a little
22 bit.  What happened, what happened back at
23 Nesquehoning in March of 2013 that you say you
24 believe is evidence of racial discrimination that
25 was in part considered by Redner's in terminating

Page 120

1 you?
2 A.      So we I believe got a new meat cutter at
3 that time.  The last meat cutter was written up and
4 moved without my opinion, I was told to write him
5 up.  We then get this new meat cutter and this
6 woman, Sue, I don't remember her last name, was
7 alone with the new meat cutter.  And things weren't
8 working out the way she wanted them to be working
9 out.  They weren't flowing together on the days I
10 was off.  So she used to tell me the stories about
11 things that happened, the prior day, to let me know
12 why things aren't done.
13         So as we're talking, I'm in the room,
14 Joe, the meat cutter that was there, and Joanne is
15 in the room and she's telling the story.  And I'm
16 walking in and out of the meat room with boxes
17 trying to set it up, and she's telling me, she's
18 like, he's going to be there tomorrow, and she's
19 trying to say she's telling him what to do and he's
20 like, man, I don't care.  She, she's telling the
21 story and I walk in and come out and I heard the N
22 word.  And she looked at me and she's saying, I'm
23 not saying you are, but that's how you want the work
24 to get done or something along the lines like that.
25 And I stopped, I let it go, she left, and everybody



Page 121

1  asked me, oh, my God, did you hear what she said.  I
2  said, I did.  And they said, what are you going to
3  do about it.  And honestly, I said I don't know,
4  because I don't know if I want her to get fired.
5          I talked to Mr. McDonough too.  At the
6  end of the day there's a lot of racist people in the
7  world and I understand that.  But when you take a 40
8  to 50-year-old woman and fire her, personally I
9  start thinking about what is she going to do next.
10  Q.      Okay.
11  A.      And I know that seems simple, but even the
12  store -- I had a conversation with the store
13  manager, because I said, I'm not the one that told
14  the store manager, because I didn't want the ball to
15  get so big, I said, could you just move her out of
16  the department.
17  Q.      What was your position at that time at that
18  store?
19  A.      I was the meat manager again.
20  Q.      And was this your regular assignment at
21  this point?
22  A.      Edwardsville flooded, the floor I was in,
23  Edwardsville got flooded, and that's what made me
24  move to Nesquehoning.
25  Q.      Who if you can recall was the assistant

Page 122

1  store manager and store manager?
2  A.      The store manager was Lois Gasser.  The
3  assistant store manager I'm pretty sure was Kevin
4  Pachinski, I cannot spell that last name for you,
5  I'm sorry.
6          MR. SCHAUER:  Well, let's mark this
7  document I'm going to show you as Exhibit 12.
8          (Exhibit 12, handwritten statement,
9  marked for identification.)
10  Q.      Take a moment.  Look at this Exhibit 12 and
11  I'm going to ask you some questions about it.
12  A.      Go ahead.
13  Q.      Is that your handwriting?
14  A.      Yes, it is.
15  Q.      Is that a -- to your recollection is that a
16  document that you prepared as part of an
17  investigation by Redner's Markets into an incident
18  that occurred at that Nesquehoning store in March of
19  2013?
20  A.      Yes.
21  Q.      Is it the incident that you just
22  described?
23  A.      Yes.  I might have been off a thing or two,
24  but, yes.
25  Q.      Okay.  And this appears at the top it says

Page 123

1  it was faxed on March 18, 2013, do you see that?
2  A.      Yes.
3  Q.      9:09 a.m.?
4  A.      Yes.
5  Q.      And it references on the first line,
6  something that occurred on March 17?
7  A.      Uh-huh.
8  Q.      Do you see that?
9  A.      Yes.
10  Q.      Do you -- do you have a recollection of
11  preparing this statement I'll call it, Exhibit 12,
12  on the 17th or soon after the event or some time
13  before 9 o'clock on March 18?
14  A.      It was definitely after the event.  But I
15  was in the store manager's office.  I don't know if
16  it was -- it might have been already after the
17  event.  Like I don't know if it was exactly on March
18  18, but it should have been somewhere around the
19  18th.
20  Q.      In fairness, I think the last sentence
21  says, I didn't feel comfortable talking with Lois,
22  or I felt --
23  A.      So uncomfortable.
24  Q.      So uncomfortable I waited until the next
25  day as soon as I saw her.  So you went to her the

Page 124

1  next morning, does that refresh your recollection?
2  A.      Yeah.
3  Q.      Does it help you with when you wrote this?
4  A.      I think it was -- if it was Saturday, I
5  didn't talk to her on Sunday, so it would have been
6  Monday.
7  Q.      Okay.  So it appears if I go to sort of the
8  middle of your statement here, Exhibit 12, where it
9  says, I was returning with boxes, do you see that
10  language?
11  A.      Yeah, that's when -- go ahead.
12  Q.      I was returning with boxes in hand, I hear
13  Susan saying as I am in the room, he keeps telling
14  me what to do -- do you know what that next word is?
15  A.      I believe -- hold on let me find it.  Susan
16  saying as I am in the room, he keeps telling me what
17  to do, F that, what does he think this is, does my
18  skin color look black to you.  I stopped in my
19  tracks and smiled.  He said --
20  A.      She said.
21  A.      I guess --
22  Q.      Sigh.
23  A.      Sigh, I'm sorry, I walked in and when I
24  walked in she walked out.
25  Q.      Does that refresh your recollection as to



Page 125

1  what was said relative to the incident you've been
2  describing here that occurred at that store in
3  March?
4  A.      Yes.
5  Q.      Is there some separate incident where the N
6  word was involved?
7  A.      Well, the N -- I believe the N word was
8  written in there, was actually there.  I didn't
9  write the N word.
10 Q.      So you're saying that when you gave your
11 report to Redner's you changed the N word -- well,
12 where would the N word have been or where was it
13 with what he said, I'm not going to guess?
14 A.      I believe it was somewhere in there.  It
15 don't -- does my skin color look black to you, I
16 thought she said something along the lines, I'm not
17 your N word.
18 Q.      Who asked you to prepare this statement?
19 A.      Lois.
20 Q.      Your manager, store manager?
21 A.      Yes.
22 Q.      Okay.
23 A.      And I don't believe I went to Lois about
24 this.  She came to me after the department told her
25 about this.

Page 126

1  Q.      Are you aware whether there was anything --
2  what if anything was done by Redner's as a result of
3  the information that was provided to them around
4  this incident?
5  A.      They fired her.  I'm pretty sure they fired
6  her.  The store manager said they would have to.
7  Q.      Did you -- to your knowledge did you --
8  were you treated differently by any members of
9  management following the termination of Susan's
10 employment?
11 A.      Lois was a little upset, because she did
12 like Susan.  That was one of the issues there.  Not
13 that she liked Susan, but that some people were
14 treated differently than others.  But in this
15 situation Lois definitely was not -- she wasn't
16 defending -- I'm not saying she was defending Susan
17 in any way, but she was definitely upset that she
18 had to fire her.
19 Q.      Were you satisfied in the sense that
20 Redner's took action you thought was appropriate to
21 address what had happened?
22 A.      Yes and no.  As I explained to Lois and I
23 believe to Mr. McDonough on the phone, once again, I
24 didn't want to see someone get -- people say bad --
25 and this is how I explained -- sorry.

Page 127

1  Q.      For your purposes in the workplace?
2  A.      All right.
3  Q.      And having one that, you know --
4  A.      Of course.
5  Q.      Is not, you know, have racial ageist,
6  whatever, inappropriate things going on, did you
7  think that was the appropriate response?
8  A.      Yes, I understood why they did it.
9  Q.      I understand you had personal concerns with
10 respect to somebody losing their job.
11 A.      Yes.
12         (Exhibit 13, Statement dated 6/10/19,
13 marked for identification.)
14 Q.      I'm going to show you Exhibit 13.  Exhibit
15 13 is again a document that you probably have not
16 seen before.  It has been produced to your counsel
17 in the course of discovery in this case.  I will
18 suggest to you it is a summary prepared by
19 Mr. McDonough of conversations with you it appears
20 in June of 2013.  Okay?
21 A.      Okay.
22 Q.      The first sentence, during the week of June
23 3 Quentin made a request to the human resource
24 department to discuss some of his concerns while
25 working at store 19 in Nesquehoning.  Do you see

Page 128

1  that?
2  A.      Yes.
3  Q.      I spoke with Quentin on Wednesday June 5.
4  Quentin told us of many of the events that had taken
5  place where some form of racial discrimination, do
6  you recall -- let me read the next sentence.
7  Quentin never said these words specifically, but
8  implied many employees and customers were talking
9  about him in and out of the store.  A complaint came
10 in about him and how he handled a customer return
11 that he was rude.  The fact is you weren't working
12 that day.  There were other reports of employees
13 commenting on the outcome of an unemployment hearing
14 that he took offense to.
15         With respect to people talking about
16 you in and out of the store, employees and
17 customers, that kind of thing, do you recall that
18 conversation with Mr. McDonough?
19 A.      Yes.
20 Q.      Did you ever say to Mr. McDonough, he
21 doesn't say you did, that there was some, you know,
22 it was racially based, did you say that to him, if
23 you recall?
24 A.      I don't believe I said it was racially
25 based.



Page 129

1  Q.      But the concerns you voiced in a general
2  nature about people talking about you, the
3  customers, the other employees, you did share with
4  him?
5  A.      Yes.
6  Q.      Second part of the statement says, Mr.
7  McDonough offered you an opportunity to transfer to
8  Lehigh Valley store or be located in Delaware,
9  correct?
10  A.      Yes.
11  Q.      Did you take up Mr. McDonough on any of
12  those offers, or what happened?
13  A.      It was too far away.  And Mr. McDonough did
14  say -- and this was -- listen, it wasn't him trying
15  to be difficult.  He did say if he had something
16  closer, he would, but Edwardsville just got flooded,
17  that's what moved me down and it got tight near
18  me.
19  Q.      The last sentence of Exhibit 13 says,
20  Quentin agreed we were not responsible for any of
21  the actions that were taking place, and thanked us
22  for listening and offering him a potential solution.
23  Did you do that?
24  A.      Yes.
25  Q.      And we, being Redner's Markets I assume, is

Page 130

1  that what you understand that to have meant, or what
2  it means?
3  A.      Yeah, him -- well, I just meant him, but I
4  understand that now.
5  Q.      Okay.  Did anything further occur relative
6  to the incident back on or about March 16, 2013 that
7  we talked about or, you know, as sort of a
8  repercussion that you're aware of?
9  A.      Repercussion of the events that happened.
10  Q.      Back in March of 2013 around the
11  termination of Susan, what happened, what she said?
12  A.      I think that things did escalate a little
13  bit.
14  Q.      Can you give me an example?
15  A.      My department started getting less and less
16  hours.  I asked about interdepartmental, that was a
17  bad mistake.  I was told -- that's when I was told I
18  should follow the chain of command after talking to
19  Mr. McDonough, not in a bad way, but usually in
20  situations I should go to the grocery manager,
21  assistant manager.  We didn't have a grocery manager
22  in Nesquehoning, things like that.  But other than
23  that, no.
24  Q.      Do you believe any of those things that
25  you've described were because of your race or

Page 131

1  because you had provided information relative to,
2  you know, what had occurred with Susan?
3  A.      No.  The customer complaints and things
4  like that I think did.  Customers started
5  complaining about me, the ex-meat manager, his whole
6  family lived in town, so they started making
7  complaints.  She wouldn't mark it like to corporate,
8  but she would come back and say there was a
9  complaint about this, or a complaint about this.
10  Q.      So you felt that perhaps, what, friends of
11  Susan were coming in and making complaints about you
12  because of what had happened?
13  A.      And Mr. Marusak having to get moved.  He
14  was in that store for generations almost.  I think
15  that's really -- between that and --
16  Q.      Okay.
17  A.      You see what I mean?  The day Ray left I
18  said to Lois, I introduced myself to the store
19  manager and she said, you're the one that's making
20  my meat manager leave.  She said, you're really
21  going to -- I don't know what you're going to do,
22  but no one is going to be the meat manager he is.
23  And he's a supervisor, I get that, but from jump
24  street, you're kind of automatically going downhill.
25          That's the only -- and even the two

Page 132

1  people, Harley, my meat cutter, on my days off, one
2  of my days off him and Sue got into an argument
3  almost on the same thing.  He's telling her to do
4  things, she's saying she's not doing it, whatever.
5  Supervision comes in one day and says that Lois is
6  going to keep on me, I need to write him up.  I
7  said, I wasn't here, I don't know the full
8  situation, how do you write somebody up when you're
9  not here.  He said, just write him up, it's
10  something you've got to do.  So I did it, he got
11  transferred, that's my fault.  His dad writes a note
12  that says I was ignorant.  I don't even know his
13  father.
14  Q.      Well, you mentioned these things that
15  friends of Susan's perhaps or friends of the former
16  meat manager, you said that, however, Lois didn't
17  write you up to corporate, she just said, hey, so
18  and so came in or this was said?
19  A.      Yeah, and she threatened -- it wasn't as so
20  me, but it was my employees.  So, for instance, she
21  would threaten my employees that they're going to
22  get written up.  Any mistake, my wrapper, if there
23  was a customer complaint about meat, it wasn't
24  wrapped right, you're going to get written up.  And
25  her and Joanne used to go at it back and forth, you



Page 133

1 can ask Redner's about the situations with those.
2 Q.     Do you believe what you just described is
3 somehow based upon or a result of your race?
4 A.     I believe it's based upon, if it's not
5 based upon it's my race, it's based upon my events
6 that other people avoided.  I believe I was put into
7 a store that was already in a situation that people
8 warned me about, including my supervisor before
9 getting there, and then things start rolling down
10 here from there.
11 Q.     What's the situation they warned you
12 about?
13 A.     Lois Gasser, Sue, and my wrapper.  They
14 just --
15 Q.     The way they are in the workplace?
16 A.     The fact is that I couldn't -- I couldn't
17 schedule Sue and Joanne together on a day off.  Lois
18 didn't want to have Joanne not there on weekends or
19 certain -- there was just a constant battle with
20 them going on that was hard.  If the ex-meat manager
21 came in, the one girl would go missing and I would
22 hear about it, but I can't control it.  There was
23 lots of things going that were brought up that I
24 wasn't in control of, I wasn't in full control of
25 those things.

Page 134

1              MR. SCHAUER:  Let's take a break.
2        (The deposition was recessed.)
3 BY MR. SCHAUER:
4 Q.     Let's take this chronologically
5 Mr. McClellan.  You return to work from your leaves,
6 we are now in late August, early September, 2017.
7 And what happened, how does it go?
8 A.     The whole week?
9 Q.     Well, let's go up until situations that may
10 have been involved or led to your termination.  So
11 you come back and, you know, you have the confusion
12 around who is the meat manager.  And how does that
13 all sort out?
14 A.     I believe I came back for an inventory.
15 Q.     Okay.
16 A.     So the confusion was still there somewhat.
17 I got in, the store manager I believe said, just
18 start taking inventory.  So I started taking
19 inventory.  The first day was pretty much all
20 inventory, that's normally a process.  I did that
21 with the meat manager at the time.  And then that
22 was it for that day really.  I believe it was -- it
23 might have been it for that day, either that day or
24 the next day when the situation came up with the
25 schedule.  And the meat cutter who may not be there

Page 135

1 or no meat cutter for the weekend I believe, because
2 this is leading up into a holiday weekend.  So this
3 is between me and Jeff, the store manager.
4              I didn't know the situation or anything
5 about the time, about the meat cutter or anything
6 like that, I didn't make the schedule.  I believe we
7 talked about the doctors appointment or note, I had
8 to bring him something, paperwork or something like
9 that -- no, actually, no, that got sent in, so at
10 that point we didn't talk about the doctors
11 appointment.  I told him I'll come in to talk with
12 the meat cutter, find out what's going on.  The meat
13 manager wasn't there -- it had to have been the next
14 day.
15              So then I go, Jeff is not there now,
16 and I tell Alan I have to go to a doctor
17 appointment.  He said he believes it's for FMLA.  I
18 said, I don't know what I do with the FMLA time or
19 anything like that, if I still have it or not.  He
20 said, all right, just bring in a note.  I said all
21 right, I can get the note, I'll bring in a note.  We
22 say all right and let it be.  I think I asked if
23 they're good, that's the only thing I really worry
24 about.  We leave it there.
25              I come in the next day, make sure that

Page 136

1 the meat cutter was showing up and everything,
2 everything was good there.
3 Q.     Not to interrupt, but I'm going to to put a
4 point on things.  That was the Wednesday of the
5 week, wasn't it, when you had your appointment?
6 A.     Yes, I believe so.
7 Q.     And had you said anything about your
8 appointment prior to the day you left?
9 A.     I believe to Jeff.  That's why --
10 Q.     Okay.
11 A.     I believe it was Jeff.  But the day when I
12 left, that's when the assistant store manager was
13 there.
14 Q.     And you also told Alan that you had to go?
15 A.     Yeah, I had to go for the doctors
16 appointment.
17 Q.     And he said, it might or might not be FMLA
18 time, whatever, go and bring back a note?
19 A.     Yeah, because he -- I don't know, he
20 brought up the FMLA part, yes.  The time, FMLA time.
21 Q.     Did you ever check with HR around the issue
22 whether there was somehow time that would be counted
23 against your FMLA time or entitlement?
24 A.     No.  Usually they would let you know.
25 Let's say even if you miss an hour or something, an



QUENTIN MCCLELLAN
QUENTIN MCCLELLAN vs REDNER'S MARKETS

June 19, 2019
137–140

Page 137

1  emergency came up, they'll tell you, hey, just make
2  it up the next week or whatever and they'll discuss
3  that with you.
4  Q.     But specific to the FMLA, did you ever
5  contact them and say, hey, is that time away seeing
6  this doctor, is that time that's going to count
7  against my, you know, time that's protected by the
8  Family Medical Leave Act?
9  A.     No, I thought the assistant manager must
10  have knew something about it.  That's what I mean, I
11  said, I have a doctors appointment, and he said,
12  well, is this a part of FMLA time?  I said, I don't
13  know, I don't know how much time I have or anything
14  like that.  So I didn't ask.
15  Q.     Okay.  So did you ever -- what was the
16  doctor appointment, who did you go see?
17  A.     I believe I had to see both my doctors.  I
18  had to see my normal physician and I had to see my
19  psychiatrist.
20  Q.     Did you ever return a note to anybody at
21  Redner's relative to that afternoon?
22  A.     No, not that afternoon, no.
23  Q.     Did you ever return a note to somebody at
24  Redner's while you were still employed there
25  relative to that afternoon?

Page 138

1  A.     No, I had it, but I did not get to.  I was
2  going to return it to the store manager.
3  Q.     Did you get -- did anybody push on you
4  about the note?
5  A.     No.
6  Q.     Right.
7  A.     Even when I saw the store manager I believe
8  Thursday or so, there wasn't a discussion about the
9  note or the doctor.
10  Q.     Okay.
11  A.     So I don't know if he talked to -- that's
12  why I say, I don't know if he talked to the
13  assistant yet.  They work sometimes -- one would
14  work during the day, they don't see each other all
15  the time especially on the weekend.
16  Q.     So you're now -- did you work that
17  Thursday?
18  A.     I'm not really sure, sir.
19  Q.     The next day, after the doctor?
20  A.     I believe I did, but I'm not sure.  I know
21  I ended up having to come in Friday.  That's the
22  only reason -- I remember that part.
23  Q.     And so you came into work on Friday,
24  anything unusual occur?
25  A.     Everyone was a little confused.  The meat

Page 139

1  manager was there, I asked the meat manager if
2  everything was all right, if he needed anything, the
3  meat cutters were there, I talked to the meat
4  manager about the schedule, I don't think Jeff was
5  there yet, that made it a little weird.
6  Q.     And what did you talk to the meat manager
7  about relative to the schedule?
8  A.     Why it was changed and why I was there.
9  Like I said, everyone was confused.  I don't think I
10  was supposed to be there even on Friday.
11  Q.     So what if anything happened around that?
12  A.     With the -- with me coming in Friday?
13  Q.     Right.
14  A.     Nothing.
15  Q.     Did you stay?
16  A.     Yeah, I stayed for -- I didn't stay the
17  whole day, but yeah, I stayed.  I don't remember how
18  long I stayed or anything like that.
19  Q.     Did you come into work on Saturday?
20  A.     Yes, for a partial day, yeah.
21  Q.     Now, Saturday, who was working in the meat
22  department?
23  A.     Saturday I believe it was the wrapper, and
24  I want to say two meat cutters.
25  Q.     Was the other meat manager working that

Page 140

1  day?
2  A.     I don't believe so, but he might have just
3  worked a couple of hours in the morning if he did,
4  but I don't believe so.
5  Q.     Did you have scheduled hours on June 2 as
6  you recall?
7  A.     That's that Saturday?
8  Q.     Yes.
9  A.     I did, I was scheduled that day.
10  Q.     And did you -- you say you left a little
11  bit earlier.  How was it that you came to leave?
12  A.     Usually when something like that came up,
13  like, for instance, Jeff said, just lose it, don't
14  worry about it, just if you come in Friday, come in
15  Friday, lose the time Saturday.  My only concern was
16  to make sure they're in good shape before I left,
17  that's how it worked.  With the vacation time, like
18  if I went up to Jeff and said, hey, I wanted to use
19  a half a vacation day, there's usually three
20  questions you'll be asked, who is back there, what
21  do you have backed up, and what are the conditions
22  like for the rest of the day.  And then that would
23  be it.  There was no major thing, he'll say I'll put
24  in a vacation day or no I can't leave or somewhere
25  along the lines of that.



Page 141

1    MR. SCHAUER:  I'm going to mark two
2 exhibits here.
3        (Exhibit 14, copy of work schedule,
4 marked for identification.)
5        (Exhibit 15, copy of work schedule,
6 marked for identification.)
7 Q.    Let's look at Exhibit 14 do you recognize
8 what that document is?
9 A.    It's a schedule.
10 Q.    It looks like it's your name in the upper
11 left.  I apologize, it looks like it got copied and
12 had folded over.  Quentin McClellan, that's you?
13 A.    Yes.
14 Q.    It says for week ending 9/2/17, right?
15 A.    Yes.
16 Q.    So it shows you working Monday, Tuesday,
17 then Wednesday and then Thursday there's like a 6
18 and 3 written in, Friday 6 and 3 is scratched out
19 and Saturday is 6 to 3, right?
20 A.    Uh-huh.
21 Q.    Is that correct?
22 A.    That's -- yes, it's correct that that stuff
23 is there.
24 Q.    Let's look at Exhibit 15.  The other
25 exhibit.  Do you recognize what that document is?

Page 142

1 A.    It looks like the same thing, but it's the
2 budget from the back of it.
3 Q.    And what if anything is different with
4 regard to the upper half where it has the names and
5 scheduling?
6 A.    What is different, Saturday 6 to 10.
7 Q.    Now, would that, Exhibit 15, have been what
8 was actually, you know, what was worked to your
9 knowledge?  I mean, is this --
10 A.    I assume, yeah.  I have to assume.
11 Q.    Was it about 10 o'clock on Saturday that
12 you left?
13 A.    Oh, probably, yes.  Somewhere around there.
14 Q.    The records would indicate that you were in
15 and worked approximately 35 hours on the week of
16 September 2.  Do you recall that information if
17 nothing else being shared at the unemployment
18 compensation hearing?
19 A.    I do.
20 Q.    Do you have any reason to dispute that
21 number?
22 A.    No.  I assume you guys will have an a --
23 no, I can't.
24 Q.    Okay.  And you left at approximately what
25 time on Wednesday for your appointments?

Page 143

1 A.    I do not remember, sir, sorry.
2 Q.    Okay.
3 A.    It had to have been early, if he said 35
4 hours I assume it was before 3.  Well, I know it was
5 before 3 because I had my doctor's appointment.
6 Q.    All right.  So when did it first come to
7 your attention there was a concern amongst the
8 Redner's Management relative to what occurred on
9 September 2?
10 A.    Concerned about what?
11 Q.    You leaving.  At some point on or after
12 September 2 of 2017 were you contacted by your
13 manager or managers from Redner's about a concern
14 that you had left early on Saturday?
15 A.    First they were concerned about Wednesday.
16 That was the concern at first.
17 Q.    Okay.  What was said to you by who?
18 A.    I believe -- I believe that was when -- I
19 believe Jeff asked me about that first and foremost.
20 Q.    And what did he say?
21 A.    He asked me about the -- did I go to the
22 doctors and just things like that.  He wasn't asking
23 me in any concerning way or anything like that.
24 Q.    When did he ask you about that?
25 A.    That's -- see, I think it would have been

Page 144

1 Thursday, you see what -- oh, you're not looking at
2 the schedule, I think it would have been Thursday.
3 Q.    That he asked you about --
4 A.    I would have saw him -- I'm pretty sure I
5 would have saw him Thursday.  So that's when I
6 believe it would have been.
7 Q.    When you say, he asked, was it more he was
8 just confirming you had gone?
9 A.    Yeah, he didn't say it like, oh, like you
10 left again on Wednesday or anything.  No, he didn't
11 say anything like that.  He was just asking if
12 everything was all right, the doctors went all right
13 and we started talking about the store.
14 Q.    Didn't press on you about the note or did
15 you have a note or anything like that?
16 A.    No, didn't bring it up.
17 Q.    So you have that conversation.  What next,
18 you know, was asked of you or said to you by
19 Redner's management relative to the events of the
20 week of September 2?
21 A.    It was either Tuesday or Thursday, when I
22 would have seen Jeff also.  That's the days I
23 believe he would have asked me about Friday.
24 Q.    And what did he ask you about Friday?
25 A.    I believe his name was John Rodriguez.



QUENTIN MCCLELLAN
QUENTIN MCCLELLAN vs REDNER'S MARKETS

June 19, 2019
145–148

Page 145

1   They didn't believe he was going to be in.  This is
2   my first week back.
3   Q.       Right.
4   A.       I didn't know the whole situation about it
5   or anything along the lines of it.
6   Q.       And they asked you to come in?
7   A.       Yes, and make sure he was going to be
8   there, make sure they were in good shape, make sure
9   there was not going to be any problems for the
10  holiday.
11  Q.       And do you have a recollection of coming in
12  on Friday?
13  A.       I know I came in.  I don't know what time I
14  came in or what time I left honestly.  Sorry.
15  Q.       Did you have any discussions with any
16  managers on that Friday around, hey, you know, I got
17  it covered, I'm leaving now, what if anything did
18  you say to store management relative to Friday and
19  coming in and leaving?
20  A.       What I usually did in that situation
21  because of how they worked, the store and assistant
22  manager, if it was the beginning of the week I would
23  just let him know the situation of the meat room,
24  and when I was leaving told him it was approved by
25  Jeff.  Usually that's what you did just because --

Page 146

1   like I said, if they don't see each other throughout
2   the week all the time, you just said it was approved
3   by Jeff, worse comes to worse he's going to talk to
4   Jeff and find out it was approved by Jeff.  Honestly
5   that's just how that worked.
6   Q.       Okay.  All right.  Well do you have a
7   recollection of what you did on that Friday, you get
8   in and looks like things are working out?
9   A.       I think I got in, I put out the freight.
10  They had a couple of meat cutters, I believe they
11  had the meat cutters on, they were already backed up
12  and Paul was there, I believe I talked to Paul about
13  what needed to be done and what didn't need to be
14  done.  I did what they needed me to do and I got out
15  of there.
16  Q.       Paul is the other meat manager?
17  A.       He's the other, yeah, he's the meat
18  manager.
19  Q.       So then I assume that nobody contacted you
20  then Friday relative to what happened on Friday,
21  correct?
22  A.       I'm pretty sure.  I might have had a
23  conversation with either Paul or someone just about
24  how things turned out.  But, no, I don't think
25  anyone questioned me about the time there or

Page 147

1   anything like that.
2   Q.       All right.  So then on September 2 you went
3   in and, again, what did you do on September 2?
4   A.       September 2, made sure the meat department
5   was good, we were dying down, said I'm going to lose
6   the hours from Friday I'm pretty sure, because I
7   came in Friday.  At that time I didn't -- just like
8   you were saying, 35 and a half hours, at that time I
9   didn't know anything about the time I worked or how
10  many hours or was told.  In my agreement with Jeff,
11  which was the one that asked me to come in, was just
12  to come in, get the job done Friday, whatever I
13  need, make sure we were in good shape and I could
14  take off on Saturday.
15  Q.       But you were scheduled Saturday?
16  A.       Yeah, but I wasn't scheduled on Friday.
17  Q.       Okay.
18  A.       Do you mind if I say something?
19  Q.       Go ahead.
20  A.       A lot of times, and this is even, through
21  my whole career at Redner's, lots of times the
22  schedule will get changed or things that happen at
23  store level that wasn't exactly policy, but it was
24  all right.  So, for instance, there was times when
25  schedules were made that you would work 4 to 12 and

Page 148

1   just skip lunches.  There was times -- depending on
2   the store and the store manager you had, there was
3   lots of different rules.  Just because there was
4   times the budget didn't allow for premiums or things
5   like that.  So what they'll do -- for instance,
6   vacation time, they would hint, without asking you
7   specifically, they'll say, if anybody needs -- like
8   in a manager meeting, if anybody has vacation you
9   can use this week it would be a great week.  So lots
10  of times if things like this happen, I mean, I just
11  took it.  And I never took lunches, there was lots
12  of times I didn't take lunches so I thought this was
13  agreed upon by me and Jeff.
14  Q.       For Saturday to leave?
15  A.       Well, Saturday to leave in the department
16  that wasn't really mine at that point.
17  Q.       And I think you've said before that you
18  hadn't on Saturday told any of the managers that you
19  were leaving, you left?
20  A.       Yeah.
21  Q.       Okay.  All right.
22  A.       And I told the meat room, I didn't tell the
23  managers.
24  Q.       Right.
25  A.       All right.



QUENTIN MCCLELLAN                                        June 19, 2019
QUENTIN MCCLELLAN vs REDNER'S MARKETS                       149–152

Page 149

1          (Exhibit 16, E-mail dated 9/2/17,
2    marked for identification.)
3    Q.     I'm going to show you Exhibit 16.  I'm
4    going to direct your attention to the middle of 16,
5    the part below on September 2, 2017, 11:30 a.m.  Do
6    you see that?
7    A.     Yes.
8    Q.     This is a document that was provided to
9    your counsel in the course of discovery here.  And
10   in summary it says, Jim, which is, I'm not sure who,
11   Jim Polchin, I went back to the meat department
12   looking for Quentin around 10:45.  He wasn't back
13   there and the crew said they had not seen him for a
14   while.  I looked outside and his car was gone.  He
15   didn't report to me he was leaving.
16          Would that be consistent with what --
17   probably what happened?  You left before 10:45, and
18   as you said you didn't report to Jeff that you were
19   leaving that day, you didn't go to him that day,
20   correct?
21   A.     Well, isn't this Rick Merkel speaking, or
22   is this -- oh, no, this is Jeff.
23   Q.     Jeff?
24   A.     This is the store director.
25   Q.     Correct.

Page 150

1    A.     All right.
2    Q.     So this is, right, this is Jeff, an e-mail
3    to Jim Polchin, 11:38 on September 2.  It says, I
4    went back to the meat department looking for
5    Quentin.  You wouldn't necessarily know that?
6    A.     Of course.
7    Q.     But it was 10:45, you weren't there, which
8    would be -- you said you left somewhere around 10,
9    you're not sure when you left, his car was gone,
10   that would be consistent with what you said.  He
11   didn't report to me that he was leaving.  And I
12   think you said, you didn't tell Jeff that day when
13   you were leaving?
14   A.     No.
15   Q.     It says, I tried to call his cell phone.
16   Do you have a recollection did you notice a missed
17   call?
18   A.     I believe he might have.  I'm assuming he's
19   not going to lie about that.
20   Q.     I left a message for him to call me.  Do
21   you recall getting a message from Jeff on September
22   2?
23   A.     I think we had a conversation.
24   Q.     Okay.  For what it's worth, it says, as of
25   11:30 he still hadn't gotten back to me.  Do you

Page 151

1    recall whether you did or didn't?
2    A.     I believe -- no, I believe after that we
3    had text messages, if it wasn't with him it was with
4    Mr. Swartzlander, but I'm pretty sure it was with
5    Jeff, because it was Jeff, Swartzlander, and Mr.
6    McDonough, or that week leading over that time
7    frame.
8    Q.     It says, he did work a couple of hours
9    yesterday, but that was to make up for leaving early
10   Wednesday, do you see that?
11   A.     I do see that.
12   Q.     And is that consistent with with your
13   recollection or not?
14   A.     No, because I didn't talk to Jeff about
15   Wednesday.  And I didn't -- so for me to say I was
16   going to make up time for Wednesday didn't make
17   sense.
18   Q.     Your understanding was since you got asked
19   to come in Friday with Jeff, he was mistaken, he
20   should have put in there, he did work a couple of
21   hours yesterday, but that was to make up for coming
22   in on Friday -- Thursday, excuse me -- no, Friday?
23   A.     No.  He meant for Wednesday is what he
24   meant, about the doctor's note.
25   Q.     Uh-huh.

Page 152

1    A.     But that wasn't what we talked about.  And
2    I still at this time didn't even know about FMLA,
3    because according to the assistant store manager I
4    may have had FMLA time.  Up until this point there
5    was no hostility until the e-mails and text messages
6    until whenever the conversation started happening
7    Monday or somewhere around there.
8    Q.     He is off tomorrow, but back Monday.  If an
9    emergency came up, I understand, he still needs to
10   tell me he is leaving.
11          But you felt you didn't need to
12   because you talked to him earlier in the week?
13   A.     Yes.
14   Q.     Is that what you're saying?
15   A.     A lot of times that's how that worked.
16   Q.     It says I talked to him earlier this
17   morning and he seemed fine.
18          Did you have -- did you run into Jeff?
19   A.     I'm assuming.
20   Q.     Do you have a recollection of talking to
21   him in the morning?
22   A.     Because I would have had to tell him what
23   happened Friday and what's going on on Saturday.
24   He's the one that asked me to come in and talk to
25   John.  So if I did talk to him in the morning I



QUENTIN MCCLELLAN
QUENTIN MCCLELLAN vs REDNER'S MARKETS

June 19, 2019
153–156

Page 153

1 would have had to tell him the situation what
2 happened with John because that's the reason he
3 wanted me to come in.
4 Q.    So that part is accurate in what he wrote,
5 it says, I talked to him earlier this morning?
6 A.    Yeah, I assume.
7 Q.    Okay.  All right.
8 A.    Yes.
9        MR. SCHAUER:  We're marking this 17.
10        (Exhibit 17, Screen shot of text
11 messages, marked for identification.)
12 Q.    I'm going to show you what's been marked as
13 Exhibit 17.  This was actually produced by your
14 attorney and I guess by you.  Do you recognize, is
15 this your phone?
16 A.    It was, yes.
17 Q.    Okay.  And I guess at the top is a message
18 to you from Bill Swartzlander?
19 A.    Uh-huh.
20 Q.    And then I guess the messages below that
21 starting with Thursday, August 31, through
22 September, are those messages from you to Bill?
23 A.    Yes.
24 Q.    Do you recall having received any response
25 by Bill to these text messages?  There doesn't

Page 154

1 appear to be any of these on this part of the phone.
2 A.    I believe he called me after that.  And if
3 not, the messages then went from him not answering
4 me to I believe Mr. McDonough reaching out to me.
5 So it was either he called me and got back to me or
6 Mr. McDonough e-mailed me shortly somewhere around
7 there.
8 Q.    Okay.  Because it goes through the 5th.
9 Okay.  You do use the term, this is bullshit.  Is
10 that kind of phraseology you would usually use, or
11 were you upset about that?
12 A.    Where is that?
13 Q.    Oh, I'm sorry, in the September 4, 2017.
14 A.    Oh, I see it.  Well, that was the day that
15 I walked in and was told to wait up front and then
16 got told I was suspended because of an e-mail.
17 Q.    You were suspended because of an e-mail?
18 A.    Yeah.
19 Q.    What was said to you by who?
20 A.    I walk into the store, Diane Mitchell stops
21 me up front she said, I have to wait for Alan.  She
22 pages him, who is the assistant manager, the grocery
23 manager and him walk up to me in the front.  And
24 said, listen, I have to let you know your being
25 suspended.  I said, for what?  He said, I don't

Page 155

1 know, something in an e-mail sent to Jeff.  I said
2 you're, suspending me for something sent in an
3 e-mail sent to Jeff.  He said yes, it was from Bob
4 McDonough.  He said, do you have something to say?
5 I said, no.  If I start a scene that's not going to
6 be good.
7        MR. SCHAUER:  We'll mark this Exhibit
8 18.
9        (Exhibit 18, E-mail dated 9/5/17,
10 marked for identification.)
11 Q.    If you turn to the second page what's
12 marked as Exhibit 18 at the bottom of that page
13 there appears to be an e-mail from number 55 store
14 director, I assume that would be Jeff, is that
15 correct?
16 A.    At the bottom, right?
17 Q.    Correct.
18 A.    Yes.
19 Q.    And there is an e-mail then from him, it's
20 dated September 4, to Mr. McDonough, subject, Q.
21 Are you sometimes referred to that, I noticed in
22 some of the earlier writings?
23 A.    (Witness nodded.)
24 Q.    You have to say yes -- you don't have to
25 say yes, but you have to give an oral answer.

Page 156

1 A.    Yes.
2 Q.    It talks about your schedule, do you see
3 that?
4 A.    Yes.
5 Q.    Then about halfway down through that e-mail
6 it says, Wednesday he left for an appointment at 11.
7 Does that sound about right?
8 A.    Yes.
9 Q.    Wednesday you were scheduled from 6 to 3,
10 right, so you would have missed four hours that day?
11 A.    On Wednesday?
12 Q.    Of what was otherwise scheduled?
13 A.    Yes.
14 Q.    Thursday it says that you left at 1:15 or
15 1:30?
16 A.    Yes.  That's what it says.
17 Q.    Friday you came in to make up the time from
18 Wednesday, I guess that's something you don't agree
19 with, right?
20 A.    Yes, I do not agree.
21 Q.    Okay.  In your mind coming in on Friday was
22 simply an accommodation to the request of your
23 supervisor?
24 A.    Because of previous situations, yeah.
25 That's how that usually worked.



Page 157

1  Q.    Saturday you were scheduled to work 6 to 3,
2  do you see that?
3  A.    Yes.
4  Q.    And is that your recollection?
5  A.    If that's what was scheduled.
6  Q.    And then so you left about 10 o'clock on
7  Saturday, about five hours early, right?
8  A.    Yes.
9  Q.    So you have, you know, five hours early on
10 Saturday, setting aside what was or wasn't agreed
11 to, so you have five hours earlier on the schedule,
12 and Thursday you left about an hour and a half
13 early, so that's six and a half hours before you
14 were scheduled to leave, is that fair?
15 A.    Oh, I see what you're saying, yes, seems
16 about right.
17 Q.    You had taken time on Wednesday, not
18 counting that.  So not counting the four hours or so
19 that you missed on Wednesday would be roughly 10
20 hours.  And then Friday you worked some hours,
21 correct?
22 A.    Yes.
23 Q.    Do you have any particular reason to not
24 necessarily agree with the times that are shown?
25 A.    No, I have no reason to disagree or agree

Page 158

1  with the times shown.
2  Q.    Okay.  You can set that aside.
3  A.    Okay.
4  Q.    Do you have Exhibit 19 in front of you?
5  A.    I do.
6  Q.    I'm not even going to ask you about that.
7  We're going to remark something else as 19.  So at
8  some point you were suspended, and what happened
9  next with respect to being contacted at an anybody
10 at a Redner's?
11 A.    I'm not sure Mr. Swartzlander ever got back
12 to me.  That's why I said before it might have been
13 just Mr. McDonough.
14 Q.    All right.  And how did he get back to you?
15 A.    E-mailed I believe.
16 Q.    All right.  And do you have a recollection
17 of what was in that e-mail?
18 A.    I believe the first e-mail might have been
19 like, what's going on, or what's the issues type
20 deal.  And then that led to the phone call, the
21 phone conversation I believe.
22     MR. SCHAUER:  Okay.  So let's mark
23 this document as Exhibit 19.
24     (Exhibit 19, Screen shot of e-mail
25 dated 9/5, marked for identification.)

Page 159

1  Q.    All right.  So Exhibit 19, this is an
2  e-mail from apparently Mr. McDonough to you, is this
3  a shot of your phone?
4  A.    Yes.
5  Q.    And it talks about a conversation earlier
6  that day, correct?
7  A.    Yes.
8  Q.    All right.  And tell me about that
9  conversation.
10 A.    Conversation was that should have been a
11 conversation between me, Mr. McDonough, Mr. Merkel,
12 and Mr. Polchin on speaker.  I was asked somewhere
13 along the lines of what the issues were, what was
14 wrong, somewhere along the lines of that, did I
15 still want to work there, if they were my -- I think
16 somewhere along the lines, what were my intentions.
17 Q.    Did you answer with, you know, do you want
18 to work there, did you say --
19 A.    Yeah.  That's what got the conversation
20 kind of going sideways.  The question wasn't -- the
21 question that got -- made the question go so far
22 left was the question of somewhere along the lines
23 of, was this your intention, or were you
24 intentionally trying to get -- somewhere along the
25 lines of -- he wasn't saying were you intentionally

Page 160

1  trying to get fired, but he somewhere along the
2  lines asked, are you intentionally trying to get
3  fired.  And, no, like this isn't what I woke up
4  trying to do.  This isn't what I came -- and that's
5  when things got, well, you're not answering the
6  question, just like sometimes the situation -- if
7  the situation depends on it.  Did you work 45 hours,
8  no.  Well, is that the first time you didn't work 45
9  hours, it depends on the situation.  And the answers
10 started getting him angry I think.
11 Q.    Did you tell him that you did work 45, or
12 did you tell him that you didn't work 45?
13 A.    I told him that I believed I did.
14 Q.    So you told him you thought you had?
15 A.    Yes.
16 Q.    And did you -- again, I think I asked you
17 earlier, so I'll try not to repeat earlier
18 questions, but you didn't have some independent
19 record?
20 A.    No, that's where the issue came in.
21 Q.    All right.  During the course of that week
22 do you recall any kind of effort to keep track of
23 the hours you were working, you know, like, hey,
24 Monday it was this, Tuesday, kind of in your own
25 head fashion?



Page 161

1  A.    No, I was still more worried -- the whole
2  time I was still worried about what was happening
3  with the doctor's note Wednesday.  Honestly up until
4  that point the only time I talked to someone was
5  literally when I found out I was getting suspended,
6  or maybe Jeff before that, otherwise there was no
7  conversation with anyone until the early morning
8  conversation and then the -- which didn't go well,
9  and then the e-mail.  And there might have been -- I
10 don't know if we contacted each other after that or
11 not like just to say, that's it, you're terminated,
12 because sooner or later he said, well, you're
13 terminated, so that was later in the day.
14 Q.    It continues with this e-mail, should I
15 take your hanging up and abrupt end to our
16 conversation to mean that you are quitting the job
17 at Redner's.  I think you said earlier you agree you
18 did hang up?
19 A.    He said if the conversation isn't going to
20 be -- if I'm not answering his questions, he's not
21 just going to waste his time on the phone.  I was
22 answering his questions, just like I'm trying to
23 answer your questions, I was answering his
24 questions.  But when he got to the point of me
25 deliberately or intentionally trying to do this,

Page 162

1  like that got me a little upset, that got me upset.
2  Q.    Well, is that, in effect, the language that
3  was said that caused you to hang up, were you trying
4  to get yourself somehow in trouble or terminated?
5  A.    That amongst the other parts of the
6  conversation.  I can't -- the situation was the
7  situation.  I can't say it was the comments in the
8  situation, but the conversation started off like a
9  normal conversation.  Unfortunately -- well, a
10 somewhat normal conversation I was getting told
11 about my suspension, so I don't want to make it seem
12 like it was the most normal conversation, but it
13 wasn't an irate conversation at the beginning of the
14 conversation.
15 Q.    Were you asked about your leaving early on
16 Saturday?
17 A.    I believe I was.
18 Q.    Near the end of Exhibit 19 this e-mail from
19 Mr. McDonough says, I can't promise you anything,
20 especially after our call this morning, but if you
21 had any thought of continuing your employment you
22 should contact me immediately.  Do you see that?
23 A.    Yes.
24 Q.    And you did reply, right?
25 A.    I believe so.  I think it was immediate.

Page 163

1         MR. SCHAUER:  Let's mark this.
2         (Exhibit 20, Note dated 9/6/17, marked
3  for identification.)
4  Q.    I'm showing you now a document that's
5  marked as Exhibit 20.  It is a, I suggest a
6  statement made by Mr. Polchin, Jim Polchin.  It's
7  dated September 6, 2017.  I'm going to suggest to
8  you that's the date it was done, and we'll discuss
9  the contents.  But just so you understand what we're
10 looking at.  Okay?
11 A.    Yes, sir.
12 Q.    It has been produced to your counsel.  Did
13 you see this document prior to testifying today?
14 A.    I'm not sure, but it might have been in an
15 unemployment hearing.  I'm not sure.
16 Q.    Beginning, it says Tuesday, September 5, I
17 sat in on a conference call with Bob McDonough, Rick
18 Merkel, and Quentin McClellan.  You're in agreement
19 there.  The purpose of our call was to address
20 breaking of company policy when he left work early
21 on 9/2 without informing the store director.
22        That did come up, correct?
23 A.    Yes, that's what they were asking.
24 Q.    I'm not asking you to agree it was the
25 purpose, but that came up?

Page 164

1  A.    Yes, sir.
2  Q.    Q had left at 10 a.m. when he was scheduled
3  until 3.
4         The schedule says you were there at a
5  3, you left at 10, right?
6  A.    Yes, sir.
7  Q.    This had been an issue previously addressed
8  with Q.
9         Do you recall prior discussions about
10 leaving early and taking vacation?
11 A.    They're two separate things.
12 Q.    An issue where you had left at 10 a.m. when
13 you were scheduled until 3, had that issue been
14 discussed with you before?
15 A.    No.
16 Q.    What is it that had been discussed, the
17 issue over tracking vacation that we've discussed a
18 few times?
19 A.    Yes.
20 Q.    While Q had admitted he was wrong not
21 talking with Jeff the store director, he said it
22 should be no issue since he put in his required
23 hours for the week.
24        Is that what you said?
25 A.    At that time.  Once again, I didn't get any



Page 165

1   records or know any records of the 45 hours.
2   Q.      Okay.  So you said that while you admitted
3   you were wrong not talking with Jeff the store
4   director, he said it would be no issue since he put
5   in his required hours for the week.  So, yeah, you
6   said, I put in the required hours.
7           Do you remember saying you were wrong
8   not to talk with Jeff the store director?
9   A.      That's what started making the conversation
10  go -- they already said that you didn't talk to
11  Jeff, and we argued about that on and off.
12  Q.      Okay.  Bob reminded him, again, it was not
13  okay, that as the meat manager he was required to
14  check out with Jeff, especially since he was leaving
15  earlier than scheduled he would need to get Jeff's
16  approval.
17          Did Mr. McDonough say that to you?
18  A.      I'm pretty sure, yeah.
19  Q.      Next, Q kept trying to bring up past
20  issues, but we kept trying to discuss the current
21  issue only of not following schedule or company
22  policy.  Did you bring up other issues then in this
23  conversation on the morning of September 5?
24  A.      Yes.
25  Q.      If you have a recollection, I don't need

Page 166

1   the detail, but what kinds of issues did you bring
2   up?
3   A.      I was explaining times when -- two things.
4   I was explaining the difference from the meeting in
5   April, about the vacation day, and this one, they're
6   not the same thing, and two, that there was times
7   previous to this why I didn't think I was breaking
8   any rules, because that's how it happened, store
9   managers and supervisors asked you to do something
10  else and they make a deal with you.  It's like,
11  let's make a deal.  It's not on purpose, it's not
12  something -- after eight years I don't think I would
13  have did it if I thought it was an issue.  I'm just
14  being honest.
15  Q.      You've said like, when it's sometimes you
16  have to work -- have you ever done the deal where
17  you worked like the next week for less than a day?
18  A.      I've done -- well, I would work a week and
19  not get paid for the -- so, you know how you asked
20  about the premium pay, what they would do a lot of
21  times, especially holiday weeks, things like that,
22  most people in your department get extra days off,
23  but the budget doesn't always work out either way.
24  So lots of times the manager will stay salary, and
25  then the next week work it off or something along

Page 167

1   the lines of that, or if you could -- if you were
2   short -- sorry, go ahead.
3   Q.      Stick to that example, would you stay a day
4   off in the next week if you worked premium but
5   weren't paid premium as a manager?
6   A.      It depends on the store and the store
7   director.
8   Q.      What about you?
9   A.      I worked in a different store, that's what
10  I'm getting ready to elaborate.  Let's say it's
11  January, holiday, New Years.
12  Q.      Let's focus on the Pittston store.
13  A.      All right.  Four different managers, all
14  different.
15  Q.      Let's talk about Jeff.
16  A.      Jeff, yes, he would still do the same
17  thing, he was a veteran, not just from here,
18  sometimes, even themselves, they wouldn't get
19  premium pay.  If there was times they weren't
20  getting premium they would work it out if they would
21  lose if it was enough.  Maybe not take a whole day,
22  or maybe you would take a whole day, lots of times
23  for a department manager at 2 o'clock you know your
24  guys are still there, can I leave, and they're
25  usually like, go ahead, or they don't care if the

Page 168

1   department is good.
2   Q.      Let's go back to this summary, or
3   statement, Q tried to bring up -- Q said he did not
4   want to be a meat manager or work at the Pittston
5   location.  Did you say that?
6   A.      After the previous conversations.
7   Q.      Did you say that?
8   A.      Yes.
9   Q.      In this conversation?
10  A.      Yes.
11  Q.      When asked what he wanted to do, we never
12  got a straight answer as he kept bringing up the
13  past when he was a manager trainee and how that
14  ended.  Did you ever tell them what you wanted to
15  do?
16  A.      I was told there was no positions.
17  Q.      So you -- did you bring up and go back to
18  what had happened when you were manager trainee and
19  how that ended?
20  A.      Possibly.  I'm going to say yeah, I guess.
21  Q.      Next paragraph, after quite a few minutes
22  of conversation all over the place that to me made
23  little sense.  You don't have to agree.  We finally
24  just said to Q, what is it you want to do?  It says,
25  we never got a response as he hung up on us.



QUENTIN MCCLELLAN                                          June 19, 2019
QUENTIN MCCLELLAN vs REDNER'S MARKETS                      169–172

Page 169

1            Does that refresh your recollection,
2  does that sound like what happened at the end, or
3  you seem to have a little bit different recall?
4  A.    Yes and no.  There's conversation after
5  that, call two, still asked me about what I wanted
6  to do.
7  Q.    I'm asking about this call.
8  A.    Well, that's what I'm trying to say.
9  Q.    On this call, did you get asked what is it
10 you want to do?
11 A.    And I said, stay employed.
12 Q.    Okay.  It says, we never got a response.
13 So you're saying, well, I did respond, stay employed
14 and then you hung up?
15 A.    I don't believe it was right after that
16 question I hung up.
17 Q.    What's your recollection?  That's what I
18 want to find out.
19 A.    I believe there was an argument match back
20 and forth between me and Mr. McDonough.  Rick Merkel
21 and Jim Polchin, I don't think said anything on the
22 phone.  The conversation ended, somewhere along the
23 lines, do you think I intentionally wanted to fire
24 you this morning, and I said, do you think I
25 intentionally wanted to get up and get fired this

Page 170

1  morning?  Like, what do you mean?  And he kept
2  saying, well, you're not answering any of any
3  questions.  And I said, I did, Bob, you want to
4  know, do I want to keep my job, I want my job,
5  that's what I want, I want a job.
6  Q.    All right.  Set aside Exhibit 20.
7  A.    Okay.
8            MR. SCHAUER:  We'll mark this 21.
9            (Exhibit 21, Note dated 9/7/17, marked
10 for identification.)
11 Q.    Mr. McClellan, this is a document that was
12 also produced in discovery.  It's been marked as
13 Exhibit 21.  It is I'll suggest to you a statement
14 that was prepared by and signed by Mr. Merkel who is
15 present today dated September 7, 2017.  Do you see
16 that?
17 A.    Yes.
18 Q.    I'm trying to edit some of the things we've
19 already gone over.  All right.  Let's go to the
20 third paragraph.  Begins, Quentin proceeded to state
21 that he had to leave suddenly on Wednesday and may
22 or may not return to work later that day to complete
23 the shift.  He did say that he did communicate all
24 this to someone in charge of the store.
25         You agree that you say those things,

Page 171

1  that you did have to leave suddenly on Wednesday and
2  told someone at the store.
3  A.    I didn't say I had to leave suddenly on
4  Wednesday.
5  Q.    Okay.  All right.  Yeah, you said -- you
6  left Wednesday and you had let them know?
7  A.    Yeah, because I told them about the doctor
8  and everything like that.  It wasn't sudden.
9  Q.    He did not return that day.  That sounds
10 like something you probably would have said.  He did
11 some work -- he did work some time on Friday,
12 however, it was not a full day.
13         Does that sound like something you
14 would have shared -- something you would have shared
15 in this phone conversation?
16 A.    Yeah, I assume so, yes.
17 Q.    Do you have a recollection of having said
18 that you worked on Friday, you know, this is that
19 conversation on the morning of September 2?
20 A.    Yes.
21 Q.    And then he said he came into work on
22 Saturday and left early because he thought he was
23 going -- he was over on his salaried amount of time.
24         And I think that's something that you
25 believe that you said in this call, correct?

Page 172

1  A.    Yes.
2  Q.    He said he consulted with the workers and
3  asked them if they were going to be good and if they
4  could handle the burger situation and they said they
5  were good and he left.
6         Do you have a recollection of saying
7  that?
8  A.    Yes.
9  Q.    He did admit he did not communicate to
10 someone in charge of the store he was leaving.
11 A.    Uh-huh.
12 Q.    On that day.  You have to say yes or no.
13 A.    Yes, for Saturday.
14 Q.    I would be best to explain Quentin's
15 attitude towards Bob agitated and irritated and
16 bordering on disrespectful.  Would you agree or
17 disagree with that statement?
18 A.    From an outside -- yeah.
19 Q.    Next sentence, this became more agitate as
20 Bob stressed to him this is not the first time
21 anyone from Redner's has had a conversation with him
22 regarding the need to communicate a manager's
23 attendance to a member of the store management team.
24         Have you had other conversations with
25 people at Redner's, you know, about your attendance



Page 173

1    as a store management member?
2    A.    The vacation time.  That conversation about
3    vacation time I believe is what they're referring
4    to.
5    Q.    Quentin honestly came across that he felt
6    he did not do anything unacceptable and was not
7    trying to be deceitful.
8          You would agree with that
9    characterization also?
10   A.    Yes, but that takes me back to disgruntled
11   or disrespectable.  That seems respectable.
12   Q.    We've covered that.  Quentin did say he
13   thought he put in his amount of time of 45 hours for
14   the week.  Right?
15   A.    Yes.
16   Q.    I know I've asked you this before, but in
17   the context here, it is your understanding that
18   salaried employees in your position, meat manager,
19   co-meat manager, whatever, are expected to put in 45
20   hours a week, right?
21   A.    Yes, there's times that that changed.
22   Q.    But as a general proposition that's the
23   goal, that's the expectation?
24   A.    Yes.
25   Q.    Bob questioned him if he was sure and he

Page 174

1    said I think so.
2          Do you recall that exchange with Mr.
3    McDonough?
4    A.    Yes, sir.
5    Q.    Bob asked him what he wanted to do and
6    Quentin said he couldn't go back there.  Do you
7    recall saying that?
8    A.    Yes, and I tried to elaborate.
9    Q.    I am not sure what he meant by, back there.
10   The conversation continued to get more agitated, and
11   at that point Quentin would not answer Bob's
12   questions as to whether or not he left early.  Do
13   you recall being asked by Bob whether you had left
14   early and refusing to answer that?
15   A.    I believe I said yes, but I refused, if
16   that's what he said.
17   Q.    I'm going to skip next, Bob insisted if
18   they were going to continue talking Quentin had to
19   answer a simple question or Bob would hang up and
20   Quentin said, well, then I will end it and, hung up.
21          Do you have a recollection of having
22   said words to that effect?
23   A.    Yes.
24   Q.    Right before you hung up you said, well,
25   then, I will end it, and that's when you hung up?

Page 175

1    A.    Yeah, because the question that he asked
2    was the question --
3    Q.    What do you want to do?
4    A.    It was either, what do you want to do, or
5    if I believe that I worked the 45 hours.  Those two
6    questions were answered.
7          MR. SCHAUER:  Let's mark this Exhibit
8    22.
9          (Exhibit 22, Note dated 9/6/17, marked
10   for identification.)
11   Q.    All right.  Mr. McClellan, Exhibit 22 is
12   another statement that was prepared, this one by
13   Robert McDonough.  It's dated September 26, 2017.
14   It's a two page document.  I would suggest to you
15   that's what it is.  It's been provided to your
16   counsel in discovery in this case.  Okay?
17   A.    Yes, sir.
18   Q.    I want to go down to the third paragraph
19   because we've more or less covered most of it.
20   A.    The call?
21   Q.    The call continued to a point where I asked
22   him to answer yes or no to this simple question, did
23   you tell anyone or get permission to leave on
24   Saturday.  He never answered yes or no.  I also
25   asked him, yes or no, did he leave early on

Page 176

1    Saturday, and he wouldn't answer yes or no to that
2    either.  The first is permission, the second is
3    leave.  The facts are that he didn't tell anyone he
4    was leaving.
5          So did you say -- refuse to answer at
6    some point the question, did you get permission to
7    leave on Saturday?
8    A.    No.  Because even in this one it says
9    that --
10   Q.    I'm asking --
11   A.    Sorry.
12   Q.    Take my questions as is.
13   A.    I believe I did answer.
14   Q.    I said during the conversation, I'm now in
15   the last paragraph, I said during the conversation,
16   I asked, what do you want to do now, where do you
17   think you can go from here?  He said, well, I'm not
18   going back to Pittston, there's no way I can go back
19   there.
20          Again, did you say that?
21   A.    Yes, I assume.
22   Q.    What was -- what was your reason for
23   saying, assuming you said it, that I'm not going
24   back to Pittston?
25   A.    The events that led up, and I understand --



QUENTIN MCCLELLAN
QUENTIN MCCLELLAN vs REDNER'S MARKETS

Page 177

1 see, that's what made it hard to discuss, the events
2 that led up to the situation I felt were all
3 intertwined. I felt like it was just a roll
4 downhill. You didn't have a position for me when I
5 was done with training, and I felt me going back
6 there wasn't going to be a good situation, meaning I
7 you didn't have a position for me when I was in
8 training, there was no position for me when I was
9 out of training, there was problems with the meat
10 assistant store manager and things like that, what
11 was I going to do? And that's what I kept trying to
12 ask. Yes, I wanted to be employed, and that's what
13 I was trying to state, I do want to be employed, but
14 what position can you put me in I believe is how it
15 ended up.
16 Q.     So the reason, you know, what was
17 underlying your statement to the effect of, well,
18 I'm not going back to Pittston, there's no way I can
19 go back there, was a, what happened relative to the
20 management training program, and no position, and
21 then, B, the fact of this other person there who had
22 been serving and was still there as a meat manager?
23 A.     And the situation -- the things that I
24 addressed, the people got fired, yeah, a lot of
25 stuff that happened.

Page 178

1 Q.     Well, the people that got fired was at
2 another store, wasn't it?
3 A.     No, the meat cutter got fired in Pittston,
4 sorry.
5 Q.     Oh, sorry, that one.
6 A.     That was there too.
7 Q.     Anything else?
8 A.     The clean up guy and the store manager with
9 the marking down meat, my supervisor was looking
10 into, that's what he told Mr. Swartzlander. So
11 there was a situation, me and Alan had a situation
12 before when I first got to Pittston in 2015 --
13 actually, no, probably 2013, somewhere around there.
14 So there was always a situation where I was worried
15 about if I was being retaliated against by certain
16 people.
17 Q.     For the things you've described?
18 A.     Yeah, and things in the past. And Jeff
19 would have been recent because he was the most
20 recent there. Jeff wasn't there until reducing the
21 product and things like that that made it a little
22 fishy for me.
23 Q.     Are you able to identify any event that you
24 believe was somehow based upon race that, you know,
25 contributed to your statement in this phone

Page 179

1 conversation on June 6 that, I'm not going back to
2 Pittston, there's no way I can go back there?
3 A.     Something based on race?
4 Q.     Yeah.
5 A.     There's no way for me to base that on race.
6 Q.     I said, where do you think you could go?
7 He said, I can't go back there. And I said, what
8 are you telling me? He went on about all the things
9 he had done on Saturday and the conversation can be
10 best described as all over the road.
11          I wouldn't ask for the
12 characterization, but you didn't really know -- you
13 just said, I can't go back to Pittston.
14 A.     No. First the question was I believe, what
15 are my intentions or what do I plan on doing, do I
16 want the job, do I want a job in that instance. And
17 that led to, what do you except, what do you want?
18 Well, I want a job. If I can't go back there, I'll
19 go somewhere else. If I go back there, I don't know
20 what position you're going to give me.
21 Q.     Now, at this point you were having a
22 discussion around the concern or the issue about --
23 and I'm trying to say it neutrally, what happened on
24 the morning of September 2 and you were leaving and
25 who knew and who didn't know and that kind of thing.

Page 180

1 That was really what this call was about initially,
2 right?
3 A.     No, I'm just trying to make sure. I
4 believe so, yes.
5 Q.     Okay. Was there then a subsequent or later
6 in the day telephone conversation with Mr. McDonough
7 and you?
8 A.     I believe it was a phone call, but it might
9 have been an e-mail first.
10 Q.     Okay.
11 A.     Is this an e-mail?
12 Q.     Let's stick with Exhibit 22. At the top of
13 the second page at around 4 p.m. I sent him an
14 e-mail asking what his intentions were, and I think
15 we've identified --
16 A.     Was that 19 that you put over there?
17 Q.     Correct. He called me a little after 5
18 p.m. and asked what was going on. That would be you
19 called Mr. McDonough?
20 A.     Yeah, I believe I got an e-mail from him or
21 text or something.
22 Q.     Mr. McDonough says, well, are you
23 resigning, you ended the call today. He, you, then
24 admitted he ended the call but claimed he wanted to
25 continue in his employment.



Page 181

1        Would that be reasonably accurate in
2  what you said?
3  A.      Yes.
4  Q.      This is when I told him we were letting him
5  go.  You asked if we were firing him and I said yes.
6        Does that pretty much reflect the
7  conversation between you and Mr. McDonough?
8  A.      I believe so, yes, I can't argue that one.
9  Q.      All right.  We're done with that.
10  A.      Okay.
11         MR. SCHAUER:  Mark this as Exhibit 23.
12         (Exhibit 23, Screen shot of e-mail
13  dated 9/5, marked for identification.)
14  Q.      So Mr. McClellan, I'm showing you what's
15  been marked as Exhibit 23 and I presume this is the
16  e-mail that you then sent to Mr. McDonough in
17  response to his, which has already been marked as
18  Exhibit 19.  It's a question, sorry, is this a
19  response to Mr. McDonough earlier's e-mail?
20  A.      Yes.  I believe so.  Wait, something is not
21  right.  I believe it is, but something is out of
22  date.  This says 9/6 on top of this, but this says
23  9/5.  Or is this just when he wrote down his
24  experience?
25  Q.      I'm just asking you, Exhibit 23, is that

Page 182

1  your response to the e-mail that we've marked as
2  Exhibit 19 to Mr. McDonough's e-mail?
3         MR. BARRON:  I think Exhibit 19 is the
4  text message.
5         MR. SCHAUER:  You know, I've changed
6  my mind.  We'll mark this 24.
7         (Exhibit 24, E-mail dated 9/7/17,
8  marked for identification.)
9  Q.      Exhibit 24 is --
10         MR. BARRON:  That's the one that was
11  19?
12         MR. SCHAUER:  Yes.
13  Q.      If you turn to the second page of Exhibit
14  24, I would suggest to you what we've been trying to
15  piece together between Exhibits 19 and 23.  The
16  second page of Exhibit 24, the e-mail at the bottom
17  of that page is one to you at 4:11 from Mr.
18  McDonough?
19  A.      Uh-huh.
20  Q.      Is that a yes?
21  A.      Yes, sorry.
22  Q.      Which appears to line up with Exhibit 19,
23  which is a screen shot from your phone?
24  A.      Yes.
25  Q.      And then the e-mail that -- is at the top

Page 183

1  of Exhibit 24 that begins, at least as far as the
2  addresses go at the bottom of the first page, that
3  would be Exhibit 23, which is your response that
4  appears to have been sent at 4:40?
5  A.      Yes.
6         MR. SCHAUER:  Off the record.
7         (Discussion held off the record.)
8  BY MR. SCHAUER:
9  Q.      You were told you were terminated.  Did you
10  reach out to anyone in management at Redner's
11  Markets after you were told you were terminated that
12  day?
13  A.      I do not believe so.  I believe I only
14  talked to Jeff in text messages before that, and
15  Bill before that.  So I do not believe I reached out
16  to anyone.
17  Q.      Okay.  Did anyone -- did anyone in
18  management from Redner's markets talk -- reach out
19  and talk to you after your termination on September
20  5?
21  A.      I do not believe so.
22  Q.      Have you spoken with any other employees,
23  management or nonmanagement, at Redner's Markets
24  relative to any, you know, any of the claims in this
25  case?

Page 184

1  A.      Since -- no, no.
2  Q.      Have you asked them about well, gee, did
3  anybody say anything after I left, did you hear
4  anything?  Have you communicated with any of them?
5  A.      No, I saw two people after, since I've been
6  gone.
7  Q.      They talked --
8  A.      They just talked the normal water cooler,
9  this happened today, kind of stupid, nothing.
10  Q.      Do I understand your testimony that through
11  your termination on September 6, 2017 that the only
12  mention to you relative to the FMLA leave was the
13  suggestion made to you by Jeff your manager prior to
14  taking the leave, your discussions with the
15  administrator, Joyce I think --
16  A.      Sue.
17  Q.      Sue, that you had about applying for FMLA
18  leave, and then I believe you said your manager
19  referred to whether the time you took off on the
20  Wednesday after you returned might be FMLA leave.
21  Other than those three occurrences was there mention
22  to you by any management employees at Redner's
23  relative to your FMLA?
24  A.      To mine, no, sir.
25  Q.      To you.



QUENTIN MCCLELLAN

QUENTIN MCCLELLAN vs REDNER'S MARKETS

June 19, 2019

185–188

Page 185

1  A.    No, sir.

2  Q.    Was -- I think you said that on one

3  occasion you mentioned to your manager that you had

4  depression in the context of a conversation about

5  somebody who, you know, did something that seemed to

6  be somewhat, you know, inexplicable, is that fair to

7  say?

8  A.    Yes.

9  Q.    Other than that, did any member of

10  management at Redner's Markets come to you, allude

11  to and discuss with you the fact of or possibility

12  that you may have some mental condition, some

13  disability, even, you know, some of the diagnosis

14  that you described, depression or anxiety?

15  A.    No.  But I've experienced when they talked

16  about other people.

17  Q.    Did anyone come to you and discuss your

18  situation with you or allude to it in any way, any

19  management members at Redner's Markets?

20  A.    No.

21  Q.    And you never said to them, hey, you know,

22  part of this situation where I find myself here,

23  whatever it was, whether it was back in April, March

24  into April, you know, with the issue around

25  lateness, up through September 5 of 2017 you did not

Page 186

1  say, hey, well, I think part of the reason I'm, you

2  know, in the situation I'm in here, is because I

3  have a condition that might need accommodated

4  because I have, you know, I'm anxious or I'm

5  depressed, I need some kind of special

6  accommodation, et cetera, you didn't say that?

7  A.    No, I didn't say that.

8  Q.    Okay.  I have some stuff to run through,

9  not quite done yet.

10  A.    Okay.

11        (Exhibit 25, Employee handbook signoff

12  sheet, marked for identification.)

13  Q.    Mr. McClellan, I'm showing you a document

14  marked Exhibit 25.  At the top it says, employee

15  handbook signoff sheet.  I direct your attention to

16  the low, you know, right near the bottom, there's a

17  red arrow next to it, I apologize for that.  Is that

18  your signature?

19  A.    Scribbled, yes, sir.

20  Q.    And the other -- some of the other

21  signatures have the date of March 25, 27, late March

22  2017.  Would that be about when you signed this

23  document?

24  A.    I believe so.  But someone signed it the

25  27th below.

Page 187

1  Q.    The dates vary on the signatures.  Somebody

2  signed it on the 25th above.  But generally late

3  March.  Is it your recollection when you would have

4  signed this and it says you received updated page 19

5  of the handbook.  Do you see that?

6  A.    I do see that.

7  Q.    It says, please sign acknowledging that you

8  have read the updates and you understand and agree

9  with all the policies in the handbook.  Do you see

10  that?

11  A.    I do.

12  Q.    Do you recall when you were hired having

13  received a copy of the handbook?

14  A.    I did not.  I didn't receive a copy here

15  either.

16  Q.    But as you said, it was available for you

17  if you wanted to find it?

18  A.    Yeah.

19  Q.    Or look at it?

20  A.    Yeah.

21  Q.    And when you were in the management program

22  you could go to the manager's office and look at it,

23  right?

24  A.    Yeah, if it wasn't -- I mean, if it wasn't

25  busy.

Page 188

1  Q.    And even when you weren't a manager, as an

2  employee you were certainly entitled to go to the

3  manager's office and say, hey, I would like to look

4  at the handbook?

5  A.    Some stores if they had it.

6  Q.    What about Pittston, it was there wasn't

7  it?

8  A.    Yes, sir.

9        (Exhibit 26, Acknowledgement & receipt

10  of handbook, marked for identification.)

11  Q.    This is Exhibit 26.  It appears to be a

12  document acknowledgment and receipt of handbook.  Do

13  you recognize the signature above the line, employee

14  signature?

15  A.    Yes, sir.

16  Q.    And it's dated October 18 of '08.  Would

17  that have been when you were hired?

18  A.    Yes, sir.

19  Q.    Do you recall having signed this document I

20  guess as part of on boarding process at Redner's?

21  A.    Yes, sir.

22  Q.    Again, I guess I've asked you this, but

23  your recollection is you weren't handed a handbook

24  at that time, or were you?

25  A.    I wasn't given a handbook.



QUENTIN MCCLELLAN
QUENTIN MCCLELLAN vs REDNER'S MARKETS

June 19, 2019
189–192

Page 189

1 Q.    But were you given the opportunity?
2 A.    Maybe, but on day one you didn't look at
3 the handbook.
4          (Exhibit 27, Understanding of
5 employment, marked for identification.)
6 Q.    I'm going to show you Exhibit 27.
7 Mr. McClellan, Exhibit 27, at the top it says,
8 Redner's Markets, Inc., understanding of employment.
9 Do you see that?
10 A.    Yes.
11 Q.    And then at the bottom there's an employee
12 signature line.  Is that your signature?
13 A.    Yes.
14 Q.    And did you have the opportunity to review
15 this document prior to signing it?
16 A.    I believe so, yes.  That's the only reason
17 I said yeah, that's my signature.
18 Q.    Do you know did you receive a copy of this
19 document at the time you were hired or any time
20 thereafter?
21 A.    It would have been in an on boarding
22 packet, so I would have signed it and gave it all to
23 them.  I wouldn't really have kept it.
24 Q.    Just as a -- did you -- were you employed
25 before working at Redner's?

Page 190

1 A.    Yes.
2 Q.    So the first item on this Exhibit 27, the
3 understanding of employment, it says, all employees
4 are expected to abide by all company rules and
5 regulations including but not limited to those set
6 forth in the employee handbook that is distributed
7 to every employee.  Do you see that?
8 A.    I do, sir.
9 Q.    Was it your understanding both at Redner's
10 and from employment that employers expect you to
11 comply with their rules and regulations when you
12 work for them?
13 A.    At this date I did.
14          (Exhibit 28, job descriptions, marked
15 for identification.)
16 Q.    I'm showing you Exhibit 28.  It's a two
17 page exhibit.  The first page it says, position
18 title, meat cutter, second page says, meat manager.
19 And I suggest to you that these are job descriptions
20 for those respective positions.  I would like you to
21 take a moment and look at the documents and see, you
22 know, if you -- you know, if you can agree these are
23 the job descriptions for the positions indicated,
24 that would be meat cutter on page 1 of Exhibit 28
25 and meat manager on the second page.  I'm not

Page 191

1 necessarily asking you, is this exactly what you
2 did, but are you familiar with the job descriptions
3 generally?
4 A.    It changes from store to store, yes, how
5 many people you've got, yes.
6 Q.    And do these appear to be reasonably
7 consistent with your understanding of the job of the
8 meat cutter and/or meat manager at Redner's
9 Markets?
10 A.    The meat cutter position changed, like some
11 people will give them more or less things to do, but
12 somewhat consistent.
13          MR. SCHAUER:  This is 29.
14          (Exhibit 29, employee handbook, marked
15 for identification.)
16 Q.    Exhibit 29 I'll suggest to you is the
17 employee information and handbook.  In the lower
18 left hand corner is the date 3/20/17.  Do you see
19 that document?
20 A.    I do.
21 Q.    Interestingly one of the earlier documents
22 we looked at in fact referenced an amendment that
23 would happen in late March of 2017 if you recall,
24 page 19, do you remember looking at that one?
25 A.    Yes, yes I do.

Page 192

1 Q.    So I will suggest to you that this is the
2 Redner's employee handbook effective as of March of
3 2017.  If you want you can take your time and look
4 through, but do you have any reason to believe it's
5 not?
6 A.    Any reason to believe it's not the
7 handbook?
8 Q.    Right.  Does it appear to be --
9 A.    Yeah, it appears to be the handbook.
10 Q.    I'm not sure I asked this question, did you
11 consult the handbook with respect to -- I did ask
12 it, strike that.  Okay.  Set that aside.
13 A.    Okay.
14          MR. SCHAUER:  This is 30.
15          (Exhibit 30, Complaint, marked for
16 identification.)
17 Q.    I'm going to show you what's been marked
18 adds Exhibit 30.  I'll suggest to you, you can kind
19 of tell by the top, this is a copy of the complaint
20 filed on your behalf and by you, in this case.
21 A.    Yes, sir.
22 Q.    Did you review this complaint prior to it
23 being filed?
24 A.    Yes, I believe so.
25 Q.    Well, do you recall having, you know,



Page 193

1  reviewed it prior to it being filed and adopting
2  what's in the complaint?
3  A.    Yes.
4  Q.    But for some of the legal things included
5  by your counsel?
6  A.    I'm not going to lie, all the legal things
7  weren't 100 percent.
8  Q.    Sure.  But as to facts and things like
9  that?
10  A.    I believe so, yes, sir.
11  Q.    Give me a moment.  I just want to -- I may
12  have some questions for you on this, I may not, they
13  may have already been covered.
14  A.    Okay.
15  Q.    I would like you to go to page 6, paragraph
16  34.  That paragraph says, referring to the posting
17  in the break room.
18  A.    Yes, sir.
19  Q.    When Mr. McClellan arrived at the office,
20  Mr. Treichel had the racist posting in hand and
21  repeated that he didn't see anything wrong with the
22  racist posting.  Now, I think your earlier testimony
23  was that he said he hadn't seen it?
24  A.    This would have been after HR called him.
25  What happened was HR -- remember I said I was in the

Page 194

1  back talking.
2  Q.    Right.
3  A.    HR paged overhead for him to pick up the
4  phone.  When he picked up the phone he then went
5  back I assume and grabbed the pictures after HR told
6  him to grab them.
7  Q.    Okay.
8  A.    That's when that would have -- when he came
9  back up front with them.
10  Q.    All right.  I'm just trying to understand,
11  it says, 34 says, when you arrived at the office, he
12  had the racist posting in hand and repeated he
13  didn't see anything wrong.  My understanding was the
14  first time he said, I didn't see them or then said,
15  I didn't see them.
16  A.    If you look on page 27, he said he didn't
17  see nothing wrong either.  But then after I talked
18  to them -- after I sent the e-mail and Mr. McClellan
19  -- or Mr. McDonough called Mr. McClellan about the
20  racist poster, Mr. McClellan explained the situation
21  and Mr. Treichel's response to Mr. McDonough.  So
22  that was the second time, when you said on page 6,
23  that was the second time.
24  Q.    Okay.  Who at Redner's do you recall
25  talking -- sorry, I'm jumping around a little, but

Page 195

1  I'm trying to fill in things.
2  A.    Okay.
3  Q.    Who do you recall talking to at Redner's
4  Markets after you felt you completed the management
5  training program about being put into an assistant
6  manager position?
7  A.    Everyone possible.
8  Q.    Who would that -- most of us won't know who
9  that is.
10  A.    Jeff, because he was the one that -- the
11  store manager, Jeff signed off.  Mr. McDonough was
12  only asked about it in April.  I didn't really -- I
13  didn't contact the vice president of HR for that.
14  Brandy I believe, Jim Polchin, I might have asked
15  Rick Merkel once or twice when he was in the store
16  in passing.  Did I say Bill Swartzlander?
17  Q.    No.
18  A.    Bill Swartzlander.  Bob Malia, I mean, he's
19  the grocery -- assistant -- or the grocery manager.
20  Mr. Fiore, just because we were in a conversation
21  that time in a conversation.
22  Q.    Did you have any understanding of who would
23  have been probably the, you know, point person at
24  Redner's to explore getting a manager's position?
25  And I say that because you've got eight people here.

Page 196

1  Probably not all of them are in a position to put
2  you in an assistant manager position.  Do you have
3  an understanding of who amongst that group would be
4  the one who was really, you know, kind of at the
5  controls, who would have known about openings?
6  A.    I believe it started when I asked my
7  supervisor during an evaluation about it, just about
8  moving up, how do you move up.
9  Q.    All right.
10  A.    And I believe I was told it takes approval
11  from a supervisor and store manager to take it to
12  whoever they take it to.  So I don't know --
13  Q.    Was there anybody -- your contact person
14  oftentimes you said Randy Kostelac?
15  A.    That's after I was put in the program.
16  Q.    Right.  I'm just trying to get an
17  understanding, like you say, I guess if there was an
18  opening you would have to get an approval from your
19  store manager to go and the person who was the
20  manager where you would be the assistant at had to
21  approve it.  But was there anybody else at Redner's
22  corporate level that also night know about those
23  things?
24  A.    Of course.
25  Q.    One would think someone at Redner's



Page 197

1  corporate would know about openings in the stores.
2  A.      Before I got put in the program, Randy, I
3  didn't talk to Randy too much, depended what region
4  he was in. I talked to my supervisor first, because
5  I just was inquiring, what does it take, how do you
6  get in. Once I inquired to my supervisor, my
7  supervisor I believe talked to the store manager at
8  the time who was John Martz.
9  Q.      My question is, after you completed the
10 program and felt you were prepared to be an
11 assistant manager, who was it that you would talk
12 to, not how did you get into --
13 A.      Sorry.
14 Q.      Now how do you find a position. Your store
15 manager isn't going to know about vacancies.
16 A.      Of course.
17 Q.      Who at the Redner's corporate level?
18 A.      Would be able to inform me about what's
19 going on?
20 Q.      That would be the contact. Because you
21 mentioned eight people. Who to your knowledge was
22 the person who was really like the one?
23 A.      To my knowledge, I believe it was Randy.
24 Q.      Okay. There's an allegation in the
25 complaint starting at the bottom of page 8 to the

Page 199

1  of salt. But then it leads up to the fact that,
2  well, could that be true? And then, yeah, I just
3  got sent out on FMLA, and I'm a little confused, I
4  didn't think I did anything.
5  Q.      So this conversation you heard in the
6  lunchroom?
7  A.      Meat room. This is my department, this
8  used to happen in my department.
9  Q.      In your department was with who, who was
10 involved in saying those things?
11 A.      My department, usually it was my department
12 -- a lot of those conversations happen in the meat
13 room while the meat room would be working.
14 Q.      Talking about other employees there?
15 A.      Anything from day-to-day. For instance,
16 the evening manager, there was conversations before
17 the evening manager punched that about how
18 management wanted to get rid of him.
19 Q.      Okay. But as to you personally, did you
20 receive any information --
21 A.      No.
22 Q.      That there was some plot to put you on the
23 FMLA leave in the hope you would not return?
24 A.      No.
25 Q.      There are claims in this case against not

Page 198

1  top of page 9 where you say, on information and
2  belief, Redner's imposed this leave, you're
3  referring to the Family Medical Leave Act leave, on
4  Mr. McClellan in the hope that he would not return
5  to work.
6          Do you have any, you know,
7  information, something that was said to you, et
8  cetera, that supports that contention that this FMLA
9  leave was suggested in the hope that you would not
10 return to work?
11 A.      There was a gentleman before when he said
12 if anybody heard about it, the conversations that
13 were had in the stores sometimes would make you feel
14 that way. There was a gentleman with the initials
15 JB who was a stocker who ended up going out on FMLA
16 that the store -- the assistant store manager and
17 the grocery manager were in the meat room having a
18 discussion, that's where lots of powwows happen,
19 about how that person is not going to come back.
20 That once they go out on FMLA they're not coming
21 back. It was just one of those things, well, he's
22 not a good worker, he's not this, he's not that.
23 After you hear those conversations, which is jokes
24 at first, that may not be true. Just because the
25 grocery manager -- you can't take that for a grain

Page 200

1  just Redner's Markets, but also against Jim Polchin
2  under the Family Medical Leave Act that somehow
3  those individuals in addition to Redner's Markets
4  are responsible to you because of alleged violation
5  of the Family Medical Leave Act. One of, you know
6  -- let me ask you if with respect to Jim Polchin,
7  what if anything do you know about Mr. Polchin's
8  involvement in your taking FMLA leave?
9  A.      Mr. Polchin -- I'm honestly just trying to
10 think from that. Because we're only talking about
11 the week before I went on FMLA, right, we're not
12 talking about -- so honestly I don't think I've seen
13 Mr. Polchin within that time.
14 Q.      Mr. McDonough, do you have any reason to
15 believe he was involved this any fashion in the
16 granting administration of the FMLA leave?
17 A.      I have no idea. I'm assuming someone from
18 HR had to be involved. I assume someone from HR had
19 to be involved.
20 Q.      Rick Merkel, was he in some fashion or
21 knowledge involved in your --
22 A.      FMLA?
23 Q.      Right.
24 A.      No, not that I know of.
25 Q.      I'm going to take the leap of faith that



QUENTIN MCCLELLAN
QUENTIN MCCLELLAN vs REDNER'S MARKETS

June 19, 2019
201–204

Page 201

1  your counsel believes that your termination was in
2  some fashion related to having gone out on FMLA
3  leave, I think there is a claim for retaliation in
4  this case?
5  A.     Yes.
6  Q.     Is there anything over and above that we've
7  discussed relative to you getting terminated that
8  somehow, you know, would indicate that Mr. Polchin,
9  Jim Polchin, you know, retaliated against you for
10 taking FMLA leave?  You know, we talked about his,
11 what he did to your knowledge in the decision to
12 terminate.  Other than that, was there anything that
13 you're aware of that indicated there was retaliation
14 against you by Mr. Polchin for taking FMLA leave?
15 A.     I wasn't able to talk to anyone about --
16 within that week, I didn't see any supervision
17 except for Bill Swartzlander.
18 Q.     Well, I mean, you could call him, right,
19 you could send him e-mails, you did that pretty
20 regularly, right?
21 A.     Not regularly.  That got me sent on FMLA.
22 Q.     You could send e-mails and call people, you
23 said you were doing that to look for a job as an
24 assistant manager?
25 A.     That got me suspended.

Page 202

1  Q.     That's what you're saying.
2  A.     That's what I'm going to stick with.
3  Q.     Let's keep it simple.  Anything other than
4  the fact of your termination that Mr. Merkel did to
5  your knowledge that would have been an interference
6  with your FMLA?
7  A.     That would --
8  Q.     Retaliation against you for taking --
9  A.     Can you repeat that?
10 Q.     Any other actions of Mr. Merkel except to
11 the extent he may have been involved in
12 conversations around your termination that you can
13 point to that were retaliatory against you for
14 taking FMLA?
15 A.     No.
16 Q.     You didn't get a pay cut, you made the same
17 money the first week of September as you did when
18 you went out, right?
19 A.     Yeah.
20 Q.     You had the same position, or kind of
21 confusion about the position, but nonetheless, you
22 were in the same spot when you returned from FMLA
23 leave as you were when you left, not one you liked,
24 it was the same spot?
25 A.     Somewhat.

Page 203

1  Q.     There was another guy there that was a
2  manager, there was you, that didn't change?
3  A.     No, I don't believe that changed.
4  Q.     Okay.  With respect to Mr. McDonough, but
5  for whatever role he may have played in your
6  termination, were you aware of any information that
7  would support a retaliation that Mr. McDonough
8  retaliated against you for taking FMLA leave?
9  A.     No, but the situations leading up to it
10 looked like it could have been an issue that would
11 make him want to retaliate.  Not that I want to say
12 that.
13 Q.     What do you mean issues leading up to it?
14 Leading up to what?
15 A.     He made a special trip to talk to me about
16 vacation, isn't that something that -- the vice
17 president of HR and the vice president of operations
18 randomly come up to Scranton, Pennsylvania to have a
19 talk with me, that seems weird.
20 Q.     Well, I'm talking about did they -- can you
21 show me anything they did that you think was
22 retaliation for taking FMLA leave, so it would
23 appear to be after August 25 or June, July 25 when
24 first approved?
25 A.     No.

Page 204

1  Q.     Okay.  I know this is a broad question,
2  have we -- were there any discussions or e-mails
3  that you recall other than the ones that we reviewed
4  today, involving, you know -- that involved you,
5  that led -- surrounding the issue of your separation
6  of employment for Redner's?  In other words, did you
7  have some other conversation on September 3 with
8  somebody else, or have we pretty much covered the
9  communications you had with Redner's management
10 around the circumstances of it leading up to your
11 termination?
12 A.     I believe so.
13 Q.     Are you employed?
14 A.     I work as a newspaper delivery guy right
15 now.
16 Q.     You indicated in your interrogatory answers
17 for some period of time you worked at Chopper?
18 A.     Price Chopper.
19 Q.     What did you do there?
20 A.     I was a meat clean up guy.
21 Q.     What happened with that employment?
22 A.     The hours fluctuated a lot.  They got more
23 people, my hours got cut and then my hours didn't
24 work out.
25        MR. SCHAUER:  You've provided, you or


ESQUIRE
DEPOSITION SOLUTIONS

Page 205

1  your counsel, provided documents indicating I guess
2  a series of jobs that you have looked for.  We'll
3  have that marked as Exhibit 31.
4          (Exhibit 205, Indeed job listing,
5  marked for identification.)
6  Q.     Take a look at that, is that a description
7  of what that document 31 is?
8  A.     I believe so.
9  Q.     Are you looking for employment now?
10 A.     On and off, yes, sir.  I'm currently in
11 school studying for hopefully my future job.
12 Q.     What are you doing?
13 A.     Software engineer.
14 Q.     Where are you in the educational process?
15 A.     September I think I'll be done.
16 Q.     Where are you going to school?
17 A.     Online, Colorado Technical University.
18 Q.     How long have you been doing that?
19 A.     Years.  July 2015 or '16, 2016 I believe.
20 It sounds weird but it was only three years because
21 it was online.
22 Q.     So since your termination in September of
23 2017, approximately how much time have you --
24 however you break it down, on a weekly, monthly, how
25 much time have you spent pursuing your degree?

Page 206

1  A.     Pursuing my degree, it's full-time, it's
2  always been full-time.
3  Q.     So after your termination did you devote --
4  what's full-time as a student?
5  A.     It goes by credits.  I don't know the
6  number of credits, but you have to take a certain
7  number of credits to get funding or scholarships.
8  Q.     How many hours a week have you devoted to
9  getting your degree being online with courses and
10 doing course work?
11 A.     Depends on the class.  Some of the classes
12 if it's word processing or document typing, two to
13 three hours maybe.  But if it's some of the newer
14 like development things that you have to really
15 research and do things like that, that's the part
16 takes quite a bit of time.  I don't know exactly how
17 long.  Just with researching and searching how to do
18 things, putting it together and making it work,
19 that's the only problem with things like that.
20 Q.     Has that presented any issues or conflicts
21 with your employment since September of 2017?
22 A.     No.  I'm really trying to think.  Yes and
23 no.  It hurt my employment, one, because a lot of
24 people ask and are kind of stuck in that limbo mode,
25 are you coming on, are you going to be here if

Page 207

1  you're graduating.  It's one of those questions, so
2  they start questioning that.  But work-wise I was
3  able to do a part-time to full-time job.  Like Price
4  Chopper I was getting close to full-time hours, but
5  it dropped so much I wasn't able -- he started
6  calling me in.  So I wasn't able to balance the four
7  hour shift that he wanted randomly to getting a
8  normal -- you know what I mean, getting a normal
9  schedule and having a plan.  So that became a little
10 bit -- because I was only part-time clean up guy.
11 It was an awkward position.  I used to have a clean
12 up guy.  So you may not schedule him four hours but
13 a day, but you may need him a holiday.
14 Q.     Is your intention to pursue work that
15 you're pursuing your degree for?
16 A.     Yeah.  But I knew I had to get a job --
17 like I knew I had to get a job before, I couldn't go
18 three years without a job.
19 Q.     I just -- we ask obvious questions
20 sometimes.
21 A.     I'm just giving -- sorry.
22 Q.     I want to make sure.  It's what we have to
23 do.  So I think you said September of 2019 you
24 anticipate your degree?
25 A.     I do.  I'm hoping.

Page 208

1  Q.     Do you recall testifying at the
2  unemployment compensation hearing in this case?
3  A.     A little bit.
4  Q.     When you testified at the unemployment
5  compensation hearing did you answer the questions
6  truthfully and accurately to the best of your
7  ability?
8  A.     I believe so yes, sir.
9  Q.     You have no recollection of having said
10 anything at that hearing that in retrospect, I'm not
11 going to ask you to review the whole transcript, but
12 in retrospect you said -- you thought to yourself
13 you should have changed, I should have said that
14 differently because it wasn't accurate or wasn't
15 truthful?
16 A.     Just like now I'm going to think back and
17 said, did I say something -- I don't, you're asking
18 me about two or three years ago.  I would hope not,
19 because that was closer to time.
20 Q.     Well, you certainly didn't knowingly
21 provide any false or inaccurate information,
22 correct?
23 A.     Yes, sir, no, I did not.
24         MR. SCHAUER:  Now I need a few
25 minutes.



QUENTIN MCCLELLAN
QUENTIN MCCLELLAN vs REDNER'S MARKETS

June 19, 2019
209–212

Page 209

1         (Discussion held off the record.)
2         MR. SCHAUER:  I don't have any more
3    questions.
4         MR. BARRON:  I just have one.
5              * * * *
6              EXAMINATION
7              * * * *
8    BY MR. BARRON:
9    Q.    Mr. McClellan, I would like you to explain
10   if you would, just for the sake of the record, you
11   made reference a couple of times to, and please
12   correct me if I mischaracterize your testimony, but
13   you made reference a couple of times to a practice
14   where if management people at the supermarket would
15   work extra hours on one week, the next week they
16   might lose hours, and you used the word, lose hours,
17   or the phrase, lose hours.  Can you explain what you
18   meant by the phrase, lose hours, because I've never
19   heard it used that way and I want to make it
20   clear?
21   A.    Instead of them paying you the premium
22   because it wasn't in the budget, let's say instead
23   of taking an eight hour day off, which would be hard
24   for a department manager to do, they would say lose
25   your hours.  So by the end of the week you could cut

Page 210

1    off eight hours.  That could be one hour today, one
2    tomorrow throughout the week.  They would rather
3    that at store level than to have the manager not
4    there for a full day.  They call it lose hours, work
5    it off, they got their time, they didn't pay you and
6    let it be.
7         MR. BARRON:  Okay.
8              * * * *
9              RE-EXAMINATION
10             * * * *
11   BY MR. SCHAUER:
12   Q.    When you would lose hours in a given week
13   was there an expectation that you let them know when
14   you would lose the hours, them being the manager?
15   A.    Yes and no.  It depended on the week.  If
16   it was a slow week the store manager didn't mind as
17   long as you had enough people in your department,
18   your department wasn't down a meat cutter or
19   wrapper -- that's when I said after a holiday, they
20   had the busy week, your next week is slow in a
21   grocery business, so they said, lose the hours that
22   week.  And instead of this department -- the store
23   manager talking to every single department manager,
24   in the managers meeting that week they'll just say,
25   if you guys have hours, lose some hours, just let me

Page 211

1    know, or if you need vacation time put in, let me
2    know.  So it would be at the beginning of the week
3    or end of the week.  And then what happened after,
4    that would be what happened after that.
5    Q.    And it may or may not include discussion
6    with respect to specific days of the week when
7    you're going to lose the hours, things like that?
8    A.    Depends on the time.
9    Q.    Right.
10   A.    If it was going to be a busy week you
11   better make sure, yeah.  But otherwise if you were
12   covered and -- and if your store manager trusted
13   you.  If you were guy who was leaving and screwing
14   them over all the time, but if the store manager got
15   to know you and let you go usually it wasn't big.
16        MR. SCHAUER:  Nothing further.
17        MR. BARRON:  Nothing further.
18        (The deposition concluded at 2:45 p.m.)
19
20
21
22
23
24
25

Page 212

1
2    _____, 2019
3
4
5              I hereby certify that
6    the evidence and proceedings are contained fully and
7    accurately in the notes taken by me of the testimony
8    of the within witness who was duly sworn by me, and
9    that this is a correct transcript of the same.
10
11
12   _____
     Justine Starrick
13   Registered Professional Reporter
     Notary Public
14
15
16
17
18
19
20
21
22
23
24
25



# EXHIBIT 4

## REDNER'S MARKETS INC:  Understanding of Employment

The success of our Company, like that of any other, calls for teamwork on the part of everyone in the group. We do not like to burden people with numerous formal rules and regulations; nevertheless, when a group of people works closely together there have to be some guidelines for everyone to adhere to for the best interests of all.  These are as follows:

1.  All employees are expected to abide by all Company rules and regulations, including but not limited to those set forth in the employee handbook that is distributed to every employee.
2.  Nothing in this or any other Company document alters the at-will employment relationship between Redner's and its employees.  Either Redner's or its employees may terminate employment at any time, for any reason, with or without notice.  No representative of Redner's has the authority to enter into an agreement for employment for any specified period of time.
3.  Employees are expected to read all the Company bulletin boards since they are for the general benefit of all employees.
4.  Employees are expected to clock in with their own time badge anytime they are performing their job duties at their job location. I will not ask nor allow another employee other than myself to use my time badge.
5.  Employees are expected to wear a name badge, which the Company will provide, while performing my job duties.  If a name badge has been lost, the cost to replace the badge is $5.00.
6.  Employees are expected to reimburse the Company for any loss of cash or property due to carelessness or gross negligence.
7.  Employees are expected to give all customers and fellow employees treatment that is courteous, cheerful, and considerate.
8.  I understand that I may be hired while my work references are being obtained, and I realize I may be terminated at any time should any reference be unfavorable or disclose discrepancies in facts submitted for employment consideration.
9.  I hereby consent to the publication of my photograph in any Company publication or advertising promotion, and hereby release this Company or its agents from any or all liability for the use of my picture or news story.
10.  Employees are expected to check all store purchases through the check out lane and leave them by the front exit.  Employees are expected to keep their sales slip for their protection, to cover the purchase of items that they may have eaten in the store during their break or lunch period to verify payment for those items.  All purchases in the store must be paid for at the marked price.
11.  I understand that if I become covered under the Company's group medical insurance plan during my employment, and if I leave the Company for any reason, I may continue this coverage by paying 102% of the premium costs by notifying the Company in writing of this fact.
12.  Any hospital, doctor, or testing laboratory has my consent to conduct medical or drug tests on me, and I hereby give my consent to having all information released for the Company to determine my abilities to perform my job now or in the future.  I also give my consent, if reasonable suspicion occurs, to physical searches of myself, my tool or lunch box, car, locker, or any packages or purse I have on the Company's premises, whether or not I have a lock on such items.
13.  Employees are expected to report to their manager or supervisor any dishonesty or carelessness that is observed, since this directly affects the security of employees' jobs.  It is understood that federal law permits the Company to administer honesty verification examinations in connection with the investigation of cash shortages and the disappearance of Company property or merchandise.
14.  I hereby acknowledge that the Company, as a part of my orientation program, has given me the Right-To-Know training about hazardous chemicals/materials in the workplace.

I have read the above understanding of employment, I fully understand them, and I expect to abide by them during the period of time I am employed.

EMPLOYEE SIGNATURE: *Quentin McClellan*     DATE: *10-18-08*

PRINTED NAME AND STORE LOCATION: *QUENTIN McCLELLAN #81*

WITNESS: *Meredith Whittaker*



QMvRM - 000619

# EXHIBIT 5

**POSITION TITLE:  Meat Cutter**
**DEPARTMENT:     Meat**
**REPORTS TO:      Meat Manager**

### JOB SUMMARY:

To cut meat and related products in a variety, size, quality, and trim as directed by company standards.

### ESSENTIAL JOB FUNCTIONS:

1)   Cut and trim all merchandise as directed by company standards.
2)   Price and display product in cases as directed by Meat Manager or Meat Supervisor.
3)   Maintain a clean and sanitary work, display, and storage areas.
4)   Communicate temperature failure of cases and storage areas to manager in charge.
5)   Maintain good customer service relations by providing prompt and courteous service at all times.
6)   Observe policies and procedures established by the department.
7)   Observe all local, state, and federal health weights and measures laws.
8)   To prevention of cross contamination throughout the department by following procedures established by Department of Health.
9)   Have an understanding of shrink control and achieving budgeted gross profit established by Redner's Markets.
10)  Abide by all company policies stated in the Employee Handbook.

### SUPPLEMENTAL JOB FUNCTIONS:

1)   Assist in wrapping and packaging of product when needed.
2)   Receive, weigh, and breakdown meats and related products.
3)   Maintain operating equipment and follow OSHA regulations.
4)   To assist in making signs and tags when needed.

### MINIMUM KNOWLEDGE, SKILLS, AND ABILITIES REQUIRED:

1)   Ability to read and write to properly tag product.
2)   Must have dexterity in hands to enable the cutting and trimming of the meats.
3)   Ability to lift up to seventy (70) pounds at least forty percent (40%) of the time.



EXHIBIT
28
6/18/19 JB

QMvRM - 000004

**POSITION TITLE:  Meat Manager**
**DEPARTMENT:      Meat**
**REPORTS TO:       Store Director/Meat Supervisor**

**JOB SUMMARY:**  Direct and manage all functions and activities of Meat Department to achieve sales and profit goals.

## ESSENTIAL JOB FUNCTIONS:

1)     Prepares a weekly schedule based on projected sales, volume and work load.
2)     Along with Store Director, work out localized merchandising plans for the department.
3)     Follow approved Meat Department plans for effective space management based on movement, consumer demand and profitability.
4)     Order merchandise and control inventory to minimize out-of-stock and overstocks, and to maximize sales.
5)     Follow approved procedures for receiving product, price marking and restocking cases to ensure quality protection, accuracy and product rotation.
6)     Control department expenses.
7)     Take action to control shrinkage and pilferage losses.
8)     Effectively supervise, train, schedule, and conducts annual performance reviews on all Meat Department personnel.
9)     Follow planned program of maintenance on cases, coolers refrigeration and meat department personnel.
10)    Ensure favorable department image with customers through a clean, attractive and friendly department.
11)    Maintain and submit required records, reports, and bi-weekly inventory.
12)    Observe local conditions and competitive activity relating to the Meat Department and keep others informed.
13)    Maintain good communications and competitive activity relating to the Meat Department and keep other informed.
14)    Observe State and health regulations.
15)    Ensure compliance to local, state, and government weights and measures, and labeling laws.
16)    Greet all customers and be observant.
17)    Must ensure that all employees follow proper "lock out/tag out" procedure while repairing or cleaning mechanical or electrical equipment.
18)    Receive, weigh, and breakdown meat and related products.
19)    Cut and trim all merchandise as directed by company standards.
20)    Handle all associates with proper professionalism including employee relations and employee performance appraisals.
20)    Abide by all company policies as stated in the Employee Handbook.

## MINIMUM KNOWLEDGE, SKILLS AND ABILITIES REQUIRED:

1)     High school education minimum requirement.
2)     Ability to read and write to properly tag merchandise, order and maintain inventory and to insure proper rotations of product.
3)     Above average analytical skills necessary to study and interpret various reports to keep the department profitable.
4)     Should have at least two years experience as a meat cutter.
5)     Must have excellent oral and written communications skills for dealing with customers, employees and vendors.
6)     Must have dexterity in hands to enable the cutting and trimming of the meats.
7)     Ability to lift up to seventy (70) pounds at least forty percent (40%) of the time.

# EXHIBIT 6

# Employee Handbook Sign-off Sheet

**We have recently updated page 19 of the handbook.  Please sign acknowledging that you have read the updates and you understand and agree with all the policies in the handbook.**

| Employee Name | Signature and Date |
|---|---|
| PETERS, KEVIN A. | |
| PINTHA, JONATHAN E. | |
| PODMINICK, MARY L. | *Mary L. Podminick* 3/25/17 |
| PSAILA, BRIANNA M. | Quit |
| RAMOS, MATTHEW S. | |
| RENFER, RYAN M. | |
| SIMMONS, HANNA | *Hanna Simmons* |
| STEININGER, BRITNEY M. | |
| STEININGER, PAMELA A. | *Pam Steininger* 3-27-17 |
| SUPRUM, JENNIFER M. | 3/29/17 |
| WESLEY, JUSTIN P. | *Justin Wesley* |
| WILLIAMSON, DIANE | *Diane Williamson* |
| **FROZEN** | |
| KAPLANSKI, PAUL J. | *Paul Kaph* |
| KRATZ, TOM P. | *Tom KATZ* |
| **GROCER** | |
| ADKINS, ANDREW W. | *Andrew Adkins* |
| BOOTH, JEREMY J. | |
| CAFFREY, DEBRA A. | |
| CAREY, JOSEPH R. | *Joseph R. Carey* |
| CASAGRANDE, RICHARD F. | *Richard F. Casagrande* |
| GIMA, BRIAN | |
| HARVILLA, ALAN E. | |
| HOOVER, DYLAN J. | |
| JOHNSON, RICHARD A. | *Richard Johnson* |
| KAVINSKI, MATTHEW R. | |
| MALIA, ROBERT J. | |
| MANDICOTT, SARA E. | |
| MATTEY, KATHLEEN M. | *Kathleen M. Mattey* 3-27-17 |
| → MCCLELLAN, QUENTIN M. | |
| MCLEAN, CODY A. | 3-25-17 |



EXHIBIT
25
6/19/19  JB

# EXHIBIT 7



*Employee Owned*

# Redner's
# WAREHOUSE MARKETS
### Serving Our Local Communities Since 1970

*Serving Our Local Communities Since 1970*

AN EMPLOYEE OWNED
COMPANY

---

# EMPLOYEE
# INFORMATION AND HANDBOOK

3/2017



EXHIBIT
29
6/19/19  JS

QMvRM - 000058

THIS EMPLOYEE HANDBOOK IS AVAILABLE ONLINE
AT: http://hrinfo.rednersmarkets.com

ALL EMPLOYEES MUST READ THE EMPLOYEE HANDBOOK

EMPLOYEES WITHOUT INTERNET ACCESS CAN
REQUEST A PAPER VERSION OF THIS HANDBOOK
BY CONTACTING YOUR SUPERVISOR OR THE
HUMAN RESOURCE DEPARTMENT

QMvRM - 000059

# TABLE OF CONTENTS

INTRODUCTION
PURPOSE OF THE HANDBOOK ................................................................................................ 1
WELCOME ................................................................................................................................... 2
HISTORY OF REDNER'S .......................................................................................................... 3
EXECUTIVE COMMITTEE ......................................................................................................... 5
BOARD OF DIRECTORS ............................................................................................................ 5
EMPLOYEE AND CUSTOMER PHILOSOPHY ......................................................................... 6
COURTESY AND SERVICE ....................................................................................................... 6
STATEMENT ON UNIONS .......................................................................................................... 6
PURPOSE OF THE HANDBOOK ............................................................................................... 7
EMPLOYMENT ............................................................................................................................ 7
EMPLOYMENT RELATIONSHIP ................................................................................................ 7
EQUAL OPPORTUNITY EMPLOYMENT ................................................................................... 7
NO HARASSMENT ..................................................................................................................... 8
COMMUNICATION POLICY ....................................................................................................... 9
FAIR TREATMENT POLICY ....................................................................................................... 9
APPLICATION FOR EMPLOYMENT ........................................................................................ 10
VERIFICATION OF EMPLOYMENT ELIGIBILITY ................................................................... 10
PERFORMANCE REVIEWS ..................................................................................................... 10
SUMMARY OF DRUG AND ALCOHOL POLICY ..................................................................... 11
PURPOSE AND COVERAGE ................................................................................................... 11
DEFINITIONS OF EMPLOYEES .............................................................................................. 12
TRAINING .................................................................................................................................. 12
PROMOTIONS AND TRANSFERS ........................................................................................... 13
HIRING OF RELATIVES ........................................................................................................... 13
BENEFITS ................................................................................................................................. 13
YOUR BENEFITS IN GENERAL .............................................................................................. 13
PAYDAY AND PAYCHECKS .................................................................................................... 14
LUNCH AND REST PERIODS .................................................................................................. 14
IMPROPER DEDUCTIONS FROM EXEMPT EMPLOYEES' SALARIES ................................ 14
ERROR IN PAY .......................................................................................................................... 15
OVERTIME ................................................................................................................................ 15
PREMIUM PAY .......................................................................................................................... 16
AWARDS AND BONUSES ........................................................................................................ 16
EMPLOYEE PURCHASES / FOOD HANDLING ...................................................................... 17
SAMPLING AND GRAZING AND PRODUCT HANDLING POLICY ......................................... 17
SERVICE TIME .......................................................................................................................... 19
WORK RELATED INJURIES OR ILLNESSES ......................................................................... 20
VACATIONS ............................................................................................................................... 20
HOLIDAYS ................................................................................................................................. 21
PERSONAL DAYS ..................................................................................................................... 22
FAMILY AND MEDICAL LEAVE ............................................................................................... 22
MILITARY-RELATED FMLA LEAVE ......................................................................................... 26
INELIGIBLE FOR FMLA LEAVE ............................................................................................... 29

QMvRM - 000060

ADMINISTRATIVE SEPARATION POLICY ...................................................... 29
SERVICE RESTORATION RULES FOR ELIGIBLE EMPLOYEES .................... 29
CLASSES ELIGIBLE FOR REHIRE ............................................................... 30
REHIRE SERVICE DATE ADJUSTMENT ....................................................... 30
REASONABLE ACCOMMODATION POLICY .................................................. 30
BEREAVEMENT LEAVE ............................................................................... 30
JURY DUTY ................................................................................................. 30
VOTING LEAVE ........................................................................................... 31
MILITARY LEAVE ......................................................................................... 31
EMPLOYEE STOCK OWNERSHIP PLAN (ESOP) ......................................... 31
401(K) RETIREMENT PLAN ......................................................................... 31
EDUCATION ASSISTANCE PLAN ................................................................ 31
MEDICAL INSURANCE ................................................................................ 32
ACCIDENTAL DEATH BENEFITS ................................................................. 33
SALARY CONTINUATION PLAN ................................................................... 33
OPTIONAL EMPLOYEE BENEFITS .............................................................. 33
EMPLOYEE RESPONSIBILITIES ................................................................. 33
INTRODUCTORY PERIOD ........................................................................... 33
PERSONNEL INFORMATION ....................................................................... 34
SOLICITATION AND DISTRIBUTION ............................................................ 34
BULLETIN BOARDS .................................................................................... 34
EMPLOYEE HONESTY AND INTEGRITY ..................................................... 34
DISCIPLINARY PROCEDURE ....................................................................... 35
SAFETY ...................................................................................................... 37
WORKPLACE VIOLENCE ............................................................................. 38
SECURITY AND LOSS PREVENTION ........................................................... 39
TOBACCO PRODUCTS AND LOTTERY TICKETS ......................................... 39
INVENTORY SHRINK ................................................................................... 39
FRONT END POLICY .................................................................................... 39
ATTENDANCE AND WORK SCHEDULES ..................................................... 40
TIME CARDS ............................................................................................... 40
MISCELLANEOUS INFORMATION ............................................................... 41
SOCIAL MEDIA POLICY ............................................................................... 41
CONFIDENTIALITY OF COMPANY INFORMATION ...................................... 43
CONDUCTING PERSONAL BUSINESS ........................................................ 43
PERSONNEL RECORDS ............................................................................. 43
PERSONAL APPEARANCE AND DRESS POLICY ........................................ 43
PERSONAL APPEARANCE AND DRESS POLICY·CONT• ............................. 45
NAME BADGES ........................................................................................... 45
EMPLOYEE PARKING ................................................................................. 45
ENTERING AND LEAVING PREMISES .......................................................... 45
COMPANY PROPERTY ................................................................................ 45
CELL PHONES ............................................................................................ 46
COMPANY COMMUNICATIONS SYSTEMS ................................................... 46
CLOSING REMARKS .................................................................................... 47

QMvRM - 000061

INTRODUCTION

**PURPOSE OF THE HANDBOOK**

This handbook should be used by you to get to know Redner's Warehouse Markets ("Redner's" or "Company") and to help you get the most out of your relationship with us.

The purpose of this handbook is to provide an overview of policies, procedures, and benefits that guide Redner's relationship with its employees. This handbook cannot anticipate every situation or answer every question about policy or employment. It is designed solely as guides to help employees better understand their role at the Company. It is for general information only and does not replace more detailed policy and procedure manuals.

Much of this handbook is devoted to explaining pay, benefits, advancement opportunity, holidays, vacations, and other conditions at Redner's.  Please refer to this handbook to obtain general information, but also feel free to ask questions you may have.  It is management's intent to make all of Redner's employees well informed in matters concerning their work and their Company. We feel this handbook helps to accomplish this objective.

Sincerely,

RICHARD E. REDNER
President & Chief Executive Officer
Chairman of the Board

RYAN S. REDNER
Chief Operating Officer

GARY M. REDNER
Executive Vice President
Procurement


MICHAEL MCNANEY
Vice President
Finance

JASON B. HOPP, Esq.
Vice President &
General Counsel

ROBERT MCDONOUGH
Vice President
Human Resources


NICHOLAS J. HIDALGO
Vice President
Information Technology

DOUGLAS W. EMORE
Vice President
Maintenance, Construction & Real Estate


*Redner's Warehouse Markets An Equal Opportunity Employer. The Friendly Food People*

1

**Welcome To**
**REDNER'S WAREHOUSE MARKETS**

It is a pleasure to welcome new employees and to extend the best wishes for continued success to those whose careers have become a part of the growth and progress of Redner's. Whether you have been with us for a short time or for many years, we want you to know how much we appreciate the contribution you are making to the continued successful operation of our Company.

We take pride in our accomplishments to date and recognize that each employee is a contributor to our success. We want each employee to know that they are an important part of our continued growth. We all share the responsibility for continuing the success of Redner's.

This handbook has been prepared to inform new employees about Redner's and its current policies and benefits and to update current employees regarding important employment matters and changes in policies and benefits. Please read it carefully and keep it for future reference. If you should have any questions concerning the policies and benefits outlined in this handbook, please feel free to discuss it with your department manager or store director.

As a successful company in a competitive marketplace, we must continually review policies, procedures and benefits. We reserve the right to change any policies, procedures, benefits, and terms of employment without notice, consultation, or publication, except as may be required by law. This handbook is intended to be a general source of information and is not a contract. This handbook has been drafted for compliance with federal law. Some state laws provide rights in addition to those provided by federal law. For information on rights provided by your state's laws, please check with your store director or human resources. Redner's reserves the right to modify or change any portion of the handbook at any time.

We are sincerely proud to have you as an employee.

Richard Redner
President & Chief Executive Officer

QMvRM - 000063

## HISTORY OF REDNER'S

In 1940, at the age of sixteen, Earl Redner started his career in the food business with the Grand Union Tea Company in Middletown, New York. His first job was potato bagger and stoker of the furnace. He spent the next twenty-nine years working for this company until March 1970 when he left and started his own business with the purchase of two small supermarkets near Reading, Pennsylvania.

Earl held the various positions of full-time clerk, assistant store director, district sales manager, division grocery sales manager, and superintendent of stores in Washington, DC while working for Grand Union. He still holds the record of being the youngest store director, district store director, and store superintendent for that company.

In 1968, Earl started his quest for a new challenge. His wife, Mary, played a major role in his decision because of her faith in his ability and her contribution of the financial resources to start the business. Mary has a Master's Degree in Education and taught school all the years of their marriage, except when their children were very young. Her savings account, with Earl's Grand Union stock and pension money, was used for the acquisition of two supermarkets.

Earl and Mary have three children: Chere, Richard and Gary. Richard remains as President & CEO.

When the first stores were purchased, there was no intention of adding more, but after enjoying success from the very start, the decision was made to expand the company for two reasons. After Richard and Gary decided to make the food business their career, it was obvious that expansion was necessary to support three families and to create potential for personal growth. The Redner's are also employee oriented and wanted to provide more career opportunity for their employees.

Redner's Markets, Inc. started out as IGA Food Stores until January 1, 1979, when the name "Redner's Markets" was established. The decision to change from IGA was actually made three years prior, but the transition was gradual to prevent confusion with our customers. This decision was made because there are many restrictions under franchise agreements and, in many cases; policy decisions are made which are not necessarily in the best interest of the individual store operators. We were also able to eliminate many franchise charges, making it possible to be more competitive.

In 1975, the Redner Development Company was formed as a limited partnership with Earl, Richard and Gary as partners. With the information of the partnership, several reasonably priced pieces of real estate were purchased, making it possible to lease buildings at reasonable rentals to Redner's Markets. One of these buildings is our office with a warehouse to store merchandise distributed to our supermarkets.

The Company has experienced steady growth, and sales have continued to increase tremendously from what they were at the beginning of the first year. Earl believes that the greatest asset of an independent operator is flexibility. Our Company has taken great advantage of this fact and has moved quickly as changes have occurred in our industry. For example, the Company now operates pharmacies, self-service gas stations, delicatessens, convenience stores, sandwich shops, and bakeries. In March of 1987, the Company decided to take a bold step and change its retailing philosophy. This resulted in our first warehouse market. The idea is simple; get rid of the gimmicks and games, use discipline in buying and controlling costs, and put these savings into the lowest retail price possible while still offering the quality, variety and service for which Redner's has always been known. The results were outstanding and by November of 1987 all supermarkets had been converted to our warehouse concept. Our convenience store division also is flourishing. We continue to explore new sites and expand both our supermarket and convenience store divisions. As future changes occur in the supermarket industry, Redner's will change direction accordingly.

3

QMvRM - 000064

Our Employee Stock Ownership Plan ("ESOP") was formed in 1975 with the intent to give 49% of the Company stock ownership to the employees. The Company's objective is for future continuity. We want to avoid the necessity at a later date of being forced to sell the Company because of lack of management or the inability to pay estate taxes. Richard is President, Chief Executive Officer and Chairman of the Board. The late Gary W. Redner served as Executive Vice President of Procurement & Director of Wholesale Operations, until his untimely death in March of 2008.



**EARL REDNER**
Founder



**MARY REDNER**
Founder
Aug. 5, 1917 – July 14, 2007



"In Loving Memory of"
GARY W. REDNER
1952-2008
You Will Not Be Forgotten

4

# EXECUTIVE COMMITTEE
# BOARD OF DIRECTORS



**RICHARD E. REDNER**
*President & Chief Executive Officer*
*Chairman of the Board*



**RYAN S. REDNER**
*Chief Operating Officer*



**GARY M. REDNER**
*Executive Vice President*
*Procurement*



**MICHAEL McNANEY**
*Vice President*
*Finance*



**JASON B. HOPP, Esq.**
*Vice President &*
*General Council*



**ROBERT McDONOUGH**
*Vice President*
*Human Resources*



**Nicholas J. Hidalgo**
*Vice President*
*Information Technology*



**DOUGLAS W. EMORE**
*Vice President*
*Maintenance, Construction & Real Estate*

## EMPLOYEE AND CUSTOMER PHILOSOPHY

The philosophy of Redner's is simple:  Be prepared to work hard, continue to learn and expand yourself, and be honest with the customer, your fellow employees, the Company, and yourself. Each employee has an opportunity to contribute to the progress of Redner's.  Our image is simple, consisting of the following:

- Maintain clean stores
- Fresh, quality merchandise
- Fast, friendly and courteous customer service
- Low prices
- Community involvement

If this philosophy is adopted by everyone and applied to our daily tasks, the history of Redner's will be long and distinguished.

## COURTESY AND SERVICE

The first rule of a retail business is that all employees keep a friendly, courteous, and service-oriented attitude. The Company is made of more than brick and mortar because people give the structure of a store only a passing glance.  The lifeblood of any store and the way the customer evaluates a store is by the WAY AND THE MANNER that employees treat them. Redner's employees are asked to provide exceptional service to our customers.

ANYTIME AN EMPLOYEE COMES IN CONTACT WITH A CUSTOMER, SHOW THEM A NICE, WARM, SINCERE SMILE.   IF YOU ARE WITHIN NORMAL SPEAKING DISTANCE, GREET THEM WITH THE TIME OF DAY – "GOOD MORNING," "GOOD AFTERNOON," OR "GOOD EVENING."

YOUR CUSTOMERS ARE YOUR JOB...BE FRIENDLY, COURTEOUS AND HELPFUL...REMEMBER, THESE CUSTOMERS PAY YOUR WAGES.  Remember that your contact with customers, you – for the moment – represent the Company as far as they are concerned. Our reputation with them is at stake...IN YOUR HANDS.  Your actions and attitude toward them bring them back again and again or it can quickly turn them against us. If, just once, we fail to serve them well, they may leave us and never return. You have everything to gain by being courteous and showing the customer where an item is rather than just telling them or pointing to the general area.  The customer is "always right" as to receiving bad merchandise or not receiving merchandise through our error.   All employees should be courteous and apologize for any inconvenience we might have caused.   Please do not defeat our policy: "WHERE SHOPPING IS A PLEASURE."

## STATEMENT ON UNIONS

Redner's believes it is essential to provide a safe and satisfying work environment to you, to listen to what you have to say and accord you the respect you deserve.  Redner's believes that its present employment policies will create the most effective, efficient, and profitable method of operations.  The efficiency and profitability resulting from these policies will provide the maximum opportunity for job satisfaction and personal accomplishment. Each employee is treated as an individual and a full participant in Redner's.

Redner's strongly endorses the philosophy that individual consideration in employee-supervisor relationships provides the best climate for the maximum development of the individual and the attainment of the goals of both the individual employee and Redner's. Redner's employees do not belong to a union. This union-free status is decided by the choice of our employees, under rights guaranteed to them by federal law.    We acknowledge the right of our employees to be represented by a union if they wish.  However, Redner's does not believe that union representation of our employees would be in the best

6

QMvRM - 000067

interests of either Redner's or its employees. Unions involve costs (such as union dues), which our employees do not presently have, and unions impose legally enforceable obligations on union members. For all of these costs, a union would not improve Redner's ability to succeed and to provide valuable employment opportunities in today's competitive marketplace.

Please remember you, our employees, are our greatest assets. We place the highest value on you and appreciate the trust that you have shown in us. We will always strive to live up to our commitments to you and honor your faith and trust.

## PURPOSE OF THE HANDBOOK

This Handbook is designed to acquaint you with our Company and to give you a ready reference to answer many of your questions regarding your employment with us. Of course, please remember that business conditions change, and this Handbook is only a summary of the employee benefits, personnel policies, and employment rules that are in effect at the time we published the Handbook.

**This Handbook does not create an "employment contract" or other contractual rights. Although the Company intends that the benefits, policies and regulations outlined in this Handbook will generally remain in effect, the Company reserves the right at any time to amend, curtail or to otherwise revise the benefits, policies or regulations outlined in this Handbook.**

This Handbook applies to all employees. However, where it conflicts with any contract, such as insurance summary plan descriptions, that contract shall control.

**This Handbook supersedes all prior inconsistent handbooks or policies and may be changed from time-to-time as necessary.**

## EMPLOYMENT

### EMPLOYMENT RELATIONSHIP

This handbook is not an express or implied contract of employment. It is not to be considered as a guarantee of continued employment. Redner's and the employee have an at-will employment relationship. The employee has the right to terminate his/her employment at any time and Redner's has a similar right. This handbook does not make any promise of employment for any specified period of time, nor does any representative of Redner's have authority to enter into an agreement for employment for any specified period of time.

### EQUAL OPPORTUNITY EMPLOYMENT

We believe that the best working environment is one where everyone is treated equally with fairness and respect. We are an Equal Employment Opportunity employer committed to providing equal opportunity in all of our employment practices, including selection, hiring, assignment, re-assignment, promotion, transfer, compensation, discipline, and termination. The Company prohibits discrimination, harassment, and retaliation in employment based on race; color; religion; national origin; sex (including same sex); pregnancy, childbirth, or related medical conditions; age; disability or handicap; citizenship status; service member status; or any other category protected by federal, state, or local law. Violation of this policy will result in disciplinary action, up to and including immediate termination.

QMvRM - 000068

## NO HARASSMENT

We do not tolerate the harassment of applicants, employees, customers, or vendors.  Any form of harassment relating to an individual's race; color; religion; national origin; sex (including same sex); pregnancy, childbirth, or related medical conditions; age; disability or handicap; citizenship status; service member status; or any other category protected by federal, state, or local law is a violation of this policy and will be treated as a disciplinary matter.

**Violation of this policy will result in disciplinary action, up to and including immediate termination.**

If you have any questions about what constitutes harassing behavior or what conduct is prohibited by this policy, please discuss the questions with your immediate supervisor or one of the contacts listed in this policy.  At a minimum, the term "harassment" as used in this policy includes:

• Offensive remarks, comments, jokes, slurs, or verbal conduct pertaining to an individual's race; color; religion; national origin; sex (including same sex); pregnancy, childbirth, or related medical conditions; age; disability or handicap; citizenship status; service member status; or any other category protected by federal, state, or local law.

• Offensive pictures, drawings, photographs, figurines, or other graphic images, conduct, or communications, including e-mail, faxes, and copies pertaining to an individual's race; color; religion; national origin; sex (including same sex); pregnancy, childbirth, or related medical conditions; age; disability or handicap; citizenship status; service member status; or any other category protected by federal, state, or local law.

• Offensive sexual remarks, sexual advances, or requests for sexual favors regardless of the gender of the individuals involved.

• Offensive physical conduct, including touching and gestures, regardless of the gender of the individuals involved.

We also absolutely prohibit retaliation, which includes: threatening an individual or taking any adverse action against an individual for (1) reporting a possible violation of this policy, or (2) participating in an investigation conducted under this policy.

Our supervisors and managers are covered by this policy and are prohibited from engaging in any form of harassing, discriminatory, or retaliatory conduct.  No supervisor or other member of management has the authority to suggest to any applicant or employee that employment or advancement will be affected by the individual entering into (or refusing to enter into) a personal relationship with the supervisor or manager, or for tolerating (or refusing to tolerate) conduct or communication that might violate this policy.  Such conduct is a direct violation of this policy.

Even non-employees are covered by this policy. We prohibit harassment, discrimination, or retaliation of our employees in connection with their work by non-employees.  Immediately report any harassing or discriminating behavior by non-employees, including contractor or subcontractor employees. Any employee who experiences or observes harassment, discrimination, or retaliation should report it using the steps listed below.

**If you have any concern that our No Harassment policy may have been violated by anyone, you**

8

<u>must</u> immediately report the matter.  Due to the very serious nature of harassment, discrimination and retaliation, you must report your concerns to one of the individuals listed below: Robert McDonough, Vice President of Human Resources ; Alexis Foreman, Human Resources Manager ; Randy Kostelac, Human Resources Manager or Any District Manager

1. First, discuss any concern with your immediate supervisor.

2. If you are not satisfied after you speak with your immediate supervisor, or if you feel that you cannot speak to your immediate supervisor, discuss your concern with your Store Director.

3. If you are not satisfied after you speak with your Store Director, or if you feel you cannot speak to your Store Director, speak to your District Manager.

4. If at any time, you feel the need to speak to other members of management, you may contact the Vice President of Human Resources.

**You should report any actions that you believe may violate our policy no matter how slight the actions may seem.**

**We expect employees to be honest and make such complaints in good faith.**

We will investigate the report and then take prompt, appropriate remedial action. The Company will protect the confidentiality of employees reporting suspected violations of this or any other Company policy to the extent possible consistent with our investigation.

**You will not be penalized or retaliated against for reporting improper conduct, harassment, discrimination, retaliation, or other actions that you believe may violate this policy.**

We are serious about enforcing our policy against harassment.  Persons who violate this or any other Company policy are subject to discipline, up to and including immediate termination. We cannot resolve a potential policy violation unless we know about it. You are responsible for reporting possible policy violations to us so that we can take appropriate actions to address your concerns.

## COMMUNICATION POLICY

Redner's invites open communication between employees and management throughout the organization. We encourage you to bring your questions, suggestions and complaints to our attention. Careful consideration will be given to each of these in our continuing effort to improve operations.

Your suggestions and comments on any subject are important to us – we encourage you to take every opportunity to discuss them with us. If you prefer, there are several confidential methods of communicating your concerns or suggestions, including the "Grapevine" (accessible by a toll-free number posted in your store), e-mail, and letters to the President.  All confidential communication will be investigated promptly and thoroughly.

## FAIR TREATMENT POLICY

**Employees, please note:  Due to the serious nature of harassment, discrimination, and retaliation, you must voice your concerns or complaints about such behavior to the individuals listed in the No Harassment Policy in this Handbook.**

QMvRM - 000070

Our Fair Treatment Policy provides that every employee, regardless of position, be treated with respect, dignity and in a fair and just manner at all times. In keeping with this policy, all persons will be considered for employment, promotion or training on the basis of qualifications and experience. We want to ensure that you work in an environment free from discrimination and harassment. We can achieve this by your prompt use of the Fair Treatment Policy.

We recognize, that being human, mistakes may be made in spite of our best efforts. We want to correct such mistakes as soon as they happen. The only way we can do this is to know your problems and complaints. NO MEMBER OF MANAGEMENT IS TOO BUSY TO HEAR PROBLEMS OR CONCERNS FROM ANY EMPLOYEE. If you have a problem or concern, this is what you should do:

1. Tell your department manager. During this discussion, feel free to lay your cards on the table. Your department manager will listen in a friendly, courteous manner because it is our desire to understand and aid in solving problems which arise in your work. Generally, you and your department manager will be able to solve your problems.

2. If you do not get your problems corrected with your department manager, see your store director, who will investigate the matter and try to settle your problem in a fair and equitable manner. If you are still not satisfied, you may refer the entire matter to your department district's supervisor.

3. If, for any reason, after you have completed the above procedure we have not properly resolved the problem, you may refer the entire matter to the Human Resources Department.

NOTE: It is the policy of Redner's that all employee concerns and complaints shall be given full consideration. We will not tolerate discrimination or retaliation against any employee because they, in good faith, present a concern or problem. We are sure that the above procedure will resolve any problems that you may have.

## APPLICATION FOR EMPLOYMENT

All candidates for employment must fully complete, date and sign the standard Company employment application form. The form should be completed in detail and signed by the applicant to verify the accuracy and completeness of previous employment, personal information, as well as all other requested information. We may investigate any portion of the information you supply and may deny employment of or terminate anyone giving false or incomplete information. Such information may include requesting information from the candidate's previous employers relative to his or her work record in connection with his or her application for employment.

## VERIFICATION OF EMPLOYMENT ELIGIBILITY

The Federal Immigration Reform and Control Act of 1986 require employers to verify the legal working status of all employees hired on or after November 7, 1986. The Act makes it unlawful to hire anyone who is not either a citizen or an alien who has the legal right to be employed in the United States. All employees will be required to complete Form I-9 and provide current documentation from time to time, as required by federal law.

## PERFORMANCE REVIEWS

Each hourly employee will receive a performance review approximately 60 days after their date of hire and annually thereafter. Salaried employees are reviewed on an annual basis. The purpose of the review is to provide every employee with feedback about his or her job performance. The performance

QMvRM - 000071

review enables the employee and his or her supervisor to discuss issues such as the employee's progress and future goals.

*If at any time you want to know how you are doing or what you can do to improve your performance, please ask your supervisor who will always try to help you in every way possible.*

## SUMMARY OF DRUG AND ALCOHOL POLICY

### PURPOSE AND COVERAGE

Redner's Markets, Inc. values its employees and customers and recognizes the need for a safe, productive and healthy work environment. Employees who abuse drugs and/or alcohol are less productive, less dependable, and are a critical threat to the safety, security and welfare of Redner's Markets, Inc., its employees, customers, vendors, those who do business with Redner's Markets, Inc., as well as the general public. The establishment of a Drug-Free Workplace Policy (Policy) is consistent with Redner's Markets, Inc.'s desire to provide a safe, productive work environment for our employees.

Accordingly, it is the policy of Redner's Markets, Inc. to maintain a workplace free from the use and abuse of drugs and alcohol. Redner's Markets, Inc. will require that all employees and applicants participate in, consent and comply with the terms of this Policy as a condition of employment and continued employment. If questions arise regarding this Policy, please direct them to Robert McDonough, Redner's Markets, Inc.'s Drug Program Coordinator (DPC).

As a condition of initial and continued employment, the Company prohibits employees from reporting to work or performing their duties with <u>any</u> unlawful drugs or alcohol in their systems. Employees also are prohibited from using, possessing, manufacturing, distributing, or making arrangements to distribute unlawful drugs or alcohol while at work, off site at training or meetings, on Company or customer property (including in personal vehicles onsite), during lunch or breaks, or in Company vehicles. Further, the Company prohibits all unlawful drug use, possession, or distribution, whether on or off duty — drugs can stay in one's system and affect work later.

To enforce this policy, the Company may, at any time where lawful, require as a condition of employment, any employee to submit to a physical examination and/or urine, breath, blood or other type of test to determine the presence of drugs or alcohol in his or her system. The possible occasions for drug testing include, but are not limited to:

1. Pre-employment and re-employment;
2. When the Company has a reasonable suspicion that an employee has violated the Drug & Alcohol Policy;
3. When an employee seeks a transfer or promotion, or returns from a suspension or a leave of absence; or
4. As part of any random program of testing which the Company may implement.

The Company may conduct drug and alcohol testing when the Company has reasonable suspicion that the employee has violated the drug or alcohol policy, including accidents suggesting carelessness, disregard of safety rules or other conduct indicating possible violation of the Drug and Alcohol Policy.

11

as needed, so that they are familiar with their new duties.

## PROMOTIONS AND TRANSFERS

Redner's knows that our employees are our most valuable asset and are key to the Company's success. We provide excellent opportunities for personal growth as well as job advancement within the Company. We make reasonable efforts to promote from within the organization and often transfer employees from one department or location to another and promote qualified employees to new or vacant positions. If you would like to be considered for a transfer or promotion, you should discuss your interest with your store director or the training department.

Many of our employees are part-time because of the nature of our business. Employees are hired with this understanding, and, in many cases, prefer part-time work. As full-time positions become available, we generally offer these full-time positions to our part-time employees before full-time positions are filled from outside the Company.

Full-time positions are posted on Company bulletin boards and often appear in our newsletter. Part-time employees who want to move to a full-time position should notify their immediate supervisor and the store director. Part-time employees who request a transfer to full-time work will be evaluated on several factors, including but not limited to, skills, abilities, education, service time, attendance, willingness to accept assignments, and dependability.

Please note that Redner's reserves the right to fill positions from outside of the Company when, in its sole discretion, it is in its best interest to do so. All transfers and promotions must be approved by the Human Resources Department.

## HIRING OF RELATIVES

The employment of family members at different stores is permitted. Within the same store, employment of family members, which includes husband, wife, sons, daughters, brothers, and sisters, is permitted under certain circumstances. Such family members must either work in different departments or on different shifts. We do not allow one family member to supervise another.

## BENEFITS

## YOUR BENEFITS IN GENERAL

Redner's hopes its employees consider their work a career rather than a job. For this reason, the Company has established plans to help its employees build their own future.

Here are some of Redner's benefit plans for which you may become eligible. They represent, in part, Redner's program to help you save for the future, to help tide you over in case of sickness or disability, to furnish life insurance at a reasonable cost, and to provide income following retirement. Employee benefits include:

• Employee Stock Ownership Plan (ESOP)
• 401(k) Retirement Plan
• Education Assistance Plan
• Health Insurance
• Life & Accidental Death Insurance
• Short-Term Disability
• Long-Term Disability

QMvRM - 000074

Information is available by contacting the Human Resources Department.

## PAYDAY AND PAYCHECKS

Redner's policy is to pay wages commensurate with those prevailing in the community for similar work under similar conditions. Each employee is assigned a job classification for which a range of pay rates has been established.   Pay rates are reviewed and may be adjusted at the time of an employee's performance review or if an employee is assigned to another job.

Paychecks for employees are issued every Thursday.

Changes regarding your withholding tax, benefits, or any other payroll deductions should be made by completing the proper forms and forwarding the completed form to the Human Resources Department.

## LUNCH AND REST PERIODS

Paid rest periods are for the well-being and enjoyment of employees.  Scheduled rest periods are 15 minutes.  Employees are entitled to one rest period if they work 3 ½ to 7 hours, and a second rest period for work of more than 7 hours.  Breaks are scheduled by department managers with the least interference with store operations or service to customers. All employees must take rest periods when scheduled and punch in and out.

Employees who are scheduled to work 6 or more hours a day must take a lunch period near the middle of this shift.  The lunch period is either a half hour or an hour, depending on the employee's schedule.  This lunch /meal break is not paid.

Any employee under age eighteen and working more than 4 1/2 hours must be scheduled for a half hour lunch break.

## IMPROPER DEDUCTIONS FROM EXEMPT EMPLOYEES' SALARIES

The Fair Labor Standards Act (FLSA) is a federal law which requires that most employees in the United States be paid at least the federal minimum wage for all hours worked and overtime pay at time and one-half the regular rate of pay for all hours worked over 40 hours in a workweek. Some state laws provide rights in addition to those provided by the FLSA.

The FLSA provides an exemption from both minimum wage and overtime pay for employees employed as bona fide executive, administrative, professional, outside sales employees, and certain computer employees. Job titles do not determine exempt status. In order for an exemption to apply, an employee's specific job duties and salary must meet all the requirements of the Department of Labor's regulations.

_Salary Basis Requirement_
To qualify for exemption, employees generally must be paid at not less than $455 per week on a salary basis. These salary requirements do not apply to outside sales employees, teachers, and employees practicing law or medicine. Exempt computer employees may be paid at least $455 on a salary basis or on an hourly basis at a rate not less than $27.63 an hour. Being paid on a "salary basis" means an employee regularly receives a predetermined amount of compensation each pay period on a weekly, or less frequent, basis. The predetermined amount cannot be reduced because of variations in the quality or quantity of the employee's work. Subject to certain exceptions, the FLSA states that an exempt employee must receive the full salary for any workweek in which the employee performs any work, regardless of the number of days or hours worked. Exempt employees do not need to be paid for any workweek in which they perform no work. If the employer makes deductions from an employee's predetermined salary, i.e., because of the operating requirements of the business, that employee is not paid on a "salary basis." If

14

the employee is ready, willing and able to work, deductions may not be made for time when work is not available.

<u>Circumstances in Which the Employer May Make Deductions from Pay</u>
Under federal and state law, exempt employees' salaries are subject to certain deductions. Exempt salaried employees should contact Human Resources for additional information on when deductions may be made from their pay.

<u>Company Policy</u>
Redner's is committed to avoiding improper deductions and will act promptly to remedy any situation in which such a deduction may have been made by reimbursing the employee for any such improper deduction not later than the first payday upon which the reimbursement reasonably may be made following a timely final determination that the deduction was improper.

Any employee who believes that a deduction from salary is improper should discuss the matter with his or her immediate supervisor or Human Resources. Upon receiving a complaint of an improper deduction, supervisors will immediately inform Human Resources. Human Resources will promptly make an initial determination as to whether the deduction is proper, including a written explanation if it is found that the deduction was proper. The employee should ordinarily initiate this inquiry within 48 hours after being paid or being notified of the deduction unless special circumstances justify later action. If the employee is not satisfied with that decision, the employee may file a written appeal within 48 hours of the determination to Vice President of Human Resources, which states the basis for disagreeing with the decision. The appeal shall be promptly considered with a final decision issued within five (5) business days whenever possible. Any final decision may be appealed in accordance with state or federal requirements as applicable.

If any deduction was found to have been made improperly, Redner's shall make a sincere and good faith effort to avoid any such improper deductions in the future for the employee and any similarly situated employees.

## ERROR IN PAY

Every precaution is taken to avoid errors in your paycheck. If an error does occur, advise your store director or immediate supervisor, who will obtain the correct information for you. If an error is found, every reasonable effort will be made to make the adjustment on the next payday.

## OVERTIME

*The Company may periodically schedule overtime work or weekend work to meet our business needs. We will attempt to give employees advance notice, if possible. We expect that all employees who are scheduled to work overtime or who are called out to work on a special project will be at work unless specifically excused by their supervisor. Failure to report for scheduled overtime work may result in discipline, up to and including immediate termination.*

**Overtime Hours:** *All hours worked in excess of forty (40) hours in a workweek are overtime hours. For purposes of calculating overtime hours, only actual hours of work will be counted. Paid time off is not counted as hours worked for purposes of calculating overtime hours.*
**Overtime Compensation:** *Overtime compensation varies depending on the employee's pay plan, job duties, DOT status, and other regulatory factors. For example, our salaried-exempt employees normally do not receive extra pay for overtime hours. Likewise, certain other employees are exempt from overtime premium pay, so we pay those employees straight-time pay for overtime hours. Our hourly non-exempt employees receive straight-time pay plus half-time pay (the time-and-one-half rate) for overtime hours.*

QMvRM - 000076

In any event, all overtime work performed by such employees will be paid properly.

All employees (other than salaried-exempt employees) must receive approval from their supervisor prior to performing overtime work or they may be subject to disciplinary action up to and including immediate termination.

## PREMIUM PAY

Hourly employees with a hire date on or after June 1, 1997 will receive premium pay for hours worked on Sunday and designated holidays.  Hourly employees with a last hire date prior to June 1, 1997 will continue to be paid time and one-half on Sundays and designated holidays.

## AWARDS AND BONUSES

Inventory Improvement Bonus
If, after year-end inventories, the total Company shows a shrink lower than the budgeted amount, a special cash bonus may be available to eligible employees of supermarkets which had an acceptable shrink.  Pharmacy managers are excluded from this bonus program.

Service Awards
Our service award program was established to recognize our employees who have extended years of service time. Service awards are given after 5 years of continuous service and in 5 year increments thereafter.  Each eligible employee is provided with a brochure from which they can select their award. Service awards and certificates are presented at the annual service award function.

Employee of the Month Program
This program was established to recognize hourly employees who have exhibited exemplary job performance.  One employee from each supermarket, the convenience stores, the warehouse, driver, maintenance, and the main office is selected by the management team of each area as the Employee of the Month.

All hourly employees with a minimum of 90 days of continuous service are eligible to receive this award. Employees are nominated by other hourly employees or by a member of management placing a completed nomination form in a ballot box available at each facility.  Nominations are reviewed by each area's management team and a winner is selected.

The Employee of the Month receives a certificate, a $30.00 gift card, and has their picture posted in their location. Each monthly winner then becomes a candidate for Employee of the Year.

Employee of the Year Program
This award is presented each October.  The  management team  of each supermarket, the convenience stores,  the  warehouse,  the  maintenance, and the  main office  reviews  their Employees of the Month from  the prior year and from that group selects one  Employee of the Year.

The Employee of the Year receives a certificate, a $50.00 gift card, and has their picture posted in their work location. These employees participate in the raffle to win a Company trip.

The Earl & Mary and Gary W. Redner Scholarships for Higher Education

The scholarships are named to honor Earl and Mary Redner, co-founders of Redner's Markets, and the late Gary W. Redner. The Earl and Mary Redner scholarship fund was created in 1997 and the Gary W.

QMvRM - 000077

Redner scholarship fund was created in 2008, each to honor their contributions to the food industry and to the employees of Redner's Markets. There will be a total of six scholarships awarded. Three scholarships will be awarded in the name of Earl and Mary Redner and three in the name of Gary W. Redner. Applicants should complete only one application.   This application will be considered for both scholarships.

You are eligible to apply for a Redner scholarship if you have one year of continuous service with Redner's Markets, Inc. as of January 1st of the year the scholarship would begin and have averaged 15 hours or more per week within the prior year. Children or step-children of a qualified employee are also eligible to apply, however;   each qualified employee and/or a child is only eligible to win twice.
A scholarship applicant must be a full-time or graduate student in the fall of the academic year in which the scholarship begins.

The Berks County Community Foundation administers the scholarship fund. Details about his program are posted in all stores in the late fall of each year.  For more information, you may ask you store director or contact a member of the Human Resources Department.

## EMPLOYEE PURCHASES / FOOD HANDLING

All employee purchases must be rung at the established price, paid, and immediately removed from the store upon being recorded. Employees cannot assemble purchases for recording at a later date or time.

All food consumed within the store and any reading material must be purchased and paid for before consumption or reading.  A "paid" sticker must be affixed to the item and the register tape must be approved and signed by a qualified supervisor and must be retained and in the possession of the purchaser at the time of consumption or reading.

All purchases made during scheduled breaks or lunches should be done only after the employee has punched the time clock accordingly.

Employees are not permitted to ring up their own purchases through the register.

Employees are not permitted to record the purchases of any relative or persons residing in the same household.

Employees may not discard, consume, or otherwise use damaged or spoiled product or merchandise without the approval of the store director or designate.

Employees may not request, sell, or purchase any merchandise below the established retail price.

Concealment of any merchandise without purchase will be considered a violation of this policy and may result in discipline up to and including termination.

Management reserves the right to inspect packages taken from the store by all employees.

Violation of any of the above will result in disciplinary action up to and including termination.

## SAMPLING AND GRAZING AND PRODUCT HANDLING POLICY

· Part of good customer service is helping our customers understand the great products that we offer for sale in our perishable  departments this includes Meat, Deli, Bakery, Produce, Salad bar, coffee bar, fountain soft drink machines among others...

· There are no better sales people for Redner's Markets than our own employees.  One of the best ways

QMvRM - 000078

for you to be able to confirm the quality of our product is to sample the products yourself.

· We have outlined the appropriate ways to sample and taste product so you can best talk to our customers about the product we sell.

· We have also outlined procedures for product handling that will give each associate a strong understanding of our policies.

· Following the guidelines below will ensure that you are not violating our Purchase Policy: "Merchandise is not to be used, consumed or removed until it is paid for in full."

**ASSOCIATE SAMPLING**

· A "Sample" is a portioned off piece of an actual product (sliced apple, sectioned donut, etc.) sampled by associates to gain knowledge of the product to assist with the sales of that product.

· Sampling only occurs *with approval* and in the presence of your Department Manager, Store Director, Assistant Director or regional supervisor.

· When a department receives a new product the Department Manager should make sure that each associate in his/her department has a chance to sample the product under supervision (as described above).

· It is important for our produce associates to know the current status of fresh product. When we receive fruit or sometimes even vegetables such as tomatoes that can be sampled it makes sense for the product manager to have his/her associates taste the product so that they can recommend it to our customer.

· Sampling occurs on the sales floor, break room or other meeting areas, and does not occur behind any sales floor service counter. (The current Food Code prohibits any eating or drinking in food prep areas).

· Associates must not consume samples that are placed on the service counters or "Tastestation stands" around the store, unless the associate is off the clock and actually shopping in the store.

**CUSTOMER SAMPLING**

· A "Sample" is a portioned off piece of an actual product (sliced apple, sectioned donut, etc.) tried by customers (a person or associate shopping, ready to make purchase, not on company time) to gain knowledge of a product they might buy.

· Product must be kept at the proper temperature.

· Signage (product identification, price, location in the store) is essential to sell this item.

**OUTDATED OR DISCARDED PRODUCT**

· Perishable outdated product must be recorded and properly disposed of right away. Product must not be given / sold to associates or customers at any time. (Exception may be in areas where the food bank has been authorized)

· Non-Perishable outdated product must be properly recorded in accordance with the company established receiving policies, or given to vendor for proper credit or discarded as per company policy. Product must not be given / sold to associate or customer at any time.

**DAMAGED PRODUCT**

· Damaged product must be put into designated area for proper handling.

QMvRM - 000079

· Damaged product must not be reduced for sale to associates at any time.

## GRAZING

· Associates are not allowed to consume any product from any department regardless of the amount or size. This is in contrast to the sampling policy this would occur without authorization or proper authority to consume a product. If you haven't paid for it and it is not an authorized sample don't consume it. Violating the Grazing policy is subject to discipline up to and including termination. Incidents that involve grazing will be referred to the Human Resource Department. Discretion as to the severity and intent will be evaluated to determine appropriate discipline.

## EMPLOYEE PURCHASE

· Violations of the employee purchase policy are outlined above in this handbook. In brief are described as removing product from the shelf and either leaving the store with the product and not paying for it, or consuming the product without paying for it.

· Others are intentionally altering the price or weight of a product so as to reduce the cost for purchase. Employees are prohibited from preparing and pricing or ringing their own personal orders unless at the self checkouts or otherwise authorized.

· Examples would be; A) Removing a frozen dinner from the case and taking it to the lunch room and heating it and consuming. B) An individual prepares freshly cooked chicken for their lunch and prices a 5 piece order as 3, thus reducing the price. These are serious policy violations that will subject employees to termination.

## SERVICE TIME

A company's strength can be measured by the number of years that employees remain with the company. Our Company is proud of the service record of its employees. Redner's is one of the strongest growing companies in the area because of the job knowledge that the employees have accumulated through the years.

Service time is defined as priority in continued employment because of the length of service an employee has with the Company. Your service time ensures you work, provided that work is available. Service time accumulates from the first day worked and is recognized once 90 days of employment have been completed.

Your service time is important to you because it represents an investment of time, money and facilities by the Company in your training and experience. Promotion possibilities may be provided as your experience increases. Your service time also qualifies you for important benefit plans based on length of employment.

If you serve in the U.S. Armed Forces or if you are transferred or promoted to another position, your service continues without interruption. Service time is lost if you:

• Quit
• Are terminated
• Fail to report for work after a leave of absence
• Are a student working only during vacations and holiday periods

QMvRM - 000080

## WORK RELATED INJURIES OR ILLNESSES

All employees are protected while on the job by workers' compensation insurance. This insurance will provide coverage for you if you sustain a work-related injury or personal illness.

Any employee who sustains a work-related injury or illness, no matter how slight, must immediately notify the store director, or in the absence of the store director, the person in charge. An injury report must be filled out at that time.

If an employee is unable to complete the shift on the day the injury occurs, the employee will be paid for the rest of their scheduled hours.

Any Pennsylvania employee who requires medical attention for a work-related illness or injury is required to consult with a Company designated physician and/or medical facilities for diagnosis and treatment. Delaware and Maryland employees must consult with a State certified workers compensation provider. This consultation must occur as soon as practical and prior to the payment of any medical bills or workers' compensation benefits. Should the injury or illness require the employee to seek a medical consultation, the consultation may include a drug and alcohol screening test, if the company has reasonable suspicion that the employee was under the influence of drugs or alcohol at the time of the occurrence of the work injury.

When a Company authorized physician restricts an employee's capabilities, a reasonable attempt will be made to place the employee in a position which accommodates the restrictions.  The employee's pay rate, average scheduled hours, and work schedule will be maintained as it was prior to the injury. The Company will recognize this as "light duty." The purpose of this program is to help our employees with work related injuries to maintain their standard of living.

If any employee is unable to return to work due to a work-related injury, regular contact must be maintained with the Risk Manager. Failure to maintain contact may result in disciplinary action. If eligible, all time off from work due to a work injury will be considered an FMLA leave.  All existing FMLA policies will apply. All work injuries must be reported to your supervisor immediately.

## VACATIONS

We believe you should take time off to rest and relax and therefore have set the accrual rate at a level to encourage time off. Accrued vacation time must be taken in each anniversary year. All employees earned vacation in the year previous to that in which it is taken.  Because of the nature of the business, all vacations during holiday weeks must be requested and approved at least a month in advance.

Accrual of Vacation – Full-Time Employees

• After one full year of continuous service, all full-time employees accrue 40 hours of paid vacation at the then hourly rate.

• After two years of continuous service, all full time employees accrue 80 hours vacation paid at the then hourly rate.

• After eight full years of continuous service, all full time employees accrue 120 hours at the then hourly rate.

• After fifteen years of continuous service all full time employees accrue 160 hours vacation paid at the then hourly rate.

QMvRM - 000081

Exempt (Salaried) Employee's Accrue vacation weeks at the same intervals as full time employees, each based on their salary category; there are 3 categories 45 hour, 47 hour and 50 hour.

Accrual of Vacation – Part-Time Employees

• After two years of continuous employment, all part-time employees accrue paid vacation equal to one average week's hours at the then hourly pay rate. The number of vacation hours is based on the average hours worked during the prior year, up to 40 hours.  For example, a part-time employee who worked an average of 32 hours in the prior year would receive 32 hours of paid vacation at the then hourly rate.

• After four years of continuous service, all part-time employees accrue paid vacation equal to two average weeks' hours at the then hourly pay rate. The number of vacation hours is based on the average hours worked during the prior year, up to 40, which is then doubled.  For example, a part-time employee who worked an average of 32 hours in the prior year would receive 64 hours of paid vacation at the then hourly rate.

Requesting and Using Vacation Leave

• Employees must take time off from work to receive vacation pay.

• Vacation cannot carry over from year to year, but must be taken in the vacation period following the in which earned.  Any deviation this policy must be approved in advance by the Vice President of Human Resources.

A request for time off in excess of one week more than earned vacation time must be approved by the V.P. of Human Resources.

## HOLIDAYS

After successful completion of ninety   (90) days of continuous full-time service, full-time employees enjoy six (6) paid holidays whenever the holiday falls on a regular workday:

New Year's Day
Memorial Day
Independence Day
Labor Day
Thanksgiving Day
Christmas Day

If the eligible employee works the day of the holiday, the employee will receive eight (8) hours of holiday pay, and will be paid for hours worked on the holiday.   Holiday pay   will not be calculated as time worked for payment of overtime.

All part-time employees with two (2) years of continuous service and 1,000 hours worked in each year, are eligible for four (4) hours of holiday pay.

In order to be eligible for holiday pay, the employee must work the scheduled day before and the scheduled day after the holiday unless the absence is authorized in advance.

If a holiday falls in a week in which you have scheduled a vacation, you will be entitled to an additional day of vacation scheduled at a time convenient for you and the Company.

An employee who a leave of absence during the holiday week is not entitled to holiday pay.

QMvRM - 000082

**Arrangements for time off for religious holidays may occur with prior PERSONAL DAYS**

All full-time employees, after six (6) months of continuous full-time employment, are eligible for three (3) personal days per year which must be taken during their full-time anniversary year.

All part-time employees with one (1) year of continuous service and 1,000 hours worked in the previous year are eligible for three (3) personal days of four hours each. Personal days must be taken in the year the personal days are earned.

• Personal days cannot be scheduled during a holiday week.

• An employee must request a personal day off two weeks in advance for approval from their store director, unless an emergency arises.

• Unused personal days will be paid out after the employee's vacation anniversary date at the then hourly rate of pay.

• Unused personal days are not payable upon termination of employment.

## FAMILY AND MEDICAL LEAVE

The Family and Medical Leave Act ("FMLA") provides eligible employees the opportunity to take unpaid, job-protected leave for certain specified reasons. The maximum amount of leave an employee may use is either 12 or 26 weeks within a 12-month period depending on the reasons for the leave.

### Employee Eligibility

To be eligible for FMLA leave, you must:

1. Have worked at least 12 months for the Company in the preceding seven years (limited exceptions apply to the seven-year requirement);

2. Have worked at least 1,250 hours for the Company over the preceding 12 months; and

3. Currently work at a location where there are at least 50 employees within 75 miles.
All periods of absence from work due to or necessitated by service in the uniformed services are counted in determining FMLA eligibility.

### Conditions Triggering Leave

FMLA leave may be taken for the following reasons:

1. Birth of a child, or to care for a newly-born child (up to 12 weeks);

2. Placement of a child with the employee for adoption or foster care (up to 12 weeks);

3. To care for an immediate family member (employee's spouse, child, or parent) with a serious health

QMvRM - 000083

condition (up to 12 weeks);

4. Because of the employee's serious health condition that makes the employee unable to perform the employee's job (up to 12 weeks);

5. To care for a Covered Service member with a serious injury or illness related to certain types of military service (up to 26 weeks) (see Military-Related FMLA Leave for more details); or,

6. To handle certain qualifying exigencies arising out of the fact that the employee's spouse, son, daughter, or parent is on covered active duty or call to covered activity duty status in the Uniformed Services (up to 12 weeks) (see Military-Related FMLA Leave for more details).

The maximum amount of leave that may be taken in a 12-month period for all reasons combined is 12 weeks, with one exception.  For leave to care for a Covered Service member, the maximum combined leave entitlement is 26 weeks, with leaves for all other reasons constituting no more than 12 of those 26 weeks.

## Definitions

A "Serious Health Condition" is an illness, injury, impairment, or physical or mental condition that involves either an overnight stay in a medical care facility, or continuing treatment by a health care provider for a condition that either prevents the employee from performing the functions of the employee's job, or prevents the qualified family member from participating in school or other daily activities. Subject to certain conditions, the continuing treatment requirement includes an incapacity of more than three full calendar days and two visits to a health care provider or one visit to a health care provider and a continuing regimen of care; an incapacity caused by pregnancy or prenatal visits, a chronic condition, or permanent or long-term conditions; or absences due to multiple treatments.  Other situations may meet the definition of continuing treatment.

## Identifying the 12-Month Period

The Company measures the 12-month period in which leave is taken by the "rolling" 12- month method, measured backward from the date of any FMLA leave with one exception.  For leave to care for a covered service member, the Company calculates the 12-month period beginning on the first day the eligible employee takes FMLA leave to care for a covered service member and ends 12 months after that date. FMLA leave for the birth or placement of a child for adoption or foster care must be concluded within 12 months of the birth or placement.

## Using Leave

Eligible employees may take FMLA leave in a single block of time, intermittently (in separate blocks of time), or by reducing the normal work schedule when medically necessary for the serious health condition of the employee or immediate family member, or in the case of a covered service member, his or her injury or illness.  Eligible employees may also take intermittent or reduced-scheduled leave for military qualifying exigencies. Intermittent leave is not permitted for birth of a child, to care for a newly-born child, or for placement of a child for adoption or foster care. Employees who require intermittent or reduced-schedule leave must try to schedule their leave so that it will not unduly disrupt the Company's operations.

23

QMvRM - 000084

## Use of Accrued Paid Leave

Depending on the purpose of your leave request, you may choose (or the Company may require you) to use accrued paid leave (such as sick leave, vacation, or PTO), concurrently with some or all of your FMLA leave. In order to substitute paid leave for FMLA leave, an eligible employee must comply with the Company's normal procedures for the applicable paid-leave policy (e.g., call-in procedures, advance notice, etc.).

## Maintenance of Health Benefits

If you and/or your family participate in our group health plan, the Company will maintain coverage during your FMLA leave on the same terms as if you had continued to work. If applicable, you must make arrangements to pay your share of health plan premiums while on leave. In some instances, the Company may recover premiums it paid to maintain health coverage or other benefits for you and your family. Use of FMLA leave will not result in the loss of any employment benefit that accrued prior to the start of your leave.

## Notice and Medical Certification

When seeking FMLA leave, you are required to provide:

1. sufficient information for us to determine if the requested leave may qualify for FMLA protection and the anticipated timing and duration of the leave. Sufficient information may include that you are unable to perform job functions, a family member is unable to perform daily activities, the need for hospitalization or continuing treatment by a health care provider, or circumstances supporting the need for military family leave. You must also inform the Company if the requested leave is for a reason for which FMLA leave was previously taken or certified.

If the need for leave is foreseeable, this information must be provided 30 days in advance of the anticipated beginning date of the leave. If the need for leave is not foreseeable, this information must be provided as soon as is practicable and in compliance with the Company's normal call-in procedures, absent unusual circumstances.

2. medical certification supporting the need for leave due to a serious health condition affecting you or an immediate family member within 15 calendar days of the Company's request to provide the certification (additional time may be permitted in some circumstances).    If you fail to do so, we may delay the commencement of your leave, withdraw any designation of FMLA leave or deny the leave, in which case your leave of absence would be treated in accordance with our standard leave of absence and attendance policies, subjecting you to discipline up to and including termination. Second or third medical opinions and periodic re-certifications may also be required;

3. periodic reports as deemed appropriate during the leave regarding your status and intent to return to work; and

4. medical certification of fitness for duty before returning to work, if the leave was due to your serious health condition. The Company will require this certification to address whether you can perform the essential functions of your position.

Failure to comply with the foregoing requirements may result in delay or denial of leave, or disciplinary

QMvRM - 000085

action, up to and including termination.

**Employer Responsibilities**

To the extent required by law, the Company will inform employees whether they are eligible under the FMLA.  Should an employee be eligible for FMLA leave, the Company will provide him or her with a notice that specifies any additional information required as well as the employee's rights and responsibilities.  If employees are not eligible, the Company will provide a reason for the ineligibility.  The Company will also inform employees if leave will be designated as FMLA-protected and, to the extent possible, note the amount of leave counted against the employee's leave entitlement. If the Company determines that the leave is not FMLA-protected, the Company will notify the employee.

**Job Restoration**

Upon returning from FMLA leave, eligible employees will typically be restored to their original job or to an equivalent job with equivalent pay, benefits, and other employment terms and conditions.

**Failure to Return After FMLA Leave**

Any employee who fails to return to work as scheduled after FMLA leave or exceeds the 12-week FMLA entitlement (or in the case of military caregiver leave, the 26-week FMLA entitlement), will be subject to the Company's standard leave of absence and attendance policies. This may result in termination if you have no other Company-provided leave available to you that applies to your continued absence. Likewise, following the conclusion of your FMLA leave, the Company's obligation to maintain your group health plan benefits ends (subject to any applicable COBRA rights).

**Other Employment**

The Company generally prohibits employees from holding other employment. This policy remains in force during all leaves of absence including FMLA leave and may result in disciplinary action, up to and including immediate termination of employment.

**Fraud**

Providing false or misleading information or omitting material information in connection with an FMLA leave will result in disciplinary action, up to and including immediate termination.

**Employers' Compliance with FMLA and Employee's Enforcement Rights**

FMLA makes it unlawful for any employer to interfere with, restrain, or deny the exercise of any right provided under FMLA, or discharge or discriminate against any person for opposing any practice made unlawful by FMLA or for involvement in any proceeding under or relating to FMLA.

While the Company encourages employees to bring any concerns or complaints about compliance with FMLA to the attention of the Human Resources Department, FMLA regulations require employers to advise employees that they may file a complaint with the U.S. Department of Labor or bring a private lawsuit against an employer.

Further, FMLA does not affect any Federal or State law prohibiting discrimination, or supersede any State

QMvRM - 000086

or local law or collective bargaining agreement which provides greater family or medical leave rights.

## MILITARY-RELATED FMLA LEAVE

FMLA leave may also be available to eligible employees in connection with certain service-related medical and non-medical needs of family members.  There are two forms of such leave. The first is Military Caregiver Leave, and the second is Qualifying Exigency Leave.  Each of these leaves is detailed below.

### Definitions

A "covered service member" is either: (1) a current service member of the Armed Forces, including a member of the National Guard or Reserves, with a serious injury or illness incurred in the line of duty for which the service member is undergoing medical treatment, recuperation, or therapy, is otherwise in outpatient status, or is otherwise on the temporary disability retired list; or (2) a "covered veteran" who is undergoing medical treatment, recuperation, or therapy for a serious injury or illness.

A "covered veteran" is an individual who was discharged under conditions other than dishonorable during the five-year period prior to the first date the eligible employee takes FMLA leave to care for the covered veteran.  The period between October 28, 2009 and March 8, 2013 is excluded in determining this five-year period.

The FMLA definitions of "serious injury or illness" for current service members and veterans are distinct from the FMLA definition of "serious health condition."  For purposes of Military-Related FMLA Leave, the term "serious injury or illness" means an injury or illness incurred by the member in the line of duty while on active duty in the Armed Forces that may render the service member medically unfit to perform the duties of the service member's office, grade, rank, or rating, or one that existed before the beginning of active duty and was aggravated by service in the line of duty while on active duty.

With regard to covered veterans, the serious injury or illness may manifest itself before or after the individual assumed veteran status, and is: (1) a continuation of a serious injury or illness that was incurred or aggravated when the covered veteran was a member of the Armed Forces and rendered the service member unable to perform the duties of the service member's office, grade or rating;  (2) a physical or mental condition for which the covered veteran has received a VA Service Related Disability Rating (VASRD) of 50 percent or greater and such VASRD rating is based, in whole or in part, on the condition precipitating the need for caregiver leave; (3) a physical or mental condition that substantially impairs the veteran's ability to secure or follow a substantially gainful occupation by reason of a disability or disabilities related to military service or would be so absent treatment; or (4) an injury, including a psychological injury, on the basis of which the covered veteran has been enrolled in the Department of Veterans Affairs Program of Comprehensive Assistance for Family Caregivers.

"Qualifying exigencies" include activities such as short-notice deployment, military events, arranging alternative childcare, making financial and legal arrangements related to the deployment, rest and recuperation, counseling, parental care, and post-deployment debriefings.

### Military Caregiver Leave

Unpaid Military Caregiver Leave is designed to allow eligible employees to care for certain family members who have sustained serious injuries or illnesses in the line of duty while on active duty.  Military

QMvRM - 000087

Caregiver Leave is a special leave entitlement that permits eligible employees to take up to 26 weeks of leave to care for a covered service member during a single 12-month period.

To be "eligible" for Military Caregiver Leave, the employee must be a spouse, son, daughter, parent, or next of kin of the covered service member. "Next of kin" means the nearest blood relative of the service member, other than the service member's spouse, parent, son, or daughter, in the following order of priority: blood relatives who have been granted legal custody of the service member by court decree or statutory provisions; brothers and sisters; grandparents; aunts and uncles; and first cousins; unless the service member has specifically designated in writing another blood relative as his or her nearest blood relative for purposes of Military Caregiver Leave. The employee must also meet all other eligibility standards as set forth within the FMLA Leave policy.

An eligible employee may take up to 26 workweeks of Military Caregiver Leave to care for a covered service member in a "single 12-month period." The "single 12-month period" begins on the first day leave is taken to care for a covered service member and ends 12 months thereafter, regardless of the method used to determine leave availability for other FMLA-qualifying reasons. If an employee does not exhaust his or her 26 workweeks of Military Caregiver Leave during this "single 12-month period," the remainder is forfeited.

Military Caregiver Leave applies on a per-injury basis for each service member. Consequently, an eligible employee may take separate periods of caregiver leave for each and every covered service member, and/or for each and every serious injury or illness of the same covered service member. A total of no more than 26 workweeks of Military Caregiver Leave, however, may be taken within any "single 12-month period."

Within the "single 12-month period" described above, an eligible employee may take a combined total of 26 weeks of FMLA leave including up to 12 weeks of leave for any other FMLA-qualifying reason (i.e., birth or adoption of a child, serious health condition of the employee or close family member, or a qualifying exigency). For example, during the "single 12-month period," an eligible employee may take up to 16 weeks of FMLA leave to care for a covered service member when combined with up to 10 weeks of FMLA leave to care for a newborn child.

An employee seeking Military Caregiver Leave may be required to provide appropriate certification from the employee and/or covered service member and completed by an authorized health care provider within 15 days. Military Caregiver Leave is subject to the other provisions in our FMLA Leave Policy (requirements regarding employee eligibility, appropriate notice of the need for leave, use of accrued paid leave, etc.). Military Caregiver Leave will be governed by, and handled in accordance with, the FMLA and applicable regulations, and nothing within this policy should be construed to be inconsistent with those regulations.

**Qualifying Exigency Leave**

Eligible employees may take unpaid "Qualifying Exigency Leave" to tend to certain "exigencies" arising out of the covered active duty or call to covered active duty status of a "military member" (i.e. the employee's spouse, son, daughter, or parent). Up to 12 weeks of Qualifying Exigency Leave is available in any 12-month period, as measured by the same method that governs measurement of other forms of FMLA leave within the FMLA policy (with the exception of Military Caregiver Leave, which is subject to a maximum of 26 weeks of leave in a "single 12-month period"). Although Qualifying Exigency Leave may be combined with leave for other FMLA-qualifying reasons, under no circumstances may the combined

QMvRM - 000088

total exceed 12 weeks in any 12-month period (with the exception of Military Caregiver Leave as set forth above). The employee must meet all other eligibility standards as set forth within the FMLA policy.

Persons who can be ordered to active duty include active and retired members of the Regular Armed Forces, certain members of the retired Reserve, and various other Reserve members including the Ready Reserve, the Selected Reserve, the Individual Ready Reserve, the National Guard, state military, Army Reserve, Navy Reserve, Marine Corps Reserve, Air National Guard, Air Force Reserve, and Coast Guard Reserve.

A call to active duty refers to a *federal* call to active duty, and *state* calls to active duty are not covered unless under order of the President of the United States pursuant to certain laws.

Qualifying Exigency Leave is available under the following circumstances:

(1) **Short-notice deployment.** To address any issue that arises out of short notice (within seven days or less) of an impending call or order to covered active duty.

(2) **Military events and related activities.** To attend any official military ceremony, program, or event related to covered active duty or call to covered active duty status or to attend certain family support or assistance programs and informational briefings.

(3) **Childcare and school activities.** To arrange for alternative childcare; to provide childcare on an urgent, immediate need basis; to enroll in or transfer to a new school or daycare facility; or to attend meetings with staff at a school or daycare facility.

(4) **Financial and legal arrangements.** To make or update various financial or legal arrangements; or to act as the covered military member's representative before a federal, state, or local agency in connection with service benefits.

(5) **Counseling.** To attend counseling (by someone other than a health care provider) for the employee, for the military member, or for a child or dependent when necessary as a result of duty under a call or order to covered active duty.

(6) **Temporary rest and recuperation.** To spend time with a military member who is on short-term, temporary rest and recuperation leave during the period of deployment. Eligible employees may take up to 15 calendar days of leave for each instance of rest and recuperation.

(7) **Post-deployment activities.** To attend arrival ceremonies, reintegration briefings and events, and any other official ceremony or program sponsored by the military for a period of up to 90 days following termination of the military member's active duty status. This also encompasses leave to address issues that arise from the death of a military member while on active duty status.

(8) **Parental care.** To care for the military member's parent who is incapable of self-care. The parent must be the military member's biological, adoptive, step, or foster father or mother, or any other individual who stood in loco parentis to the military member when the member was under 18 years of age.

(9) **Mutually agreed leave.** Other events that arise from the military member's duty under a call or order to active duty, provided that the Company and the employee agree that such leave shall qualify as an exigency and agree to both the timing and duration of such leave.

QMvRM - 000089

An employee seeking Qualifying Exigency Leave may be required to submit appropriate supporting documentation in the form of a copy of the military member's active duty or rest and recuperation orders or other military documentation indicating the appropriate military status and the dates of active duty status, along with a statement setting forth the nature and details of the specific exigency, the amount of leave needed and the employee's relationship to the military member, within 15 days. Qualifying Exigency Leave will be governed by, and handled in accordance with, the FMLA and applicable regulations, and nothing within this policy should be construed to be inconsistent with those regulations.

**Limited Nature of This Policy**

This Policy should not be construed to confer any express or implied contractual relationship or rights to any employee not expressly provided for by FMLA. The Company reserves the right to modify this or any other policy as necessary, in its sole discretion to the extent permitted by law. State or local leave laws may also apply.

## INELIGIBLE FOR LEAVE

If you are not eligible for a FMLA Leave but have been granted a discretionary leave and you are out of work for two consecutive weeks due to an illness or injury, you will be considered to have voluntarily separated, (unless otherwise provided by law).

However, when you are released by a physician to return to work, you may reapply and Redner's will consider rehiring you.

## ADMINISTRATIVE SEPARATION POLICY

Upon conclusion of an FMLA medical leave of absence, an employee must either:

(1) return to work, or

(2) contact Human Resources to discuss whether there is a reasonable accommodation available under the Americans with Disabilities Act that would allow the employee to return to work. Redner's Markets will evaluate the request for additional unpaid leave or other accommodation under the Americans with Disabilities Act.

An employee who fails to return to work at the conclusion of an FMLA medical leave of absence or fails to request a reasonable accommodation that would allow the employee to return to work, will be considered to have voluntarily terminated his or her employment with Redner's. An employee who fails to return to work at the conclusion of an FMLA parental or family care leave of absence, will be considered to have voluntarily terminated his or her employment with Redner's.

## SERVICE RESTORATION RULES

(1) If an eligible former employee is rehired within one year of their termination date, the employee will generally be credited their original service time and will be eligible to participate in the ESOP plan, subject to terms and condition of the plan.

(2) An eligible employee who is rehired will generally get credit for their prior service in regards to the annual evaluation/wage review and accrual of vacation time after completing one year of service after their date of rehire.

QMvRM - 000090

## CLASSES ELIGIBLE FOR REHIRE

Employees who completed one year of service prior to taking a FMLA leave of absence, or who were separated from employment because they did not return to work at the conclusion of their FMLA leave (and properly notified the Human Resources) of absence, may be eligible for rehire.

## REHIRE SERVICE DATE ADJUSTMENT

When recognition of prior service is granted, a rehired employee's company service date will be adjusted in accordance with the service restoration rule.

## REASONABLE ACCOMMODATION POLICY

To assist our employees who are or become disabled and those employees who suffer on-the-job injuries, we will make reasonable accommodations to enable such employees to continue performing the essential functions of their jobs. Consistent with this policy, we may modify job duties to comply with medical requirements or restrictions. Other accommodations, such as transfer to a vacant position for which the employee is qualified, may be appropriate, depending upon specific facts and circumstances of individual situations.

Obviously, there are limits to the accommodations which we can realistically make.  For example, where an accommodation would cause an undue hardship to the Company we would be unable to make the particular accommodation.  Similarly, when placing an individual in a position, with or without accommodation, would cause the employee to be a direct threat to the employee or others, we may be unable to place the employee in a particular position.

If you need to request a reasonable accommodation because of a disability or on-the-job injury, please direct the request to the Human Resources department. " We will discuss the matter with you, investigate your request, and to the extent possible, attempt to reasonably accommodate you.

## BEREAVEMENT LEAVE

A regular full-time employee is eligible for up to 5 days off with pay for any scheduled work hours, excluding overtime and premium pay for the death of a spouse or a child, and eligible for up to 3 days off with pay for any scheduled work hours for the death of a parent, sibling, legal guardian, grandparent, grandchild, mother-in-law, father-in-law, sister-in-law or brother-in-law.

## JURY DUTY

Redner's supports all employees, whenever requested, to perform their duty as a juror or as a subpoenaed witness.  A full-time employee serving as a juror or subpoenaed witness will be paid the difference between the juror's pay or witness's pay and the employee's regular weekly pay, excluding overtime and premium pay. A receipt for jury duty must be provided to your supervisor. This benefit is paid only one time in a twelve month period, unless otherwise required by law.

A part-time employee serving as a juror or witness may work a schedule which enables them to make up the difference between juror's and witness's pay and their regular pay with approval of the store director. Additional pay will be provided only when required by applicable law.

QMvRM - 000091

or satisfied with it.   For this reason, an introductory period is provided so you and the Company can evaluate each other.  All employees are on an introductory period during their first ninety (90) days of employment.  If at any time during the 90-day period, the Company concludes that the employee is not suited for the job, action can be initiated to terminate the employee. At the end of the 90-day introductory period, your immediate supervisor will evaluate your performance and you will be advised of your progress.

During the introductory period you should take full advantage of the training and orientation that is provided.

Employees can be discharged before the completion of the 90-day introductory period. Successful completion of the introductory period does not change the at-will nature of the employment relationship.

## PERSONNEL INFORMATION

As an employee, it is your responsibility to notify the store director whenever there is a change in your:

Name
Address
Phone Number
Marital Status
Immigration Status
Number of Dependents
Insurance Beneficiaries
Person to Notify in Case of Emergency

This information is necessary to provide appropriate insurance coverage, to contact you in case of schedule changes or emergencies, etc.

## SOLICITATION AND DISTRIBUTION

Solicitation and distribution of literature by non-employees on Company property is prohibited at all times.

Solicitation by employees on Company property during working time is prohibited.   Solicitation is prohibited if either the solicitor or person being solicited is on working time. Working time does not include free time such as break periods and meal times.

Distribution of literature by employees on Company property during working time is prohibited. Distribution is prohibited if either the distributor or the person receiving the distribution is on working time.
Distribution of literature by employees in working areas is prohibited at all times

## BULLETIN BOARDS

Bulletin boards are located throughout the Company to bring you timely information. These bulletin boards are not to be used as all-purpose boards.  Company bulletin boards are reserved for Company business only.  The store director is responsible for the approval and posting of all bulletin board information.

## EMPLOYEE HONESTY AND INTEGRITY

Employees are hired with the expectation that their honesty and integrity are of the highest level. We are certain that our employees will meet this expectation, which includes abiding by the following guidelines.

• Each employee must advise management if they see another employee or individual taking

34

merchandise without paying for it.

• Employees may be entrusted with large sums of money or other items, including confidential information. Employees are not permitted to remove any Company property, equipment, merchandise, or supplies from Redner's premises without permission from top management.

• From time to time, surprise cash register checks, cashier's accuracy tests, and standard security checks of purchases will be made by a supervisor or manager.

• All merchandise samples, premiums, merit coupons, broken packages, or damaged property are the property of Redner's.  These should be given to the store director.

• Cash or merchandise that has been misplaced by a customer or another employee must be turned over to the store director.  The Company will make every reasonable effort to return the misplaced item to the rightful owner.  If, after a reasonable amount of time, the owner cannot be identified, the cash or merchandise becomes the property of Redner's.

• Employees are not permitted to perform any services or have any interest or involvement, either directly or indirectly, in any other business which resembles or competes with a product, process or service of Redner's. If employees violate this rule, they may be disciplined up to and including termination. If you already have or are considering outside business involvement or employment which would appear to violate this rule, you should advise your supervisor.

## DISCIPLINARY PROCEDURE

Whenever people work together, persons must conform to standards of reasonable conduct for an orderly and efficient atmosphere.  This is very true in an organization where the actions of one employee may adversely affect the job security and opportunities of the other employees.  This handbook sets forth many of our expectation, but should not be viewed as limiting the rights of the Company to discipline or terminate employees for any legal reason.

Redner's recognizes its continuing responsibility to properly administer rules and regulations in a fair and consistent manner.  Regulations for acceptable employee conduct are necessary for the protection of the rights and safety of all employees and the efficient and effective operation of the Company.  The primary purpose of any disciplinary action or penalty, if taken, shall be corrective; but in certain instances, separation from employment will occur.

The standards of behavior and conduct encompassed in the rules are of a general nature and, therefore, do not cover every situation which may lead to disciplinary action or termination.  They should be regarded as illustrations rather than a complete and all-inclusive statement of misconduct.

Employees are expected to observe appropriate standards of job performance and good conduct. When performance or conduct does not meet the Company's standards, Redner's will endeavor, when it deems appropriate, to provide the employee a reasonable opportunity to correct the deficiency.  If, however, the employee fails to make the correction, he or she will be subject to discipline, including termination.

Discharge for poor performance, failure to meet the Company's standards and/or misconduct will often be preceded by an Incident Report (recorded verbal warning), an Official Written Warning, and an Official Written Warning and suspension without pay (generally 1 to 3 days).  Redner's reserves the right to proceed directly to any step in this process, including but not limited to termination, for failure to meet the Company's standards, without resort to prior disciplinary steps, when the Company deems such action appropriate.

QMvRM - 000096

The great majority of employees want to do what is expected of them while at work.  The understanding of and compliance with these and other common sense rules of good conduct will benefit the well-being of everyone.  Violation of the following subjects an employee to disciplinary action. The disciplinary action taken will depend upon the circumstances and severity of each case, but may result in disciplinary action up to and including termination.

1.   Falsifying records or information.

2.   Recording another employee's time card.

3.   Theft, dishonesty or embezzlement.

4.   Destruction of Company property due to horseplay, neglect, or carelessness.

5.   Leaving the job without permission.

6.   Insubordination.

7.   Fighting, immoral conduct, threats or intimidation.

8.   Gambling.

9.   Violation of the drug and alcohol policy.

10. Improper disclosure of confidential Company information.

11. Unauthorized possession of weapons.

12. Padding of department inventories by department managers.

13. Sleeping on the job.

14. Working another job while absent.

15. Failure to ring up a sale immediately or in proper sequence.

16. Consuming product without paying for it.

17. Unauthorized use of Company telephones.

18. Selling tobacco products, alcohol or lottery tickets to persons not of legal age.

19. Excessive cashier shortages.

20. Irregular attendance.

21. Excessive tardiness.

22. Failure to follow instructions.

23. Substandard quality or work quantity.

24. Unauthorized smoking or eating.

25. Failure to report defective equipment or safety hazard.

26. Failure to promptly complete accurate reports.

QMvRM - 000097

27. Undesirable appearance.

28. Unauthorized parking.

29. Discourteous treatment of customers.

30. Failure to report absence.

31. Horseplay in violation of safety rules.

32. Misuse or unauthorized use of Company property.

33. Violation of Redner's no solicitation/distribution policy.

34. Violation of the Company discrimination or harassment policies.

35. Abusive, threatening, or rude language to Company personnel or customers.

36. Disregarding safety rules or otherwise working or acting in an unsafe manner.

37. Immoral conduct or indecency on Company or customer premises.

38. Failure to provide information as requested by the Company.

39. Threatening, intimidating, abusing, coercing or interfering with employees or management, or customers, at any time.

40. Fraud.

Nothing in this policy alters the at-will employment relationship between Redner's and its employees.

## SAFETY

Safety is everyone's full-time job.  With your cooperation and assistance, the Company will make every effort to provide a clean, safe and healthy place for you to work.  You are expected and required to do your part to work safely, wear required safety equipment, abide by all safety rules and regulations, and keep your workplace neat and clean.  Specific safety rules may be available from your supervisor.

It is the responsibility of every employee to help maintain a safe working environment by obeying the safety regulations established by our Company.  Failure to comply with Company safety rules may lead to disciplinary action and possible dismissal.

1.  Report any personal injury, however minor, immediately to your store director or, in the absence of the store director, the person in charge.

2.  Make regular disposal of waste and trash.

3.  Work areas are to be kept clean and free of debris.

4.  Any hazardous conditions or equipment are to be corrected or reported to the store director immediately so corrective action can be taken.

5.  No employee under eighteen years of age may operate any power equipment.

6.  Any employee who willfully bypasses the built-in safety of the equipment will be subject to disciplinary

37

action up to and including discharge.

7. The Company will identify hazardous chemicals/materials, label containers, secure Safety Data Sheets or SDS, and train all employees with regard to the safe utilization of all hazardous chemicals/materials in the workplace.

8.   Horseplay and similar actions are not permitted since accidents may occur.  Company property that is damaged or destroyed because of horseplay, gross neglect or carelessness will be replaced at the expense of the offender.

9.   The Risk Manager has established and continues to evaluate the safety policies and standards of all locations.  Employees are encouraged to participate in the development of these policies and standards.

10. Employees are responsible for ensuring that they are familiar with and abide by all safety and fire procedures.

11. Equipment is costly and is designed for a certain purpose.  It should not be used for a job it is not designed to handle or perform.  All equipment should be restored to good, clean operating condition when you have finished with it.  Return moveable equipment to proper storage areas.

## WORKPLACE VIOLENCE

Redner's is committed to preventing workplace violence and maintaining a safe work environment. Given the increasing violence in society in general, Redner's has adopted the following guidelines to deal with intimidation, harassment, or other threats of (or actual) violence that may occur during business hours or on Company premises.

All employees should be treated with courtesy and respect at all times.  Employees are expected to refrain from fighting, "horseplay," or other conduct that may be dangerous to others.  Firearms, weapons, and other dangerous or hazardous devices or substances are prohibited from Company premises.

Conduct that threatens, intimidates, or coerces another employee, a customer, or a member of the public will not be tolerated. This prohibition includes all acts of unlawful harassment, including but not limited to harassment that is based on an individual's sex, age, or any characteristic protected by applicable law.

All threats of (or actual) violence, both direct and indirect, should be reported as soon as possible to your immediate supervisor, or a member of the Human Resources Department.  This includes threats by employees, as well as threats by customers, vendors, solicitors, or other members of the public.  When reporting a threat of violence, you should be as specific and detailed as possible.

All suspicious individuals or activities should be reported as soon as possible to a supervisor. Do not place yourself in peril.  If you see or hear a commotion or disturbance near your workstation, do not try to intercede or see what is happening.

Redner's will promptly and thoroughly investigate all reports or threats of (or actual) violence, suspicious individuals or activities. The identity of the individual making the report will be protected to the extent possible.  Redner's may suspend employees, with or without pay, pending its investigation.

Anyone determined to be responsible for threats of (or actual) violence, or other conduct that is in violation of these guidelines, will be subject to prompt disciplinary action, up to and including termination of employment.

Redner's encourages employees to bring their disputes or differences with other employees to the

QMvRM - 000099

attention of their supervisors or the Human Resources Department before the situation escalates into potential violence.   Redner's is eager to assist in the resolution of employee disputes, and will not retaliate against employees for raising such concerns.

## SECURITY AND LOSS PREVENTION

The purpose of the Security/Loss Prevention Department is to enable Redner's to provide a safe, profitable work environment for you.

Retail establishments like Redner's are a part of the community and from time to time fall victim to crimes such as shoplifting, bad checks, robbery, and employee theft.   We depend on our employees to report any activities of a suspicious nature. You should bring any concerns regarding possible dishonest acts to the attention of your store director or supervisor.   If you prefer, there are also several confidential methods for reporting any type of concerns you may have including the "Grapevine" (accessible by a toll-free number posted in your store), e-mail, and letters to the President.   All reports are investigated promptly and thoroughly by the members of this department.

Additional information on security and loss prevention is contained in the materials provided to you during your orientation and training. Periodic training programs are conducted throughout the year and you are encouraged to attend these sessions.

## TOBACCO PRODUCTS AND LOTTERY TICKETS

State law prohibits the sale of all tobacco products and lottery tickets to minors under the age of eighteen (18). When in doubt, ask for a photo I.D. If the customer does not have I.D., do not sell the product. It is for your protection and ours that these laws must be adhered to. State laws make no exception for employees.  Minors cannot purchase tobacco or lottery tickets with a note from their parents.

## INVENTORY SHRINK

Profits generate the capital necessary to give raises, benefits, create additional jobs, purchase new equipment, remodel, and purchase new stores, as well as promote stores already in existence. Each employee must help control waste, theft, spoilage, breakage, and all other losses commonly referred to as "inventory shrink." Inventory shrink can be a serious problem that erodes Company profits and is the result of poor training, loose management, carelessness or lack of operating controls. "Shrink" includes merchandise that is:

• Loss due to dishonesty
• Damaged by carelessness or poor handling
• Not rotated
• Not properly received
• Improperly priced or recorded
• Over trimmed
• Not scanned correctly

## FRONT END POLICY

If you are working the front end of a store, remember the following guidelines:

• Never ask a customer for the price of any merchandise.
• Tips cannot be accepted by any employee.
• We have a policy listing the conditions under which checks will be accepted.
• Gum chewing, eating or drinking is not permitted while on duty at the checkout.

QMvRM - 000100

• We have a cash control policy.  Consistent overages and shortages may result in disciplinary action up to and including termination.

## ATTENDANCE AND WORK SCHEDULES

Work schedules are posted each week. Changes to existing schedules will be made no later than noon on each Friday for the following week.  You should check the work schedule sheet often to be sure that you know when you are scheduled to work.  This schedule reflects the needs of our customers and employees in each location.  Employees are expected to adhere strictly to it. Employees are to be ready at their work stations at their starting time and remain there until their schedule quitting time.  Time worked in excess of the employee's posted schedules must be approved by management.

• Changes in your work schedules can be made only by approval of the store director or department manager. You may request a schedule change in the following week if written notice is given to your manager a week in advance.

• Please notify the store director if you are going to be more than 10 minutes late past your scheduled starting time.   If we do not hear from you in that time period, another employee will be called to work your schedule.

• It is your responsibility to notify your store director or the person in charge of the store as soon as you know that you are going to be absent and, when possible, with at least one hour notice.  You must report in advance each day that you are absent.

• Employees who are excessively absent or tardy are subject to disciplinary action up to and including termination.  Excessive absenteeism and tardiness are generally defined as being absent more than an average of one day per month or are tardy 4 times a month.  Employees who are absent two (2) consecutive work days without reporting their absence will be considered to have abandoned their employment and will be removed from the payroll.

• Employees who are absent due to illness three (3) or more consecutive days must present a doctor's excuse upon their return to work.

• Do not leave your job during your normal work schedule without obtaining permission from your department manager or the person in charge.

• Take only the scheduled time for lunch and breaks.  (1/2 hour lunch; 15 minute breaks.) If more time is required, obtain your manager's approval.

• Employees are expected to work a reasonable amount of overtime when requested.
If there are no volunteers to work when needed, including but not limited to, Saturday nights, Sundays, or holidays, these hours will be assigned. Assignment of these hours will be done on a fair and equitable basis, rotating hours among the normally scheduled management and employees of the department.

• Employees who have not worked for 2 or more weeks will be considered to have voluntarily separated from employment.

## TIME CARDS

Time cards are necessary for an accurate record of hours to receive correct payment of wages. All employees are required to record in and out on their own time card as per their own schedule. Under no circumstances are you to record the time card of another employee or permit them to punch your time card. Company policy requires all work done by employees to be performed while clocked in.

QMvRM - 000101

Employees are to be at their workstation at the scheduled starting time and remain at their stations until their scheduled quitting time.

Employees are paid for all time worked per their schedule. All time worked beyond your posted time must be approved by your manager. All employees must punch in and out for all scheduled lunch and rest periods. If you forget to punch in or out, inform the manager so that they can record your time. Employees who repeatedly fail to punch in and out as directed above will be subject to disciplinary action up to and including termination.

## MISCELLANEOUS INFORMATION

### NO FRATERNIZATION

Romantic or sexual liaisons that develop among employees in the workplace may be potentially disruptive to our business. The Company will intervene and discuss the romantic or sexual liaisons with involved employees. We may also take remedial measures, up to and including transfer or immediate termination, when the Company decides that such action is in the Company's best interests.

Managers or supervisors are expressly prohibited from dating or becoming similarly involved with any non-management employee within their sphere of responsibility. Any supervisor or manager who becomes involved with an employee must immediately report this to Human Resources so that appropriate action can be taken. In the event the Company becomes aware of such a relationship that has not been reported, the supervisor or manager involved will be subject to immediate termination.

### TOBACCO AND SMOKING

Use of tobacco (including electronic cigarettes) in any form is permitted **only** in designated outdoor places at Company facilities. Smoking is prohibited by law in any area where paint or other flammable materials may be present.

### CRIMINAL CONVICTIONS AND ARRESTS

Any employee arrested or convicted of a crime must report this to your supervisor. You must provide information about the nature of the crime, any expected court dates that may conflict with your work schedule. Depending on the nature of the charges and the deposition of the crimes Redner's Markets may provide a discipline up to and including termination as a result of information provided by the employee or investigating authorities.

### SOCIAL MEDIA POLICY

We understand that social media can be a fun and rewarding way to share your life and opinions with family, friends and co-workers around the world. However, use of social media also presents certain risks and carries with it certain responsibilities. To assist you in making responsible decisions about your use of social media, we have established these guidelines for appropriate use of social media.

### GUIDELINES

QMvRM - 000102

In the rapidly expanding work of electronic communication, *social media* can mean many things. *Social media* includes all means of communicating or posting information or content of any sort on the Internet, including to your own or someone else's web log or blog, journal or diary, personal web site, social networking or affinity web site, web bulletin board or a chat room, whether or not associated or affiliated with the Company, as well as any other form of electronic communication.

The same principles and guidelines found in the Company policies and three basic beliefs apply to your activities online. Ultimately, you are solely responsible for what you post online. Before creating online content, consider some of the risks and rewards that are involved. Keep in mind that any of your conduct that adversely affects your job performance, the performance of fellow employees or otherwise adversely affects customers, suppliers, people who work on behalf of the Company or its, legitimate business interests may result in disciplinary action up to including termination.

**Know and follow the rules**

Carefully read these guidelines, No Discrimination and No Harassment Policy, and ensure your postings are consistent with these policies. Inappropriate postings that may include discriminatory remarks, harassment, and threats of violence or similar inappropriate or unlawful conduct will not be tolerated and may subject you to disciplinary action up to and including termination.

**Be respectful**

Always be fair and courteous to fellow employees, customers, suppliers or people who work on behalf of the Company. Also keep in mind that your are more likely to resolve work related complaints by speaking directly with your co-workers or by utilizing our Open Door Policy than by posting complaints to a social media outlet. Nevertheless, if you decide to post complaints or criticism, avoid using statements, photographs, video or audio that reasonably could be viewed as malicious, obscene, threatening or intimidating, that disparage customers, employees or suppliers, or that might constitute harassment or bullying. Examples of such conduct might include offensive posts meant to intentionally harm someone's reputation or posts that could contribute to a hostile work environment on the basis of race, sex, disability, religion or any other status protected by law or company policy.

**Be honest and accurate**

Make sure you are always honest and accurate when posting information or news, and if you make a mistake, correct it quickly. Be open about any previous posts you have altered. Remember that the Internet archives almost everything; therefore, even deleted postings can be searched. Never post any information or rumors that you know to be false about the Company, fellow employees, customers, suppliers, and people working on behalf of the Company or competitors.

**Post only appropriate and respectful content**

- Maintain the confidentiality of the Company trade secrets and private or confidential information. Trade secrets may include information regarding the development of systems, processes, products, know-how and technology. Do not post internal reports, policies, procedures or other internal business-related confidential communications.
- Do not create a link from your blog, website or other social networking site to the Company website without identifying yourself as a Company employee.
- Express your personal opinions. Never represent yourself as a spokesperson for the Company. If the Company is subject to the content you are creating, be clear and open about the fact that you're

QMvRM - 000103

an employee and make it clear that your views do not represent those of the Company, fellow employees, customers, suppliers or people working on behalf of the Company. If you do publish a blog or post online related to the work you do or subjects associated with the Company, make it clear that you are not speaking on behalf of the Company. It is best to include a disclaimer such as "The postings on this site are my own and do not necessarily reflect the views of the Company."

**Using social media at work**

Refrain from using social media on work time or on equipment we provide, unless it is work-related as authorized by your manager or consistent with the Company Equipment Policy. Do not use the Company email addresses to register on social networks, blogs or other online tools utilized for personal use.

**Retaliation is prohibited**

The Company prohibits taking negative action against any employee for reporting a possible deviation from this policy or for cooperating in an investigation. Any employee who retaliates against another employee for reporting a possible deviation from this policy or for cooperating in an investigation will be subject to disciplinary action, up to and including termination.

## CONFIDENTIALITY OF COMPANY INFORMATION

All Company records, documents and mail are to be kept confidential. Employees should only read Company documents or co-worker's documents or mail if the employees are authorized by the Redner's to read such materials. It is considered a serious offense for an employee to read or gain access or control over documents not belonging to or addressed to that employee.

## CONDUCTING PERSONAL BUSINESS

Employees are to conduct only Company business while at work. Employees may not conduct personal business or business for another employer during working time.

## PERSONNEL RECORDS

Redner's will maintain an updated personnel file on each employee. Personnel records are Company property and will be treated the same as other confidential Company information. Medical information pertaining to employees is extremely confidential and will be maintained separately from non-medical personnel information. Access to employees' personnel and medical records is restricted to authorized persons only. It is considered a very serious, dischargeable offense for any unauthorized employee to gain access to personnel and/or medical files.

## PERSONAL APPEARANCE AND DRESS POLICY

Effective January 1, 2012, the following changes to the Redner's Markets dress code will be enforced. Because Redner's is a retail establishment which serves the public, all employees are required to wear clean, conservative, and businesslike attire at all times. Employees who are in violation of the Redner's Dress Code Policy are subject to disciplinary action up to and including termination of employment.

<u>Hourly Associates:</u>

<u>Shirts:</u> Only company issued RED polo shirts (short sleeve or long sleeve) are permitted. All shirt tails must be tucked in at all times while on Redner's property whether you are on or off the clock. If you

QMvRM - 000104

choose to wear a long sleeve shirt under your short sleeve polo it must be black, white, or red no other colors are permitted.

Pants: A clean, properly fitting pair of BLACK slacks (no black jeans are permitted) must be worn at all times, no other color is permitted. Faded, ripped, or patched pants are not acceptable. Jeans, corduroys, cargo pants, capri's, cropped pants, sweatpants, yoga pants, and shorts are not permitted

Dresses: Female employees may wear a mid-calf length dress/skirt that is clean and properly fitting. The dress must be BLACK and no other color is permitted.  Faded, ripped, or patched dresses are not acceptable.

Shoes:  Any type of work shoe, boot, or sneaker is permitted.  All shoes must be BLACK, WHITE, GRAY, or the combination of the three.   Sandals, clogs, crocs, flip flops, or open toed/heeled shoe are not permitted.

Sweaters: Only a company issued V-Neck sweater may be worn over your polo shirt during times of colder weather. No hooded sweatshirt or other sweatshirts are permitted at any time.

Hats: Only company issued hats may be worn.  Hats can be worn by any employee except for employees working on the Front End.

**Department Manager, CSR/Office associates, Pharmacy Managers, and C-Store Management: (not including Dairy/Frozen manager, HBA clerk, Scan Coordinator, Receiver or Night Crew Leader):**

Shirts: Only Company issued button down Oxford shirt permitted. All shirt tails must be tucked in at all times while on Redner's property whether you are on or off the clock.

Pants: A clean, properly fitting pair of BLACK slacks (no black jeans are permitted) must be worn at all times, no other color is permitted. Faded, ripped, or patched pants are not acceptable. Jeans, corduroys, cargo pants, capri's, cropped pants, sweatpants, yoga pants, and shorts are not permitted.

Shoes: Any type of work shoe, boot, or sneaker is permitted. All shoes must be BLACK, WHITE, GRAY, or the combination of the three.  Sandals, clogs, crocs, flip flops, or open toed/heeled shoe are not permitted.

Sweaters: Only a company issued V-Neck sweater may be worn over your polo shirt during times of colder weather. No hooded sweatshirt or other sweatshirts are permitted at any time.

**Store Management and Evening Managers:**

Shirts: A neatly pressed collared shirt and tie must be worn at all times.  Female member of store management may wear professional businesswoman like attire. Female managers may also wear a mid-calf length dress that is clean and properly fitting, no color requirements.

Pants:  A clean, properly fitting pair of slacks must be worn at all times. Any color is permitted. Cargo pants, Capri pants, cropped pants, sweatpants, yoga pants, and shorts are not permitted.

Dresses:  Female managers may wear a mid-calf length dress/skirt of any color that is clean and properly fitting.  Faded, ripped, or patched dresses are not acceptable.

Shoes:  Any type of work shoe or boot is permitted.  Sneakers are not permitted.

Sweaters: Only a company issued V-Neck sweater may be worn over your dress shirt during times of colder weather.

QMvRM - 000105

<u>Personal Appearance</u>

Hairstyles and Beards: Must be neat and conservative and neatly trimmed. Proper use of hair and beard restraints are a must in all food handling departments, please refer to the Food Preparation Health and Hygiene Policy.

## PERSONAL APPEARANCE AND DRESS POLICY CONT.

<u>Piercings:</u> Businesslike earrings are permitted except if you work in a perishable (meat, bakery, deli, or produce). No facial piercings or ear plugs are permitted at any time. All employees who work in a food preparation or food service area, MAY NOT wear any jewelry, except for a plain wedding band.

<u>Tattoos:</u> At the time of hire, visible tattoos will be reviewed by management and handled individually. All tattoos must be appropriate for a retail establishment.

*It is the employee's responsibility to maintain the cleanliness of their attire. All attire must be clean, well pressed, and worn correctly at all times. Store management reserves the right at any time to request that an associate return home to change if in fact their attire does not meet the standard.*

## NAME BADGES

Name badges are worn by employees to help create a friendly store atmosphere. Customers and fellow employees feel more at ease if they can refer to an employee by his or her name. A name badge will be worn during working hours where it may be easily seen.  If your badge is lost or becomes unsightly, obtain a replacement.  Badge replacement is an added expense that can be prevented by proper care and use.

## EMPLOYEE PARKING

All employees reporting to work in vehicles must park in the area designated by the store director. This would normally be at the far end of the parking lot away from or behind the store.
On especially busy days, it may be necessary to park outside the store lot due to the large volume of business.
If employees desire an escort to their car after dark, during late hours; such requests should be made to the store director or the person in charge of the store.

## ENTERING AND LEAVING PREMISES

All employees reporting to or leaving work must use the front door.  Side and back doors cannot be used for this purpose. Back doors are to be kept locked at all times unless to receive merchandise. Only authorized personnel will have keys for these doors. You are permitted in the building no earlier than fifteen (15) minutes prior to the start of your scheduled work shift and are to leave the premises within fifteen (15) minutes after completing your work assignment and recording out on your time card. If you are not working, you should not loiter on Company premises. Employees who are doing their shopping are to be treated like all customers.

## COMPANY PROPERTY

All Company property, including but not limited to, lockers, desks, file cabinets, and vehicles, is subject to

QMvRM - 000106

being searched and the contents held    by Company personnel upon    reasonable suspicion of misconduct. Theft   of any funds or property in any form or fashion will result in immediate dismissal. The Company reserves the right to investigate any circumstances, including suspected theft of any form or matter, any accident or any other matter deemed appropriate by the Company using any lawful investigative procedures.

Employees are discouraged from bringing personal items to work.   The Company may, from time to time, search and/or  require employees to  allow  searches of parcels, bags  and/or  other personal items and/or personal vehicles brought onto Company property.

All Company property must be returned to Redner's upon separation from employment.    The replacement cost of any Company property that is not returned to the  Company upon separation from employment or upon  request will be charged to the  employee and  the  employee will be expected to pay for such property, as required by law.

## CELL PHONES

Employee cell phones are considered to be  personal property and, as such, are to be  secured in lockers or a designated secure area if lockers are not available.  Employees are not permitted to carry or use personal cell phones while clocked in at work.   Use of personal cell phones is restricted to rest periods and lunch periods while the employee is punched out.   Violation of this policy will result in disciplinary action.

## COMPANY COMMUNICATIONS SYSTEMS

Company telephones are for business and are not intended for personal calls.  In case of an emergency, local calls (both in  and out) may be  made when other telephones are not available. Company telephones should never be used for long distance calls.

All computer, electronic mail  ("e-mail"), and  telephonic communication systems, including voicemail, and  all  communications and  information transmitted by, received from,  or stored in these systems are the property of Redner's and, as such,  are to be  used solely for job-related purposes. Use of Redner's business systems or equipment, including but    not    limited to, facsimiles, telecopiers, computers, and copy machines for personal purposes is prohibited. Employees using the Company's business systems or equipment for personal purposes without prior permission do at their own risk.

Employees are not permitted to use  a code,  access a file, or retrieve any stored communication unless authorized to do so or unless they have received prior clearance from an authorized Company representative. All pass codes belong solely to Redner's and are not to be shared with others outside the Company.  Employees who violate this policy are subject to disciplinary action, up to and including discharge.

To ensure that the use of the Company's business systems and equipment is consistent with the Company's legitimate business interests, authorized representatives of Redner's may monitor the use of such equipment from time to time. All e-mail and voice mail messages are Company records.

Redner's reserves the right to access all messages sent over its e-mail system or voicemail system for any purpose.  Please note that back-up copies of e-mail messages may be retained and accessed by

QMvRM - 000107

the Company even though such messages have been "deleted."

Information concerning Redner's proprietary or confidential information and trade secrets that is on the Company's computer system may not be used by any employee except as required to perform at employee's job.   For privacy reasons, employees may not gain access to another employee's mail or voice mail messages without the recipient's express permission.

There is to be no display or transmission of sexually explicit images, messages, or cartoons, or any transmission or use of e-mail communications that contain offensive or inflammatory messages, ethnic slurs, racial epithets, or anything that may be construed as harassment or disparagement of others based on their race, national origin, sex, age, disability, or religious beliefs practices. Violation of this policy may result in appropriate disciplinary action.

Employees should use the Company's business systems and equipment for Company business only. The e-mail system, Smart phones, cell phones and PDA devices should not be used to solicit or proselytize others for commercial ventures, religious or political causes, outside organizations, or other non-job related solicitations.

Further details on the Redner's Markets Information Systems Security Policy are available for review at your locations office or Human Resource Department or on the Web Portal website. This addendum was added on 9/09/2009 and is the complete IS policy.   All employees acknowledge receipt and understanding of these policies. By signing the Renders Markets Understanding Agreement you will acknowledge your compliance.

## CLOSING REMARKS

This handbook is intended as a summary description of your policies, procedures and benefits while employed at Redner's. The information in this handbook is general in nature and your supervisor can be consulted for additional details. This handbook is not intended to establish terms of employment which may not be amended at Redner's discretion. While we intend to observe these general policies, benefits and rules contained in this handbook, changes or improvements in their interpretation or application may made from time to time.

THIS HANDBOOK IS NOT A CONTRACT.   IT DOES NOT CHANGE THE BASIC AT-WILL EMPLOYMENT RELATIONSHIP BETWEEN REDNER'S AND ITS EMPLOYEES. THIS AT-WILL RELATIONSHIP MAY ONLY BE VARIED BY WRITTEN AGREEMENT SIGNED BY THE PRESIDENT OF REDNER'S.

QMvRM - 000108

**ACKNOWLEDGMENT OF RECEIPT OF EMPLOYEE HANDBOOK**

I acknowledge that I have received a copy of the Redner's Markets ("Company") Employee Handbook.  I will familiarize myself with the Handbook and all of its contents.

I understand that this Handbook represents only current policies and benefits and that it does not create a contract of employment. The Company retains the right to change these policies and benefits at any time, without advance notice, as it deems appropriate.

I understand that I have the right to terminate my employment at any time, for any reason with or without advance notice, and that the Company has a similar right.  I further understand that my status as an at-will employee may not be changed except in writing signed by the Company's President.

_____        _____
Signature                                Job Title


_____        _____
Printed Name                             Date

48

QMvRM - 000109

# EXHIBIT 8

Quentin McClellan 9/6/17 meat manager # 55

The record contains information regarding Quentin's termination from Redners Markets. Quentin is meat manager for Redners markets his duties are outlined in a meat manager job description. This is my record of events that led to his termination. I was notified that he had left the store on Saturday without permission or without telling anyone in store management. When the store tried to reach him he did not return any calls or provide an explanation for leaving. My instructions to the store were, if he came into work he was to be suspended for this action. Notably he was warned about this conduct in the past. (April of 2017) in fact he was demoted as a result of this behavior in April of 2017.

Quentin was suspended on Monday, he left me a voice message and I returned his call on Tuesday. Rick Merkel and Jim Polchin were present. Quentin was informed they were present for the call. The call lasted more than 17 minutes. During the call Quentin was asked several times why he left without permission. He admitted that he didn't check with management but claimed he had informed department staff he was leaving. This was determined to be untrue we spoke with everyone that worked that day and no one knew he was leaving and they had not been informed he was leaving. He claimed two things; 1,that there was enough burger done ahead that "they" would be fine 2, He claimed he was making up hours from another day he had left early which was Wednesday. On Wednesday he had informed Alan (Co Director) that he had to leave for an appointment at 11 and wasn't sure if he would return. He claimed he would have paperwork that Alan believed to be medical excuses to explain his need to leave early. He didn't return or call to indicate he wasn't returning. He didn't provide the store with any such documents. There was no information provided to explain his absence. Also on the call he claimed that he had left early because he would have too many hours. I asked, ok how many hours have you worked this week? I asked specifically did you work your minimum 45 hours. He hesitated and said "I think so". Video evidence concludes he has only worked or was at the store 34.75 hours. This was a false statement and I believe he knew it and that's why he hesitated.

The call continued to a point where I asked him to answer yes or no to this simple question. Did you tell anyone or get permission to leave on Saturday. He never answered yes or no. I also asked him yes or no did he leave early on Saturday and he would answer yes or no to that either. The facts are that he didn't tell anyone he was leaving and he did leave early he left at approximately 10 am.

The call can be described as contentious and frustrating. I was growing frustrated by his avoidance to answer the questions and his making excuses and diverting the conversation away from the facts. I said during the conversation I asked what to you want to do now where do you think we can go from here? He said, well I'm not going back to Pittston there's no way I can go back there... I said where do you think you can go? He said I can't go back there and I said what are you telling me? he went on about all the things he had done on Saturday and the conversation can best be described as "all over the road" None of what he was saying was making any sense...I said listen this conversation is going nowhere and I am not listening to all of this if you are not going to answer my questions or tell me what you want to do I'm planning on ending the call. I said I am going to hang up unless you answer some of my questions he said something like well I am going to end the call and he hung up.



QMvRM - 000485

At around 4 pm I sent him an e mail asking what his intentions were bother are enclosed. He call me a little after 5 pm and asked what was going on? I said well are you resigning you ended the call today. he admitted he ended the call but claimed he wanted to continue in his employment. This is when I told him we were letting him go. He asked if we are firing him and I said yes. The reasons for termination are as follows. Quentin had been warned previously about leaving early and following his schedule he was told in April that continued violations of this nature would result in termination. Having left without permission and not letting anyone know is a serious violation of policy for all employees and especially for a manager. At the time we believed he abandoned his job. He also lied about his time. This is fact that he only worked 34.75 hours and he claimed he worked 45. The minimum number of hours is 45. He falsely reported his time this is also a serious violation of policy and subject top termination. He was warned about this in April also. He misrepresented his time worked in April. He was supposed to put in for vacation at the time and did not. In this case he worked 36 hours not 45 and failed to report it. All of the above is cause for termination.

Robert McDonough VP Human resource

9/6/17

# EXHIBIT 9

Quentin McClellan 4/3/17

On Thursday 3/30/17 Frank Fiore and I met with Quentin to discuss some of his concerns that he had expressed in an e mail recently where he had requested a transfer. During the conversation Quentin expressed many concerns that we addressed as best we could. It was difficult to discern exactly what he wanted us to do as many of the complaints were dated and most seemed trivial. During the conversation we addressed Quentin's reluctance to participate in day to day operations and that it was noted there would be things he could or should do to help out when training opportunities were not available. As the conversation proceeded, Quentin indicated that he lacked enthusiasm and his morale was low. This prompted me to ask the question about his leaving early and coming in late. On Friday he left at 10.30 on Saturday he left at 7 and on Sunday he left around 10. All of these days he was scheduled into the afternoon. His response was that he lacked the drive and motivation to come in on time and that he basically just wasn't in to it. I warned him that that was not acceptable and that he also failed to report vacation time and this could be a violation of policy not to mention irresponsible conduct for a manager trainee.

Quentin was informed that this lateness and leaving early must end immediately. And he agreed this was not acceptable. We also discussed ending the training and having him return to be a meat manager.. I wanted to give him this option because he just didn't seem like this was for him. I told him to think about it over the weekend and we should have a call on Monday to decide. On Monday I learned that Quentin was late again on Saturday 4/1/17 he arrived at 6.30 am this was one day after being warned about being late. Randy and I were on the call on Monday and Quentin agreed this was best for him at this time. I confirmed this with Quentin on Tuesday 4/3/17 and we worked out most of the details salary etc and he will return to a meat manager position effective 4/10/17 at a pay rate of $ 990.16.

Robert McDonough

Vice President Human Resources.



# EXHIBIT 10

Quentin McClellan 4/3/17

On Thursday 3/30/17 Frank Fiore and I met with Quentin to discuss some of his concerns that he had expressed in an e mail recently where he had requested a transfer. During the conversation Quentin expressed many concerns that we addressed as best we could. It was difficult to discern exactly what he wanted us to do as many of the complaints were dated and most seemed trivial. During the conversation we addressed Quentin's reluctance to participate in day to day operations and that it was noted there would be things he could or should do to help out when training opportunities were not available. As the conversation proceeded, Quentin indicated that he lacked enthusiasm and his morale was low. This prompted me to ask the question about his leaving early and coming in late. On Friday he left at 10.30 on Saturday he left at 7 and on Sunday he left around 10. All of these days he was scheduled into the afternoon. His response was that he lacked the drive and motivation to come in on time and that he basically just wasn't in to it. I warned him that that was not acceptable and that he also failed to report vacation time and this could be a violation of policy not to mention irresponsible conduct for a manager trainee.

Quentin was informed that this lateness and leaving early must end immediately. And he agreed this was not acceptable. We also discussed ending the training and having him return to be a meat manager.. I wanted to give him this option because he just didn't seem like this was for him. I told him to think about it over the weekend and we should have a call on Monday to decide. On Monday I learned that Quentin was late again on Saturday 4/1/17 he arrived at 6.30 am this was one day after being warned about being late. Randy and I were on the call on Monday and Quentin agreed this was best for him at this time. I confirmed this with Quentin on Tuesday 4/3/17 and we worked out most of the details salary etc and he will return to a meat manager position effective 4/10/17 at a pay rate of $ 990.16.

Robert McDonough

Vice President Human Resources.



# EXHIBIT 11

Quentin McClellan 9/6/17 meat manager # 55

The record contains information regarding Quentin's termination from Redners Markets. Quentin is meat manager for Redners markets his duties are outlined in a meat manager job description. This is my record of events that led to his termination. I was notified that he had left the store on Saturday without permission or without telling anyone in store management. When the store tried to reach him he did not return any calls or provide an explanation for leaving. My instructions to the store were, if he came into work he was to be suspended for this action. Notably he was warned about this conduct in the past. (April of 2017) in fact he was demoted as a result of this behavior in April of 2017.

Quentin was suspended on Monday, he left me a voice message and I returned his call on Tuesday. Rick Merkel and Jim Polchin were present. Quentin was informed they were present for the call. The call lasted more than 17 minutes. During the call Quentin was asked several times why he left without permission. He admitted that he didn't check with management but claimed he had informed department staff he was leaving. This was determined to be untrue we spoke with everyone that worked that day and no one knew he was leaving and they had not been informed he was leaving.  He claimed two things; 1,that there was enough burger done ahead that "they" would be fine 2, He claimed he was making up hours from another day he had left early which was Wednesday. On Wednesday he had informed Alan (Co Director) that he had to leave for an appointment at 11 and wasn't sure if he would return. He claimed he would have paperwork that Alan believed to be medical excuses to explain his need to leave early. He didn't return or call to indicate he wasn't returning. He didn't provide the store with any such documents. There was no information provided to explain his absence. Also on the call he claimed that he had left early because he would have too many hours. I asked, ok how many hours have you worked this week? I asked specifically did you work your minimum 45 hours. He hesitated and said "I think so". Video evidence concludes he has only worked or was at the store 34.75 hours. This was a false statement and I believe he knew it and that's why he hesitated.

The call continued to a point where I asked him to answer yes or no to this simple question. Did you tell anyone or get permission to leave on Saturday. He never answered yes or no. I also asked him yes or no did he leave early on Saturday and he would answer yes or no to that either. The facts are that he didn't tell anyone he was leaving and he did leave early he left at approximately 10 am.

The call can be described as contentious and frustrating. I was growing frustrated by his avoidance to answer the questions and his making excuses and diverting the conversation away from the facts. I said during the conversation I asked what to you want to do now where do you think we can go from here? He said, well I'm not going back to Pittston there's no way I can go back there… I said where do you think you can go? He said I can't go back there and I said what are you telling me? he went on about all the things he had done on Saturday and the conversation can best be described as "all over the road" None of what he was saying was making any sense…I said listen this conversation is going nowhere and I am not listening to all of this if you are not going to answer my questions or tell me what you want to do I'm planning on ending the call. I said I am going to hang up unless you answer some of my questions he said something like well I am going to end the call and he hung up.



At around 4 pm I sent him an e mail asking what his intentions were bother are enclosed. He call me a little after 5 pm and asked what was going on? I said well are you resigning you ended the call today. he admitted he ended the call but claimed he wanted to continue in his employment. This is when I told him we were letting him go. He asked if we are firing him and I said yes. The reasons for termination are as follows. Quentin had been warned previously about leaving early and following his schedule he was told in April that continued violations of this nature would result in termination. Having left without permission and not letting anyone know is a serious violation of policy for all employees and especially for a manager. At the time we believed he abandoned his job. He also lied about his time. This is fact that he only worked 34.75 hours and he claimed he worked 45. The minimum number of hours is 45. He falsely reported his time this is also a serious violation of policy and subject top termination. He was warned about this in April also. He misrepresented his time worked in April. He was supposed to put in for vacation at the time and did not. In this case he worked 36 hours not 45 and failed to report it. All of the above is cause for termination.

Robert McDonough VP Human resource

9/6/17

# EXHIBIT 12



**Bill Swartzlander**
+16105635706

helping out at #34 a couple days a week . Think about it I'll call you in a day or two
9:23 AM

Thursday, August 31, 2017

Just asking but what do you need me to do when you say help out a little bit?
10:19 AM

Monday, September 4, 2017

Bill told I was suspended today! For what? And when will I hear from HR?  This is bullshit.
7:25 AM

Tuesday, September 5, 2017

What's up? Do I show up for work tomorrow?
12:52 PM

I guess I will show up for work tomorrow unless I'm told otherwise pass that on I guess. No one has answered me back yet. So yeah
4:02 PM

McClellan P205

EXHIBIT
17

# EXHIBIT 13

# Bob McDonough

**From:** Rick Merkel
**Sent:** Saturday, September 02, 2017 11:47 AM
**To:** #55 Store Director
**Cc:** Jim Polchin; Bob McDonough; Bill Swartzlander; Gary O'Brien
**Subject:** Re: Quentin @ 55

Thanks Jeff and keep us posted.

Rick Merkel
Senior Meat Category Manager
610 587 7692.
rmerkel@rednersmarkets.com.

On Sep 2, 2017, at 11:38 AM, #55 Store Director <director55@rednersmarkets.com> wrote:

> Jim,  I went back to the meat department looking for Quentin around 10:45. He wasn't back there and the crew said they had not seen him in a while. I looked outside and his car was gone.  He didn't report to me that he was leaving. I tried calling his cell phone. I left a message for him to call me. As of 11:30 he still hasn't gotten back to me. He did work a couple hours yesterday but that was to make up for leaving early on Wednesday. He is off tomorrow but is back on Monday. If an emergency came up I understand. But he still needs to tell me he is leaving. I talked to him earlier this morning and he seemed fine. I will keep you updated as the day goes on. I know Bill is on vacation but I copied him, Rick and Bob also.
> Thanks Jeff #55



EXHIBIT
16
6/14/19 JS

QMvRM - 000536

1

# EXHIBIT 14

# Bob McDonough

| | |
|---|---|
| **From:** | Rick Merkel |
| **Sent:** | Thursday, September 07, 2017 1:56 PM |
| **To:** | Bob McDonough; Gary O'Brien; Bill Swartzlander; Jim Polchin |
| **Cc:** | Randy Kostelac; Alexis Foreman |
| **Subject:** | RE: Status |

Bob,

Mary Jo V at 55 validated the same story as Jonathan. See and the other boys arrived at 6 and Quentin came in around 7. He was scheduled a full day that day. See and the boys went about their work like they normally do without instruction. Quentin came in worked some freight. Mary Jo, Rob and Jonathan went to break around 830 and when they came back from break, Quentin went to break. They continued to work for some time and Quentin returned. They did not see him after around 10 am. He had not given them any instructions for the remainder of the day or told them where he would be. Mary Jo and Rob went to lunch around 1030 because Jonathan was to leave at 11 am. When Mary Jo and Rob went outside and they did not see Quentin's car anymore. When they came back from lunch, they told Jeff what had happened. She said that Jeff called Quentin's phone and left a message. Mary Jo and Rob worked the rest of the day and didn't see Quentin any more that day.

Rick

**From:** Bob McDonough
**Sent:** Tuesday, September 5, 2017 5:36 PM
**To:** Gary O'Brien <gobrien@rednersmarkets.com>; Rick Merkel <rmerkel@rednersmarkets.com>; Bill Swartzlander <bswartzlander@rednersmarkets.com>; Jim Polchin <jpolchin@rednersmarkets.com>
**Cc:** Randy Kostelac <RandyK@rednersmarkets.com>; Alexis Foreman <aforeman@rednersmarkets.com>
**Subject:** Fwd: Status

I had a follow up call from Quentin this evening after a dispute over who ended our call I informed him of his termination. I will write it up in the morning.

Sent from my iPhone

Begin forwarded message:

> **From:** quentin mcclellan <qmcclellan@gmail.com>
> **Date:** September 5, 2017 at 4:40:30 PM EDT



1

**To:** Bob McDonough <BobM@rednersmarkets.com>
**Subject: Re: Status**

Hello Bob,

The convestion at 730 this mornimg i assume you are speaking of.At the end of that conversation you guys(jim,yourself,and rick) had to decide my future with the company, as your words not mine. I told you that I want my position which is still very confusing to me because I might have been demoted back to meat even though I was assistant store director and did nothing wrong! I was told I was coming to the store to help with no assistance and did not try to complain. I have trained the meat manager and helped bill as much as he asked. You have not treated me the same as anyone else in that store since day one. I do want my job and pay for a suspension that is bogus from people starting stuff. I would have been at work today and yesterday if someone didn't stop me. My question is and has been do you want me still, which is the same question since 730 this morning.

Thank you,
Quentin McClellan

On Sep 5, 2017 4:11 PM, "Bob McDonough" <BobM@rednersmarkets.com> wrote:

Good afternoon Quentin,


Hope this e mail finds you well. I wanted to check in with you as a result of how our conversation ended today. Is it safe to say that you have resigned your position at Redners? If you recall you had indicated you didn't want to go back to Pittston and that you couldn't go back there. Should I take your hanging up and abrupt end to our conversation to mean that you are quitting the job at Redners? Can you tell me what your intentions are at this point? I can't promise you anything especially after our call this morning but if you had any thought of continuing your employment you should contact me immediately. Otherwise I will assume you have decided to move on.  Thank you


Sincerely,



*Robert McDonough*

*Vice President Human Resources*

*Redners Markets Inc.*

*3 Quarry Road Reading Pa. 19605*

2

# EXHIBIT 15

# Bob McDonough

**From:** Jay Schaeffer

**Sent:** Tuesday, September 05, 2017 1:54 PM

**To:** Bob McDonough

**Subject:** RE: Q

Here is the week:   Monday   5:05 to 2:15-9
　　　　　　　　　Tuesday   6:22 to 2:36-8 ¼
　　　　　　　　　Wednesday  6:04-11:01-5
　　　　　　　　　Thursday   6:06 to 1:21-7 ¼
　　　　　　　　　Friday   9:12 to 11:30-2 ¼
　　　　　　　　　Saturday  6:42 to 9:54-3    total 34 ¼

Jay S. Schaeffer
Security & Loss Prevention Supervisor
Redner's Markets
484-248-5888-Office

**From:** Bob McDonough
**Sent:** Tuesday, September 05, 2017 9:49 AM
**To:** Jay Schaeffer
**Subject:** RE: Q

Mcclellen

*Robert McDonough*
*Vice President Human Resources*
*Redners Markets Inc.*
*3 Quarry Road Reading Pa. 19605*
*bmcdonough@rednersmarkets.com*
*Ph. 484-248-5718*
*Fx 610-916-4835*

**From:** Jay Schaeffer
**Sent:** Tuesday, September 05, 2017 9:49 AM
**To:** Bob McDonough
**Subject:** RE: Q

What is Quentin's last name? I want to see if I can get lucky with a rewards card. Thanks,

Jay S. Schaeffer



EXHIBIT
18
6/16/19 JS

1

QMvRM - 000540

Security & Loss Prevention Supervisor
Redner's Markets
484-248-5888-Office

**From:** Cory Deily
**Sent:** Tuesday, September 05, 2017 7:40 AM
**To:** Jay Schaeffer
**Subject:** FW: Q


Cory Deily
Director of Security and Loss Prevention
Redners Markets
3 Quarry Road
Reading pa, 19605
484-248-5710


**From:** Bob McDonough
**Sent:** Tuesday, September 05, 2017 7:25 AM
**To:** Cory Deily <cdeily@rednersmarkets.com>
**Subject:** FW: Q

Can you help?

*Robert McDonough*
*Vice President Human Resources*
*Redners Markets Inc.*
*3 Quarry Road Reading Pa. 19605*
bmcdonough@rednersmarkets.com
*Ph. 484-248-5718*
*Fx 610-916-4835*


**From:** #55 Store Director
**Sent:** Monday, September 04, 2017 12:46 PM
**To:** Bob McDonough
**Subject:** Q

Last week Q was scheduled
Monday 5 am-2pm
Tuesday 6am-3pm
Wednesday 6am-3pm
Thursday  6am-3pm
Saturday  6am-3pm
On Wednesday he left for an appointment at 11 and did not return.
Thursday the meat dept said he left at 115 or 130.
Friday he came in to make up the time he left on Wednesday.
Saturday  he left about 10am without any notice.

Alan@55

Jeff is off until Thursday.

*Schedule week ending 9/2* (handwritten)

2

QMvRM - 000541

# EXHIBIT 16

September 6,2017

On Tuesday September 5,2017 I sat in on a conference call with Bob McDonough,, Rick Merkel, and Quentin McClellan. The purpose of our call with Quentin was to address his breaking of company policy when he left work early on Saturday 9/2 without informing the store director he was leaving. Q had left at 10am when he was scheduled until 3. This has been an issue previously addressed with Q.  While Q admitted he was wrong not talking with Jeff the store director he said it should be no issue since he put in his required hours for the week. Bob reminded him again it was not ok, that as the Meat manager he is required to check out with Jeff especially since he was leaving earlier than scheduled, he would need to get Jeff's approval as well.

Q tried to bring up past issues but we kept trying to address the current issue only of his not following his schedule or company policy. Q said he did not want to be a meat manager or work at the Pittston location. When asked what he wanted to do we never got a straight answer as he kept bringing up the past when he a manager trainee and how that ended.

After quite a few minutes of conversation all over the place, that to me made little sense, we finally just said to Q, "What is it you want to do?". We never got a response as he hung up on us.

After the call a review of video showed Quentin had worked less than 35 hours that week of his required 45 hours.

*Jim Polchin*   9-6-2017
Jim Polchin

EXHIBIT
20
6/14/19  JS
PENGAD 800-631-6989

# EXHIBIT 17

On Saturday, September 2 around 1130,  we received an email from Jeff the store director at 55 that he was informed that Quentin was not on duty any more that day.   Jeff investigated and found his car not there any more, called his phone and left a message. Bob replied that Jeff should suspend him until Tuesday.

On Tuesday, September 5 around 8 am Jim and I were summoned to Bob's office.   Quentin had a past history of leaving short of his scheduled shifts and hours and was warned about this in the past.   Bob was going to contact Quentin to get his side of the story.

Quentin proceeded to state that he had to leave suddenly on Wednesday and may or may not return to work later that day to complete the shift. He did say that he did communicate all this to someone in charge of the store.   He did not return that day.   He did work some time on Friday, however it was not a full day.  And then he said he came into work on Saturday and left early because he thought he was over on his salaried amount of time.   He said he consulted with the workers and asked them if they were going to be good and if they could handle the burger situation and they said they were good and he left. He did admit that he did not communicate to someone in charge of the store that he was leaving.

I would be best to explain Quentin's attitude towards Bob as agitated and irritated and bordering on disrespectful.  This became more agitate as Bob stressed to him that this is not the first time that anyone from Redners has had a conversation with him regarding the need to communicate a manager's attendance to a member of the store management team.    Quentin honestly came across that he felt like he did not do anything unacceptable and was not trying to be deceitful.  Quentin did say that he "thought" he put in his amount of time of 45 hours for the week.   Bob questioned him if he was sure and he said I think so.

Bob asked him what he wanted to do and Quentin said he couldn't go back there.  I am not sure what he meant by "back there".  The conversation continued to get more agitated  and then at that point Quentin would not answer Bob's questions as to whether or not he left early.   He kept avoiding answering and going in a different direction.   Bob insisted that If they were going to continue talking, Quentin had to answer a simple question or Bob would hang up and Quentin said well then I will end it and hung up.

Rick Merkel (Rd.  9/7/17

EXHIBIT
21
6/4/19

QMvRM - 000537

# EXHIBIT 18

Work schedule for W/E    9/2/17    Store # 55    Department    Meat

| NAME | SUNDAY | | MONDAY | | TUESDAY | | WEDNESDAY | | THURSDAY | | FRIDAY | | SATURDAY | | REG | Sun | OT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| McCla..., Quentin | | | 5:00 AM | 2:30 PM | 6:00 AM | 3:00 PM | 6:00 AM | 3:00 PM | 6 | 3 | 6:00 AM | 3:00 PM | 6:30 AM | 3:00 PM | 45 | | |
| Austin, Paul | 6:00 AM | 3:00 PM | 5:00 AM | 2:00 PM | 6:00 AM | 3:00 PM | 6:00 AM | 3:00 PM | | | 6:00 AM | 3:00 PM | | | 45 | | |
| | | | | | | | | | | | | | | | | | |
| Williamson, Robert | 6:00 AM | 2:30 PM | | | 6:00 AM | 2:30 PM | 6:00 AM | 2:30 PM | | | 6:00 AM | 2:30 PM | 6:00 AM | 2:30 PM | 32 | 8 | |
| Vancharr, Mary Jo | 5:00 AM | 1:30 PM | 5:00 AM | 1:30 PM | | | | | 6:00 AM | 2:30 PM | 6:00 AM | 2:30 PM | 6:00 AM | 2:30 PM | 32 | 8 | |
| RODRIGUEZ, JONATHAN | | | 6:00 AM | 2:30 PM | | | 6:00 AM | 2:30 PM | 6:00 AM | 2:30 PM | 6:00 AM | 2:30 PM | 6:00 AM | 11:00 / 2:30 PM | 48 | | |
| | | | | | | | | | | | | | | | | | |
| Total Hours | | | | | | | | | | | | | | | 194 | 16 | 0 |



EXHIBIT
14
6/9/18
73
PENGAD 800-631-6989

X-14

# EXHIBIT 19



## Work schedule for W/E

| NAME | | SUN | MON | 9/2/17 TUES | Store # WED | 55 THURS | Department FRI | SAT |
|---|---|---|---|---|---|---|---|---|
| McClellan, Osvaldo | 4421075 | 6:00 AM | 5:00 AM 5:00 PM | 6:00 AM | 6:00 AM | 6:00 AM | 8:00 AM | |
| Austin, Paul | 7231919 | | | | 6:00 AM | 6:00 AM | 6:00 AM | |

| NAME | | | MON | TUES | WED | THURS | FRI | SAT |
|---|---|---|---|---|---|---|---|---|
| Wilkerson, Robert | 9852955 | 6:00 AM | 6:00 AM | 6:00 AM | 6:00 AM | 6:00 AM | | 6:00 AM |
| Voorhees, Mary Jo | 1461255 | 5:00 AM | | | | | | 6:00 AM |
| RODRIGUEZ, JONATHAN | 6043595 | | 1:30 PM | | | | | 6:00 AM |

MEAT & SEAFOOD

Store sales

QMvRM - 000717

# EXHIBIT 20

**Alexis Foreman**

| | |
|---|---|
| **From:** | quentin mcclellan <qmcclellan@gmail.com> |
| **Sent:** | Thursday, February 16, 2017 11:07 AM |
| **To:** | Bill Swartzlander; Jim Polchin; Alexis Foreman |
| **Subject:** | What do you think? |
| **Attachments:** | 20170216_074954.jpg |

Good morning,

    I am emailing you because of the things that I see here. I try to stay out of the day to day problems because of the fact that I do want my job. Yet once again I find these things that don't make sense. I feel like It is offensive seeing as though I am once again the only African American here. I told the store director and he said he didn't see anything wrong with it. You let me know and understand I don't want to ,but feel like something needs to be done. Maybe it isn't just one store that I may not belong in. Once again tried to bottle it up, but it ain't going away.



1

QMvRM - 000420

2

# EXHIBIT 21

## Bob McDonough

*Quentin McClellan –*

| | |
|---|---|
| **From:** | Jim Polchin |
| **Sent:** | Thursday, March 16, 2017 11:45 AM |
| **To:** | Bob McDonough; Randy Kostelac; Frank Fiore |
| **Subject:** | FW: What can be done? |

Just received this from Q. I have not responded back yet. Looking for input from everyone.

**From:** quentin mcclellan [mailto:qmcclellan@gmail.com]
**Sent:** Thursday, March 16, 2017 11:36 AM
**To:** Jim Polchin
**Subject:** What can be done?

Good morning,

Sir I am bringing this matter to you because i believe i followed all the correct steps. I am feeling that the same thing that happened in other stores is going to happen here. I came up here to help correct some issues I was told. Then was in management in training where I was pretty much told to stock shelves. I was told during training to observe and shadow I got through training and started to use some of the tools learned. Things i see i taje to the people above me for that is what i am supposed to do. I then have mysterious emails written about me from a "customer" who knows what time i am to be scheduled. The last time a customer wrote about me was because of an employee that had issues also. This compiled with the pics on the wall, the point that lots of people assume it was me and are pissed about it. I am seeing other things that I don't believe is company policy being done. Things will be the same way as in the other stores. I would like to be transferred, moved, or something. Please let me know.

Quentin McClellan



QMvRM - 000475

# EXHIBIT 22



**quentin mcclellan**
to Bill, jpolchin, aforeman
Feb 16 View details

Good morning,

I am emailing you because of the things that I see here. I try to stay out of the day to day problems because of the fact that I do want my job. Yet once again I find these things that don't make sense. I feel like It is offensive seeing as though I am once again the only African American here. I told the store director and he said he didn't see anything wrong with it. You let me know and understand I don't want to ,but feel like something needs to be done. Maybe it isn't just one store that I may not belong in. Once again tried to bottle it up, but it ain't going away.

20170216_074954.jpg

EXHIBIT
Leoner's 7
MEV 8/29/19
PENGAD 800-631-6989

# EXHIBIT 23

Quentin McClellan #55

On Thursday, 3/16/17 we had received an email from Quentin about some challenges that he is facing at the Pittston location and had expressed interest in possibly transferring. Bob McDonough, Jim Polchin, and I called Quentin on Friday, 3/17/17 to discuss his concerns to get a better idea of what he was referring to in relation to letters that were written and sent into the corporate office. During the conversation we determined it was best to go to the store and have more in depth discussion and Quentin agreed.

On Wednesday, 3/22/2017 I went to the store and a very good conversation with Quentin. We discussed the letters and reaffirmed our support for him as these letters were written by someone with little knowledge of the situation. Since Quentin is in training we discuss how we need him to observe the other managers and learn from them, and we don't need him doing 100% of the stock work. I asked him on numerous occasions during the meeting to let me know if there is anything else that he would like to discuss. He did talk about how difficult it can be being in training because he wants to make a difference within the store but doesn't want to overstep any boundaries with the managers he is working with. I assured him the very scenario is common amongst trainees. He also referred to the challenges of adjusting to the new store director as he is very particular about the management team upholding the policies within the handbook, and that is a little challenging with the employees that have been working at this location for many, many years. He feels like the employees see him as a bad guy because many of the policies weren't strictly enforced with pervious managers. Again, this is a common adjustment for everyone when a new store director takes over.

I reaffirmed with him that we will stand behind all of our managers as a large part of their job responsibility is to uphold all of our policies set forth in the handbook. These aren't to most glamorous parts of being a manager. It's part of the territory!

Quentin understood our discussion and we ended on a very good note and was very appreciative of the visit. Once again I let him know to reach out to me with any questions or concerns that he would have...I am very easy to get in touch with.

Randy Kostelac

*Randy Kostelac*

HR Manager

3/23/2017

Left Message For Quentin
on Friday 3/24/17 @ 3:45
R.M.

Quentin McClellan

Vac Day    4 hrs

3    24-17



EXHIBIT
4

6 18 19   JS

PENGAD 800-631-6989

QMVRM 000750

# EXHIBIT 24

REDNER MARKET        Fax 5706697032        Mar 18 2013 09:09am  P001/001

#19  file

Quentin
McClellan

On Saturday March 17th, there was an incident that occured when an employee (Susan) was explaining how the day before was a disaster. While explaining she started to describe her feelings about another employee (Jeremy). She is saying things such as " He is a F**king piece of sh*t, and didn't do anything all ~~day~~ She then kept on explaining to Joe when I went into the back cooler to get meat. When I was returning with boxes in hand I hear Susan saying as I am in the room he keeps telling me what to do f**k that. What does he think this is, does my skin look black to you? I stopped in my tracks smiled, she said, "Jeez I'm sorry." I walked out and when I walked in she walked out. I didn't want to make a scene, so as soon as I could I called my supervisor. I ~~get~~ did'nt feel comfortable talking with Lois ~~with~~ for I felt s. uncomfortable I waited until the next day as soon as I saw her.

Quentin McClellan



EXHIBIT
12
6/14/12 JS

attention: Alexis

QMvRM - 000699

# EXHIBIT 25

3-17-13

When I(Lois Gasser), came in at 6:00am, I went back to the meat department to talk to Quentin McClellan, our meat manager about why he left on Saturday without telling me and why the fish case was not filled as I had asked him to do. I also knew he had concerns about the enforcement of later shifts in the department and I wanted to let him know that I sent an E-mail to Jim Polchin and Bill Schwartzlander regarding his situation.

My response turned out to be a summary of issues in the meat department beginning with his promotion last year, and promises made to him at that time, to the events of the past few days that are making Quentin feel that he can no longer continue in his present capacity in this location.

Saturday morning, one of the meat wrappers, Susan Loftus, spoke to Quentin regarding tasks she was given to do by Jeremy Dunbar, one of the other meat cutters. She made reference to the color of ones skin in assigning menial tasks. Quentin was upset by her remark but did not say anything at the time. On another occasion he was told that the meat manager in Douglasville had referred to him as being a "coon". This information was relayed to him by Sean McGIll, an associate on night crew. Quentin has never been to Douglasville, or to his knowledge, met the meat manager in that location.

He also feels very strongly that the dissention in the department is causing a poor work environment for everyone. This situation has been addressed several times in the past with Bill (Schwartzlander), Jim( Polchin), Alexis and me.The girls are openly hostile to each other and each will try to undermind the other. He feels that we are doing nothing to remedy that situation. He even believes that the scanning co-ordinators are intentionally incorrectly printing signs so that he and Joann the other wrapper are made to look bad.

He thinks we are setting him up to fail. I had Susan and one of the deli clerks do up fish on Saturday because the fish case was empty and it was

1


EXHIBIT
Reaver's 10
8/29/19

QMvRM - 000700

all shrink on Sunday. Bill and Jim both want us to be more aggressive with fish sales and the product was in the cooler.

He feels Jeremy Dunbar was sent here because he did not get along with Sean Marchou at #14, and since he has come here he has been excessively absent, not performing to his potential and gossiping between stores. Jeremy has had several warnings since he has been here.

His impression of this store is that it is filled with cliques and he is the outsider. I don't think this is true but it is how it is percieved by Quentin.

Lois Gasser, Store Director #19 Nesquehoning

*[handwritten notes:]*

Q - LEFT FRIDAY - USE VAC. DAY.

FRIDAY - 10:30 →
SATURDAY IN AT 6 LEFT @ 7
SUNDAY 6:45 - 11.

5½
8
4 - MAKEUP - 4? MISSING - ?

# EXHIBIT 26

REDNER MARKET          Fax 5706697032          Mar 18 2013 07:28am  P002/004

3/18/13

I OVER HEARD ANOTHER EMPLOYEE
THAT USED TO BE IN THIS STORE THAT
WAS FROM ANOTHER STORE #8 TELL ME
THAT A MEAT MANAGER + ANOTHER MEAT
EMPLOYEE NAMED DOMINIC SAID THAT
WHEN YOU GO TO STORE #19 THAT
YOU WILL BE WORKING WITH A
COON!!!

CONCERNED
EMPLOYEE



# EXHIBIT 27

I was working in the meat Room with Quinton when Sue came in the Room and said That Jeremy was mistreating her by giving her orders and she was not the Black Person who worked in the meat Room.

Joe Rosonio 3/18/1.

EXHIBIT
REDNER's 12
MEV 8/29/19
PENGAD 800-631-6989

Attention: Aleuis

# EXHIBIT 28

## Bob McDonough

| | |
|---|---|
| **From:** | #19 Nesquehoning Department Mail |
| **Sent:** | Wednesday, June 05, 2013 12:21 PM |
| **To:** | Redner's HR |
| **Subject:** | Important |

Hello,

   My name is Quentin McClellan from store 19 I left multiple messages with hr and supervision about the things that are happening store that needs to be addressed. I asked to be contacted yesterday and It did not happen. The problems that i spoke to Alexis about before still has not been taken care of, I did not get a meeting  that was supposed to occur with Human resources, and about being moved. The problems still exsits so I feel as if I am being pushed under the rug. I need to be contacted immediately! Thank you.



PENGAD 800-631-6989

**EXHIBIT**

_Redner's_ 13

_MEV_  8/29/19

QMvRM - 000705

# EXHIBIT 29

# Bob McDonough

**From:** Randy Kostelac
**Sent:** Friday, March 24, 2017 11:57 AM
**To:** Bob McDonough; Jim Polchin
**Subject:** Fwd: These are the issues

Passing this on from Quentin. I am a little confused at this point. We met alone for about 45 minutes and he didn't bring any of this up.

He is being critical of managers of the store are doing their job.

Randy

Sent from my iPhone

Begin forwarded message:

> **From:** quentin mcclellan <qmcclellan@gmail.com>
> **Date:** March 24, 2017 at 9:16:42 AM EDT
> **To:** rkostelac@rednersmarkets.com
> **Subject:** Re: Fwd: Re: These are the issues
>
> All of these things aren't just from the past couple days this has been going on atleast since training began until now. Some where since the last time we talked. The reason I didn't want to say anything because when I tell somethings they get right out and or isn't getting to the right people. So that is why I tried to bite my tongue. I am getting very frustrated and angry with the situation but I guess I should have just shut my mouth. Have a good day off. Sorry to bother you.
>
> On Mar 24, 2017 8:53 AM, "quentin mcclellan" <qmcclellan@gmail.com> wrote:
> Because nothing is being done. I kept trying to think it will change and it wont.
>
> On Mar 24, 2017 8:52 AM, "quentin mcclellan" <qmcclellan@gmail.com> wrote:
> ---------- Forwarded message ----------
> From: "Randy Kostelac" <RandyK@rednersmarkets.com>
> Date: Mar 24, 2017 8:27 AM
> Subject: Re: These are the issues
> To: "quentin mcclellan" <qmcclellan@gmail.com>
> Cc:
>
> Hey Quentin.



EXHIBIT
5
6/19/19   JB
PENGAD 800-631-6989

1

I am off today but very curious to why you didn't tell me these things when I was there speaking with you. I gave you opportunity to point specific items out to me.

I can't imagine all these items happening from Wednesday to now.

I am confused at this point.

Randy

Sent from my iPhone

> On Mar 24, 2017, at 8:19 AM, quentin mcclellan <qmcclellan @ gmail.com> wrote:
>
> I feel that there are a lot of issues Randy. It isn't always their fault but this place is not working out for me because of these reasons.
> 1. Today was told to steam clean bottom shelves.
> 2. Yesterday condensed pallets of water and seen the PowerPoint from the deli meeting.
> 3. I have witnessed friendships between store personnel and out side venders and reciever audits on them.
> 4. Reported employee theft and other offense that am unsure if it was correct. Or brought to your attention.
> 5. Seen an evening manger fired for writing good notes that people ignored and then wrote a note that was to a little to far and was fired.
> 6. The new evening manager eats food on sales floor and pulls people out of departments and that's ok.
> 7. Havent been trained and is useless here.
> 8. Out dated product in back coolers.
> 9. Deli and meat possibly not following policies.
> 10. I didn't mess up my schedule Friday said I wouldn't be here but store and assistant said they were but only assistant was?
> 11. Cashiers telling CSM they won't how lines at other things.
> With these things and other things just have driven me once again not to want to be here. I wanted to try and change and adapt to it but I can't. When it comes down to it I was wrong in some of the things I thought would change but it still has not. What do I need to do? I learned some things I completed the book but I don't want to be here anymore. Everyday here I am more and more just a body. There is only the grocery manager here I will be using a vacation day. If you would like to talk. I trust no one in this store.
> Quentin McClellan

QMvRM - 000480

# EXHIBIT 30

Jul. 3. 2017 7:33PM                                    No. 5598   P. 3

Certification of Health Care Provider for
Employee's Serious Health Condition
(Family and Medical Leave Act)

**U.S. Department of Labor**
Wage and Hour Division



OMB Control Number: 1235-0003
Expires: 5/31/2018

**SECTION I: For Completion by the EMPLOYER**
**INSTRUCTIONS to the EMPLOYER:** The Family and Medical Leave Act (FMLA) provides that an employer
may require an employee seeking FMLA protections because of a need for leave due to a serious health condition to
submit a medical certification issued by the employee's health care provider. Please complete Section I before giving
this form to your employee. Your response is voluntary. While you are not required to use this form, you may not ask
the employee to provide more information than allowed under the FMLA regulations, 29 C.F.R. §§ 825.306-825.308.
Employers must generally maintain records and documents relating to medical certifications, recertifications, or
medical histories of employees created for FMLA purposes as confidential medical records in separate files/records
from the usual personnel files and in accordance with 29 C.F.R. § 1630.14(c)(1), if the Americans with Disabilities
Act applies, and in accordance with 29 C.F.R. § 1635.9, if the Genetic Information Nondiscrimination Act applies.

Employer name and contact: SUSAN ROTKISKE, BENEFIT MANAGER  484-246-5764 FAX 610-916-4835

Employee's job title: _Meat manager_       Regular work schedule: _45 hrs per week_

Employee's essential job functions: _____

Check if job description is attached: _N/A_

**SECTION II: For Completion by the EMPLOYEE**
**INSTRUCTIONS to the EMPLOYEE:** Please complete Section II before giving this form to your medical
provider. The FMLA permits an employer to require that you submit a timely, complete, and sufficient medical
certification to support a request for FMLA leave due to your own serious health condition. If requested by your
employer, your response is required to obtain or retain the benefit of FMLA protections. 29 U.S.C. §§ 2613,
2614(c)(3). Failure to provide a complete and sufficient medical certification may result in a denial of your FMLA
request. 29 C.F.R. § 825.313. Your employer must give you at least 15 calendar days to return this form. 29 C.F.R.
§ 825.305(b).

Your name: _Quentin_ _ _McClellan_
First                        Middle                          Last

**SECTION III: For Completion by the HEALTH CARE PROVIDER**
**INSTRUCTIONS to the HEALTH CARE PROVIDER:** Your patient has requested leave under the FMLA.
Answer, fully and completely, all applicable parts. Several questions seek a response as to the frequency or
duration of a condition, treatment, etc. Your answer should be your best estimate based upon your medical
knowledge, experience, and examination of the patient. Be as specific as you can; terms such as "lifetime,"
"unknown," or "indeterminate" may not be sufficient to determine FMLA coverage. Limit your responses to the
condition for which the employee is seeking leave. Do not provide information about genetic tests, as defined in 29
C.F.R. § 1635.3(f), genetic services, as defined in 29 C.F.R. § 1635.3(e), or the manifestation of disease or disorder
in the employee's family members, 29 C.F.R. § 1635.3(b). Please be sure to sign the form on the last page.

Provider's name and business address: _Saxon Psychiatric Services_

Type of practice / Medical specialty: _1425 Chenaben Lane_

Telephone: (___) _West Wyoming PA 18644_   Fax: _____

Page 1   _520_  _718 1996_ CONTINUED ON NEXT PAGE _520_  _718 1997_   Form WH-380-E Revised May 2015

EXHIBIT
8
_1/16/19 B_

_(570-718-1997)_   QMVRM - 000795

**PART A: MEDICAL FACTS**

1. Approximate date condition commenced: _6-24-17_

   Probable duration of condition: _7-24-17_

   **Mark below as applicable:**
   Was the patient admitted for an overnight stay in a hospital, hospice, or residential medical care facility?
   _X_No ___Yes. If so, dates of admission:
   _7-3-17 & 6/28/17   Emer_

   Date(s) you treated the patient for condition:
   _7-3-17 - & 6/28/17_

   Will the patient need to have treatment visits at least twice per year due to the condition? ___No _X_ Yes.

   Was medication, other than over-the-counter medication, prescribed? ___No _X_ Yes.

   Was the patient referred to other health care provider(s) for evaluation or treatment (e.g., physical therapist)?
   _X_No ___Yes. If so, state the nature of such treatments and expected duration of treatment:

2. Is the medical condition pregnancy? ___No _X_ Yes. If so, expected delivery date: _____

3. Use the information provided by the employer in Section I to answer this question. If the employer fails to provide a list of the employee's essential functions or a job description, answer these questions based upon the employee's own description of his/her job functions.

   Is the employee unable to perform any of his/her job functions due to the condition: ___No _X_ Yes.

   If so, identify the job functions the employee is unable to perform:
   _Unable to work_

4. Describe other relevant medical facts, if any, related to the condition for which the employee seeks leave (such medical facts may include symptoms, diagnosis, or any regimen of continuing treatment such as the use of specialized equipment):

   _Symptom of Depression and anxiety causing irritability and difficulty with sleep and inability to concentrate_

QMvRM - 000796

Jul. 3. 2017  7:33PM                                        No. 5598   P. 5

5. Will the employee be incapacitated for a single continuous period of time due to his/her medical condition, including any time for treatment and recovery?   ___No   _X_Yes.

   If so, estimate the beginning and ending dates for the period of incapacity: 6/24/.7 – 7/24/.7

6. Will the employee need to attend follow-up treatment appointments or work part-time or on a reduced schedule because of the employee's medical condition?   ___No   ___Yes.

   If so, are the treatments or the reduced number of hours of work medically necessary?
   ___No   ___Yes.

   N/A   Estimate treatment schedule, if any, including the dates of any scheduled appointments and the time required for each appointment, including any recovery period:

   _____

   Estimate the part-time or reduced work schedule the employee needs, if any:

   _____ hour(s) per day; _____ days per week from _____ through _____

7. Will the condition cause episodic flare-ups periodically preventing the employee from performing his/her job functions?   ___No   ___Yes.

   Is it medically necessary for the employee to be absent from work during the flare-ups?
   ____ No ____Yes. If so, explain:

   N/A   _____

   _____

   Based upon the patient's medical history and your knowledge of the medical condition, estimate the frequency of flare-ups and the duration of related incapacity that the patient may have over the next 6 months (e.g., 1 episode every 3 months lasting 1-2 days):

   Frequency              : _____ times per _____ week(s) _____ month(s)

              Duration: _____ hours or ___ day(s) per episode

_____

_____

_____

_____

_____

_____

QMvRM - 000797

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**Completed form may be faxed to: Redner's HR Dept. 610-916-4835**

Signature of Health Care Provider                    Date  7/3/17

### PAPERWORK REDUCTION ACT NOTICE AND PUBLIC BURDEN STATEMENT

If submitted, it is mandatory for employers to retain a copy of this disclosure in their records for three years. 29 U.S.C. § 2616; 29 C.F.R. § 825.500. Persons are not required to respond to this collection of information unless it displays a currently valid OMB control number. The Department of Labor estimates that it will take an average of 20 minutes for respondents to complete this collection of information, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. If you have any comments regarding this burden estimate or any other aspect of this collection information, including suggestions for reducing this burden, send them to the Administrator, Wage and Hour Division, U.S. Department of Labor, Room S-3502, 200 Constitution Ave., NW, Washington, DC 20210. DO NOT SEND COMPLETED FORM TO THE DEPARTMENT OF LABOR; RETURN TO THE PATIENT.

QMvRM - 000798

# EXHIBIT 31



Human Resources Department
Mailing Address:  3 Quarry Road
Reading, PA  19605
Phone:  484-248-5764
Fax: 610.916.4835
Email: srotkiske@rednersmarkets.com

July 5, 2017

Quentin McClellan
58 S Dawes Ave
Kingston, PA  18704

Dear Quentin:

This letter follows up the Designation Notice you are receiving about your Family and Medical Leave regarding the date on which that leave will be exhausted and when you will need to return to work.

Your leave period will conclude on July 23, 2017.  Accordingly, you are expected back at work and must return on the following workday on **July 24, 2017.**  If your leave was due to your own serious health condition, in accordance with our Company policy, you must provide a note from your health care provider that you are able to return to your job.  (If your leave was for maternity or family reasons a note from your health care provider is not required to return to work;   we however do request that you notify us of your return to work).

If you fail to return to work on the date indicated above, the Company will conclude that you have abandoned your position, and your employment will be terminated.

 If there are additional circumstances that may be relevant to your job that you wish to bring to the Company's attention regarding your absence or your condition, please contact Human Resources department in advance of your scheduled date of return.

We look forward to your return to work as scheduled, or to hearing from you in advance of that date should other circumstances be present.

Sincerely,


Susan Rotkiske
Benefit Manager



QMvRM - 000794

# EXHIBIT 32



Human Resources Department
Mailing Address: 3 Quarry Road
Reading, PA 19605
Phone: 484-248-5764
Fax: 610.916.4835
Email: srotkiske@rednersmarkets.com

July 25, 2017

Quentin McClellan
58 S Dawes Ave
Kingston, PA 18704

Dear Quentin:

This letter follows up the Designation Notice you are receiving about your Family and Medical Leave regarding the date on which that leave will be exhausted and when you will need to return to work.

Your leave period will conclude on August 27, 2017. Accordingly, you are expected back at work and must return on the following workday on **August 28, 2017.** If your leave was due to your own serious health condition, in accordance with our Company policy, you must provide a note from your health care provider that you are able to return to your job. (If your leave was for maternity or family reasons a note from your health care provider is not required to return to work;  we however do request that you notify us of your return to work).

If you fail to return to work on the date indicated above, the Company will conclude that you have abandoned your position, and your employment will be terminated.

 If there are additional circumstances that may be relevant to your job that you wish to bring to the Company's attention regarding your absence or your condition, please contact Human Resources department in advance of your scheduled date of return.

We look forward to your return to work as scheduled, or to hearing from you in advance of that date should other circumstances be present.

Sincerely,


Susan Rotkiske
Benefit Manager



QMvRM - 000789

# EXHIBIT 33

Store #55

# Commonwealth Health

WILKES-BARRE GENERAL HOPSITAL
575 North River Street
Wilkes-Barre, PA   18764

June 14, 2017

To Whom It May Concern,

Quentin McClellan was seen by me today at the Wilkes-Barre General Hospital Emergency Room.

He can provide you with any recommendation for follow-up care.

Sincerely yours,

Jillian Gavin

JG/rk



QMvRM - 000799

# EXHIBIT 34

**Redner's Markets FMLA & Short Term Disability**

*55*

Store: _____

| Employee Name | SSN | Hire / Full-time Date | Part-time Date |
|---|---|---|---|
| Quentin Mcclellan | 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 | | |

| Period of Time Requested | | Amount of Short term disability available | |
|---|---|---|---|
| 6-24-  7-24-17  8-28-17 | | | |

| Weekly Pay Date | Amount of Pay | Vacation | PTO time |
|---|---|---|---|
| 6-26-17 | 9 vac | (6-24    6-30) | |
| 7-3-17 | 27 vac | | |
| 7-10-17 | 45-100% | **Weekly Deductions** | **Amount** |
| 7-17-17 | 45-100% | | |
| 7-24-17 | 45-100% | | |
| 7-31-17 | 45-100% | | |
| 8-7-17 | 45-100% | | |
| 8-14-17 | 45-100% | | |
| 8-21-17 | 45-80% | | |

1-6  -100% -270
7-12-  80%

EXHIBIT
REDNER'S 18
MEV  8/29/19
FERRAJO 800-631-6989

QMvRM - 000788